**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BENCHMARK RESOURCES CORPORATION, GENTRY CORPORATION and SUNRISE HOLDING, INC., Plaintiffs, | ) | No. 03-178L |
| v. | ) | Honorable Christine Odell Cook Miller |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**REPLY BRIEF IN SUPPORT OF UNITED STATES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

There is a small set of simple and undisputed facts that require the dismissal of this lawsuit. First, there is no dispute that Plaintiffs have never filed an application for a permit to mine the property at issue in this case. Because Plaintiffs have failed to seek the statutorily required permit, Plaintiffs' taking claim is not ripe and must be dismissed by the Court. Second, Plaintiff Santiago filed this lawsuit more than 15 years after the events that fixed the government's alleged liability. As a result, Santiago's claim is time-barred by the Tucker Act's six year statute of limitations. 28 U.S.C. § 2501. Finally, at the time of the alleged taking in 1987, a timber lease precluded Plaintiffs from conducting surface coal mining on a portion of their property. Plaintiffs had also granted the right to coal mine the entire property to a third party. As such, Plaintiffs had no right to mine the Wharton Property in 1987 and, therefore, had no compensable property interest at the time of the alleged taking.

## I. PLAINTIFFS' CLAIM IS NOT RIPE

Plaintiffs do not deny that, under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), they must submit an application for a permit and be granted a permit before they can legally mine their property. 30 U.S.C. § 1256(a). Also, Plaintiffs admit that they have never filed an application for a permit to mine their property. 02/14/2006 Proctor Dep. 185:16-18 (U.S. Ex. K, App. III 429). As such, Plaintiffs have no basis to allege that their claim is ripe. Instead, Plaintiffs argue that they are entitled to invoke a futility exception to the ripeness requirement. Plaintiffs, however, attempt to stretch the futility exception well beyond the limits the Federal Circuit has placed on that exception.

### A. Plaintiffs Misapply the Futility Exception to the Ripeness Requirement

Where a previous permit application has been denied and that denial makes clear that the agency will not grant a permit for any use, the futility exception is intended to protect a party from having to return to the same federal agency multiple times. As the Federal Circuit announced in Howard Heck & Assocs. Inc. v. United States, "the futility exception simply serves to 'protect property owners from being required to submit *multiple* applications when the manner in which the first application was *rejected* makes it clear that no project will be approved.'" 134 F.3d 1468, 1472 (Fed. Cir. 1998) (emphasis in original) (citing Southern Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 504 (9th Cir. 1990)).

In the instant case, Plaintiffs do not meet the limited futility exception endorsed by the Federal Circuit. First, Plaintiffs have never submitted a single application for a permit to mine their property. Second Declaration of Douglas K. Siddell ("Siddell Dec. II") at ¶ 16 (U.S. Ex. V, App. III at 592). Second, because Plaintiffs have never submitted a permit application, the Office of Surface Mining ("OSM") has never rejected any such application. Third, a portion of

Plaintiffs' property is not within the Petition Area and has never been designated as unsuitable for surface coal mining operations.[1/] Fourth, as set forth in detail below, OSM has the authority to permit a wide range of mining operations on the Wharton Property both outside and within the Petition Area. See generally Siddell Dec. II at ¶¶ 6-7 (U.S. Ex. V, App. III at 589-590).

The Court of Federal Claims has previously dismissed a takings claim as unripe in a case that is virtually identical to the case at bar. In Cane Tenn. Inc. v. United States, like in the instant case, a portion of the property owned by plaintiff Colten had been designated unsuitable for surface mining pursuant to SMCRA. 57 Fed. Cl. 115 (2003). As a result, Colten brought a takings claim arguing that the designation effectively prevented mining on the entire property at issue. Id. at 129. In ruling that Colten's claim was not ripe, Judge Hewitt stated that "[p]laintiff cannot argue that it would be futile to apply for a permit to mine the undesignated area." Id. at 130. Similarly, a substantial portion of the property at issue in this case falls outside of the designated area. As such, the futility exception cannot apply.[2/] Moreover, Judge Hewitt further held that the futility exception to the ripeness requirement is only available to plaintiffs who have made at least one meaningful permit application to the regulatory agency. Id. ("futility exception generally requires that a permit be denied before [the exception] applies"); see also Eastern Minerals Int'l v. United States, 36 Fed. Cl. 541, 548 ("[e]ach plaintiff must satisfy the threshold requirement of a single meaningful application to maintain the futility exception").

---

[1/]See Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment ("Pls. Resp.") at 5 ("The Wharton Tract and the Petition Area are not identical properties: the Wharton Tract includes property outside the Petition Area. . .").

[2/]Indeed, far from being futile, the evidence indicates that there is good reason to believe that mining on the Wharton Property may be permitted. Since it took over the permitting of mining in Tennessee in 1984, OSM has granted more than 80 % of the new permit applications accepted for processing and on which it rendered a decision. Siddell Dec. II at ¶ 13 (U.S. Ex. V, App. III at 591).

Instead of relying upon the accepted breadth of the futility exception, Plaintiffs attempt to craft an "economic futility" argument. In Morris v. United States, the plaintiffs raised a similar argument in an attempt to stretch the futility exception past its intended limits. 392 F.3d 1372 (Fed. Cir. 2004). In that case, the Federal Circuit considered a takings claim by property owners who argued that the application for a permit was futile because the application process would be cost prohibitive. Id. at 1375-76. The Federal Circuit rejected the plaintiffs' argument in Morris. The Federal Circuit reasoned that "[w]here further administrative process could reasonably result in a more definite statement of the impact of the regulation, the property owner is generally required to pursue that avenue of relief before bringing a takings claim." Id. at 1376.

The futility exception as applied by the Federal Circuit is far from the facts of the instant case. Plaintiffs have never submitted a single application for a permit to mine their property. OSM has never rejected an application to mine Plaintiffs' property. Indeed, even Plaintiffs admit that mining can be permitted on at least a portion of their property which lies outside of the Petition Area. Given these undisputed facts, Plaintiffs' claim is not ripe and the case should be dismissed.

**B. Plaintiffs Have Failed to Present Competent Evidence of Futility**

Even if the economic futility exception proffered by Plaintiffs was not precluded as a legal matter, Plaintiffs have failed to meet their burden to prove facts that support their invocation of this Court's jurisdiction. The ripeness argument raised by the United States represents a challenge to this Court's jurisdiction. As such, Plaintiffs "must support [their jurisdictional allegations] by competent proof." Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404-05 (1994) (quoting McNutt v. General Motors Acceptance Corp., 198 U.S. 178, 189 (1936)). Plaintiffs have not provided competent proof of economic futility.

**1. Plaintiffs' Alleged "Expert Report" Is Unsworn**

Plaintiffs present a theory of "economic futility" based upon a report submitted by Marcus Wiley ("Wiley Report"), who they claim is a "professional mining engineer." Pls. Resp. at 5.[3] The Wiley Report, however, is unsworn and not supported by an affidavit or declaration made "under penalty of perjury." RCFC 56(c) clearly states that a motion may be supported by "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any. . . ." In addition, pursuant to 28 U.S.C. § 1746, an affidavit or declaration must be "subscribed . . . as true under penalty of perjury." The Wiley Report does not fall into any of the accepted supporting materials permitted by Rule 56 and was not made "under penalty of perjury." As such, the Wiley Report may not be considered by the Court in deciding the instant motion.

**2. Plaintiffs Present No Evidence that Mr. Wiley is a Competent Witness**

RCFC 56(e) also requires that any affidavit "show affirmatively that the affiant is competent to testify to the matters stated therein." Plaintiffs have provided no evidence to support their allegation that Mr. Wiley is an expert qualified to offer the opinions contained in his report. Unlike Alan Stagg[4] whose declaration is offered by the United States in support of this reply brief, Mr. Wiley provides no evidence of his education, training, or experience. Because Plaintiffs have not demonstrated that Mr. Wiley is "competent to testify to the matters"

---

[3] Plaintiffs also cite to the self-serving lay testimony of Darold Proctor, the President of two of the Plaintiff companies. Pls. Resp. at 6-7. Mr. Proctor, however, admits that he has absolutely no "education or background" in the coal industry. 02/13/06 Proctor Depo. 65:23-66:5 (U.S. Ex. W, App. III at 601-602). As such, his testimony regarding potential coal reserves is not competent and may not be considered by the Court.

[4] In his declaration, Mr. Stagg sets forth his qualifications, education, and experience under penalty of perjury and attaches his detailed resume. See Declaration of Alan K. Stagg ("Stagg Dec.") ¶ 1 (U.S. Ex. X, App. III at 603, 616-628).

in his report, the Wiley Report and Mr. Wiley's conclusions may not be considered by the Court.

**3. The Wiley Report Is Not Admissible Evidence**

The Wiley Report contains nothing more than conclusory opinions unsupported by data or meaningful analysis. The report, which would be inadmissible at trial, also cannot be relied upon by the Court in determining whether it has jurisdiction to hear the instant complaint. RCFC 56(e) requires that information submitted by affidavit in support of or in opposition to a dispositive motion " . . . be admissible as evidence." Before expert opinion testimony is admissible, the Court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 592-93 (1993).

As set forth in detail in the attached declaration by Alan Stagg – a registered professional geologist with 42 years of experience in the mining industry and who is familiar with the geology of the Wharton Property at issue here – the Wiley Report (1) does not meet the generally accepted standards for estimating coal reserves and (2) does not provide evidence that would allow the Court to assess the level of reliability of his conclusions. Both of these omissions represent critical failures for admissibility of expert opinion evidence under Daubert. In addition, Mr. Wiley has not applied his conclusions to the property at issue in this case.

First, Mr. Wiley fails to apply generally accepted techniques for estimating coal reserves. As Alan Stagg's declaration indicates, geologists in the coal industry generally rely upon the *Coal Reserve Classification System of the U.S. Geological Survey* ("Circular 891") and *The SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves* ("2005 SME Guide") to estimate economically viable coal reserves. Stagg Dec. ¶¶ 9-13, Ex. 2, & Ex. 3

(U.S. Exs. X, X-2, & X-3, App. III at 605-07, 629-702 & 703-746). Mr. Wiley never once mentions either of these accepted standards in his report and there is no indication that he relied upon or applied the standards contained in Circular 891 or the 2005 SME Guide. Id. ¶ 8.

Second, Mr. Wiley has failed to define the key terms contained within the ultimate conclusions he offers to the Court. For example, Mr. Wiley fails to define the terms “Reserve” and “Recoverable Reserves” as used in his report. Stagg Dec. ¶¶ 16-18 (U.S. Ex. X, App. III at 608-09). Moreover, Mr. Wiley has failed to define the time period applicable to his conclusions. Because the economic viability of coal mining is driven in large measure by coal selling prices and given that coal selling prices can vary substantially over time, the failure to define the relevant time period applied in the report renders Mr. Wiley’s conclusions essentially meaningless. Id. ¶ 17 (U.S. Ex. X, App. III at 608).

Third, The generally accepted standards for estimating coal reserves – Circular 891 and the 2005 SME Guide – identify several key component estimates that are necessary predicates to a valid analysis of available reserves on a given piece of property. For example, in estimating surface-mineable coal, the estimator must establish the “minimum bed thickness” and the “maximum overburden-to-coal ratio.” Id. ¶¶ 24-25 (U.S. Ex. X, App. III at 611-12). Mr. Wiley never presents, and apparently never estimated, either of these critical components of a coal reserve analysis. Also, in estimating underground-mineable coal, the estimator must establish the “minimum bed thickness” as well as the “in-bed parting.” Id. ¶ 23 (U.S. Ex. X, App. III at 611). The Wiley Report is completely devoid of these critical elements of a coal reserve estimation. Without these critical components, Mr. Wiley’s coal reserve analysis represents nothing more than a guessing game.

Fourth, Mr. Wiley fails to provide an analysis of the reliability of his estimates and fails

to present the information that would be necessary for anyone else to independently assess the reliability of his estimates. As Mr. Stagg indicates, the generally accepted practice within the coal industry is to identify the reliability of coal estimates by categorizing the estimates as either "measured," "indicated," or "inferred." Id. ¶¶ 24-27 (U.S. Ex. X, App. III at 611-613). A "measured" estimate has the highest degree of reliability because it is based upon a greater concentration of actual measurements and thus a lower degree of extrapolation. Id. "Indicated" and "inferred" estimates are increasingly less reliable because they involve a decreasing concentration of actual measurements and an increasing level of extrapolation. Id. Because Mr. Wiley does not identify his estimates as either "measured," "indicated," or "inferred" and does not present the distances between his data points, the Court is unable to assess the reliability of his estimates, a critical part of the Daubert analysis.

Finally, Mr. Wiley does not apply his conclusions to the actual property at issue in this case. For example, Mr. Wiley states that the operations available for mining, given the OSM Designation, would not be economically feasible "[f]or **most** areas." Pls. Resp. Ex. 1, p. 3. Even if this conclusion – which is unsupported by any analysis, data, or citations to authority – were in fact true, Mr. Wiley never applies his general conclusion to the specific piece of property at issue in this case. It is not necessarily true that a technique that is uneconomic in "most areas" is uneconomic in every area or, more importantly, in this area.[5] In short, the conclusory and unsupported opinions offered by Mr. Wiley are exactly the type of opinions the Supreme Court

[5] Similarly, Mr. Wiley also bases his conclusions on his opinion that "**possible** subsidence" may occur as the result of underground mining. Even if relevant, this assertion of "possible" consequences, without any attempt to quantify the risk does not rise to the level of certainty related to the Wharton Property that is required for the admission of an expert opinion. Stagg Dec. at ¶28 (U.S. Ex. X, App. III at 613-14); Siddell Dec. II at ¶¶ 19-21 (U.S. Ex. V, App. III at 593-94).

meant to prohibit in Daubert.

Because the Court's jurisdiction "is always strictly construed . . . and is not to be extended by implication," the incompetent evidence of alleged futility presented by Plaintiffs must be rejected. Catellus, 31 Fed. Cl. at 404 (citations omitted). As such, because Plaintiffs have failed to apply for a permit, their takings claim is not ripe and must be dismissed by this Court.

### C. The Ripeness Doctrine is Particularly Relevant to Complex Technical Claims, Such as the Claims in the Instant Case

The need for a ripe claim is particularly important in a case such as this where technical expertise regarding complex methods and types of coal mining are at issue and where it is undisputed that several types of mining may well be permitted on the property at issue.[6] "[S]ince agency decisions are frequently of a discretionary nature or **frequently require expertise**, the agency should be given the first chance to exercise that discretion or **to apply that expertise**." McKart v. United States, 395 U.S. 185, 194 (1969) (emphasis added). In the instant case, OSM's review of a permit application required by SMCRA, will allow it to apply its specialized expertise to address all of the following potential mining operations which are not

[6] Without the final word from the administrative agency regarding the permitted use of the property, the Court will also be unable to conduct the sort of analysis that the Court is called to make under the Penn Central standards. Palazzolo v. Rhode Island, 533 U.S. 606, 607-08 (2001) ("[a] final decision by the responsible agency informs the constitutional determination whether a regulation . . . defeated the reasonable investment backed expectations of the landowner to the extent that a taking has occurred" citing Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 124"). As the Supreme Court has said "[o]ur cases uniformly reflect the insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." Macdonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 351 (1986). The Court has based this requirement on the fact that without a clear statement of the impact of the regulations as applied by the appropriate administrative agency, the court is left to guess as to the true impact of the regulations. See id. at 348 ("A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."). By failing to apply for a permit, Plaintiff have deprived this Court of knowing the nature and extent of permitted development on the Wharton Property. Had Plaintiffs applied for a permit, Plaintiffs and OSM – and the Court – "would know with substantial certainty the extent of mining operations" permitted on the Wharton Property after the OSM Designation. Siddell Dec. II at ¶¶ 11-12.

precluded by the OSM designation:

1. A large portion of the Wharton Property lies outside of the Petition Area. Pls. Resp. at 5; Siddell Dec. II, Ex. 1 (U.S. Ex. V-1, App. III at 596). Mr. Douglas Siddell – Supervisor of the Technical Group in OSM's Knoxville Field Office – explains in his declaration that OSM will consider permit applications "for all surface coal mining operations (including surface and underground mining)" in this substantial portion of Plaintiffs' property. Siddell Dec. II ¶ 7 (U.S. Ex. V, App. III at 589-90).[7] In other words, all areas outside the Petition Area are unaffected by the OSM Designation. Id.

2. OSM will also consider permit applications "for all surface coal mining operations (including surface and underground mining)" in most of the Petition Area (i.e., all of the Petition Area that lies outside of the Hall, Middle, and Rock Creek gorges). Siddell Dec. II ¶ 7 (U.S. Ex. V, App. III at 589-90). In that portion of the Petition Area outside of the gorges, the only surface mining limitation applies to the Sewanee seam. Id. Plaintiffs' own alleged expert admits, however, that the Sewanee seam represents at most approximately 5.8 million tons of coal out of a possible 82.4 million tons. Pls. Resp. Ex. 1, p. 4. Moreover, outside the gorges, even the Sewanee seam can be surface mined if special overburden techniques are applied to the project and approved by OSM. Siddell Dec. II ¶ 7. This is the very sort of technical consideration that must be left to the agency as part of the permitting process before this claim can be considered ripe for judicial review.

3. In short, the only type of mining absolutely precluded by the OSM Designation is

[7] Even if the Court were to accept the conclusory allegations in the Wiley Report, 34.5 million tons of the total 82.4 million tons of coal that allegedly lie on the Wharton Property are outside of the Petition Area. Plaintiffs do not dispute that, even with the OSM Designation in place, they may well receive a permit to mine these 34.5 million tons. See also Stagg Dec. ¶ 29 (U.S. Ex. X, App. III at 614).

surface mining in the Hall, Middle, and Rock Creek gorges. As indicated on the map prepared by OSM and attached to Mr. Siddell's declaration, the gorges cover a relatively minor portion of the Wharton Property. Siddell Dec. II ¶ 5 and Ex. 1 (U.S. Exs. V & V-1, App. III at 588-89 & 596). Even the coal under the gorges can be mined using underground mining methods as long as there are no surface activities, or impacts of surface activities, within the gorges.[8/] Id. at ¶¶ 6-7. The back-and-forth typical in the permit application process would assist in the definition of possible access points and the feasibility of such an approach. Id. at ¶¶ 11-12. Again, it is just this sort of technical and scientific process that is protected by the ripeness doctrine and should, in the first instance, be left to the specialized administrative agency to pursue.

The numerous technical determinations identified above clearly support the conclusion that Plaintiffs' takings claim cannot ripen until Plaintiffs initiate and complete the permitting process. OSM's special expertise will allow it to address these many technical issues in a way that the Court cannot. Until such expertise is brought to bear on these technical issues, Plaintiffs' claims are not ripe for adjudication because, as the Supreme Court has said, "judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to . . . apply its expertise." McKart, 395 U.S. at 194. Because Plaintiffs have not allowed OSM to apply its specialized expertise to a review of the required permit application, the instant taking claim is not ripe and must be dismissed.

---

[8/]The Wiley Report suggests that underground mining in the designated area is not feasible because of "possible subsidence" and "probable hydrologic consequences." Pls. Resp. Ex 1, p. 3. Mr. Wiley seems to assume that the subsidence he predicts, with no data to support his conclusion, would be considered "surface coal mining operations" which are prohibited by the OSM Designation. This assumption, however, is faulty. OSM's regulations indicate that subsidence is not part of the definition of "surface coal mining operations." Siddell Dec. II ¶¶ 19-20 (U.S. Ex. V, App. III at 593). Thus, even if Wiley's predictions of subsidence are correct, this would not necessarily prevent OSM from issuing a permit to underground mine in the gorges. Id.; Stagg Dec. ¶ 28 (U.S. Ex. X, App. III at 613-14).

### D. Plaintiffs' Letters to OSM Do Not Constitute the Application for a Permit Required by SMCRA and the OSM Regulations

Plaintiffs admit that they have never submitted an application to mine on the property at issue in this case. Proctor 02/14/06 Depo. 185:16-18 (U.S. Ex. K, App. II at 429). Moreover, at all times, Plaintiffs were on notice that a permit is a necessary prerequisite to mining the Wharton Tract. 30 U.S.C. § 1256(a). Not only did SMCRA and its implementing regulations put Plaintiffs on notice of the required permit, but on March 30, 2000, Beverly Brock, Supervisor in OSM's Technical Group in Knoxville, Tennessee, wrote to Mr. Proctor and provided detailed information regarding the application process as well as a one hundred page sample application. U.S. Ex. L, App. II at 435-37. Even after the detailed information contained in Ms. Brock's letter, Plaintiffs never filed an application to mine the Wharton Property. Siddell Dec. II ¶¶ 15-16 (U.S. Ex. V, App. III at 592).

Plaintiffs now attempt to excuse their failure to submit the required permit application by claiming that OSM failed to respond to general inquiries attempting to confirm that Plaintiffs had "exhausted [their] administrative remedies as the necessary prerequisite to seeking Judicial review."[9] Proctor "Jan. 7, 2002" Letter to OSM, Pls. Resp. Ex. 4. Simply put, this assertion is false. See generally Siddell Dec. II ¶¶ 23-28. OSM did respond to Mr. Proctor in a letter sent by OSM to Mr. Proctor by certified mail on February 1, 2002.[10] Id. ¶ 26. The letter specifically

[9] Frankly, it is not even clear from Mr. Proctor's letters exactly what type of "Judicial review" and "administrative remedies" he is referencing. In context, it appeared that Mr. Proctor was referring to a judicial challenge to the OSM desingation, not a taking claim in this Court. Siddell Dec. II at ¶ 28.

[10] Of course, OSM had neither the responsibility nor the expertise to advise Plaintiffs on the central inquiry of how to "exhaust their administrative remedies." Id. ¶ 28. The only relevant question in determining whether Plaintiffs' takings claim is ripe is whether Plaintiffs submitted a permit application that was denied. Plaintiffs' letters to OSM are telling, however, because they demonstrate that, long before any analysis of the economic use of their property (the Wiley Report is dated April 5, 2006), Plaintiffs were already attempting to avoid the required permitting process and to proceed prematurely to

denied that Plaintiffs had somehow exhausted their administrative remedies by sending the letters of general inquiry. Id. ¶ 27.

Given the detailed permit application information provided by OSM to Mr. Proctor on March 30, 2000, if Plaintiffs truly wished to mine the Wharton Property they should have proceeded to complete the application and submit it to OSM. Instead, Plaintiffs embarked on a letter writing campaign in an apparent attempt to ripen a takings claim while circumventing the required application process. None of the letters submitted by Plaintiffs to OSM even begin to meet the requirements of a permit application as required by the regulations. Id. ¶¶ 8-10. Moreover, Plaintiffs have provided no legal support for their apparent allegation that their letter writing campaign exempts them from the clear regulatory and statutory requirement of a permit application.

## II. SANTIAGO'S COMPLAINT IS BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS

### A. The Appropriate Standard For Determining Claim Accrual is Whether the Plaintiff "Was or Should Have Been Aware" of the Events Giving Rise to the Claim

The only acceptable test for claim accrual remains the test announced by the Federal Circuit in Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). Santiago acknowledges as much when it approvingly cites to Hopland in its Response and states " [a] claim first accrues 'when all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'" Pls. Resp. at 9 (emphasis in Pls. Resp.). After citing to this well-established and sole test for claim accrual, Santiago then proceeds to ignore the test and constructs, in its place, a due process claim, which

litigation against the United States.

is not justiciable in this Court.[11]

Rather than applying the sole claims accrual standard endorsed by the Federal Circuit, Santiago turns to a host of cases that address due process claims, not claim accrual. For example, in Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), the case primarily relied upon by Santiago, the Supreme Court found that due process rights protect a party against whom a judicial proceeding has been brought without notice to that party; that is, stealth litigation. In the instant case, the issue is the right of a party to initiate a suit versus the right to defend one's self, which was the situation in Mullane and the other cases cited by Santiago.[12] There is good reason why the due process standard in the cases cited by Santiago is not tantamount to claim accrual and should not be superimposed upon the Federal Circuit's long-standing claim accrual standard. Individuals in a defensive position should not be forced to take affirmative actions to learn of suits filed against them in federal courts. Conversely, it is reasonable to require that someone wishing to initiate an affirmative action against others take reasonable steps to protect their interests and file within prescribed statutes of limitations.[13]

---

[11]Santiago cites Electro-Methods, Inc. v. United States, 728 F. 2d 1471 (Fed. Cir. 1984), and ATL, Inc. v. United States, 736 F.2d 677 (Fed. Cir. 1984), in support of its assertion that the Court of Federal Claims has jurisdiction over due process claims. In fact, neither Electro-Methods nor ATL address the issue of whether the Court of Federal Claims has jurisdiction to hear a due process claim. Instead, in both cases the Federal Circuit affirmed the Court of Federal Claim's jurisdiction over implied-in-fact contracts between the United States and bidders for government contracts, not due process claims. Electro-Methods 728 F.2d at 1475; ATL, 736 F.2d at 681. Moreover, Santiago's reading of these cases is in direct contravention of Federal Circuit jurisprudence that directly addresses the issue of jurisdiction over due process claims and holds that the Court of Federal Claims has no jurisdiction over due process claims. LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995); see also Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993).

[12]Accord Walker v. City of Hutchinson, 352 U.S. 112 (1956), Jones v. Flowers, 547 U.S. ___, 126 S.Ct. 1708 (2006); Schroeder v. City of New York, 371 U.S. 208 (1962); Mennonite Bd. of Missions v. Adams, 462 U.S. 791 (1983).

[13]This distinction is also the basis for the holdings in Tulsa Professional Collection Services Inc. v. Pope, 485 U.S. 478, 486 (1988), and Texaco, Inc. v. Short, 454 U.S. 516, 533-34 (1982), both of which found

Moreover, the notice requirement in the OSM regulations, which is the focus of Santiago's argument, is not a claim accrual provision and is not intended to protect the right to judicial process. Instead, the OSM regulation is intended to provide notice to those who wish to participate in the administrative process. Indeed, it would be contrary to the separation of powers doctrine to conclude that OSM has the ability, through the promulgation of regulations, to somehow grant or modify jurisdiction of the judicial branch. The prerogative to set statutes of limitations, as the name implies, lies not with the executive branch, but with the legislative branch.

**B. Santiago Received Adequate Notice of the OSM Decision**

In its response, Santiago attempts to minimize the very real factual distinctions between it and the Benchmark Plaintiffs, related to issues which this Court previously found to be critical to the statute of limitations issue. In its prior ruling this Court appeared particularly concerned by the fact that if OSM had researched the Benchmark deeds to the Wharton Property, it would have found an address for Benchmark itself. Benchmark Res. Corp. v. United States, 64 Fed. Cl. 526, 535 (2005). The same is not true for Santiago. Santiago's deeds contain no corporate address for Santiago.[14/] The deed at the very **top** states as follows:

Mail: Joe G. Bagwell

---

that due process notice requirements do not apply to self-executing statutes of limitations. Plaintiffs attempt to distinguish these cases, arguing that the government had a much larger role in the instant case than in the cited cases. The critical governmental involvement in both Tulsa Professional and Texaco, however, was the government's involvement in failing to notify the party of judicial action. Here, there is no judicial action against the Plaintiffs and the involvement of OSM in the administrative proceedings is irrelevant in the context of claim accrual.

[14/] Santiago suggests that the United States' statute of limitations argument is premised on the assertion "that Santiago's deed does not provide an address other than Mr. Bagwell's." Pls. Resp. at 13. This is not a correct presentation of the United States' position. The United States claims only that "Santiago's deed did not list its address" (U.S. Mot. at 35), which it does not.

162 1st St. N.E.
Cleveland, TN 37311

U.S. Ex. O, App. II at 459. At the **bottom** the deed indicates the following:

Tax Notice: c/o Warshaw, Burnstein, Cohen & Kuh
555 Fifth Ave.
New York, NY 10017

Id. There is no actual corporate address for Santiago in the deed. Moreover, there is no reason from the face of the deed to prefer the generic law firm address in New York over Mr. Bagwell's address in Tennessee. The generic law firm address is not placed prominently at the top of the document like Mr. Bagwell's and the generic law firm address indicates that it is purely for "Tax Notice" purposes. Id. Santiago argues that OSM should have known to prefer the generic law firm address over Mr. Bagwell's address because Warshaw Burnstein was "Santiago's long time attorneys." Pls. Resp. at 13. How Santiago believes that one could determine or know this fact from the information in the deed is beyond comprehension. Indeed, Santiago relies upon nothing more than post-hoc deposition testimony by its own attorney to support this conclusion – information which was not available to OSM at the time the notices were sent.

The fact is that OSM sent notice to Santiago care of Mr. Bagwell.[15/] There is no basis to argue that this was somehow deficient. First, Santiago's owner has testified at deposition that Mr. Bagwell was, in fact, Santiago's attorney and thus its agent for purposes of the Tennessee property. Kwon Depo. 61:24-62:8 (U.S. Ex. R, App. II at 508-508a). Second, Mr. Bagwell's address was the first and most prominent address contained in Santiago's deed. U.S. Ex. O,

---

[15/] Santiago makes much of the fact that there are no copies of the mailing labels used to transmit the final OSM notice of Decision in the OSM files. Pls. Resp. at 14-15. The only evidence in the record, however, suggests that the same labels were used for the notice of Decision and the final PED/EIS. Siddel Dec. I at ¶ 13 (U.S. Ex. B, App. I at 342). Further, the labels used for the PED/EIS included labels for Santiago care of Joe Bagwell. Id. at ¶ 12.

App. II at 459. Third, the OSM mailing list indicates that notices were sent to Santiago care of Mr. Bagwell.[16] U.S. Exs. B-6 & B-7, App. I at 376, 378. This is distinct from the situation which troubled the Court regarding the Benchmark Plaintiffs, whose corporate names did not appear on the notices sent to Mr. Bagwell.

The overwhelming evidence in the record demonstrates that notice was sent to Santiago care of its agent. Even if the notice requirements of the OSM regulations apply to claim accrual, OSM met its obligations under the regulations with respect to Santiago. As such, Santiago knew or should have known about the OSM designation at or about the time it was issued in 1987, and its complaint filed in 2005 is well beyond the applicable six year statute of limitations and must be dismissed.

## III. PLAINTIFFS POSSESSED NO RIGHT TO SURFACE MINE COAL ON THE WHARTON PROPERTY AT THE TIME OF THE ALLEGED TAKING

### A. The Timber Lease Property

Plaintiffs argues that they possessed a right to strip mine on the timber lease property because the contract left open the possibility of future negotiations for mining operations. The potential to negotiate for the future right to conduct mining operations is not, however, a cognizable property interest. Such future potential negotiations are far too speculative to represent a compensable property interest on the date of the alleged taking. As well-established case law demonstrates, the claimant must hold the property interest at the time of the alleged taking, not at some potential future time. Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir.

[16] Santiago makes much of the fact that the OSM mailing list contained a one letter typographical error in the spelling of the company name: “Santiaco” versus Santiago. Pls. Resp. at 15. This argument demonstrates how desperate Santiago is to avoid the consequences of their own failure to meet the statute of limitations in this case. Surely the Court will not ignore a notice sent to a person who is admittedly an agent of the company and whose address appeared prominently on the property deed purely because of a one letter typographical error in the corporate name.

2001) ("[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation") (citations omitted); Cienega Gardens v. United States, 331 F.3d 1319,1328 (Fed. Cir. 2003) ("[f]or any Fifth Amendment takings claim, the complaining party must show it owned a distinct property interest at the time it was allegedly taken, even for regulatory takings").

**B. The Coal Lease Property**

A 1977 lease between Plaintiffs and Tennessee Partners, Inc., which had a term of twenty years, gave to Tennessee Partners "the right to remove **all coal** from the lands owned by [Plaintiffs]." U.S. Ex. U, App. II at 569 (emphasis added). Put simply, Plaintiffs had no right to mine the Wharton Property in 1987.

Plaintiffs make much of the potential "reversionary interest" and "claim for royalties" on the Wharton Property under the lease with Tennessee Partners. Pls. Resp. at 16. Plaintiffs' Complaint, however, does not claim a taking of a reversionary interest or a right to royalties. Instead, in their Complaint, Plaintiffs allege only that the United States "effectively prohibit[ed] Plaintiffs from mining . . . coal reserves located on the Property. . . ." Compl. at ¶ 25. Because the Complaint does not allege a taking of a reversionary interest or a right to royalties, the Complaint filed by Plaintiffs must be dismissed.

Indeed, Plaintiffs do not refute that on the date of the alleged taking – March 24, 1987 – they possessed no right to mine coal on the Wharton Property as a result of the lease with Tennessee Partners. Instead, Plaintiffs argue that, at some point in time after March 24, 1987, they might possibly have obtained the right to mine the Wharton Property. The mere potentiality of some future right to mine property, however, does not represent a compensable property interest.

Moreover, the United States did not interfere with any reversionary interest held by Plaintiffs in 1987. First, Plaintiffs reversionary interest in 1987 was the mineral interest in the property less **all coal**. The OSM Designation did nothing to interfere with this interest. As Plaintiffs acknowledge, they were the owner of nothing more than a non-participating royalty interest in 1987. Second, "[t]he owner of a non-participating royalty interest does not have the power to develop the mineral fee estate." Cane Tenn. Inc. v. United States, 60 Fed. Cl. 694, 699 n. 7 (2004). As a non-participating royalty holder in 1987, Plaintiffs had no right to mine for coal on the Wharton Property and, thus, cannot allege that the ability to mine the property was taken from them by the United States.

Similarly, the United States did not interfere with any Royalty payments from the lessee to Plaintiffs. "The only right reserved [in the non-participating royalty] is the right to receive royalty from the exploitation of the mineral estate." Id. at 699, citing J.M. Huber Corp. v. Square Enterprises, Inc. 645 S.W.2d 410, 412 (Tenn. Ct. App. 1982). In fact, Plaintiffs have already sued and reached a settlement with Tennessee Partners over the royalty payments. Pls. Resp. at 17, n. 4.

Because Plaintiffs possessed no right to conduct surface coal mining operations on the Wharton Property in 1987, when OSM issued its Designation, they cannot claim that the United States took that right from them. In addition, the United States did not interfere in any way with alleged reversionary interests or royalty payments, which are not even mentioned in Plaintiffs' Complaint. Given that Plaintiffs possessed no property interest in 1987, their taking claim must be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

Plaintiffs cannot prove that their claim is ripe and Plaintiff Santiago cannot prove that it

filed its action within the applicable limitations period. As such, the United States respectfully requests that the Court dismiss Plaintiffs' Complaint. In the alternative, because Plaintiffs lacked a cognizable property interest to mine the Wharton Property, the United States respectfully requests that the Court grant the United States' request for summary judgment.

September 28, 2006

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Div.

/s/

JAMES D. GETTE
Trial Attorney
Natural Resources Section
Environment and Natural Resources Div.
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044
(202) 305-1461

Of Counsel:
Daniel W. Kilduff
U.S. Dept. of the Interior
Office of the Solicitor
1849 C Street, N.W.
Washington, D.C. 20240

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENCHMARK RESOURCES CORPORATION, GENTRY CORPORATION, and SUNRISE HOLDING, INC., Plaintiffs, v. THE UNITED STATES of AMERICA, Defendant. | No. 03-178L<br>Honorable Christine Odell Cook Miller |

**SECOND DECLARATION OF DOUGLAS K. SIDDELL**

I, Douglas K. Siddell, do declare and attest, upon personal knowledge, as follows:

1. I am currently the Supervisor of the Technical Group in the Knoxville Field Office (KFO) of the Office of Surface Mining Reclamation and Enforcement (OSM). I have been employed by OSM for over 27 years.

2. OSM is the office within the Department of the Interior that administers the Surface Mining Control and Reclamation Act of 1977 (SMCRA). 30 U.S.C. § 1211. KFO is, among other things, responsible for SMCRA permitting relating to surface coal mining operations in the State of Tennessee. OSM has performed this function in Tennessee since a Federal takeover of the State of Tennessee's SMCRA program in 1984.

3. KFO processed the lands unsuitable for mining petition that resulted in the Director of OSM's March 24, 1987 decision to designate portions of the Rock Creek watershed in Tennessee

as unsuitable for surface coal mining operations under section 522 of SMCRA. 30 U.S.C. § 1272. See Exhibit 4 to my prior declaration (U.S. Ex. B-4, App. I 358-69).

4. The Rock Creek watershed petitioners asked OSM to designate the watershed – the "Petition Area" – as unsuitable for all surface coal mining operations. (Although the Rock Creek Watershed is actually larger than the Petition Area, in the context of the March 24, 1987 partial designation, the terms "Petition Area" and "Rock Creek watershed" are often used interchangeably.) OSM did not grant the petition in its entirety. Instead, the Director of OSM designated:

> All surface minable reserves of the Sewanee coal seam within the Rock Creek watershed, Tennessee as unsuitable for coal mining operations using conventional overburden mixing techniques for reclamation

and

> The Hall, Middle, and Rock Creek gorges as unsuitable for all surface coal mining operations and surface disturbance incident to underground mining.

See Id. at App. I, p. 358.

5. At the request of counsel for the United States, I directed my staff to prepare a map depicting: (1) the boundaries of the Petition Area; (2) the designated gorge areas; and (3) the boundaries of the property that is the subject of this litigation (the "Wharton Property"). My staff prepared this map by: (1) scanning a map of the Wharton Property boundaries ("General Location Map Wharton Property," attached to an April 5, 2006 report prepared by Wiley Consulting LLC for Benchmark Resources Corp. ("Wiley Report")) into a digital file; (2) importing the digital file into computer software known as Autodesk Map 3D 2007; (3) superimposing the Wharton Property boundaries on a USGS quadrangle map; and (4)

superimposing the boundaries of the designated gorge areas and the Petition Area boundaries (which we maintain in our Geographical Information System) on the same quadrangle map. A copy of the map is attached to this declaration as Exhibit 1 (U.S. Ex. V-1, App. III at 596).

6. The Statement of Reasons accompanying the Director's March 24, 1987 partial designation clearly specifies that, even after the partial designation, OSM will receive and process permit applications for a variety of proposed mining operations within the Rock Creek watershed. More specifically, the Statement of Reasons explains:

> [OSM] is responsible for approving or denying applications for proposed surface coal mining operations in the Rock Creek watershed. Under this decision, [OSM] would receive and process applications for proposed surface mining operations on any coal seam within the Rock Creek watershed except the designated portions of the gorges.
>
> Applications proposing surface mining operations and underground mining operations having surface effects in the designated portions of the gorges would be denied. However, applications for underground mining operations proposed for all other areas of the Rock Creek watershed would be processed providing they comply with the requirements for the Federal Program for Tennessee.
>
> Any application for a proposed surface mining operation on the Sewanee coal seam would be required to contain a special materials handling plan and reclamation plan; otherwise that application would be denied on the basis of this decision. If [OSM] were to receive an application to surface mine the Sewanee coal in the designated area, and that application contained an approvable materials handling plan and reclamation plan, [OSM] would continue to process that application identically with all others processed under the Federal Program for Tennessee.

<u>See</u> Exhibit 4 to my prior declaration (U.S. Ex. B-4, App. I at 368).

7. In layman's terms, even after the partial designation, an applicant could apply to KFO for a permit to conduct the following mining operations:

(a) The Wharton Property outside of the Petition Area: KFO would entertain permit applications for all surface coal mining operations (including surface and underground mining). All areas outside the Petition Area are unaffected by the partial designation.

(b) The Petition Area outside of the designated gorge areas: KFO would entertain permit applications for all surface coal mining operations (including surface and underground mining) on any coal seam, as long as there would not be any surface activities, or impacts of surface activities, in the designated gorge areas. An applicant proposing to surface mine the Sewanee coal seam would have to submit a special materials handling plan and reclamation plan.

(c) The designated gorge areas: KFO would entertain permit applications for underground mining, as long as there would not be any surface activities, or impacts of surface activities, in the designated gorge areas.

OSM would process any allowable applications in the same manner as it processes all other applications under the Federal SMCRA program for Tennessee.

8. SMCRA provides that no person may engage in surface coal mining operations without a permit to conduct surface coal mining and reclamation operations issued by the appropriate regulatory authority. 30 U.S.C. § 1256(a), 1291(15). OSM is the regulatory authority in Tennessee.

9. A permit application must contain detailed information about the possible environmental consequences of the proposed mine, as well as assurances that damage to the site will be prevented or minimized during mining and substantially repaired after mining has come to an end. See, e.g., 30 U.S.C. §§ 1257, 1260, 1265.

10. OSM reviews permit applications in three phases. We first determine whether the application is administratively complete. 30 C.F.R. § 942.773(b)(2). The purpose of the administrative completeness review is to assess whether the applicant has submitted at least the minimum amount of information for us to begin our substantive technical review. Id. Once the

application is administratively complete, we begin our technical review to determine whether the proposed mining operation will meet all the substantive requirements of SMCRA and its implementing regulations. During the final phase, we address any final legal matters and render a decision on the permit application.

11. The permitting process is highly interactive, with many back-and-forth discussions between OSM staff and the applicant. During our technical review, we always issue "technical deficiency letters" to the applicant. 30 C.F.R. § 942.773(b)(6). These deficiency letters are designed to let the applicant know of potential problems with the application and typically request additional information to allow our permit review staff to determine whether the proposed mining operation is consistent with the requirements of SMCRA and the applicable regulations. Through technical deficiency letters and other communications with applicants, we actively work with applicants to modify the proposed mine plan, as necessary, in order to obtain a permit.

12. At the end of the interactive permitting process, both OSM and the applicant know with substantial certainty the extent of mining operations that will be allowed on the proposed permit area under SMCRA and its implementing regulations.

13. Since OSM instituted a Federal SMCRA program in Tennessee in 1984, OSM has granted more than 80 percent of all new permit applications that it accepted for processing and on which it rendered a final decision. (Occasionally, applicants withdraw their permit applications on their own initiative; OSM does not render final decisions on those withdrawn applications.)

14. By letter dated March 7, 2000, Mr. Darold Proctor wrote to KFO "concerning possibilities of acquiring permits for surface mines, and drift (deep) mines" on the Wharton

Property. See Affidavit of Darold Proctor, ¶ 3, Exhibit 4 to Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment (Plaintiffs' Response).

15. KFO responded to Mr. Proctor on March 30, 2000. See U.S. Ex. L, App. II at 435-37. In our response, we summarized the March 24, 1987 partial designation, including the information as to the types of permit applications OSM would receive and process even after the partial designation. We also enclosed a "copy of the draft application form which briefly explains the permitting process and the type of information that is required to be submitted by the applicant." The draft application was approximately 100 pages long and set forth in detail most of the informational requirements for a typical permit applicant.

16. OSM has never received a permit application from Mr. Proctor or any of the Plaintiffs in this litigation.

17. Counsel for the United States provided me with a copy of, and asked me to review, the Wiley Report, a portion of which is appended to Plaintiffs' Response as Exhibit 1.

18. On page three of his report, Mr. Wiley states: "Although the OSM designation decision states that the Sewanee coal seam, could be mined using some unconventional overburden mixing technique for reclamation, it is my opinion that a method acceptable to the regulatory authority within the watershed boundary is not economically available." It is premature to speculate what type of special materials handling plan and reclamation plan OSM might find acceptable. This type of issue would be addressed in the permitting process, and any decision would have to be based on the technical merits of a specific mine plan.

19. Mr. Wiley also states: "It is my opinion, due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, that the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas."

20. OSM's partial designation does not bar subsidence in the designated gorge areas. Pursuant to section 522 of SMCRA, 30 U.S.C. § 1272, the partial designation bars "surface coal mining operations" in the designated gorge areas. By interpretative rule, OSM has explained that subsidence due to underground coal mining is not included in the definition of "surface coal mining operations" and therefore is not prohibited in areas where surface coal mining operations are barred under section 522 of SMCRA. 30 C.F.R. § 761.200. Subsidence, however, is regulated pursuant to section 516 of SMCRA. 30 U.S.C. § 1266. The partial designation did not impose any additional restrictions on subsidence beyond the generally-applicable restrictions of section 516. Any issues related to potential subsidence in the designated gorge areas would be addressed in the permitting process.

21. As to "probable hydrologic consequences," SMCRA requires a permit applicant to submit a detailed "determination of the probable hydrologic consequences of the mining and reclamation operations" sufficient to allow the regulatory authority to assess the "probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area." 30 U.S.C. § 1257(b)(11). The issue of "probable hydrologic consequences" is necessarily part of the permitting process and would be addressed in that context. It is premature to speculate that OSM would bar any underground mining in the Rock Creek watershed due to hydrologic

consequences, and any decision on that issue would have to be based on the technical merits of a specific mine plan.

22. I have been provided a copy of, and have reviewed, Plaintiffs' Response, together with the exhibits attached to that document.

23. In his affidavit dated August 28, 2006 (attached to Plaintiffs' Response as Exhibit 4), Mr. Darold Proctor identifies three letters he purportedly sent to OSM and attaches copies of those letters to his affidavit. Mr. Proctor states that the purpose of these letters was to inquire about "administrative remedies" and asserts that he never received responses to any of these letters. Plaintiffs make similar assertions in their response brief at pages 7-8.

24. At present, OSM has not been able to verify that it received the letters Mr. Proctor claims to have sent on November 24, 2001, and January 20, 2002.

25. OSM did receive a version of the letter Mr. Proctor refers to at paragraph 8 of his affidavit. The copy attached to Mr. Proctor's affidavit is dated January 7, 2002. The version in OSM's files is dated January 4, 2002, and contains a handwritten notation that it was sent by fax to OSM on January 7, 2002. A copy of the letter received by OSM is attached to this declaration as Exhibit 2 (U.S. Ex. V-2, App. III at 597). Other than the different dates, the two letters appear to be identical.

26. OSM responded to Mr. Proctor's "letter/fax of January 4, 2002" by certified mail on February 1, 2002. A copy of OSM's responsive letter is attached to this declaration as Exhibit 3 (U.S. Ex. V-3, App. III at 598-599). In its response, OSM explained that it was "unable to determine what you meant by the phrase 'exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMCRA).'" As such, OSM did not provide a

specific response to that aspect of Mr. Proctor's letter. However, OSM's responsive letter does make clear that OSM did not interpret Mr. Proctor's letter as a request for any specific administrative relief, and, therefore, that OSM did not deny any particular administrative relief.

27. OSM also clarified that it did "not agree that any action with respect to your letter, or this response, could legally constitute an exhaustion of administrative remedies that would serve as a prerequisite to judicial review."

28. The final paragraph of OSM's response discusses judicial review of OSM's "decision to designate lands unsuitable for coal mining." In this context, it is clear that OSM viewed Mr. Proctor's letter as requesting information about administrative procedures related to the March 24, 1987 partial designation. In no way did we construe Mr. Proctor's letter as a request for us to identify any administrative remedies that would have to be exhausted before he could pursue a takings claim against the government in the U.S. Court of Federal Claims. As a regulatory agency administering SMCRA, this type of legal information is beyond our purview and expertise.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 28, 2006

DOUGLAS K. SIDDELL


Rock Creek Watershed
Tennessee
Bledsoe and Hamilton Counties
Designated Gorge Areas
Wharton Property
Petition Area
Wharton Property boundaries taken from April 5, 2006 report prepared by Marcus A. Wiley for Benchmark Resources Corp
Scale
0
1
2
3
4
Miles

Sent by fax 1-7-02

# Fax Cover Sheet

**BENCHMARK RESOURCES CORPORATION**
**P.O. BOX 5611**
**480-595-7636/FAX 480-595-7636**

RECEIVED
2002 JAN 11 A 10: 39
OSM KNOXVILLE FIELD OFFICE

Mr. George C. Miller, Director
United States Dept. of the Interior
Office of Surface Mining
530 Gay Street S.W. #500
Knoxville, Tennessee 37902
Via Fax 865-545-4111
January 4, 2002

Dear Mr. Miller:

We respectfully request, on behalf of the co-tenants of record, Benchmark Resources Corporation and Santiago Limited, the specific procedures required to exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMRA), and the Federal program for Tennessee, 30 CFR 942:764. Also, any other Federal or State of Tennessee Statutes that are applied to the Rockcreek Watershed, Tennessee Petition Evaluation Document/Environmental Impact statement (final), 522 SMCRA Evaluation OSMRE-PF-8, and Environmental Impact Statement OSMRE-EIS-22.

The abovementioned request goes specifically to the Petition to declare the Rockcreek Watershed as unsuitable for all surface mining operations. The OSMRE failed to provide **Proper Notice and/or service to the identifiable ownership interest,** (i.e., the above-referenced co-tenants of record), by a legally binding conveyance pertaining to the mineral estate, under a large portion of the 22,858 acre Rockcreek Watershed Petition area.

Unless we hear from you to the contrary by February 9, 2002, we will assume that you are denying the requested administrative relief and that we have thereby exhausted our administrative remedies as the necessary prerequisite to seeking Judicial review.

Very truly yours,
Darold E. Proctor
Darold E. Proctor
Authorized Agent
Benchmark Resources Corporation
Gentry Corporation

# United States Department of the Interior

OFFICE OF SURFACE MINING
Reclamation and Enforcement
530 Gay St., S.W., Suite 500
Knoxville, TN 37902

FEB 1 2002

CERTIFIED MAIL
7000 1670 0008 9882 5456

Mr. Darold E. Proctor, Authorized Agent
Benchmark Resources Corporation
P.O. Box 5611
Carefree, Arizona 85377

Dear Mr. Proctor:

Thank you for your letter/fax of January 4, 2002. Your letter references a lack of "proper notice and/or service to identifiable ownership interest" for a lands unsuitable for mining petition decision for the Rock Creek Watershed, Tennessee. The Rock Creek Watershed lands unsuitable for mining (LUM) petition was originally received by the Tennessee Department of Health and Environment on September 28, 1984 and transferred to the Office of Surface Mining (OSM) on October 10, 1984. On or about August 11, 1985, we received a letter from you regarding this unsuitability proceeding and your company's mineral interests. The letter indicated that you might like to become an intervenor in the proceeding. However, our review of the record finds no further communication from you. Your letter to us in 1985 would demonstrate that you had personal, actual knowledge of the proceeding, in addition to the general public notices discussed below.

A draft petition evaluation document/environmental impact statement (PED/EIS) was available for public comment on March 21, 1986. Public notices were issued by local and regional newspapers and Federal Register and Tennessee Register announcements on March 20, 1986, along with a wide area mailing to interested parties, governmental agencies, and landowners.

Additional public notices were made after the issuance of the final PED/EIS on September 26,1986. And, after the decision to designate the petition area was issued, public notices were made in accordance with 30 CFR 942.764 and were provided on April 2, 1987.

We were unable to determine what you meant by the phrase "exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMCRA)", so we are not responding to this part of your letter.

We did not interpret your letter as requesting any specific administrative relief. Therefore, we are not denying any particular administrative relief. Also, we do not agree that any action with respect to your letter, or this response, could legally constitute an exhaustion of administrative remedies that would serve as a prerequisite to judicial review.

The applicable law allows judicial review of OSM's decision to designate lands unsuitable for coal mining, but only within restricted time limits. We certainly respect your right as a citizen to file a lawsuit to challenge OSM's actions if you choose.

Sincerely,

George C. Miller, Director
Knoxville Field Office

cc: Nick Holt, SOL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENCHMARK RESOURCES CORPORATION, a Colorado corporation; et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES,<br><br>Defendant. | No. 03-178L |

**DEPOSITION OF DAROLD PROCTOR**
Phoenix, Arizona
February 13, 2006
10:08 a.m.

PREPARED FOR:
Elsie Kappler
(Copy)

PREPARED BY:
George B. Finn III, RPR, CR
AZ Certified Reporter No. 50330

driver and nix
COURT REPORTERS

365 E. CORONADO ROAD, SUITE 150
PHOENIX, ARIZONA 85004
(602) 266-6525
FAX (602) 266-4303
1-800-488-DEPO (3376)
www.drivernix.com

couldn't sustain the litigation, or they gave it up, one of the two. Anyway, they got out, they quit.

Q. But you can't remember any of those allegations?

A. No, I can't remember the specific allegations.

Q. How about the broad allegations, not the specific ones, what the gist of the case was?

A. They were just -- well, mainly the problem, one of the problems was the shareholders, when the oil started down, they had to blame somebody, but I don't remember. I just can't recall it, Elsie, I'm sorry.

Q. So let's just back up and maybe you can refresh my memory on how you got involved in the oil and gas market generally.

A. How what?

Q. You got involved in the oil and gas, how you became involved in that with no background whatsoever in it.

A. Well, you don't have to have a background to get involved, Elsie.

Q. No, I understand. I'm asking how you got involved.

A. Well, I just had an interest in it.

Q. Did you have any education or background at all in oil and gas?

A. No, I haven't.

Q. Did you have any background in engineering?

A. No.

Q. What about other mineral interests, coal, did you have any background at all in that?

A. No.

Q. I'd like to go to Benchmark's tax returns that we have marked as Exhibit 12.

Mr. Proctor, have tax returns been filed for each and every year of Benchmark's existence?

A. As far as I know.

Q. Now, let me just ask a basic question. If you could turn, for instance, to the return for 1989, looks like it's about halfway through this bundle.

MR. MacKINLAY: You want to just show him yours?

Q. BY MS. KAPPLER: You will note on the face sheet this document was filed in 1997.

A. It was what now?

Q. Filed in 1997. And I'll represent to you that that's true for many of the tax returns here, in 1988 --

A. I don't recall what was going on.

Q. You don't know why Benchmark didn't report or file taxes for years and years?

Here's the 1986 tax return filed in 1997.

A. I can't recall what happened there.

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENCHMARK RESOURCES CORPORATION, GENTRY CORPORATION and SUNRISE HOLDING, INC., Plaintiffs, v. THE UNITED STATES OF AMERICA, Defendant. | No. 03-178L<br>Honorable Christine Odell Cook Miller |

## DECLARATION OF ALAN K. STAGG

I, Alan K. Stagg, pursuant to 28 U.S.C. § 1746, declare as follows:

### I. Background and Experience

1. I am a registered professional geologist with 42 years of experience in the mining industry. I am President and Principal Economic Geologist of Stagg Resource Consultants, Inc., which is the successor to Alan K. Stagg & Associates, Inc., founded in 1975, and Stagg Engineering Services, Inc., founded in 1979. I have extensive experience in the Southern Tennessee Coal Field and I am familiar with the coal beds and enclosing strata on the Wharton Property, which is the subject of the above-captioned case, and on adjoining properties. Additionally, I evaluated the coal potential of the Wharton Property during the late 1970's on behalf of one or more clients. A substantial portion of my professional experience has involved the economic evaluation of coal properties and coal mining operations including the assessment and estimation of coal reserves. I have been qualified as an expert and testified on reserve estimation

issues in a variety of venues during the past 25 years. My qualifications, education, experience, and publications are set forth in detail in Exhibit 1 to this declaration.

2. I was retained by the United States to (1) review a variety of documents relating to the above-captioned case and (2) review and comment on a report prepared by Marcus A. Wiley, PE ("Wiley") of Wiley Consulting, LLC dated April 5, 2006 (the "Wiley Report"). I was asked to focus my review on the methods, procedures, and standards used in the generation of the Wiley Report. I was not asked to independently estimate coal reserves on the Wharton Property or to assess the economic viability of mining the property at a particular date.

## II. The Wiley Report

3. The Wiley Report is intended to, as evidenced by its title, constitute a "Report of Coal Reserves Contained within The Rock Creek Watershed Boundary As Designated by the Office of Surface Mining To be Unsuitable for Surface Mining." It should be noted, however, that the report also presents estimates of coal reserves lying outside the Rock Creek watershed boundary as delineated by the OSM Designation dated March 24, 1987.

4. The area included in the Wiley Report is that property generally termed the Wharton Property, consisting of ownership of the fee simple estate or ownership of the mineral estate over approximately 29,000 contiguous acres.

5. In the Wiley Report, tonnage estimates are presented in the mining categories of surface and underground and further classified as either lying inside or outside the Rock Creek Watershed ("RCWS"). All tonnage is classified as *reserves*. It is Wiley's opinion that there are 82.4 million tons of coal that are potentially recoverable from the Wharton Property, of which 47.9 million tons lie within the RCWS. It is also his opinion that mining of these 47.9 million tons is effectively precluded by the OSM Designation.

6. Wiley further opines that the 34.5 million tons that lie outside the RCWS may be technically mineable, but that "[. . .] the overall impact to the property is that not enough coal is left contiguously mineable to amortize the capital cost for infrastructure (office, shop, warehouse, coal preparation plant, portal, ventilation, rail access, load-out, employee training, continuous miners, belt haulage, surface mining equipment, sediment control, etc.) to justify mining any tonnage at all." (Wiley 3). His final opinion is "[. . .] that the designation by OSM of unsuitability within the Rock Creek watershed boundary essentially eliminates the viability of permitting and mining the entire Wharton tract." (Wiley 3).

7. The coal industry relies upon generally accepted techniques and standards in estimating, classifying, and reporting tonnage that is represented to be economically viable to mine (that is, *reserves*). As set forth in greater detail below, the Wiley Report fails to meet these generally accepted techniques and standards for estimating and reporting coal reserves. As a result, the conclusions contained in the Wiley Report cannot be relied upon because they are not supported by disclosure of the underlying data and assumptions and thus cannot be independently verified.

## III. Generally Accepted Industry Standards for Reserve Estimation

8. The estimation of coal reserves is a dynamic process that is the subject of continuing refinement and standardization of both terminology and techniques, and it is the practice in the coal industry to cite the standard(s) being used when estimating and reporting coal reserves. The Wiley Report is notably silent in this regard.

9. One of the seminal publications in the United States in this regard is U.S. Geological Survey Bulletin 1450-B titled *Coal Resource Classification System of the U.S. Bureau of Mines and the U.S. Geological Survey*. This document was published jointly by the U.S. Bureau of Mines ("BOM") and the U.S. Geological Survey ("USGS") in 1976. The system presented in Bulletin

1450-B was widely adopted by coal industry professionals who specialized in reserve estimation.

10. In 1977, BOM and USGS decided that the coal resource classification system contained in Bulletin 1450-B "[. . .] should be revised and expanded to provide a more definitive and less ambiguous coal resource classification system." (Wood, et al. 1). Accordingly, the two agencies published Circular 831 titled *Principles of a Resource/Reserve Classification for Minerals* in 1980. The classification system presented in this publication covered all minerals and thus satisfied the needs of the BOM, which no longer had responsibility for coal resource classification. However, the USGS believed that further refinement of the classification system was needed for coal.

11. In response to this need, the USGS developed a revision of Circular 831, with two main objectives stated: (1) to provide detailed information lacking in Bulletin 1450-B; and (2) to provide standard definitions, criteria, guidelines, and methods required for uniform application of the principles outlined in Circular 831. This publication, which is titled *Coal Resource Classification System of the U.S. Geological Survey*, was published as Circular 891 in 1983. The system presented in this publication has become the generally accepted standard for coal reserve classification among coal industry professionals, both those directly employed in the by industry and those who provide consulting services to industry. Circular 891 is presented in Exhibit 2 to this declaration.

12. In 1988, the Society for Mining, Metallurgy, and Exploration, Inc. ("SME"), the largest society in the U.S. for mining professionals, undertook the development of guidelines for the public reporting of exploration information, resources, and reserves. This resulted in the publication of a document titled *A Guide for Reporting Exploration Information, Resources, and Reserves* in 1992. In 1999, an update of this document, known as the *1999 SME Guide*, was published.

13. The 1999 SME Guide underwent a substantial review in response to issues raised by international efforts to standardize resource and reserve classification and reporting systems and, domestically, issues arising from the public reporting requirements of the U.S. Securities and Exchange Commission ("SEC") in its *Industry Guide 7*. The resultant document, which is titled *The SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves* was published in April 2005 (the "2005 SME Guide"). The main principles governing the development and application of the 2005 SME Guide are transparency, materiality, and competence. The 2005 SME Guide contains a section addressing reporting matters relating specifically to coal. The 2005 Guide is presented in Exhibit 3 to this declaration.

14. I have been actively involved in the assessment, estimation, and reporting of coal reserves for 35 years throughout the United States and it is my experience that the resource/reserve classification system presented in Circular 891 and the principles embodied in the 2005 SME Guide are generally used by industry professionals who assess, estimate, and report coal reserves. Of particular note in these classification systems is the emphasis on defining terms and on establishing the level of geologic assurance.

## IV. <u>The Wiley Report Fails to Meet Accepted Industry Standards</u>

15. In my experience, there are a number of basic types of reports in which reserve estimates are presented, broadly classifiable into summary reports, complete reserve reports, and expert reports. In complete reserve reports and in expert reports, transparency is expected, with all key assumptions and criteria clearly identified, all salient terms defined, the factual data from which estimates were developed presented in full, the methodologies employed fully explained, and the classification system explained. In reviewing the Wiley Report, a number of significant deficiencies were noted including the failure to define key classification terms, insufficient data from which to evaluate tonnage estimates, and a failure to establish geological assurance levels

for the estimates contained in the report.

## A. Definitional Issues

16. Regarding the definition of classification terms, it is a fact that many common terms have been, and continue to be, used loosely and often interchangeably. One notable example is the term *reserve*. In every coal classification system of which I am aware, the term *reserve* by definition means the economically recoverable portion of the coal in the ground (the latter also termed *coal in-place*). Notwithstanding this fact, it is not uncommon to see the term used synonymously with the term *tons* by those unfamiliar with reserve estimation and reporting, with no economic connotation implied. Similarly, the term *resource* means tonnage for which economic extraction is currently or potentially feasible, but for which this determination has not been made. All, or some portion, of the tonnage classified a *resource* may not be economically recoverable at the time of the estimation. It is also not uncommon to see the terms *reserve* and *resource* used interchangeably by many in the industry that are unfamiliar with reserve estimation and reporting.

17. The Wiley Report fails to define key classification terms, most notably *reserve* and *recoverable reserve*. If the term *reserve* is intended to mean *economically recoverable in the market that existed at the time of the estimate*, which is the generally accepted definition of *reserve*, there is no statement to this effect in the Wiley Report. Even if the reader assumes that this is the definition being used, there is no indication of the time frame in which this definition is being applied, to wit: is the date of economic determination (that is, classification as a *reserve*) the date the Decision was signed, the date a complaint by Benchmark in this matter was lodged, the date of the Wiley Report, or some other date? Assuming that the term *reserve* is being used in its strict economic sense as it should be, one cannot assess the reasonableness of the representation that the tonnage estimated could be economically recoverable if, at a minimum, the effective date of the representation is not known. Coal selling prices and coal market

dynamics tend to be cyclic over time and what constitutes reserves at any given period will not necessarily constitute reserves at some other period. For example, coal in a given deposit may be uneconomic to mine when selling prices are $25 a ton but economic to mine when selling prices are $40 a ton.

18. A second definitional shortcoming in the Wiley Report is the use of the term *recoverable reserve.* Under the classification system used in Circular 891, this term is redundant since, by definition, that which comprises a *reserve* is the recoverable portion (Wood, et al. 18). Similarly, in the 2005 SME Guide, the use of the term *reserve* with respect to coal is to represent the saleable product (SEC Reserves Working Group, et al, 31).

**B. Tonnage Estimates**

19. In reporting reserves within the coal mining industry, it is the practice to delineate tonnage estimates on the basis of the type of mining by which extraction is forecast. The most basic delineation is into the categories of surface and underground mining. These categories are often expanded, with surface-mineable coal reported in sub-categories such as contour strip, area strip, mountaintop removal, auger mining, and highwall mining. Underground-mineable coal is often further delineated into the categories of room-and-pillar mining and longwall mining. Reporting in this fashion is important because the economics of mining vary considerably amongst these categories and without knowledge of the type of mining indicated, the reader cannot judge the reasonableness of the inclusion of the tonnage.

20. The Wiley Report fails to identify the key criteria that were used in estimating tonnage for both surface-mineable coal and underground-mineable coal.

### 1. Tonnage Estimates of Surface-Mineable Coal

21. In assessing the economics of extracting tonnage in the contour strip category, which appears to be the category used in the Wiley Report under the heading *Surface*, two key criteria are relevant—the minimum bed thickness and the maximum overburden-to-coal ratio that will be used (Kennedy 377). Minimum bed thickness is of particular relevance when multiple beds and benches of coal are to be recovered from a contour strip cut. In many contour strip operations, only a single bed of coal is to be recovered, and the economics of mining are driven by the thickness of this bed. This bed can be designated the basal bed. In other instances, however, there may be benches of coal lying above the basal bed that can be recovered from the cut. In such instances, it may be economic to recover benches that have a minimum thickness less than that of the basal bed. This minimum thickness must also be established. The Wiley Report does not state the bed thickness used in estimating tonnage in the surface mine category in either of these circumstances.

22. The overburden-to-coal ratio is the relationship between the volume of overburden (that is, the rock lying above and between the target coal beds) that must be removed to recover a ton of coal. This relationship is typically expressed as a mathematic ratio, such as 10:1 or 15:1. Overburden is generally denominated as *bank cubic yards*, which means the undisturbed rock lying in the ground prior to blasting. In surface mining, the vast majority of the direct mining cost is incurred in removing the overburden. It thus follows that as overburden volumes increase, direct mining costs increase. Without knowledge of the assumptions regarding the overburden-to-coal ratios used in estimating tonnage, it is not possible to assess the economic viability of mining the coal. The Wiley Report does not state the overburden-to-coal ratio(s) used in estimating tonnage in the surface mine category.

### 2. Tonnage Estimates of Underground-Mineable Coal

23. In assessing the economics of extracting tonnage in the underground category, two key criteria are required—the minimum bed thickness and the amount of in-bed parting (that is, non-coal material) that is present in the coal bed (Leonard, et al. 4-21). These two criteria are important because in underground mining, the major portion of the direct mining costs is incurred in extracting and processing the coal. There is thus a minimum bed thickness below which extraction is not economic at a given coal selling price. If the bed thickness assumed is less than the minimum thickness of the mining interval that can be taken by the mining equipment, extraneous rock—termed *out-of-bed dilution*—must be taken. If the bed thickness assumed is greater than the minimum thickness of the interval that can be taken by the mining equipment, any non-coal parting material within the bed will also comprise extraneous material. Non-coal material taken during mining, whether from out-of-bed dilution or from partings, is separated from the coal by mechanical processing, a process also termed *washing*. Because the cost of mining and processing a ton of non-coal material is at least as expensive as the cost of mining and processing a ton of coal, every ton of non-coal material that is discarded increases the effective cost of the coal that is recovered and available for sale in direct relationship to the proportion of the two materials. Thus, estimates of minimum bed thickness and the maximum amount of in-bed parting material are crucial to an assessment of the economic viability of mining. The Wiley Report does not state the minimum bed thickness nor the maximum amount of in-bed parting material that was used in establishing economic recoverability.

## C. <u>Geologic Assurance of Estimates</u>

24. The level of geologic assurance represents the relative degree of reliability of the estimated tonnage and the forecast quality. This is done through the use of modifiers, specifically the terms *measured, indicated,* and *inferred* in the system presented in Circular 891 (Wood, et al.

18). Other systems use the terms *proved, probable,* and *possible*.

a. The term *measured* implies the highest level of geologic assurance and is based on extrapolating thickness and quality data a defined distance from each point of measurement. In general, this distance is 1,320 feet (that is, a quarter mile) for coal.

b. The term *indicated* implies a lesser degree of assurance concerning both thickness and quality, with the standard distance over which data are extrapolated beyond the quarter mile distance being 3,960 feet (that is, three-quarters of a mile).

c. The term *inferred* essentially characterizes tonnage that lies between three-quarters and three miles beyond a data point, although the majority of experienced estimators tend to avoid estimating tonnage in this classification because of its uncertainty.

25. Although Circular 891 provides the recommended distances from each data point for the different levels of geological assurance as discussed above, generally accepted industry standards call for reductions in these distances in some circumstances. For example, for coal beds known to be erratic in their thickness and/or occurrence – which are defining characteristics of coal beds in the Southern Tennessee Coal Field – the estimator is expected to reduce the standard intervals to those that more accurately reflect the distances over which one can meaningfully extrapolate data (Luther 37; Thompson 25).

26. The Wiley Report contains significant deficiencies involving the categorization of tonnage estimates by their relative degree of geologic assurance. In the Wiley Report, tonnage in each of the surface and the underground mine categories is lumped together, with no effort made to distinguish between tonnage in relatively close proximity to data points and tonnage that is progressively further from such points. In assessing the significance of tonnage estimates, one

would attach a higher degree of significance to tonnage estimates in the measured category, which have a relatively high degree of assurance, than to tonnage estimates in the inferred category, which are considered to have a sufficiently low degree of assurance so as to render them speculative. The Wiley Report does not use these, or any other, assurance categories and the reader thus cannot assess the significance or the reliability of the tonnage estimates.

27. Under current generally accepted industry practice in estimating coal reserves, support is required when categorically stating that estimates comprise *reserves* (SEC Reserves Working Group, et al. 31). At a minimum, this requires an enumeration of the economic assumptions supporting this characterization, including a tabulation of forecast mining economics on which the assumptions used in defining what constitutes a *reserve* are based, as well as the assumed selling price of coal. In this fashion, the profitability (or lack thereof) of mining the tonnage included in the estimates is forecast and it can be established whether this would result in an economically viable venture. This is also a notable requirement in an expert report, in which the basis and reasons in support of the opinions formed are to be provided. None of the economic assumptions that would support classifying tonnage as a *reserve* are presented in the Wiley Report.

## V. <u>Wiley Report Fails to Support Conclusions with Generally Accepted Supporting Data</u>

28. An additional deficiency in the Wiley Report is the conclusion that the OSM Designation effectively precludes mining all coal lying outside the Hall, Middle Creek, and Rock Creek gorges but within the RCWS. According to Wiley, this conclusion is based on his opinion that "[. . .] due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, that the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas." (Wiley 3). The Wiley Report provides no supporting data that subsidence would occur if underground mining was conducted nor what the

probable hydrologic consequences of underground mining would be, much less having knowledge of what OSM's response to these issues would be. It should be noted that if this conclusion is not true, an estimated 74.8 million tons of Wiley's estimate of recoverable coal remains that does not lie within the three gorges or within the Sewanee coal bed in the remainder of the RCWS.

29. The Wiley Report effectively presents two opinions regarding economic viability. The first is that all the tonnage estimated within the Wharton Property, when considered in the aggregate, was economically recoverable at some unspecified date. No support is provided for this implicit opinion. The second is that by excluding all tonnage lying within the RCWS, which, as discussed in paragraph 28, is an assumption for which no support is provided, the remaining tonnage lying outside the RCWS would no longer be economically viable to recover. The report states that this is because "[. . .] the overall impact to the property is that not enough coal is left contiguously mineable to amortize the capital cost for infrastructure (office, shop, warehouse, coal preparation plant, portal, ventilation, rail access, load-out, employee training, continuous miners, belt haulage, surface mining equipment, sediment control, etc.) to justify mining any tonnage at all." (Wiley 3). Neither support nor justification is provided for this broad and effectively all-encompassing statement, which effectively concludes that 34.5 million tons of coal in individual bodies within relative proximity to each other could not be economically developed. This is in direct contradiction to mining practices in the Appalachian Coal Field that have occurred over a span of decades and which continue to this date.

In accordance with 28 U.S.C. § 1746, I hereby declare and affirm under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of September, 2006.

Alan K. Stagg, PG, AIMA
Tennessee Registered Professional Geologist No. 607
Registration Expires February 1, 2008

# REFERENCES


- Kennedy, Bruce A., 1990, *Surface Mining 2nd Edition*: Society for Mining, Metallurgy, and Exploration, Inc.
- Leonard, Joseph W., Kenneth K. Humphreys, William F. Lawrence, Barry G. McMillan, & Richard B. Muter, 1979, *Coal Preparation 4th Edition*: The American Institute of Mining, Metallurgical, and Petroleum Engineers, Inc.
- Luther, Edward T., 1959, *The Coal Reserves of Tennessee*, Bulletin 63: State of Tennessee, Department of Conservation and Commerce, Division of Geology.
- SEC Reserves Working Group / Resources and Reserves Committee, 2005, *The SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves (The 2005 SME Guide)*: The Society for Mining, Metallurgy and Exploration, Inc.
- Thompson, Arthur D., 1982, *The Wharton Coal Property*: Minerals Associates, Inc.
- Wiley, Marcus A., PE, 2006, *Report of Coal Reserves Contained within the Rock Creek Watershed Boundary as Designated by the Office of Surface Mining to be Unsuitable for Surface Mining*: Wiley Consulting, LLC.
- Wood, Gordon H., Jr., Thomas M. Kehn, M. Devereux Carter, & William C. Culbertson, 1983, *Coal Resource Classification System of the U.S. Geological Survey*, Geological Survey Circular 891: U.S. Department of the Interior.

# ALAN K. STAGG, PG, AIMA
# PRINCIPAL ECONOMIC GEOLOGIST



*In February 1975, Mr. Stagg founded Alan K. Stagg & Associates, Inc., to provide geologic consulting services to the natural resource industry. In September 1979, he founded Stagg Engineering Services, Inc., to provide engineering and surveying services. Shortly thereafter all services were consolidated into the engineering company. To more accurately reflect the broad-based range of services now provided by the company, Stagg Engineering's name was changed to Stagg Resource Consultants, Inc. Mr. Stagg is experienced in the development, implementation, and management of large, complex consulting projects involving the selection and coordination of a variety of professionals and support staff. With 42 years experience, he is the firm's lead professional on jobs relating to the appraisal of natural resource-bearing properties and operations; the economic evaluation of mineral and energy fuel deposits; litigation support and expert testimony; and industry cost, capacity, and pricing studies. He is a registered professional geologist in 14 states and a certified mineral appraiser.*

## PROFESSIONAL EXPERIENCE

For more than 30 years, Mr. Stagg has continued to expand his consulting firm's services in the areas of property and reserve evaluation; the operational and economic analysis of natural resource producing companies; the preparation of marketing, costing, and pricing studies for a variety of mineral resources and fuels; the preparation of environmental site assessments and audits; the appraisal of mineral properties and operations; and litigation support and expert testimony.

His experience in the **evaluation and analysis** of mining operations has been acquired from the numerous acquisition programs in which he has participated during both his tenure in industry and from projects conducted in his consulting practice. His experience ranges from preliminary evaluations of operations that are potential candidates for acquisition through in-depth evaluations made during option phases and the extremely detailed evaluations required during due diligence programs. Specific areas of experience gained through this work include reserve and environmental assessments and audits, the evaluation of operating and management practices, and the preparation of detailed pro forma cost and cash flow projections.

Mr. Stagg was instrumental in establishing his firm's service area involving the preparation of **industry cost, capacity, and pricing studies** on both local and regional bases. The development of this service area was accomplished by incorporating such disciplines as statistics, economics, and financial analysis into

the firm's existing professional and technical expertise. Examples of such studies include a coal cost/capacity study and a ten-year coal cost and pricing study—both covering the central portion of the Appalachian Coal Field, and the preparation of numerous supply and demand analyses in the course of his career for a variety of commodities.

His experience in conducting **environmental site assessments and audits**, generally restricted to mining-related sites, includes a diversity of properties located throughout the U.S. with an emphasis on large properties with complex operating histories. He has designed, implemented, and supervised Phase I Environmental Site Assessments on properties ranging in size from less than an acre to a property containing 300 thousand acres of surface and five million acres of mineral ownership lying in seven states.

Mr. Stagg is particularly experienced in **project development and management**. Examples of his larger projects include the development of a coal-mining operation in West Virginia; the investigation, evaluation, and development of an oil and gas acquisition program in Oklahoma and Texas for a corporate client; the filing of concession applications and the development and implementation of a placer gold prospecting and sampling program in the Republic of Ecuador; and the management of a small gold-mining operation in Colorado.

Mr. Stagg's experience in **appraisals** ranges from work completed on a variety of coal, oil, and gas producing properties; operations involving quarries, sand pits, and clay operations; and metallic mineral deposits. Appraisals which he has include those of the Rock of Ages granite quarries in Vermont and Quebec, the kaolin operations of Freeport Minerals in Georgia, the trona operations of a major U.S. producer, the $100+ million oil and gas subsidiary of a major public company, the mineral properties involved in an exchange of assets between Hanson Industries and Santa Fe Pacific Corporation, the shares in a construction and quarrying company in Kentucky, the simultaneous appraisal of 36 crushed stone and aggregate producing properties in 11 states; the phosphate and potash reserves in the merger of IMC Global and Cargill Crop Nutrition's operations; and a variety of undeveloped and developed coal properties throughout the U.S.

Mr. Stagg provides **expert witness and litigation support** for law firms involved in natural resource litigation and arbitration. He has participated as an expert witness in more than 80 matters, testifying on reserve/resource determination, lost coal issues, operational and cost issues, contractual issues, hydrologic issues, economic feasibility, and valuation issues in a variety of venues throughout the U.S. Examples of cases in which he has provided these services include three complex suits involving the Kaiser Steel bankruptcy, two suits involving a series of coal-related limited partnerships, a variety of lost coal claims, the valuation of the

shares in a natural resource-holding company in a dissenting shareholder's action; a number of condemnation and takings cases; and a claim of tortious interference and resulting damages in the breach of a coal sales contract. He has also served as a party-selected arbitrator in a number of arbitration proceedings.

During the early period of his firm, Mr. Stagg developed and implemented coal acquisition programs for a number of major corporate clients, conducted detailed reserve studies on various coal properties, and conducted a variety of regional studies involving coal transportation, marketing, and related items. Other work during this period included such projects as the investigation and evaluation of uranium and tungsten prospects in the western United States and providing consulting services in the central Tennessee zinc district.

In the late 1970's, Mr. Stagg expanded his consulting activities and diversified the services his firm provided. In January 1980, he incorporated Stagg Engineering Services, Inc. and simultaneously acquired a professional surveying firm in Tennessee. The affiliated consulting firms provided geologic, engineering, surveying, acquisition, and technical services to a broad spectrum of the natural resource industry. In 2001, Mr. Stagg changed his firm's name to Stagg Resource Consultants, Inc., a name that more adequately reflects the expansion of the firm's services in economic evaluation and analysis, appraisal, litigation support, and cost, capacity and pricing studies.

Prior to beginning his consulting practice, Mr. Stagg was employed by the New Jersey Zinc Company from June 1964 to January 1975. His initial assignment was geologist in the company's newly-begun zinc exploration program in central Tennessee and southern Kentucky, where his responsibilities included supervising diamond core drills, logging and sampling core, logging and interpreting cuttings, and negotiating for mineral leases. In July 1968, having become resident geologist, he was given the responsibility for the supervision of the exploration program that included twenty-five diamond core drills and involved the management of three field offices. These offices employed approximately twenty-five professional, technical, and secretarial personnel and as many as fifteen contract landmen. In the course of this program, more than 600,000 acres of mineral rights were leased and approximately one million feet of core drilled. This program resulted in the discovery and development of a major zinc district.

During 1971, Mr. Stagg designed and implemented a coal acquisition program in the Appalachian Coal Field for the Zinc Company and was responsible for locating, evaluating, and negotiating for the acquisition of coal properties. In September 1972, he was appointed regional geologist, and the coal program was expanded to include the western United States. In October 1974, he was appointed manager – coal. During the course of the coal program, Mr. Stagg also

worked with several of the Zinc Company's affiliated companies in their coal programs.

## EDUCATION

Mr. Stagg received the Bachelor of Science degree in geology from the University of Tennessee in 1963. He was enrolled in the university's masters program for one year prior to beginning his professional career. Continuing education includes the following workshops, short courses and seminars:

- *AAI and Liability: Prepare, Preserve and Protect*—Environmental Data Resources, Inc. workshop (2005)
- *Basic Carbonate Geology*—Petroleum Technology Transfer Council workshop (2005)
- *Taxation of Mining Operations*—Ernst & Young LLP annual short course (2004)
- *Economic and Financial Analysis* – Stagg Resource Consultants, Inc. workshop for its staff and associates (2004)
- *Economic and Financial Analysis – Successful Development, Practical Application*—Rocky Mountain Coal Mining Institute annual short course (2004)
- *Taxation of Mining Operations*—Ernst & Young LLP annual short course (2003)
- *Mining Costs: Identifying, Understanding, and Controlling Them*—Rocky Mountain Coal Mining Institute annual short course (2003)
- *Fundamentals of Geology and Applied Geology*—Pennsylvania Council of Professional Geologists annual short course (2003)
- *Environmental Issues in an Evolving World: Staying Abreast of Mining Industry Needs*—Rocky Mountain Coal Mining Institute annual short course (2002)
- *Mining Hydrology*—Society for Mining, Metallurgy, and Exploration short course (2001)
- *A Review of Geology for the Practicing Geologist*—Pennsylvania Council of Professional Geologists annual short course (2001)
- *Powder River Basin Coal Use*—Western Coal Council and PHB Hagler Bailly seminar (2000)
- *Standards of Professional Practice–Part A (USPAP)*—Utah Chapter of the Appraisal Institute course (1995)

- *Mine and Quarry Valuation*—The International Association of Assessing Officers workshop (1994)
- *Karst Hydrogeology*—Environmental Education Enterprises short course (1993)
- *The Legal Implications of Environmental Site Assessments*—The National Water Well Association short course (1992)
- *Environmental Auditing*—Federal Publications short course (1989)
- *Coal Property Acquisition and Technical Updates*—Kentucky Institute for Mining and Mineral Research seminar
- *Annual mineral law seminars*—University of Kentucky College of Law
- *Cost Estimating*—West Virginia University short course (1981)
- *Finance and Accounting for the Non-Financial Executive*—Wharton School of Business short course (1979)
- *Economic Evaluation and Investment Decision-Making Methods*—Colorado School of Mines short course (1978)
- *Well logging Techniques and Analysis*—University of Tennessee at Nashville short course (1970)
- *Three-hour course in statistics*—Middle Tennessee State University (1967)
- *Carbonate Petrology*—University of Missouri short course (1966)

## PROFESSIONAL MEMBERSHIPS

Mr. Stagg holds membership in the following professional organizations:

- The Society of Economic Geologists
- Society for Mining, Metallurgy, and Exploration, Inc.
- The Appalachian Geological Society
- American Institute of Minerals Appraisers
  (Treasurer – 2004, 2005)

**ALAN K. STAGG, PG, AIMA**
**PRINCIPAL ECONOMIC GEOLOGIST**

## ASSOCIATION MEMBERSHIPS

Through his firm or individually, Mr. Stagg holds membership in the following industry associations:

- Colorado Mining Association
- Illinois Mining Institute
- Kanawha Valley Mining Institute, Inc.
- Kentucky Coal Association
  (Member – Board of Directors, 1991 through 2003)
- National Stone, Sand and Gravel Association
- Northwest Mining Association
- Rocky Mountain Coal Mining Institute
  (Continuing Education Chair, 2002 through 2004)
- West Virginia Coal Association
- West Virginia Land & Mineral Owners Council

## PROFESSIONAL REGISTRATIONS

Mr. Stagg is a Registered or Licensed Professional Geologist in the following states:

- Alabama — Registration No. 623
- Arkansas — Registration No. 1258
- Illinois — Registration No. 196-000820
- Indiana — Registration No. 2059
- Kentucky — Registration No. 953
- New Hampshire — Registration No. 719
- North Carolina — Registration No. 943
- Pennsylvania — Registration No. PG-000787-G
- Tennessee — Registration No. 607
- Texas — Registration No. 1191
- Utah — Registration No. 5326440-2250

- Virginia — Registration No. 512
- Washington — Registration No. 1937
- Wyoming — Registration No. PG-761

## PROFESSIONAL CERTIFICATIONS

Mr. Stagg holds the following certifications:

- Certified Minerals Appraiser No. 2003-1
  American Institute of Minerals Appraisers
- State Registered Appraiser No. SR2978N
  Arkansas Appraiser Licensing and Certification Board

## WORKSHOP AND SEMINAR INSTRUCTION

Mr. Stagg has participated as an instructor at the following workshops and seminars:

- Short Course – *Taxation of Mining Operations*

  Presenter on resource/reserve classification systems, public reporting issues, and reserve valuation techniques at annual short course presented by Ernst & Young LLP, Tempe, Arizona, November, 2004.

- Short Course -- *Economic and Financial Analysis – Successful Development, Practical Application*

  Chairman and instructor for an IACET-accredited short course presented at the Rocky Mountain Coal Mining Institute's 100th Annual Meeting and Convention, Snowbird Resort, Utah, June 2004.

- Short Course – *Taxation of Mining Operations*

  Presenter on resource/reserve classification systems, public reporting issues, and reserve valuation techniques at annual short course presented by Ernst & Young LLP, San Francisco, California, October 2003.

**ALAN K. STAGG, PG, AIMA**
**PRINCIPAL ECONOMIC GEOLOGIST**

- Short Course—*Mining Costs: Identifying, Understanding, and Controlling Them*

  Chairman and an instructor for an IACET-accredited short course presented at the Rocky Mountain Coal Mining Institute's 99th Annual Meeting and Convention, Copper Mountain, Colorado, June 2003

- Short Course—*Environmental Issues in an Evolving World: Staying Abreast of Mining Industry Needs*

  Chairman and an instructor for an IACET-accredited short course presented at the Rocky Mountain Coal Mining Institute's 98th Annual Meeting and Convention, Breckenridge, Colorado, June 2002

- Workshop—*The Economic Evaluation of Mineral Properties*

  Instructor to representatives of the Ministry of Mines and Geology, People's Republic of China, Beijing, China, December 1997

- Workshop—*The Economic Evaluation of Mineral Properties*

  Instructor to delegation from the Ministry of Mines and Geology, People's Republic of China, Helena, Montana, October 1997

Additionally, Mr. Stagg has participated as a course instructor in the following seminar:

- ES 300 Environmental Science Seminar II

  Two modules on Environmental Site Assessments and Audits
  Marshall University, Huntington, West Virginia

## PUBLICATIONS/PROFESSIONAL PAPERS

Mr. Stagg has authored the following published papers:

- *Coal as a Competing Fuel Source*, Natural Gas & Electricity, Hoboken, New Jersey, January 2006, pp. 13-18
- *The Appraisal of Mining Enterprises: Understanding and Meeting the Challenges*, The Journal of Business Valuation, Toronto, Ontario, Canada, October 2002, pp. 255-269
- *Safety in the Coal Industry – A Perspective,* American Coal, Arvada, Colorado, April 2003, pp. 39-41.

**ALAN K. STAGG, PG, AIMA**
**PRINCIPAL ECONOMIC GEOLOGIST**

- *Industry Review, End of a Century*, World Coal, Farnham, Surrey, UK, December 1999, pp. 8-13.
- *U.S. East Coast Report*, World Coal, Farnham, Surrey, UK, August 1999, pp. 10-16.
- *Western U.S. Coal: Investing in the Future*, World Coal, Farnham, Surrey, UK, June 1998, pp. 12-20.
- *Supply & Cost Dynamics for U.S. Coal,* World Coal, Dorking, Surrey, UK, June 1996, pp. 40-47.
- *A Contemporary View of Compliance Steam Coal,* The Mining Record, Englewood, Colorado, July 1995, p. 8.

Mr. Stagg has authored or co-authored the following unpublished papers:

- *The Big Picture: Current and Future Coal Economics*, presented at the Institute for Rural Journalism and Community Issues' conference titled "Covering Coal – A Conference for Journalists in Central Appalachia," South Charleston, West Virginia, November 18, 2005.
- *Factors Influencing Fuel Supply Patterns*, presented at EUCI's conference titled "Coal: Volatile Markets & New Fuel Supply Patterns, Strategies for Addressing Coal Markets in Flux," Denver, Colorado, February 23, 2005.
- *The Next Generation of Coal Reserves: Will We Know Them When We See Them,* presented at Platts' 12th Annual Coal Properties and Investment Conference, Bal Harbour, Florida, March 15, 2004.
- *Reserves: The Cornerstone of Any Mineral Appraisal*, presented at the annual meeting of the Society of Mining, Metallurgy, and Exploration, Inc., Denver, Colorado, February 24, 2004.
- *The Appraisal of Mining Enterprises: Understanding and Meeting the Challenges,* presented at the ASA/CICBV 5th Joint Advanced Business Valuation Conference, Orlando, Florida, October 25, 2002.
- *Leasehold Estates and the Right to Mine: Obtaining Full Value in the Condemnation of Mining Properties*, presented at the annual meeting of the Society of Mining, Metallurgy, and Exploration, Inc., Phoenix, Arizona, March 2, 2002
- *Coal Supply Developments in Utah and Western Colorado*; presented at Western Coal Council's 2001 Spring Pacific Coal Forum, Park City, Utah, June 5, 2001.

- *Standards of Value and Appraisal Techniques—Making the Appropriate Selection;* presented at the annual meeting of the Society of Mining, Metallurgy, and Exploration, Inc., Denver, Colorado, February 27, 2001.
- *Operating Issues Related to Mountaintop Removal and Reclamation in West Virginia*, presented at the annual meeting of the Society of Mining, Metallurgy, and Exploration, Inc., Salt Lake City, Utah, March 1, 2000.
- *Powder River Basin Coal Leases: The Next Generation*, presented at the Western Coal Council 1999 Coal Market Strategies meeting, Santa Fe, New Mexico, October 12, 1999.
- *Montana's Northern Powder River Basin: Whither Thou Goest?*, presented at the Western Coal Council 1998 Spring Coal Forum, Billings, Montana, June 18, 1998.
- *Below Drainage Coal Beds: The Past or the Future?*, presented at Coal Outlook's Coal Properties: Evaluating, Buying, and Selling meeting, St. Petersburg, Florida, March 26, 1998.
- *The Appraisal of Mineral Properties: Selecting the Appropriate Technique*, presented at Valuation Research Corporation's Pan American Affiliates Annual Meeting, San Juan, Puerto Rico, October 13, 1997.
- *Preparation of Coal Reserve/Resource Estimates – A Consultant's Perspective*, presented at the Eastern Section of the American Association of Petroleum Geologists and TSOP Joint Meeting, Lexington, Kentucky, September 29, 1997.
- *Overview of Western U.S. Coal Production and Export Potential,* presented at the 1997 Pacific Coal Forum, Park City, Utah, June 25, 1997.
- *U.S. Coal Mine Production and Productivity: How Did We Get Here and Where Are We Going?,* presented at the National Energy Modeling System, Energy Information Administration, Annual Energy Outlook Conference, Crystal City, Virginia, March 1997.
- *Montana's Coal Industry—What Does The Future Hold?* presented at the Montana Coal Council's annual meeting, Whitefish, Montana, July 16, 1996.
- *Coal Supply Developments in Montana—A Current Perspective,* presented at the Western Coal Council Spring Meeting, Gillette, Wyoming, May 1996.

## ALAN K. STAGG, PG, AIMA
## PRINCIPAL ECONOMIC GEOLOGIST

- *U.S. Coal Production for the Next Decade: Where Will It Come From & What Will It Cost?,* presented at the Mississippi Valley Coal Trade & Transport Council, Fourteenth Annual World Coal Conference, New Orleans, Louisiana, February 1996.
- *Overview of the Russian Coal Industry,* presented at Coal Outlook's Evaluating, Buying and Selling Coal Properties meeting in Pittsburgh, Pennsylvania, March 1994.
- *Environmental Site Assessments in the Acquisition of Industrial Mineral Assets,* presented at the annual meeting of the Society of Mining, Metallurgy, and Exploration, Inc., Albuquerque, New Mexico, February 1994.
- *Investment Value Versus Fair Market Value, The Appraisal of Mineral Properties,* presented at the fall meeting of the Central Appalachian Section of the Society of Mining, Metallurgy, and Exploration, Inc., White Sulphur Springs, West Virginia, October 1993.
- *Environmental Site Assessments and Audits, The What, Whys, and Hows of Conducting Them,* presented at the annual meeting of the National Council of Coal Lessors, Inc., Washington, D.C., April 1993.
- *Investment Value Versus Fair Market Value, The Appraisal of Mineral Properties,* presented at the annual meeting of the Society of Mining, Metallurgy, and Exploration, Inc., Reno, Nevada, February 1993.
- *Acquisitions and Sales: The Consultant's Role on Each Side of the Fence—Buyer and Seller,* presented at the Annual Convention & Judicial Conference of the Kentucky Bar Association, Louisville, Kentucky, June 1991.
- A paper on exploration methods and procedures for coal, presented at the fall meeting of the Central Appalachian Section of the Society of Mining, Engineers of the AIME, White Sulphur Springs, West Virginia, October 1979.
- *Spring Field Trip Guide Book*, *Flynn Creek Structure, Jackson County Tennessee*, Safford Centennial Society, Tennessee Academy of Science – Geology Division Field Trip, with Fischer, F.T., March 1973.
- *Stones River Group Stratigraphy of Middle Tennessee,* presented at the Tennessee Academy of Science fall meeting, Murfreesboro, Tennessee, November 1971.
- *Upper Knox Stratigraphy of Central Tennessee and Southern Kentucky,* presented at the Geological Society of America annual meeting, Milwaukee, Wisconsin, October 1971.

**ALAN K. STAGG, PG, AIMA**
**PRINCIPAL ECONOMIC GEOLOGIST**

In the course of his consulting work, Mr. Stagg has authored or co-authored more than 500 unpublished reports covering the entire spectrum of his consulting activities.

GEOLOGICAL SURVEY CIRCULAR 891

# Coal Resource Classification System of the U.S. Geological Survey

QE75
.C5
NO.891
TN805.A4
COPY 3

# Coal Resource Classification System of the U.S. Geological Survey

By Gordon H. Wood, Jr., Thomas M. Kehn, M. Devereux Carter, and William C. Culbertson

GEOLOGICAL SURVEY CIRCULAR 891

1983

**United States Department of the Interior**
JAMES G. WATT, *Secretary*

**Geological Survey**
Dallas L. Peck, *Director*

*Free on application to Distribution Branch, Text Products Section,
U. S. Geological Survey, 604 South Pickett Street, Alexandria, VA 22304*

## FOREWORD

In order to use coal resource terms with precision and common understanding and to compare resource data effectively, the authors developed a standardized, definitive, broadly applicable classification system to derive uniform, coordinated coal resource estimates. The principles of the system for all mineral resources are given in USGS Circular 831. Personnel engaged in coal resources work are to use the definitions, criteria, guidelines, and instructions incorporated in this coal resource classification system in all U.S. Geological Survey publications.

Director, Geological Survey

# CONTENTS


| | Page |
|---|---|
| Introduction | 1 |
| History of the classification system | 1 |
| Coal resource classification system | 2 |
| Glossary of coal classification system and supplementary terms | 4 |
| Criteria for coal resource classification | 23 |
| Applications of criteria | 23 |
| Specific criteria | 24 |
| Guidelines for estimating coal resources | 32 |
| General guidelines for classification of coal resources | 32 |
| Specific Instructions | 33 |
| 1. Rank of coal | 33 |
| 2. Overburden | 33 |
| 3. Thickness of coal categories | 34 |
| 4. Size of unit area | 34 |
| 5. Major categories of resources | 34 |
| 6. Coal bed maps | 34 |
| 7. Thickness of coal measurements | 35 |
| 8. Distribution of coal bed thickness measurements | 35 |
| 9. Measurement of areas | 35 |
| 10. Weight of coal per unit volume | 36 |
| 11. Calculation of coal resources | 36 |
| 12. Rounding of tonnage estimates | 36 |
| 13. Estimation of resources in the vicinity of where a coal bed bifurcates into two or more tongues | 36 |
| Estimation of hypothetical resources | 37 |
| Extrapolated bed map method | 37 |
| Extrapolated coal zone method | 38 |
| Examples illustrating the basic geometric principles of constructing coal resource bed maps | 38 |
| Geophysical logs as a source of coal bed data | 46 |
| Electric logs | 51 |
| SP log | 51 |
| Normal and lateral logs | 51 |
| Focusing-electrode and induction logs | 51 |
| Discussion of electric logs | 53 |
| Gamma ray log | 53 |
| Density log | 53 |
| Neutron log | 55 |
| Acoustic velocity log | 55 |
| Measurement of the coal bed thickness | 55 |
| Composition and rank of coal | 61 |
| Stratigraphy and structure | 62 |
| Summary | 62 |
| Intended audience | 63 |
| References | 64 |

# ILLUSTRATIONS


Page

FIGURE 1. Format and classification of coal resources by reserves and subeconomic resources categories — 4
2. Format and classification of coal resources by reserve and inferred reserve bases and subeconomic and inferred subeconomic resources categories — 4
3. Flow chart showing hierarchy of coal resources and criteria for distinguishing resource categories — 6
4. Diagram showing reliability categories based solely on distance from points of measurement — 11
5–8. Maps showing:
5. Coal fields of the conterminous United States — 13
6. Coal fields of Alaska — 14
7. Coal regions of the conterminous United States — 15
8. Coal provinces of the conterminous United States — 16
9–21. Diagrams showing:
9. Determination of areas of reliability using coal thickness data only at points of measurement along outcrop line — 39
10. Determination of areas of reliability from points of measurement on the outcrop line, supplemented by mine and drill-hole data — 41
11. Determination of areas of reliability using coal thickness measurements taken along a continuously exposed, strip-mined bed, supplemented by drill-hole data — 42
12. Determination of minimum thickness isoline — 43
13. Determination of areas of reliability and overburden thickness — 44
14. A ridge with construction of 14-inch minimum thickness limit — 45
15. Same ridge as figure 14 with areas of reliability, coal thickness isopachs, and overburden contour — 46
16. A simple valley reentrant with construction of 14-inch minimum thickness limit — 47
17. Areas of reliability, overburden contours, and coal thicknessisopachs to accompany figure 16 — 48
18. A valley and ridge with part of coal bed less than minimum thickness but within determined 14-inch limit as illustrated in figure 16 — 49
19. Areas of reliability, overburden contours, and coal thickness isopachs to accompany figure 18 — 50
20. Coal categories in plane of coal bed, a structure section, and coal categories as viewed projected to the ground surface from plane of coal bed — 52
21. Areas of resource categories for a flatlying coal bed based on data only from underground mined areas and drill holes — 54
22–23. Maps showing:
22. A small coal basin divided into areas of coal resource categories — 56
23. A large, simple coal basin divided into areas of coal resource categories — 57
24. Suggested form for recording coal resource data and calculated tonnage estimates — 58
25. Suggested format for tabulating data and calculating tonnages — 59
26. Early conventional electric log (1957) of the Owanah Kendrick No. 1 well, Big Horn County, Montana — 60
27. Induction and conductivity geophysical logs (1960) of the Hose-Austin Drilling Company from Bone Brothers No. 1 well, Rosebud County, Montana — 61
28. Examples of oil- and gas-well geophysical logs from western Kentucky that can be used for coal bed correlations and coal resource evaluations — 62
29. SP, gamma ray, acoustic velocity, normal resistivity, and induction conductivity logs (1971) from Davis Oil Grady Fed No. 1-2 well, Sweetwater County, Wyoming — 63
30. SP, gamma ray, density, dual induction-lateral log, and neutron logs (1978) from Getty Tri-County No. 1 well, Rosebud County, Montana — 64
31. Five geophysical logs of a coal exploration drill hole showing response to coal and limestone — 65

## TABLES


| | | Page |
|---|---|---|
| TABLE 1. | Classification of coals by rank | 17 |
| 2. | Average specific gravity and average weight of unbroken coal per unit volume of different ranks | 22 |
| 3. | Summary of coal resource criteria | 24 |
| 4. | Areas of reliability from figure 13 listed by overburden and coal thickness categories, and by counties | 45 |
| 5. | Areas of reliability from figure 15 listed in proper overburden and coal thickness categories | 47 |
| 6. | Areas of resource categories from figure 17 listed in proper reliability and thickness of coal and overburden categories | 49 |
| 7. | Areas of resource categories from figure 19 listed in proper reliability and thickness of coal and overburden categories | 51 |

# Coal Resource Classification System of the U.S. Geological Survey

By GORDON H. WOOD, JR., THOMAS M. KEHN, M. DEVEREUX CARTER, and WILLIAM C. CULBERTSON

## INTRODUCTION

Coal is the most abundant fossil fuel in the United States. Knowledge of the size, distribution, and quality of the Nation's coal resources is important for governmental planning; industrial planning and growth; the solution of current and future problems related to air, water, and land degradation; and for meeting the short- to long-term energy needs of the country. Knowledge of the Nation's coal resources is also important in planning for the exportation and importation of fuel.

Many estimates have been made of the coal resources of the Nation, the resources of other nations, and for the world as a whole. Because of differing systems of resource classification, these estimates vary greatly in magnitude within this Nation and other nations; geologic analysis shows some of these estimates to be little more than educated guesses. The accompanying coal resource classification system of the U.S. Geological Survey is recommended as an aid in solving the problems caused by the differing systems.

A detailed resource classification system should identify deposits of coal by areal location, distance from points of information, thicknesses of coal and overburden, rank and quality, and estimates of quantity. Classes in the system, furthermore, should impart some idea as to economic, technologic, legal, and environmental factors affecting the availability of coal.

A coal resource classification system was published jointly by the U.S. Bureau of Mines and the U.S. Geological Survey in 1976 as Geological Survey Bulletin 1450–B and was believed to be a successful modification of an already existing system into the ideal system. However, Bulletin 1450–B left unanswered many questions concerning how to estimate coal resources and did not provide sufficient criteria, guidelines, and a methodology so that comparable estimates would be obtained by all workers using the same data.

The Survey and the Bureau of Mines decided in 1977 that the coal resource classification system, as outlined in Bulletin 1450–B, should be revised and expanded to provide a more definitive and less ambiguous coal resource classification system. The revision was to document standard definitions, criteria, guidelines, and methods to be used in estimating coal resources. Standardization of the elements of the system should result in comparable estimates by different workers using the same data.

In 1980, the two agencies published Circular 831, "Principles of a Resource/Reserve Classification for Minerals" (U.S. Geological Survey, 1980). The circular, which outlines a classification system for all mineral commodities, filled the classification needs of the Bureau of Mines, which was no longer responsible for coal resource classification, and was the basis for this revision of the coal resource classification system by the Geological Survey. The revision, embodied in this report, has two main objectives: (1) to provide detailed information lacking in Bulletin 1450–B; and (2) to provide standard definitions, criteria, guidelines, and methods required for uniform application of the principles outlined in Circular 831.

## HISTORY OF THE CLASSIFICATION SYSTEM

Almost since their inceptions in 1879 and 1920, respectively, the U.S. Geological Survey and the U.S. Bureau of Mines have conducted modest ongoing programs in coal resource estimation and analysis. Between

1909 and World War II, tonnage estimates of the coal resources and reserves of the United States were summary totals derived for areas from estimates that were calculated by gross statistical methods. These early estimates were inadequate for the needs of the 1940's because they did not separate thin from thick coal beds, distinguish shallow from deeply buried coal, separately quantify identified resoures and undiscovered resources, or discriminate the quality and rank of coal on the basis of physical and chemical criteria.

After World War II, requests from the public indicated the need for more detailed information about the occurrence, distribution, and availability of the Nation's coal resources. These requests indicated that a more detailed coal classification system was needed and that it should be based on bed-by-bed analysis of thicknesses of coal and overburden, reliability (distance from control points) of areal data, rank of coal, and several chemical parameters related to determining quality and usage. As a result, ongoing programs of the Geological Survey and the Bureau of Mines for geologic mapping and engineering evaluation were expanded, and programs for appraising the coal resources of the Nation on a State-by-State and a bed-by-bed basis were initiated.

After much consultation with potential users, the Geological Survey and the Bureau of Mines revised their procedures and prepared new definitions, criteria, and guidelines to be followed in estimating coal resources. The main elements of the programs used after World War II to 1976 were as follows:

1. Estimates of resources and reserves were based on existing information. Initially, attempts were not made to estimate the Nation's total coal resources or reserves; however, such estimates were long-term objectives.
2. Estimates of resources and reserves were prepared on a State-by-State basis.
3. Estimates of resources and reserves were divided into precisely defined categories such as rank, thicknesses of coal and overburden, and distance from points of information.

The estimates of coal resources and reserves from World War II to 1976 were prepared in formats suitable for use by geologists and engineers, coal specialists, and economists working for the coal industry and government. These formats included geologic maps, coal bed maps, tables, and diagrams of resource and reserve data segregated into categories suitable for comparison with similarly categorized data from other sources.

Experience with the classification system utilized from World War II until 1976 gradually showed the need for still greater detail. It also showed the need for rigidly enforced standards that would lessen individual geologic and engineering judgments in the interpretation of data and methods. Adoption of such standards should result in reproducible and comparable estimates from the same data and would allow adoption of computer technology.

In 1976, the Geological Survey and the Bureau of Mines adopted a modification of the 1944–75 system by publishing U.S. Geological Survey Bulletin 1450–B titled "Coal Resource Classification System of the U.S. Bureau of Mines and U.S. Geological Survey." This bulletin has been the standard reference for coal resource/reserve work by many Federal and State agencies.

## COAL RESOURCE CLASSIFICATION SYSTEM

The classification system presented herein is an expansion of the system adopted in 1976. It employs a concept by which coal is classified into resource/reserve base/reserve categories on the basis of the geologic assurance of the existence of those categories and on the economic feasibility of their recovery. Categories are also provided for resources/reserve base/reserves that are restricted because of legal, environmental, or technologic constraints. Geologic assurance is related to the distance from points where coal is measured or sampled; thicknesses of coal and overburden; knowledge of the rank, quality, depositional history, areal extent, and correlations of coal beds and enclosing strata; and knowledge of the geologic structure. Economic feasibility of recovery is affected not only by such physical and chemical factors as thicknesses of coal and overburden, quality of coal, and rank of coal, but also by economic variables—such as price of coal, cost of equipment, mining, labor, processing, transportation, taxes, and interest rates, demand for and supply of coal, and weather extremes—and by environmental laws, restrictions, and judicial rulings. For example, the Clean Air Act of 1970 issued standards that severely limited the emission of sulfur by new coal-burning powerplants and, as a result, made the low-sulfur, low-rank coal deposits of the Northern Great Plains economically competitive. Similarly, environmental restrictions on the surface mining of coal and the need for adequate reclamation of mined areas has adversely affected the economic and technologic feasibility of extracting coal from some near-surface deposits.

The classification system is designed to quantify the

total amounts of coal in the ground before mining began (original resources) and after any mining (remaining resources). It is also designed to quantify the amounts of coal that are known (identified resources) and the amounts of coal that remain to be discovered (undiscovered resources). The system also provides for recognizing amounts of coal that are (1) standard distances from points of thickness measurements—measured, indicated, inferred, and hypothetical; (2) similar to coal currently being mined (reserve base and inferred reserve base); (3) economically recoverable currently (reserves and inferred reserves); (4) potentially recoverable with a favorable change in economics (marginal reserves and inferred marginal reserves); and (5) subeconomic because of being too thin, too deeply buried, or lost-in-mining. Finally, the system allows tabulation of coal amounts that are restricted from mining by regulation, law, or judicial ruling.

Two factors have created difficulties in categorizing resources and reserves in all classification systems. First, most geologists and engineers who classify resources and reserves are not experts in the economics of mining, transportation, processing, and marketing. Second, economic conditions change with time, so that the economic viability of coal is relatively fluid. For example, subeconomic resources of today can become reserves of tomorrow as the price of coal rises; conversely, reserves can become subeconomic resources as the price of coal drops. Finally, changing regulations, laws, and judicial rulings can affect mining, transportation, processing, and marketing, and thus the classification of coal resources. The concept of a reserve base was developed to alleviate these difficulties (U.S. Geological Survey, 1976, p. B2).

The reserve base is identified coal defined only by physical and chemical criteria such as thicknesses of coal and overburden, quality, heat value, rank, and distance from points of measurement. The criteria for thickness of coal and for overburden have been selected so that the reserve base includes some currently subeconomic coal. The concept of the reserve base is to define a quantity of in-place coal, any part of which is or may become economic depending upon the method of mining and the economic assumptions that are or will be used. An additional purpose is to aid in long-range public and commercial planning by identifying coal suitable for economic recovery.

Thus, resource specialists need not expend their time identifying the component parts of coal deposits that are currently economically recoverable (reserves) because the reserve base category contains much of the coal that will be classed as reserves in the foreseeable future. Those required to classify coal as being economically recoverable, marginally recoverable, or subeconomic can examine reserve base estimates to locate such coal.

Figures 1 and 2 are conceptual diagrams modified from Circular 831 (U.S. Geological Survey, 1980) that show the relationship of the various classes of coal resources, the reserve base, and reserves. The classes are categorized in both figures according to their degree of geologic assurance (geologic assurance or proximity to points of control increases to the left), and according to their degree of economic feasibility of recovery (economic feasibility of mining increases upward). The resource/reserve base/reserve categories (classes) that can be used are not limited to those shown in figures 1 and 2 nor to the categories described in succeeding pages. For example, a particular bed of coal may be identified as being low-sulfur (0–1 percent), low-ash (0–8 percent), high-volatile A bituminous, and premium coking coal; other beds of coal may be identified as medium-sulfur (1.1–3.0 percent), high-ash (>15 percent), high-volatile bituminous, surface-minable cannel coal, and so forth. The ability of the classification system to precisely describe the characteristics of a body of coal allows the coal resources of the United States to be divided into many hundred resource classes or categories.

The hierarchy of coal resources shown in figure 3 illustrates the conceptual relationships between the classes of resources as distinguished by their definitions and criteria. Examination of figures 1, 2, and 3 makes clear that each succeeding class in the hierarchy from original and remaining resources to reserves is included in the overlying classes. Original resources include remaining resources and cumulative depletion. Remaining resources include identified and undiscovered resources (divisible into hypothetical and speculative resources). Identified resources include measured, indicated, inferred, and demonstrated resources. Measured and indicated resources contain coal classed as reserve base, and inferred resources contain coal classed as inferred reserve base. Some measured, indicated, and inferred resources are subeconomic because they are too thin to mine or are buried too deeply to be mined by current extraction techniques; furthermore, parts of the reserve base and inferred reserve base are potentially subeconomic because they will be lost-in-mining. Reserves and inferred reserves are economically minable as of the time of classification. The reserve base and inferred reserve base also contain some coal that is believed to be potentially economic and which is classed as marginal and inferred marginal reserves.




A PORTION OF RESERVES OR ANY RESOURCE CATEGORY MAY BE RESTRICTED FROM EXTRACTION BY LAWS OR REGULATIONS.

FIGURE 1.—Format and classification of coal resources by reserves and subeconomic resources categories.




A PORTION OF RESERVES OR ANY RESOURE CATEGORY MAY BE RESTRICTED FROM EXTRACTION BY LAWS OR REGULATIONS.

FIGURE 2.—Format and classification of coal resources by reserve and inferred reserve bases and subeconomic and inferred subeconomic resources categories

## GLOSSARY OF COAL CLASSIFICATION SYSTEM AND SUPPLEMENTARY TERMS

Some of the following general definitions of coal resources and supplementary terms are amplified elsewhere in this report by criteria and guidelines for usage. The criteria and guidelines may be revised periodically to reflect changing national needs without affecting the definitions.

All definitions herein refer only to usage in this coal resources classification system and are not intended as definitions of the terms relative to any other usage.

Comparative values for units in the metric and English (U.S. Customary) systems of measurement are based on the Handbook of Chemistry and Physics by R. C. Weast (1971, p. F-242–F-263).

---

Note.—Glossary terms and specific criteria are cross-referenced within this report. To aid the reader, glossary items, beginning below, are printed in **boldface** type, and specific criteria, beginning on p. 24, are printed in ***boldface italics***.

---

**accessed.**—Coal deposits that have been prepared for mining by construction of portals, shafts, slopes, drifts, and haulage ways; by removal of overburden; or by partial mining. See **virgin coal**.

**acre.**—A measure of area in the United States: 43,560 square feet; 4,840 square yards; 4,046.856 square meters; 0.4046856 hectare; 0.0015625 square mile; 0.0040468 square kilometer.

**acreage.**—The number of acres at the ground surface

**acre-foot (acre-ft).**—The volume of coal that covers 1 acre at a thickness of 1 foot (43,560 cubic feet; 1,613.333 cubic yards; 1,233.482 cubic meters). The weight of coal in this volume varies according to **rank**.

**acre-inch (acre-in.).**—The volume of coal that covers 1 acre at a thickness of 1 inch (3,630 cubic feet; 134.44 cubic yards; 102.7903 cubic meters). The weight of coal in this volume varies according to **rank**.

**agglomerating.**—Coal that, during volatile matter determinations, produces either an agglomerate button capable of supporting a 500-gram weight without pulverizing, or a button showing swelling or cell structure.

**anthracite** or **anthracitic.**—A rank class of nonagglomerating coals as defined by the American Society for Testing and Materials having more than 86 percent fixed carbon and less than 14 percent volatile matter on a dry, mineral-matter-free basis. (*Anthracite* is preferred usage). This class of coal is divisible into the semianthracite, anthracite, and meta-anthracite groups on the basis of increasing fixed carbon and decreasing volatile matter. (See table 1.)

**ash.**—The inorganic residue remaining after complete incineration of coal.

**ash content.**—The percentage of a laboratory sample of coal remaining after incineration to a constant weight under standard conditions following D-2795-69 (ASTM, 1981, p. 335–342).

**ash free.**—A theoretical analysis calculated from basic analytical data expressed as if the total ash had been removed.

**as-received condition** or **as-received basis.**—Represents an analysis of a sample as received at a laboratory.

**assess.**—To analyze critically and judge definitively the geologic nature or economic potential, significance, status, quality, quantity, potential usability, and other aspects of coal resources and reserves.

**assessment.**—A critical analysis based on integrating, synthesizing, evaluating, and interpreting all available data aimed at a judgment of the geologic nature or economic potential of the coal resources and reserves of an area, field, district, basin, region, province, county, state, nation, continent, or the world. An *assessment* differs from an estimate, which is a determination of the amount of coal in an area. An estimate or estimates may be the principal data used to assess the coal resources and reserves of an area. See **economic assessment** and **geologic assessment**.

**auger mining.**—A method often associated with contour strip mining to recover additional coal after the overburden to coal ratio has become too great for further contour mining. Coal is produced by boring into the coal bed much like a carpenter's wood bit bores into wood. An auger consists of a cutting head and screw-like extensions.

**bed.**—All the coal and partings lying between a roof and floor. The terms "seam" and "vein" should not be used.

**bench.**—A subdivision and (or) layer of a coal bed separated from other layers by partings of non-coal rock.

**bituminous coal.**—A rank class of coals as defined by the American Society for Testing and Materials (ASTM) high in carbonaceous matter, having less than 86 percent fixed carbon, and more than 14 percent volatile matter on a dry, mineral-matter-free basis and more than 10,500 Btu on a moist, mineral-matter-free basis. This class may be either agglomerating or nonagglomerating and is divisible into the high-volatile C, B, A; medium; and low-volatile bituminous coal groups on the basis of increasing heat content and fixed carbon and decreasing volatile matter. (See table 1.)

**bone coal** or **bone.**—Impure coal that contains much clay or other fine-grained detrital mineral matter (ASTM, 1981, D-2796, p. 344). See **impure coal**.

*Discussion*: The term *bone coal* has been erroneously used for cannel coal, canneloid coal, and well-cemented to metamorphosed coaly mudstone and (or) claystone. *Bone coal* has also been applied to carbonaceous partings. The term "impure coal" accompanied by adjective modifiers such as "silty,"






FIGURE 3.—Heirarchy of coal resources and




1. Coal resource terms are defined in glossary.
2. Resources before mining.
3. 500 ft., 1000 ft., and 6000 ft. Depth of burial or overburden thickness.
4. Anthracite, bituminous, subbituminous, and lignite are ranks of coal. See Table 1.
5. 14 in., 28 in., 30 in., and 5 ft. are minimum thicknesses of coal.
6. 1/4 mi., 3/4 mi., and 3 mi. are distances from points of measurement of coal thickness.
7. Includes coal left in room and pillar mining, in property barriers, coal too thick to be recovered completely by conventional mining, and mine and preparation plant waste.

## NOTE

OTHER OCCURRENCES

Includes coal:

a) less than minimum thickness at any depth
b) containing more than 33 weight percent ash on dry basis
c) buried at depths of more than 6,000 feet

Estimated tonnage, where calculated, is to be reported as "Other Occurrences" and not as resources, unless mined. Where mined, tonnage quantity is included in reserve base and reserve estimates.

criteria for distinguishing resource categories.

"shaly," or "sandy," is the preferred usage because the definition of *bone coal* does not specify the type or weight percentages of impurities.

**British thermal unit (Btu).**—The quantity of heat required to raise the temperature of 1 pound of water 1 degree Fahrenheit (°F) at, or near, its point of maximum density of 39.1° F (equivalent to 251.995 gram calories; 1,054.35 Joules; 1.05435 kilojoules; 0.25199 kilocalorie).

**burn line.**—The contact between burned and unburned coal in the subsurface. In the absence of definitive information, the subsurface position of a *burn line* is assumed to be vertically below the surface contact between unaltered and altered rocks. See **clinker**.

**calorie (cal).**—The quantity of heat required to raise 1 gram of water from 15° to 16° Celsius. A calorie is also termed gram calorie or small calorie (equivalent to 0.00396832 Btu; 4.184 Joules; 0.001 kilogram calorie).

**clinker.**—Baked or fused rock formed from the heat of a burning underlying coal bed.

**coal.**—A readily combustible rock containing more than 50 percent by weight and more than 70 percent by volume of carbonaceous material, including inherent moisture. It is formed from plant remains that have been compacted, indurated, chemically altered, and metamorphosed by heat and pressure during geologic time.

*Discussion*: Differences in the kinds of plant materials, in the degree of metamorphism (rank), and in the range of impurities are characteristic of *coal* and are used in coal classification. Impure coal/coaly material containing more than 33 weight percent ash is excluded from resources and reserve estimates unless the ash is largely in associated partings so that the *coal* is cleanable to less than 33 weight percent ash.

**coal bed.**—See **bed.**

**coal field.**—A discrete area underlain by strata containing one or more coal beds. (See figs. 5 and 6.)

**coal measures.**—Strata containing one or more coal beds.

**coal province.**—An area containing two or more coal regions. (See fig. 8.)

**coal region.**—An area containing one or more coal fields. (See fig. 7.)

**coal reserves.**—See **reserves**. (See also *reserves*, p. 30.)

**coal zone.**—A series of laterally extensive and (or) lenticular coal beds and associated strata that arbitrarily can be viewed as a unit. Generally, the coal beds in a *coal zone* are assigned to the same geologic member or formation.

**coke.**—A gray, hard, porous, and coherent cellular-structured solid, primarily composed of amorphous carbon. *Coke* is combustible and is produced by destructive distillation or thermal decomposition of certain bituminous coal that passes through a plastic state in the absence of air.

**concentration.**—A greater than normal accumulation of substances such as (1) coal, (2) elements, (3) compounds, and (4) minerals. In coal resource terminology, *concentration* is used in two senses: (1) concentrations of coaly material into beds that are minable, and (2) concentrations of elements, compounds, and minerals that may add or detract from the value of the extracted coal. A *concentration* of a substance always exceeds the average content of that substance in the Earth's crust.

**consolidated coal.**—See **lignite.**

**content.**—The amount of ash, an element, an oxide, other types of compounds, or a mineral in a unit amount of coal, expressed in parts per million or percent. Also refers to the heat value of coal as expressed in Joules per kilogram (J/kg), kilojoules per kilogram (kJ/kg), British thermal units per pound (Btu/lb), or calories per gram (cal/g).

**control point.**—A **point of measurement**, a **point of observation**, or a sampling point.

**correlate, correlation.**—Demonstration of the apparent continuity of a coal bed between control, measurement, or sampling points by showing correspondence in character and stratigraphic position.

*Discussion*: Correlations of coal beds are based on a knowledge of the stratigraphy of the coal beds and of the enclosing rocks and of the unique characteristics of individual coal beds. Confidence in correlations increases as the knowledge and abundance of data increases. Where a coal bed is continuously exposed along an outcrop or strip-mine face, continuity of the coal bed becomes an established fact and not a *correlation*.

Where data indicate that correlation of a coal bed is possible or probable among data points within an area, an estimate of the resources of that coal bed can be made for the entire area. However, where a coal bed at single data point cannot be correlated with beds at other data points, or where there is only one data point, resources can be calculated for that coal bed using the single data point as the center of circles defining measured, indicated, and inferred.

**cumulative depletion.**—The sum in tons of coal extracted and lost-in-mining to a stated date for a

specified area or a specified coal bed. (See ***cumulative depletion***, p. 25; and fig. 3.)

**cumulative production.**—The sum in tons of coal extracted to a stated date for a specified area or a specified coal bed. (See ***cumulative production***, p. 25; and figs. 1, 2, and 3.)

**demonstrated.**—A term commonly used for the sum of coal classified as measured and indicated resources. Used when not feasible or desirable to subdivide into **measured** and **indicated**. (See figs. 1, 2, and 3.)

**demonstrated reserves.**—Same as **reserves**. (See also, ***demonstrated reserves***, p. 25; and figs. 1, 2, and 3.)

**demonstrated reserve base.**—Same as **reserve base**. (See also ***demonstrated reserve base***, p. 25; and figs. 1, 2, and 3.)

**demonstrated resources.**—See **resources**. (See also, ***demonstrated resources***, p. 25; and figs. 1, 2, and 3.)

**density.**—Mass of coal per unit volume. Generally expressed in short tons/acre-foot or metric tons/hectare/square hectometer-meter of coal. See **specific gravity**.

**depleted resources.**—Resources that have been mined; includes coal recovered, coal lost-in-mining, and coal reclassified as subeconomic because of mining. See **cumulative depletion**. (See also ***cumulative depletion***, p. 25; and fig. 3.)

**depth (overburden) categories.**—Coal tonnage data are divided into classes by the thickness of overburden: 0–500 feet (0–150 m); 500–1,000 feet (150–300 m); 1,000–2,000 feet (300–600 m); 2,000–3,000 feet (600–900 m); and 3,000–6,000 feet (900–1,800 m). See **overburden**.

*Discussion*: The depth categories or overburden categories (see table 3, and specific instruction No. 2, p. 33) were decided after consultation among personnel from the U.S. Geological Survey, the Bureau of Mines, and various State Geological Surveys, mining companies, and agencies of foreign nations.

**dry, mineral-matter-free basis.**—A type of calculated analytical value of a coal sample expressed as if the total moisture and mineral matter had been removed. *Mineral-matter-free* is not the same as **ash-free**.

**economic.**—This term implies that profitable extraction or production under defined investment assumptions has been established, analytically demonstrated, or assumed with reasonable certainty.

**economic assessment.**—A critical analysis resulting in a judgment of the economic nature, significance, status, quantity, quality, market, demand, supply, costs, transportation, cash flow, capital, and processing of the coal resources of a mine, area, district, field, basin, region, province, county, state, or nation. See **assessment**.

**estimate.**—A determination as to the amount or tonnage of coal in an area. The term *estimate* indicates that the quantities of resources are known imprecisely. An *estimate* differs from an assessment, which is an analysis of all data concerning an area's coal resources and reserves with the objective of reaching a judgment about the geologic nature and economic potential of the coal resources and reserves of the area.

**existing market conditions.**—The relations between production, selling and transportation costs, supply, demand, and profit at any time.

**extraction.**—The process of removing coal from a deposit.

**feasibility.**—The possibility of extracting coal.

**fixed carbon.**—The solid residue, other than ash, obtained by destructive distillation of a coal, determined by definite prescribed methods (ASTM, 1981, p. 183).

**floor.**—Stratigraphically, the rock immediately underlying a coal bed. Where the bed is overturned, the stratigraphic *floor* is the mining roof.

**gasification, underground (in situ).**—A method of utilizing coal by burning in place and extracting the released gases, tars, and heat. See **in situ mining**.

**geologic assessment.**—A critical analysis resulting in a judgment of the geologic nature, significance, status, quality, and quantity of the coal resources of an area, district, basin, region, township, quadrangle, province, county, state or political province, nation, continent, or the world. See **assessment** and **economic assessment**.

**geologic assurance.**—State of sureness, confidence, or certainty of the existence of a quantity of resources based on the distance from points where coal is measured or sampled and on the abundance and quality of geologic data as related to thickness of overburden, rank, quality, thickness of coal, areal extent, geologic history, structure, and correlations of coal beds and enclosing rocks. The degree of assurance increases as the nearness to points of control, abundance, and quality of geologic data increases.

**geologic evidence.**—Information derived from geologic observations that can be used to substantiate the existence, size, depth, attitude, structure, tonnage, and physical and chemical characteristics of a body of coal.

**geologic identification.**—State of being identified as to location, areal extent or size, depth, volume, quantity, magnitude, and quality of coal resources.

**grade.**—A term indicating the nature of coal as mainly determined by the sulfur content and the amount and type of ash. This term is not recommended for usage in coal resource estimations; definitive statements as to the contents and types of sulfur and ash are preferable. Statements indicating high, medium, or low grade are inappropriate without documentation. See **quality**.

**heat value** or **heat of combustion.**—The amount of heat obtainable from coal expressed in British thermal units per pound, joules per kilogram, kilojoules or kilocalories per kilogram, or calories per gram. To convert Btu/lb to kcal/kg, divide by 1.8. To convert kcal/kg to Btu/lb, multiply by 1.8.

**hectare (ha)** or **square hectometer ($hm^2$).**—A metric unit of area equal to 10,000 square meters; 0.010 square kilometer; 2.4710538 acres; 107,639.10 square feet; 11,959.9 square yards; 0.003861 square mile.

**high-ash coal.**—Coal containing more than 15 percent total ash on an as-received basis. See **ash-content, medium-ash coal,** and **low-ash coal.**

**high-sulfur coal.**—Coal containing 3 percent or more total sulfur on an as-received basis. See **low-sulfur coal** and **medium-sulfur coal.**

**high-volatile bituminous coal.**—Three related rank groups of bituminous coal as defined by the American Society for Testing and Materials which collectively contain less than 69 percent fixed carbon on a dry, mineral-matter-free basis; more than 31 percent volatile matter on a dry, mineral-matter-free basis; and a heat value of more than 10,500 Btu per pound on a moist, mineral-matter-free basis. (See table 1.)

**hypothetical.**—A low degree of geologic assurance. Estimates of rank, thickness, and extent are based on assuming continuity beyond inferred. Estimates are made, not exceeding a specified depth beyond coal classed as inferred, by projection of thickness, sample, and geologic data from distant outcrops, trenches, workings, and drill holes. There are no measurement sites in areas of hypothetical coal. Used as a modifier to resource terms. See **resources** and **undiscovered.** (See also figs. 1, 2, and 3.)

**hypothetical resources.**—See Undiscovered Resources, p. 20; (See also ***hypothetical resources***, p. 25; and figs. 1, 2, and 3.)

**identified resources.**—See Identified Resources, p. 19; (See also ***identified resources***, p. 25; and figs. 1, 2, and 3.)

**impure coal.**—Coal having 25 weight percent or more, but less than 50 weight percent ash on the dry basis (ASTM, 1981, D-2796, p. 344). *Impure coal* having more than 33 weight percent ash is excluded from resource and reserve estimates unless the coal is cleanable to less than 33 weight percent ash. See **bone coal.**

**indicated.**—A moderate-degree of geologic assurance. Estimates of quantity, rank, thickness, and extent are computed by projection of thickness, sample, and geologic data from nearby outcrops, trenches, workings, and drill holes for a specified distance and depth beyond coal classed as measured. The assurance, although lower than for measured, is high enough to assume continuity between points of measurement. There are no sample and measurement sites in areas of indicated coal. However, a single measurement can be used to classify coal lying beyond measured as *indicated* and to assign such coal to resource and reserve base categories (fig. 4). Used as a modifier to resource terms.

**indicated reserves** and **indicated marginal reserves.**—See **reserves** and **indicated.** (See also ***indicated reserves*** and ***indicated marginal reserves***, p. 25; and figs. 1, 2, and 3.)

**indicated reserves base** and **indicated marginal reserve base.**—See **reserve base.** (See also ***indicated reserve base***, p. 26; and figs. 1, 2, and 3.)

**indicated resources.**—See Indicated Resources, p. 19. (See also ***indicated resources***, p. 26; and figs. 1, 2, and 3.)

**inferred.**—A low-degree of geologic assurance. Estimates of quantity, rank, thickness, and extent are based on inferred continuity beyond measured and indicated for which there is geologic evidence. Estimates are computed by projection of thickness, sample, and geologic data from distant outcrops, trenches, workings, and drill holes for a specified distance and depth beyond coal classed as indicated. There are no sample and measurement sites in areas of inferred coal. However, a single measurement can be used to classify coal lying beyond indicated as *inferred* and to assign such coal to inferred resource and inferred reserve base categories (fig. 4). Used as a modifier to resource terms.

**inferred reserves** and **inferred marginal reserves.**—See subdivisions of **reserves.** (See also ***inferred reserves***, p. 26, and ***inferred marginal reserves***, p. 26; and figs. 1, 2, and 3.)

**inferred reserve base.**—See **reserve base.** (See also ***inferred reserve base***, p. 26; and figs. 1, 2, and 3.)

**inferred resources.**—See Inferred Resources, p. 19. (See also ***inferred resources***, p. 26; and figs. 1, 2, and 3.)




FIGURE 4.—Diagram showing reliability categories based solely on distance trom points of measurement.

**inferred subeconomic resources.**—See Inferred Subeconomic Resources, p. 20. (See also ***inferred subeconomic resources***, p. 31; and figs. 1, 2, and 3.)

**in situ.**—Refers to coal "in place" in the ground.

**in situ mining.**—Utilization of coal by burning in place and extracting the gases, tars, and heat.

**joule (J).**—The basic metric unit of work or energy equal to $1 \times 10^7$ ergs, 0.238662 gram calorie, 0.0002386 kilogram-calorie, or 0.0009471 Btu.

**kilogram-calorie (kcal).**—A metric unit of heat equal to 1,000 gram-calories; 3.9683207 Btu; 4,184 Joules; $4.184 \times 10^{10}$ ergs; or 4,184 Watt seconds. Also known as "large calorie."

**kilogram (kg).**—The basic metric unit of weight measurement equal to 1,000 grams; 0.001 metric ton; 2.2046 pounds; 0.0011023 short ton; 0.0009842 long ton.

**kilojoule (kJ).**—A metric unit of work or energy equal to 1,000 joules; 0.948708 Btu; or 238.662 gram-calories.

**known coal.**—Coal whose existence has been perceived from measurements and observations at the outcrop, in mines, from drill holes, and from exploratory trenches. Data confirming existence may be projected for several miles (kilometers) if based upon reasonable geologic assumptions. See **identified resources.** Coal fields, basins, regions, provinces, and occurrences of coal in the United States are illustrated in figures 5, 6, 7, and 8.

**lignite** or **lignitic.**—A class of brownish-black, low-rank coal defined by the American Society for Testing and Materials as having less than 8,300 Btu on a moist, mineral-matter-free basis. (See table 1.) In the United States, *lignite* is separated into two groups: Lignite A (6,300 to 8,300 Btu) and lignite B (<6,300 Btu). *Lignite* is the preferred usage.

**long ton.**—A unit of weight in the U.S. Customary System and in the United Kingdom equal to 2,240 pounds (1.0160469 metric tons; 1.1200 short tons; 1,016.0469 kilograms). This term is not recommended for use in estimates of coal resources.

**lost-in-mining.**—Coal remaining in the ground after all extraction is completed. *Lost-in-mining* includes coal that is (1) left to support mine roofs, (2) too thin to mine, (3) unmined around oil, gas, water, and disposal wells, (4) unmined around shafts and electrical and water conduits, (5) unmined as barrier pillars adjacent to mine or property boundaries, (6) unmined adjacent to haulageways, tunnels, airways, and waterways, (7) unmined because of many other unspecified reasons, (8) the unrecovered or unrecoverable part of any coal bed in a mining property that has been or may be extracted, (9) all unrecoverable in beds that closely overlie a mined bed, (10) all unrecoverable in beds that closely underlie a mined bed, (11) unmined between mining properties.

*Discussion*: According to this system of classification, *lost-in-mining* equals reserve base minus reserves and marginal reserves. Thus, *lost-in-mining* includes all reserve base coal not economically recoverable at the time of classification or not bordering on being economically recoverable. Lost-in-mining coal is subtracted from the reserve base and is divisible into subeconomic coal or noneconomic coal according to its potential for being reclassified as economic. (See fig. 3.)

**low-ash coal.**—Coal containing less than 8 percent total ash on an as-received basis. See **ash content, high-ash coal,** and **medium-ash coal.**

**low-sulfur coal.**—Coal containing 1 percent or less total sulfur on an as-received basis. See **high-sulfur coal** and **medium-sulfur coal.**

**low-volatile bituminous coal.**—A rank group of bituminous coal as defined by the American Society for Testing and Materials containing more than 78 percent and less than 86 percent fixed carbon, and more than 14 percent and less than 22 percent volatile matter on a dry, mineral-matter-free basis. (See table 1.)

**marginal reserves.**—Borders on being economic. See **economic**; general guideline no. 8, p. 32; and subdivisions of **reserves.** (See also ***indicated marginal reserves*** and ***measured marginal reserves***, p. 25 and 27; and figs. 1, 2, and 3.)

**measured.**—The highest-degree of geologic assurance. Estimates of quantity are computed partly from dimensions revealed in outcrops, trenches, workings, and drill holes and partly by projection of thickness, sample, and geologic data not exceeding a specified distance and depth. Rank is calculated from the results of detailed sampling that may be located at some distance from this type of resource and may be on the same or other coal beds. The sites for thickness measurement are so closely spaced and the geologic character so well defined that the average thickness, areal extent, size, shape, and depth of coal beds are well established. However, a single measurement can be used to classify nearby coal as *measured* (fig. 4). Used as a modifier to resource terms.

**measured reserves** and **measured marginal reserves.**—See subdivisions of **reserves.** (See also ***measured reserves***, p. 27; ***measured marginal reserves***; p. 27; and figs. 1, 2, and 3.)

**measured reserve base.**—See **reserve base.** (See also ***measured reserve base***, p. 27; and figs. 2 and 3.)




FIGURE 5.—Coal fields of the conterminous United States (from Averitt, 1975).

**measured resources.**—See Measured Resources, p. 19; (See also ***measured resources***, p. 27; and figs. 1, 2, and 3.)

**medium-ash coal.**—Coal containing 8 percent to 15 percent ash on an as-received basis. See **ash content, low-ash coal**, and **high-ash coal**.

**medium-sulfur coal.**—Coal containing more than 1 percent and less than 3 percent total sulfur on an as-received basis. See **high-sulfur coal** and **low-sulfur coal**.

**medium-volatile bituminous coal.**—A rank group of bituminous coal as defined by the American Society for Testing and Materials containing more than 69 percent and less than 78 percent fixed carbon and more than 22 percent and less than 31 percent volatile matter on a dry, mineral-matter-free basis. (See table 1.)

**metallurgical coal.**—An informally recognized name for bituminous coal that is suitable for making coke by industries that refine, smelt, and work with iron. Other uses are space heating, blacksmithing, smelting of base metals, and power generation. Generally, *metallurgical coal* has less than 1 percent sulfur and less than 8 percent ash on an as-received basis. Most premium *metallurgical coal* is low- to medium-volatile bituminous coal.

**metric ton, megagram, tonne, or millier.**—A metric unit of weight equal to 1,000 kilograms; 1.1023113 short tons; 0.98420653 long ton; 2,204.6226 pounds. The *metric ton* is the preferred usage.

**minable.**—Capable of being mined under current mining technology and environmental and legal restrictions, rules, and regulations.

**mineral-matter.**—The solid inorganic material in coal.

**mineral-matter-free basis.**—A theoretical analysis calculated from basic analytical data expressed as if the total mineral-matter had been removed. Used in determining the rank of a coal.

**mining.**—All methods of obtaining coal or its byproducts from the Earth's crust, including underground, surface, and in situ mining.

**moist, mineral-matter-free basis.**—A theoretical analysis calculated from basic analytical data and expressed as if the mineral-matter had been removed and the natural moisture retained. Used in determining the rank of coal.

**moisture, bed.**—The percentage of moisture or water in a bed or sample of coal before mining.

**moisture content.**—The percentage of moisture (water) in coal. Two types of moisture are found in




FIGURE 6.—Coal fields of Alaska (from Averitt, 1975).

coal, namely, free or surface moisture removed by exposure to air, and inherent moisture entrapped in the coal and removed by heating to 220°F.

**noneconomic.**—Not capable of profitable production or extraction. Coal classified as *noneconomic* may be reported in other occurrences. See ***other occurrences, noneconomic coal***, p. 27.

**original.**—The amount of coal resources in the ground before production.

**original resources.**—See Original Resources, p. 19; and **original resources.** (See also ***original resources***, p. 27; and figs. 1, 2, and 3.)

**other occurrences.**—Coal in the ground that is excluded from classification as coal resources. Includes anthracite and bituminous coal less than 14 inches thick, subbituminous coal and lignite less than 30 inches thick, and any coal more than 6,000 feet deep unless it is currently being mined. May include coal that contains more than 33 percent ash. (See ***other occurrences, noneconomic coal***, p. 27; and figs. 1 and 2.)

**overburden.**—Rock including coal and (or) unconsolidated material that overlies a specified coal bed. *Overburden* is reported in feet and (or) meters and used to classify the depth to an underlying coal bed.

**partial or incomplete measurement of coal thickness.**—A determination of an incomplete coal thickness at a point of measurement.

*Discussion:* Measurements of coal thicknesses that are incomplete because of (1) near surface slumping of coal and overlying beds, (2) weathering, (3) a drill hole not penetrating the entire coal bed, (4) identified planar erosion of top part of coal bed, or (5) removal of most of a coal bed by a stream channel are to be treated as points of measurement from which circles of reliability are to be constructed. A geologist must decide whether each measurement is complete or incomplete. The thickness of coal at places where a measurement is deemed incomplete shall be located on the coal bed map by the number of feet and inches actually measured followed by a plus sign to indicate that only a part of the bed was measured. Thus, incomplete measurements define measured coal of a stated minimum thickness. If other thickness data are available to show by isopaching that a coal thickness is incomplete at a point of measurement, the isopached total thickness at the point of measurement should be used to determine the average thickness for the tonnage




**EXPLANATION**

| | |
|---|---|
| 1 Rhode Island Meta-anthracite | 14 North Central |
| 2 Pennsylvania Anthracite | 15 Tertiary lake beds |
| 3 Atlantic coast | 16 Bighorn |
| 4 Appalachian | 17 Wind River |
| 5 Northern | 18 Hams Fork |
| 6 Eastern Interior | 19 Uinta |
| 7 Western Interior | 20 Southwestern Utah |
| 8 Southwestern | 21 San Juan River |
| 9 Mississippi-Alabama | 22 Raton Mesa |
| 10 Texas-Louisiana | 23 Denver |
| 11 Fort Union | 24 Green River |
| 12 Powder River | 25 Black Mesa |
| 13 Black Hills | 26 Pacific |

FIGURE 7.—Coal regions of the conterminous United States (modified from Trumbull, 1960.)

estimates of measured, indicated, and inferred categories. In those places where the coal bed cannot be isopached, the partial thickness of coal should be used as the thickness for estimating tonnages. See **point of measurement**.

**parting**.—A layer or stratum of non-coal material in a coal bed which does not exceed the thickness of coal in either the directly underlying or overlying benches. (See specific instruction No. 3, p. 34.)

**parts per million (ppm)**.—A method of stating content of a substance in coal. One *ppm* equals 0.001 percent, or 0.000001.

**point of measurement**.—The exact location on an outcrop, in a trench, in mine workings, or in a drill hole




**EXPLANATION**

1 Eastern
2 Gulf
3 Interior
4 Northern Great Plains
5 Pacific Coast
6 Rocky Mountains

FIGURE 8.—Coal provinces of the conterminous United States (modified from Trumbull, 1960.)

where a coal bed is measured for thickness and (or) sampled for analysis. The surface position of a *point of measurement* must be located precisely on a map so that its geodetic position can be determined. The altitude of a subsurface *point of measurement* can be determined from cores, lithologic logs, mine workings, and also can be determined from a geophysical log of a drill hole or well if, in the opinion of a geologist or geophysist, the log is of good quality. See **partial or incomplete measurement of coal thickness.**

**point of observation.**—Place on an outcrop where a coal bed is visible or where evidence indicates that a coal bed could be measured or examined by trenching or digging a pit. Points of observation are used to verify the existence of a coal bed, and apparent similarity and (or) difference of a coal bed's thickness as to thickness at points of measurement. They also can be used to confirm the position of a coal outcrop on a geologic map and to support the measured, indicated, and inferred classification of a coal bed; however, these points cannot be used without actual measurements to classify a resource body.

**production.**—The coal that has been extracted from a mine for a specified period. *Production* may be reported for a mine or larger area such as a coal field, region, province, basin, township, quadrangle, state, nation, and (or) the world. Production in the United States is usually reported in short tons; most other nations report production in metric tons.

**proximate analysis.**—In coal, the determination by

TABLE 1.—*Classification of coals by rank*[A],[1]

| Class | Group | Fixed Carbon Limits, percent (Dry, Mineral-Matter-Free Basis): Equal or Greater Than | Fixed Carbon: Less Than | Volatile Matter Limits, percent Dry, Mineral-Matter-Free Basis: Greater Than | Volatile Matter: Equal or Less Than | Calorific Value Limits BTU per pound (Moist,[B] Mineral-Matter-Free Basis): Equal or Greater Than | Calorific Value: Less Than | Agglomerating Character |
|---|---|---|---|---|---|---|---|---|
| I. Anthracite* | 1. Meta-anthracite | 98 | —— | —— | 2 | —— | —— | nonagglomerating |
| | 2. Anthracite | 92 | 98 | 2 | 8 | —— | —— | |
| | 3. Semianthracite[C] | 86 | 92 | 8 | 14 | —— | —— | |
| II. Bituminous | 1. Low volatile bituminous coal | 78 | 86 | 14 | 22 | —— | —— | commonly agglomerating[E] |
| | 2. Medium volatile bituminous coal | 69 | 78 | 22 | 31 | —— | —— | |
| | 3. High volatile *A* bituminous coal | —— | 69 | 31 | —— | 14 000[D] | —— | |
| | 4. High volatile *B* bituminous coal | —— | —— | —— | —— | 13 000[D] | 14 000 | |
| | 5. High volatile *C* bituminous coal | —— | —— | —— | —— | 11 500 | 13 000 | |
| | | —— | —— | —— | —— | 10 500 | 11 500 | agglomerating |
| III. Subbituminous | 1. Subbituminous *A* coal | —— | —— | —— | —— | 10 500 | 11 500 | nonagglomerating |
| | 2. Subbituminous *B* coal | —— | —— | —— | —— | 9 500 | 10 500 | |
| | 3. Subbituminous *C* coal | —— | —— | —— | —— | 8 300 | 9 500 | |
| IV. Lignite | 1. Lignite *A* | —— | —— | —— | —— | 6 300 | 8 300 | |
| | 2. Lignite *B* | —— | —— | —— | —— | —— | 6 300 | |

[A]This classification does not include a few coals, principally nonbanded varieties, which have unusual physical and chemical properties and which come within the limits of fixed carbon or calorific value of the high-volatile bituminous and subbituminous ranks. All of these coals either contain less than 48 percent dry, mineral-matter-free fixed carbon or have more than 15 500 moist, mineral-matter-free British thermal units per pound.

[B]Moist refers to coal containing its natural inherent moisture but not including visible water on the surface of the coal.

[C]If agglomerating, classify in low-volatile group of the bituminous class.

[D]Coals having 69 percent or more fixed carbon on the dry, mineral-matter-free basis shall be classified according to fixed carbon, regardless of calorific value.

[E]It is recognized that there may be nonagglomerating varieties in these groups of the bituminous class, and there are notable exceptions in the high-volatile *C* bituminous group.

[1]ASTM, 1981, p. 215.

*Modified from ASTM, 1981.

prescribed methods of moisture, volatile matter, fixed carbon (by difference), and ash. Unless specified, proximate analyses do not include determinations of sulfur or phosphorous or any determinations other than those named. Proximate analyses are reported by percent and on as-received, moisture-free, and moisture- and ash-free bases.

**quality.**—An informal classification of coal relating to its suitability for use for a particular purpose.

*Discussion*: Most coal is used as a source of heat or energy, but coal is or will be used in making petrochemicals, metallurgical coke, synthetic gas, and synthetic liquid fuel. Factors considered in judging a coal's quality are based on, but not limited to, heat value; content of moisture, ash, fixed carbon, phosphate, silica, sulfur, major, minor and trace elements; coking and petrologic properties; and organic constituents considered both individually and in groups. The individual importance of these factors varies according to the intended use of the coal. Therefore, any designation of "high-quality coal," "moderate-quality coal," or "low-quality coal" should plainly indicate the intended or optimum use or uses and is inappropriate without such documentation.

**quantity.**—Refers to the amount or tonnage of coal. *Quantity* should be reported in short or metric tons.

**rank.**—The classification of coals according to their degree of metamorphism, progressive alteration, or coalification (maturation) in the natural series from lignite to anthracite.

*Discussion*: Classification is made on the basis of analysis of coal in accordance with table 1. The *rank* of coal can be used to infer the approximate dry,

mineral-matter-free heat value, fixed carbon, and volatile matter in a coal, because the amounts of the constituents vary little within each coal rank. (See table 1; and ***rank calculation***, p. 28.)

**rank calculation.**—The determination of the rank of a coal. Such determination must use the instructions given under ***rank calculation***, p. 28.

**recoverable coal.**—The coal that is or can be extracted from a coal bed during mining. The term "recoverable" should be used in combination with "resources" and not with "reserves."

**recovery percent.**—The percentage of coal extracted from a bed where the total tonnage originally in the bed is equal to 100 percent.

**recovery factor.**—The estimated or actual percentage of coal that can be or was extracted from the coal originally in a bed or beds for an area, mine, district, field, basin, region, province, township, quadrangle, county, state, political province, nation, and (or) the world. See ***recovery factor method***, p. 28.

**reliability categories.**—Categories based on distance from points of measurement and (or) sampling. The measured, indicated, inferred, and hypothetical resource categories, as defined, indicate the relative reliability of tonnage estimates as related to distance from points of thickness control of particular parts of a coal deposit. The *reliability categories* are not indicative of the reliability of the basic data (that is, the accuracy of coal measurements, or the accuracy of location of the coal outcrop). It is assumed that all basic data used in resource estimation have been judged reliable by the estimator and that unreliable data have been discarded. (See fig. 4.)

**reserves.**—Virgin and (or) accessed parts of a coal reserve base which could be economically extracted or produced at the time of determination considering environmental, legal, and technologic constraints. The term *reserves* need not signify that extraction facilities are in place or operative. *Reserves* include only recoverable coal; thus, terms such as "extractable reserves" and "recoverable reserves" are redundant and are not a part of this classification system. (See figs. 1 and 3; and ***reserves***, p. 30.)

*Discussion*: *Reserves* can be categorized as measured and indicated, as underground or surface minable, by thickness of overburden, by thickness of coal in the bed, and by various quality factors. The term "economic reserves" is not to be used because *reserves* by definition are economic. *Reserves*, which are derived from reserve base coal, exclude coal thinner or deeper than that classified as reserve base unless such coal is currently mined. See general guideline No. 7, p. 32.

MANDATORY SUBDIVISIONS:

A. Indicated Reserves and Indicated Marginal Reserves.—Categories of virgin reserves having a moderate degree of geologic assurance. See **indicated and marginal reserves**. (See also ***reserves***, p. 30; and figs. 1 and 3.)

B. Inferred Reserves and Inferred Marginal Reserves.—Categories of virgin reserves having a low degree of geologic assurance. See **inferred reserves and marginal reserves**. (See also ***reserves***; p. 30; and figs. 1 and 3.)

C. Measured Reserves and Measured Marginal Reserves.—Categories of accessed and virgin coal reserves having the highest degree of geologic assurance. See **measured reserves and marginal reserves**. (See also figs. 1 and 3.)

OPTIONAL SUBDIVISIONS:

A. Reserves and Marginal Reserves.—*Reserves* may be divided into subcategories other than those heretofore defined. These subcategories may be differentiated, for example, by ash and sulfur content, and heat value; by types or varieties of coal such as boghead or cannel coal; by usage such as metallurgical, petrochemical, and synthetic fuel types; by mineral ownership such as State, Federal, Indian, or private ownership; by Federal coal underlying private surface ownership; and by reserves and restricted reserves underlying State or national parks, monuments, forests, grasslands; military and naval reservations, alluvial valley floors, steep slopes, lakes and large rivers, and environmentally protected areas.

1. Restricted Reserves and Restricted Marginal Reserves.—Those parts of any reserve category that are restricted or prohibited by laws or regulations from extraction by underground and (or) surface mining.

   *Discussion*: For example, coal in a national park may meet all the physical, chemical and economic requirements of a reserve but is prohibited from extraction. The assignment to a restricted category may be either temporary or permanent; however, because laws and regulations can be repealed or changed, such coal should be separately distinguished, and tonnage estimates recorded as a restricted reserve. Locally, a specific regulation or law might prohibit one method of mining and allow or not specify other methods. In such a circumstance, the coal would be restricted



Stagg Dec. -- Exhibit 2
APP. III 653

from mining by the prohibited method and tonnage estimates would be so recorded. In other circumstances, other methods would be unrestricted, and tonnage estimates would be reported accordingly.

The separation of coal reserves into the many different subcategories listed above and other subcategories not listed in this text is desirable and encouraged. All subcategories not listed should be defined clearly and explicitly so that other resource specialists and the public will not be confused.

**reserve base.**—Those parts of the identified resources that meet specified minimum physical and chemical criteria related to current mining and production practices, including those for quality, depth, thickness, rank, and distance from points of measurement. (See **reliability categories**; and figs. 2 and 3.) The *reserve base* is the in-place demonstrated (measured plus indicated) resource from which reserves are estimated. The *reserve base* may encompass those parts of a resource that have a reasonable potential for becoming economically available within planning horizons beyond those that assume proven technology and current economics. The *reserve base* includes those resources that are currently economic (reserves), marginally economic (marginal reserves), some of those that are currently subeconomic (subeconomic resources), and some of the resources that have been or will be lost-in-mining but whose attributes indicate possible future recovery. The term "geologic reserve" has been applied by others to the reserve base category, but it also may include the inferred reserve base category; it is not a part of this classification system. (See ***reserve base***, p. 29; and figs. 2 and 3.)

**reserve base, inferred.**—The in-place part of an identified resource from which inferred reserves and inferred marginal reserves are estimated. Quantitative estimates are based largely on knowledge of the geologic character of a coal deposit for which there are no samples or measurements. The estimates are based on an assumed continuity beyond the reserve base for which there is geologic evidence. (See figs. 2 and 3.)

**resources.**—Naturally occurring concentrations or deposits of coal in the Earth's crust, in such forms and amounts that economic extraction is currently or potentially feasible. (See ***resources***, p. 30; and figs. 1, 2, and 3.)

MANDATORY SUBDIVISIONS:

A. Hypothetical Resources.—See Undiscovered Resources (p. 20). (See also ***hypothetical resources***, p. 25; and figs. 1, 2, and 3.)

B. Identified Resources.—Resources whose location, rank, quality, and quantity are known or estimated from specific geologic evidence. (See ***identified resources***, p. 25). Identified coal resources include economic, marginally economic, and subeconomic components. To reflect varying distances from points of control or reliability, these subdivisions can be divided into demonstrated and inferred, or preferably into measured, indicated, and inferred. (See ***identified resources***, p. 25; and figs. 1, 2, and 3.)

*Discussion: Identified resources* may be accessed and (or) in bodies of virgin coal which are assigned to resource and reserve base subcategories on the basis of geologic evidence from maps, samples, drill holes, wells, mine records, and fieldwork. Specific evidence must include data on the location, thickness of overburden, distance from points of measurement or sampling, and extent and thicknesses of the resource bodies. Evidence about quality and rank may be determined from analyses of samples collected from the resource bodies or may be inferred by projection of analytical data obtained elsewhere in the body or from adjacent bodies. An identified resource body may contain reserves, marginal reserves, inferred reserves, inferred marginal reserves, reserve base, inferred reserve base, demonstrated resources, measured resources, indicated resources, inferred resources, subeconomic resources and inferred subeconomic resources. (See figs. 1, 2, and 3.)

C. Indicated Resources.—Identified bodies of virgin coal having a moderate degree of geologic assurance. See **indicated.** (See also ***indicated resources***, p. 26; and figs. 1, 2, and 3.)

D. Inferred Resources.—Identified bodies of virgin coal having a low degree of geologic assurance. See **inferred resources.** (See also ***inferred resources***, p. 26; and figs. 1, 2, and 3.)

E. Measured Resources.—Accessed and virgin demonstrated resources having a high degree of geologic assurance. (See ***measured resources***, p. 27; and figs. 1, 2, and 3.)

F. Original Resources.—The amount of coal in-place before production. Where mining has occurred, the total of *original resources* is the sum of the identified resources, undiscovered resources, coal produced, and coal lost-in-mining. (See ***original resources***, p. 27; and figs. 1, 2, and 3.)

G. Remaining Resources.—The resources in the

ground in a mine, area, field, basin, region, province, county, state, and (or) nation after some mining. The term does not include coal lost-in-mining unless such coal can be considered potentially recoverable. *Remaining resources* may be divided into categories such as remaining economic, marginally economic, subeconomic, measured, indicated, inferred, identified, and undiscovered (hypothetical and speculative) resources or other types of resources. (See optional subdivisions, below; and figs. 1, 2, and 3.) The total remaining resources are the sum of the remaining identified and undiscovered resources as of the date of the estimate.

H. Subeconomic Resources.—That part of identified (demonstrated) resources that does not meet the economic criteria of reserves and marginal reserves. See **resources** and **economic.** (See also ***subeconomic resources***, p. 31; and figs. 1 and 2.)

I. Inferred Subeconomic Resources.—That part of identified (inferred) resources that does not meet the economic criteria of inferred reserves or inferred marginal reserves. See **resources** and **economic.** (See also ***subeconomic resources***, p. 31; and figs. 1 and 2.)

J. Speculative Resources.—See Undiscovered Resources (below). (See also ***speculative resources***, p. 30; and figs. 1, 2 and 3.)

K. Undiscovered Resources.—*Undiscovered resources*, the existence of which is only postulated, comprise deposits that are either separate from or are extensions of identified resources. *Undiscovered resources* may be postulated in deposits of such quality, rank, quantity, and physical location as to render them economic, marginally economic, or subeconomic. To reflect varying degrees of geologic certainty, *undiscovered resources* may be subdivided into two parts as follows. (See ***undiscovered resources***, p. 31.)

1. Hypothetical Resources.—A class of undiscovered resources that are either similar to known coal deposits which may be reasonably expected to exist in the same coal field or region under analagous geologic conditions or are an extension from inferred resources. In general, *hypothetical resources* are in the central parts of broad areas of coal fields where points of sampling and measurement and evidence for thickness and existence is from distant outcrops, mine workings, drill holes, and wells. If exploration confirms the existence of hypothetical resources and reveals enough information about their quality, quantity, and rank, they will be reclassified as identified resources.
2. Speculative Resources.—A class of undiscovered resources that may occur either in known types of deposits in favorable geologic settings where coal deposits have not been discovered or in types of deposits as yet unrecognized for their economic potential. If exploration confirms the existence of speculative resources and reveals enough information about their quality, quantity, and rank, they will be reclassified as identified resources.

OPTIONAL SUBDIVISONS:

Resources may be divided into subcategories, for example, on the basis of ash content, sulfur content, and heat value; type or variety of coal such as boghead or cannel coal; usage such as metallurgical, petrochemical, and synthetic fuel types; resources underlying specified lands owned by State governments, the Federal Government, or private interests; by restricted resources underlying State or national parks, monuments, forests, grasslands; military, naval, and Indian reservations; and alluvial valley floors, steep slopes, lakes and large rivers, and environmentally protected areas.

A. Restricted Resources.—Those parts of any resource category that are restricted or prohibited from extraction by laws or regulations.

Discussion: Restricted resources meet all requirements of coal classified as resources, except that they are restricted from extraction by law or regulation. The assignment to a restricted category may be either temporary or permanent, but, because laws and regulations can be repealed or changed, such coal should be separately distinguished and tonnage estimates recorded as restricted resources.

The division of coal resources into the many different categories described heretofore and into other categories not differentiated in the text is desirable and encouraged. Many requests for information about resources are received by coal resource specialists and are unanswerable because the scopes of the systems of classification used in the past were too limited. Persons and institutions classifying resources are, therefore, encouraged to use initiative in defining and developing additional classes of coal resources.

**restricted reserves.**—See optional subdivisions of **reserves**.

**restricted resources.**—See optional subdivisions of **resources**.

**roof.**—Stratigraphically, in underground mining the rock immediately overlying a coal bed. Where a bed is overturned, the stratigraphic *roof* is the mining floor.

**sample.**—A representative fraction of a coal bed collected by approved methods, guarded against contamination or adulteration, and analyzed to determine the nature; chemical, mineralogic, and (or) petrographic composition; percentage or ppm content of specified constituents; heat value; and possibly the reactivity of the coal or its constituents.

*Discussion*: Some samples are also collected so that fossil remains can be ascertained and physical, magnetic, or other geophysical properties can be determined, tested, observed, or analyzed. All samples should be accompanied by a description of the *sample*, including location, thickness of coal, and stratigraphic relationship to other rocks.

TYPES OF SAMPLES:

A. **as-received sample.**—A sample of coal as it is received at a laboratory.

B. **bed or channel sample.**—A sample of coal collected from a channel cut perpendicular to the stratification.

*Discussion*: This type of sample is used to ascertain the chemistry, rank of coal, mineralogy, petrography, and geophysical and physical properties of coal. Instructions for this type of sampling are contained in Geological Survey Circular 735 (Swanson and Huffman, 1976, p. 2).

C. **bench sample.**—A sample of a subdivision and (or) layer of a coal bed separated from other subdivisions by partings of non-coal rock.

*Discussion*: The term *bench sample* does not apply to coal lithotypes such as vitrinite and exinite as used by petrologists.

D. **blend pile sample.**—A sample of coal collected from the blend-pile of a processing plant or a utilization facility such as a powerplant or steel mill.

E. **breaker sample.**—A sample of coal broken or crushed in a breaker plant. A *breaker sample* is usually collected prior to cleaning of coal.

F. **cleaned coal sample.**—A sample of coal collected after use of a cleaning procedure.

G. **core sample.**—A sample of coal recovered from a core which was obtained at depth by a coring device in a drill hole.

H. **cutting sample.**—A sample of coal taken from the cuttings returned during drilling.

*Discussion*: Cutting samples are not recommended because many comparisons with properly or conventionally collected samples indicate they are rarely representative.

I. **delivered coal sample.**—A sample of coal collected from a shipment that is being or will be delivered to a user.

J. **grab sample.**—A sample, commonly a single piece, selected from a coal bed, tipple, preparation plant, blend pile, conveyor belt, or coal car.

*Discussion*: Grab samples are not recommended because many comparisons with properly collected samples indicate they are rarely representative.

K. **mine sample.**—A sample of coal collected from a mine, generally from an underground working face or from a strip-wall face.

L. **run of mine** or **mine run sample.**—Generally the same as a **tipple sample.**

M. **tipple sample.**—A sample of coal collected at a mine tipple.

**seam.**—A bed of coal lying between a roof and floor. This term is not to be used in place of "coal bed" in reports of the U.S. Geological Survey.

**short ton.**—A unit of weight equal to 2,000 pounds; 0.9071847 metric ton, tonne, or megagram; 0.8928571 long ton.

**specific gravity of coal.**—The ratio of the mass of a unit colume of coal to the mass of an equal volume of water at 4°C.

*Discussion*: The *specific gravity of coal* varies considerably with rank and with differences in ash content. The values shown in table 2 are close to the average specific gravities of unbroken or unmined coal in the ground (in situ) for the four major rank categories and are to be used in preparing U.S. Geological Survey estimates of coal resources and reserves.

Persons associated with individual mining operations sometimes use lower specific gravity factors to allow for anticipated losses in extraction. Such usage may be suitable for specific mine areas but is not recommended for use in general reports because the recoverability of coal varies greatly between areas, beds, mining methods, and mine operators.

**speculative.**—Lowest degree of geologic assurance. Estimates of rank, thickness, and extent are based on

TABLE 2.—*Average specific gravity and average weight of unbroken coal per unit volume of different ranks*

| Rank | Specific gravity | Weight of unbroken coal per unit volume | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Short tons per acre-foot | Short tons per acre-inch | Metric tons per acre-foot | Short tons per square mile-foot | Metric tons per square mile-foot | Metric tons per square hectometer-meter | Metric tons per square hectometer meter |
| Anthracite and semianthracite | 1.47 | 2,000 | 166.6 | 1,814 | 1,280,000 | 1,160,960 | 14,700 | 1,470,000 |
| Bituminous coal | 1.32 | 1,800 | 150 | 1,633 | 1,152,000 | 1,045,120 | 13,200 | 1,320,000 |
| Subbituminous coal | 1.30 | 1,770 | 147.5 | 1,605 | 1,132,800 | 1,027,200 | 13,000 | 1,300,000 |
| Lignite | 1.29 | 1,750 | 145.8 | 1,588 | 1,120,000 | 1,016,320 | 12,900 | 1,290,000 |

assuming the existence of known types of coal deposits in favorable geologic settings or on assuming the existence of unknown types of deposits as yet unrecognized for their economic potentials. Tonnages are estimated by assuming thickness of coal, overburden, extent, and rank to a specified depth. There are geologic evidence sites but no measurement sites in areas of speculative coal. Used as a modifier to resource terms. See Hypothetical Resources, p. 20; Speculative Resources, p. 20; and Undiscovered Resources, p. 20. (See also figs. 1, 2, and 3.)

**speculative resources.**—See Speculative Resources, p. 20. (See also ***speculative resources***, p. 30; and figs. 1, 2, and 3.)

**square hectometer-meter ($hm^2$–m).**—A metric unit of the volume of coal that covers 1 square hectometer at a thickness of 1 meter; 10,000 cubic meters; 10 cubic dekameters; 0.010 square kilometer-meter; 13,079.51 cubic yards; 8.107132 acre-feet; 0.0126674 square mile-foot. The weight of coal in this volume varies according to rank. (See table 1.)

**square kilometer.**—1,000,000 square meters; 100 hectares; 247.10538 acres; 1,195,990 square yards; 10,763,910 square feet.

**square kilometer-meter ($km^2$–m).**—The volume of coal (1,000,000 cubic meters; 100 square hectare-meter-meters or 100 hectare-meters; 1,307,950.6 cubic yards; 35,314,667.0 cubic feet) that covers 1 square kilometer at a thickness of 1 meter. The weight of coal varies according to the rank. (See table 2.)

**square mile.**—27,878,400 square feet; 3,097,600 square yards; 2,589,988.1 square meters; 258.99881 hectares; 640 acres; 2.5899881 square kilometers.

**square mile-foot.**—The volume of coal (27,878,400 cubic feet; 789,428.38 cubic meters; 1,032,533.33 cubic yards) that covers 1 square mile to a thickness of 1 foot. The weight of coal varies according to the rank. (See table 2.)

**strip or stripping ratio.**—The amount of overburden that must be removed to gain access to a unit amount of coal.

*Discussion*: A *stripping ratio* may be expressed as (1) thickness of overburden to thickness of coal, (2) volume of overburden to volume coal, (3) weight of overburden to weight of coal, or (4) cubic yards of overburden to tons of coal. A *stripping ratio* commonly is used to express the maximum thickness, volume, or weight of overburden that can be profitably removed to obtain a unit amount of coal.

**strip or surface mining.**—The extraction of coal by using surface mining methods such as area strip mining, contour strip mining, or open-pit mining. The overburden covering the coal is removed and the coal extracted using power shovels, front end loaders, or similar heavy equipment.

**subbituminous coal.**—A rank class of nonagglomerating coals having a heat value content of more than 8,300 Btu's and less than 11,500 Btu's on a moist, mineral-matter-free basis. This class of coal is divisible on the basis of increasing heat value into the subbituminous C, B, and A coal groups. (See table 1.)

**subeconomic resources.**—See **resources** and **economic**. (See also ***subeconomic resources***, p. 31; and figs. 1, 2, and 3.)

**sulfur content.**—The quantity of sulfur in coal expressed in percent or parts per million. May be divided into the quantities occurring as inorganic (pyritic) sulfur, organic sulfur, and sulfate sulfur.

**thickness categories.**—The categories of thickness of coal beds employed in calculating, estimating, and reporting coal resources and reserves. (See ***thickness of coal for resource calculations***, p. 31; and specific instruction No. 3, p. 34.)

**ultimate analysis.**—In coal, the determination by prescribed methods of the ash, carbon, hydrogen, nitrogen, oxygen (by difference), and sulfur contents. Quantities of each analyzed substance are reported by percentage for the following conditions: as-received, dried at 105°C, and moisture-and ash-free.

*Discussion*: The principal reason for the *ultimate analysis* is the classification of coals by rank, although it

is often used for commercial and industrial purposes when it is desirable to know the sulfur content. The *ultimate analysis* also is known as the "total analysis." This, however, is a misnomer because substances other than those noted above are not identified and quantified, such as trace elements, oxides, and rare gases.

**underground mining.**—The extraction of coal or its products from between enclosing rock strata by underground mining methods, such as room and pillar, longwall, and shortwall, or through in situ gasification.

**undiscovered.**—A category of virgin resources of coal having the lowest degree of geologic assurance. Category is divisible into the hypothetical and speculative categories. (See **hypothetical** and **speculative**.) Estimates are quantitative. There are no sample or measurement of coal thickness sites in areas of undiscovered coal. Used as a modifier to resources.

**undiscovered resources.**—See mandatory subdivisions of **resources**. (See also ***undiscovered resources***, p. 31; and figs. 1, 2, and 3.)

**vein.**—A bed of coal lying between a distinct roof and floor. Term is not to be used in place of "coal bed" in reports of the U.S. Geological Survey.

**virgin coal.**—Coal that has not been accessed by mining. See **accessed.**

**volatile matter.**—In coal, those products, exclusive of moisture, given off as gas and vapor, determined by definite prescribed methods (ASTM, 1981, p. 184, D2361-66, D3761-79, D3175-77, D3176-74, D3178-73, and D3179-73).

## CRITERIA FOR COAL RESOURCE CLASSIFICATION

Although not specifically noted, coal resources are classified in figures 1, 2, and 3 according to geologic assurances of existence and to the economic feasibility of recovery.

The degree of geologic assurance in this system of coal classification is determined from the interrelations of (1) proximity to or closeness of spacing of points where a coal bed is measured or sampled (reliability); (2) concepts, ideas, and models of the depth, rank, quality, thickness of coal, areal extent, depositional patterns and correlations of coal beds and enclosing rocks; and (3) knowledge of associated structural features as they control the distribution, extent, thickness, depth of burial, and metamorphism of coal resources. An understanding of these elements as they relate to the three dimensional configurations of stratigraphic sequence is necessary to provide the highest degree of geologic assurance as to the existence and continuity or lack of continuity of specific coal beds.

The degree of economic feasibility is determined by interrelating the (1) thickness of coal (see specific instruction No. 3, p. 34); (2) thickness of overburden; (3) the rank and quality of coal as ascertained from analyses that may be from the same bed or adjacent beds and which may be projected on geologic evidence for several miles; (4) costs of mining, processing, labor, transportation, selling, interest, taxes, and demand and supply; (5) expected selling price; and (6) expected profits.

The thickness of overburden and the thickness of a coal bed are the primary factors controlling the feasibility of mining. Knowledge of the quantity of coal and rock that must be removed per unit of recovered coal, of the roof and floor conditions, and of the difficulty of separating coal from rock determine the mining method and the equipment chosen for the mining operation. The rank, purity, heat value, and selling price of the coal commonly dictate usage and marketability. Higher rank coals generally are judged more valuable than lower rank coals owing to greater heat values and chemical characteristics that are sought currently by the metallurgical and petrochemical industries. Economic variables that influence feasibility are price of coal, cost of equipment, mining, labor, processing, transportation, interest rates, and taxes. Supply and demand for coal also influence feasibility as do environmental laws, restrictions, judicial ratings, and political considerations. The relative value of coals may change markedly in the near future as the result of utilizing new techniques for converting coal to gas and or liquid fuels. Low-rank coals and coals containing pyrite that are currently of lower economic value may in the future be considered premium fuels for conversion processes.

The criteria for the principal classes of coal resources described hereafter are summarized in table 3 and are to be used in preparing all U.S. Geological Survey coal resource estimates from January 1, 1983, until further revised.

## APPLICATIONS OF CRITERIA

The criteria are to be applied only to those deposits of coal that are currently or potentially feasible for economic extraction by underground mining, surface mining, and (or) in situ gasification methods. Coal beds that are thinner than 14 inches (35 cm; anthracite and

TABLE 3.—*Summary of coal resource criteria*

| | Depth[1] Feet (Meters) | Thickness[1] Inches (Centimeters) |
|---|---|---|
| Identified and undiscovered resources: | | |
| Anthracite and bituminous coal | ≤6,000 (1,800) | ≥14 (35) |
| Subbituminous coal and lignite | ≤6,000 (1,800) | ≥30 (75) |
| Reserve base and inferred reserve base: | | |
| Anthracite and bituminous coal | ≤1,000 (300) | ≥28 (70) |
| Subbituminous coal | ≤1,000 (300) | ≥60 (150) |
| Lignite | ≤ 500 (150) | ≥60 (150) |
| Reserves[2], marginal reserves, and inferred reserves[2]: (Criteria same as reserve base and inferred reserved base but with factors based on engineering and economic analysis applied.) | | |
| Subeconomic resources: | | |
| Anthracite and bituminous coal | 0–1,000 (300) | 14 (35)–28 (70) |
| | 1,000 (300)–6,000 (1,800) | ≥14 (35) |
| Subbituminous coal | 0–1,000 (300) | 30 (75)–60 (150) |
| | 1,000 (300)–6,000 (1,800) | ≥30 (75) |
| Lignite | 0–500 (150) | 30 (75)–60 (150) |
| | 500 (150)–6,000 (1,800) | ≥30 (75) |

[1]The metric thicknesses shown in parentheses are not exact equivalents of the thicknesses shown in feet; for convenience, they have been rounded to the amounts shown.
[2]Includes some beds that are thinner and (or) deeper than the general criteria permit, but that are being mined currently.

bituminous) and 30 inches (75 cm; lignite and subbituminous) generally are excluded from resource consideration unless currently being mined. All coal beds deeper than 6,000 feet (1,800 m) are excluded. These limits are imposed as the result of consultations with geologists and mining engineers throughout the international coal community. In the United States, beds that contain more than 33 percent ash also are excluded; because of a shortage of energy in some countries, however, coal containing more than 33 percent ash is being mined and is classified as reserves.

Coal beds thinner or more deeply buried than the imposed limits have been mined locally at several places in the United States and are mined in other parts of the world; however, their extraction in the United States has generally not proven economic. Where such mining is taking place, the coal should be classed as a reserve and recorded at the time of assessment in the coal resource figures. With the few exceptions owing to current mining and similar future exceptions, the imposed limits should be adhered to. See general guideline No. 7, p. 32.

## SPECIFIC CRITERIA

Note.—Specific criteria and glossary terms are cross-referenced within this report. To aid the reader, specific criteria, beginning below, are printed in ***boldface italics***, and glossary items, beginning on p. 5, are printed in **boldface** type.

**anthracite and bituminous coal reserves.**—Tonnage estimates for these classes of coal are determined by summing the recoverable quantities of coal in the reserve base and are assigned to the following categories: (a) thickness of coal—28 to 42 inches (70 to 105 cm), 42 to 84 inches (105 to 215 cm), 84 to 168 inches (215 to 430 cm), more than 168 inches (>430 cm); and (b) thickness of overburden—0 to 500 feet (0 to 150 m) and 500 to 1,000 feet (150 to 300 m). Tonnage estimates for the bituminous coal class may be divided into low-volatile, medium-volatile, high-volatile A, high-volatile B, and high-volatile C groups. Similarly, tonnage estimates for the anthracite class may be divided into meta-anthracite, anthracite, and semianthracite groups. Reserves assigned to these coal classes must be considered as economically producible at the time of classification, but facilities for extraction need not be in place and operative. See specific instruction No. 3, p. 34.

***anthracite and bituminous coal inferred reserves.***—Tonnage estimates for these classes of coal are determined by summing the recoverable quantities of coal in the inferred reserve base and are assigned to the same coal thickness and overburden thickness categories as anthracite and bituminous coal reserves. Inferred reserves must be considered as economically producible at the time of classification. Facilities for extraction need not be in place and operative.

***anthracite and bituminous coal marginal and inferred marginal reserves.***—Tonnage estimates for these classes of coal are determined by summing the marginally recoverable quantities of coal in the reserve base and in the inferred reserve base and are assignable to the same categories of thickness of coal and overburden described for anthracite and bituminous coal reserves. These classes of coal may be divided into the same rank groups as described for anthracite and bituminous coal reserves. Marginal and inferred marginal reserves must be considered uncertain as to economic producibility at the time of classification. Facilities for extraction need not be in place and operative.

***anthracite and bituminous coal reserve base and inferred coal reserve base.***—See ***reserve base*** for thickness of coal and thickness of overburden criteria.

***anthracite and bituminous coal resources.***—Tonnage estimates for these classes of coals are determined by summing the estimates for anthracite and bituminous coal identified and undiscovered resources (fig. 3). They are assignable to the same thickness categories as for anthracite and bituminous coal reserves with the addition of a 14–28 inch (35–70 cm) category (see specific instruction No. 3, p. 34), and the following overburden categories are to be recognized: 0 to 500 feet (0 to 150 m); 500 to 1,000 feet (150 to 300 m); 1,000 to 2,000 feet (300 to 600 m); 2,000 to 3,000 feet (600 to 900 m); and 3,000 to 6,000 feet (900 to 1,800 m). Tonnage estimates for the bituminous coal class may be divided into the low-volatile, medium-volatile, high-volatile A, high-volatile B, and high-volatile C groups, and tonnage estimates for the anthracite class may be divided into the meta anthracite, anthracite, and semianthracite groups.

***cumulative depletion.***—*Cumulative depletion* is summed from all coal extracted and lost-in-mining prior to the date of the estimate, which may be subdivided on the basis of rank and subrank (class and group) of coal, overburden class, thickness class, mining method, heat value, usage, time, cokeability, chemical constituents, and area of production.

***cummulative production.***—*Cummulative production* is summed from production from a mine, field, basin, region, province, state, or nation prior to the date of the estimate, which may be subdivided on the basis of rank and subrank (class and group) of coal, overburden class, thickness class, mining method, heat value, usage, time, cokeability, chemical constituents, and area of production.

***demonstrated reserves*** and ***demonstrated marginal reserves.***—Tonnage estimates for these categories of coal are the sum of the estimates for measured and indicated reserves and marginal reserves, repectively, which are the preferred usages. See Reserves and Marginal Reserves, p. 18.

***demonstrated reserve base.***—Tonnage estimates for this category of coal are determined by summing the estimates for the measured and indicated reserves bases. The *demonstrated reserve base* is the same as the "reserve base," which is the preferred usage. See **reserve base,** p. 19.

***demonstrated resources.***—Tonnage estimates for this category are the sum of the estimates for the reserve base and subeconomic resources.

***economic resources.***—An informal term used by geologists to indicate their estimates of the coal resources that are potentially economic.

***hypothetical resources.***—Tonnage estimates for this category of resources are for (1) extensions of inferred resources (coal beyond a radius of 3 miles or 4.8 km from a point of measurement), and (2) regions where tonnage estimates are based on a knowledge of the geologic character of coal. *Hypothetical resources* include coal that is 14 inches (35 cm) or more thick (anthracite and bituminous coal) and 30 inches (70 cm) or more thick (subbituminous coal and lignite) to a depth of 6,000 feet (1,800 m). (See section on "Extrapolated Bed Map Method," p. 37; and "Extrapolated Coal Zone Method," p. 38; see also fig. 4.)

***identified resources.***—Tonnage estimates for this category of resource include all bituminous coal and anthracite 14 inches (35 cm) or more thick and all subbituminous coal and lignite 30 inches (75 cm) or more thick from the surface to a depth of 6,000 feet (1,800 m) whose location, rank, quality, and quantity have been determined within specified degrees of reliability as demonstrated, measured, indicated, and inferred.

***indicated.***—Virgin coal that lies between 1/4 mile (0.4 km) and 3/4 mile (1.2 km) from a point of thickness of coal measurement. (See fig. 4.)

***indicated marginal reserves.***—Tonnage estimates for this category of reserves include those parts of an indicated reserve base that at the time of determination border on being economically producible assuming certain projected economic or technologic changes. The assumed changes and the specific criteria suggesting potential economic profitability should be documented. (See **indicated**, p. 10; and fig. 4.)

***indicated reserves.***—*Indicated reserves* are estimated from an indicated reserve base by subtracting the assumed tonnage of coal that will be lost-in-mining and indicated marginal reserves. The remaining tonnage—the coal that is assumed will be extracted—is the *indicated reserves*, which must be considered as economically producible at the time of classification. However, facilities for extraction need not be in place and operative. (See **indicated,** p. 10; and fig. 4.)

***indicated reserve base.***—An *indicated reserve base* is determined by projection of thicknesses of coal and overburden, rank, and quality data from points of measurement and sampling on the basis of geologic evidence using the following criteria: (a) individual points of measurement are bounded by measured coal for 1/4 mile (0.4 km) succeeded by indicated coal from 1/4 mile (0.4 km) to 3/4 mile (1.2 km); and (b) *indicated reserve base* includes anthracite and bituminous coal 28 inches (70 cm) or more thick and subbituminous coal 60 inches (150 cm) or more thick to depths of 1,000 feet (300 m) and lignite 60 inches (150 cm) or more thick to depths of 500 feet (150 m). (See **indicated**, p. 10.)

***indicated resources.***—Tonnage estimates for *indicated resources* are computed by projection of thicknesses of coal and overburden, rank, and quality data from points of measurement and sampling on the basis of geologic evidence and are assigned to the following categories: (a) individual points of measurement are bounded by measured coal for 1/4 mile (0.4 km) succeeded by 1/2 mile (0.8 km) of indicated coal; and (b) *indicated resources* include anthracite and bituminous coal 14 inches (35 cm) or more thick and lignite and subbituminous coal 30 inches (75 cm) or more thick to a depth of 6,000 feet (1,800 m). The quantity of coal estimated as *indicated resources* is the same as the sum of the indicated reserve base, and indicated subeconomic resources. (See **indicated**, p. 10; and fig. 4.)

***inferred.***—Virgin coal that lies between 3/4 mile (1.2 km) and 3 miles (4.8 km) from a point of thickness of coal measurement. (See fig. 4.)

***inferred marginal reserves.***—Tonnage estimates for this category of reserves include those parts of an inferred reserve base that at the time of determination border on being economically producible assuming certain projected economic or technologic changes. The assumed changes and the specific criteria suggesting potential economic profitability should be documented. (See **inferred**, p. 10; and fig. 4.)

***inferred reserve base.***—An *inferred reserve base* is determined by projection of thicknesses of coal and overburden, rank, and quality data from points of measurement and sampling on the basis of geologic evidence using the following criteria: (a) individual points of measurement are bounded by measured and indicated coal for 3/4 mile (1.2 km) succeeded by inferred coal from 3/4 mile (1.2 km) to 3 miles (4.8 km); and (b) *inferred reserve base* includes anthracite and bituminous coal 28 inches (70 cm) or more thick, subbituminous coal 60 inches (150 cm) or more thick, all to depths of 1,000 feet (300 m), and lignite 60 inches (150 cm) or more in thickness to depths of 500 feet (150 m).

***inferred reserves.***—*Inferred reserves* are estimated from the inferred reserve base by subtracting the inferred marginal reserves and the coal that is estimated will be lost-in-mining. *Inferred reserves* must be considered as economically producible at the time of determination considering environmental, legal, and technologic constraints. Extraction facilities need not be in place and operative.

***inferred resources.***—*Inferred resources* are determined by projecting the thicknesses of coal and overburden, rank, and quality data from points of measurement and sampling on the basis of geologic knowledge and are assigned to the following categories: (a) individual points of measurement are bounded by measured and indicated coal for 3/4 mile (1.2 km) succeeded by 2-1/4 miles (3.6 km) of inferred coal; (b) *inferred resources* include anthracite and bituminous coals 14 inches (35 cm) or more thick and lignite and subbituminous coal 30 inches (75 cm) or more thick to depths of 6,000 feet (1,800 m). The quantity of coal estimated as an inferred resource is the same as the sum of the inferred reserve base and inferred subeconomic resources.

***lignite reserves.***—Tonnage estimates for this class of coal reserves are determined by summing the recoverable quantities of coal in the reserve base and are assigned to the following categories: (a) thickness of coal—5 to 10 feet (1.5 to 3.0 m), 10 to 20 feet (3 to 6 m), 20 to 40 feet (6 to 12 m), and more than 40 feet (>12 m); and (b) thickness of overburden—0 to 500 feet (0 to 150 m). Tonnage estimates for *lignite reserves* may be divided into the lignite A and B groups. Reserves assigned to the lignite class must be considered as economically producible at the time of classification, but facilities for extraction need not be in place and operative.

> *Discussion*: Currently, there are few underground ground lignite mines in the United States. In addition, there are few, if any, lignite strip mines that are removing as much as 300 feet (100 m) of overburden. In order to provide for future technologic and surface mining advances, the maximum thickness of overburden for surface-minable *lignite reserves* and reserve base is set at 500 feet (150 m). It is deemed inexpedient to estimate underground-minable *lignite reserves* and reserve base at depths greater than 500 feet (150 m). (See specific instruction No. 3, p. 34.)

***lignite marginal and inferred marginal reserves.***—Tonnage estimates for these classes of coal reserves are determined by summing the marginally recoverable quantities of coal in the reserve base and inferred reserve base and are assignable to the same categories of thicknesses of coal and overburden described for lignite reserves; coal may be divided into the lignite A and B groups. *Lignite marginal and inferred marginal reserves* must be considered as uncertain as to their economic producibility at the time of classification. Facilities for extraction need not be in place and operative.

***lignite inferred reserves.***—Tonnage estimates for this class of reserves are determined by summing the recoverable quantities of coal in the inferred reserve base and are assignable to the same categories of thicknesses of coal and overburden described for lignite reserves. Also, this class of coal may be divided into the lignite A and B groups. Such inferred reserves must be considered economically producible at the time of classification; facilities for extraction need not be in place and operative.

***lignite reserve base and inferred reserve base.***—See ***reserve base*** for thickness of coal and thickness of overburden criteria.

***lignite resources.***—Tonnage estimates for this class of coal are determined by summing the estimates for lignite identified and undiscovered resources. The same thickness categories as for lignite reserves are to be used with the addition of a 30–60 inches (75–150 cm) category (see specific instruction No. 3, p. 34), and the following overburden categories are to be recognized: 0 to 500 feet (0 to 150 m); 500 to 1,000 feet (150 to 300 m); 1,000 to 2,000 feet (300 to 600 m); 2,000 to 3,000 feet (600 to 900 m); and 3,000 to 6,000 feet (900 to 1,800 m). The tonnage estimates for this class of coal may be divided into lignite A and B groups.

***measured.***—Accessed and virgin coal that lies within a radius of 1/4 mile (0.4 km) of a point of thickness of coal measurement. (See fig. 4.)

***measured marginal reserves.***—Accessed and virgin coal that lies within a radius of 1/4 mile (0.4 km) of a point of thickness of coal measurement. Tonnage estimates for this category of reserves includes those parts of a measured reserve base that at the time of determination border on economic producibility assuming certain projected economic or technologic changes. The assumed changes and the specific criteria suggesting potential economic producibility should be documented. (See **measured**, p. 12; and fig. 4.)

***measured reserves.***—*Measured reserves* are estimated from a measured reserve base by subtracting the sum of the assumed tonnage of coal that will be lost-in-mining and measured marginal reserves. The remaining tonnage—the coal that is assumed will be extracted—is *measured reserves* which must be considered as economically producible at the time of classification; however, facilities for extraction need not be in place and operative.

***measured reserve base.***—A *measured reserve base* is determined by projection of thicknesses of coal and overburden, rank, and quality data from points of measurement and sampling on the basis of geologic evidence for a radius of 1/4 mile (0.4 km). A *measured reserve base* includes anthracite and bituminous coal 28 inches (70 cm) or more thick and subbituminous coal 60 inches (150 cm) or more thick to depths of 1,000 feet (300 m) and lignite 60 inches (150 cm) or more thick to depths of 500 feet (50 m).

***measured resources.***—Tonnage estimates for *measured resources* are computed by projection of thicknesses of coal and overburden, rank, and quality data for a radius of 1/4 mile (0.4 km) from a point of measurement. Measured resources include anthracite and bituminous coal 14 inches (35 cm) or more thick and lignite and subbituminous coal 30 inches (75 cm) or more thick to depths of 6,000 feet (1,800 m). The quantity of coal estimated as measured is the same as the sum of the measured reserve base and measured subeconomic resource.

***original resources.***—Tonnage estimates determined for coal in the ground prior to production. Where coal has been mined, estimates are made by summing remaining resources, cummulative production, and coal lost-in-mining. An estimate of total original resources is the sum of the original resources determined for many mines, fields, basins, regions, provinces, States, and the Nation. (See ***resources*** for thicknesses of coal and overburden; and **lost-in-mining**, p. 12.)

***other occurrences, noneconomic coal.***—Such coal, except where mined locally, consists of anthracite and bituminous coal beds less than 14 inches (35 cm) thick; lignite and subbituminous coal beds less than 30 inches (75 cm) thick; and all coal beds that are buried by more than 6,000 feet (1,800 m) of overburden; coal containing more than 33 percent ash; and that coal lost-in-mining that is considered noneconomic. Tonnage estimates are optional for such coal. However, if estimates are made, they should be reported as "other occurrences" and not

as resources. However, where currently mined, coal that is considered too thin or too high in ash and would normally be classed as "other occurrences" is to be classed as reserves.

***rank assignments.***—The assignment of rank is a necessary part of classifying a coal; however, data for determining rank are commonly sparse or are far-removed from the localities where the data required for rank assignment is needed. In general, rank gradually changes laterally over many miles or stratigraphically over hundreds to thousands of feet. Because of the lack of data in some areas, conclusions concerning *rank assignments* commonly must be derived from analytic or petrographic determinations made on coal that lies some distance from where the rank assignment is desired. Conclusions concerning rank where analytic or petrographic data are sparse must be viewed as tentative. However, if a geologist's understanding of the setting of the area sampled is adequate, the rank assignment probably will be correct even though the rank data are sparse.

***rank calculation.***—The rank of coal is to be calculated by using the following instructions which are quoted from the standard specifications for classification of coals by rank (ASTM Standards, 1981, p. 212–216):

8. Calculation to Mineral-Matter-Free Basis

8.1 *Calculation of Fixed Carbon and Calorific Value:* For classification of coal according to rank, fixed carbon and calorific value shall be calculated to the mineral-matter-free basis in accordance with either the Parr formulas, Eqs 1, 2, and 3, or the approximation formulas, Eqs 4, 5, and 6, that follow. In case of litigation use the appropriate Parr Formula.

8.2 Calculation to Mm-free basis:

*Parr Formulas:*

$$\text{Dry, Mm-free FC} = \frac{(\text{FC} - 0.15\text{S})}{[100 - (\text{M} + 1.08\text{A} + 0.55\text{S})]} \times 100 \quad (1)$$

$$\text{Dry, Mm-free VM} = 100 - \text{Dry, Mm-free FC} \quad (2)$$

$$\text{Moist, Mm-free Btu} = \frac{(\text{Btu} - 50\text{S})}{[100 - (1.08\text{A} + 0.55\text{S})]} \times 100 \quad (3)$$

Note—The above formula for fixed carbon is derived from the Parr formula for volatile matter.

*Approximation Formulas:*

$$\text{Dry, Mm-free FC} = \frac{\text{FC}}{[100 - (\text{M} + 1.1\text{A} + 0.1\text{S}]} \times 100 \quad (4)$$

$$\text{Dry, Mm-free VM} = 100 - \text{Dry, Mm-free FC} \quad (5)$$

$$\text{Moist, Mm-free Btu} = \frac{\text{Btu}}{[100 - (1.1\text{A} + 0.1\text{S})]} \times 100 \quad (6)$$

where

Mm = Mineral matter,
Btu = British thermal units per pound (calorific value),
FC = percentage of fixed carbon,
VM = percentage of volatile matter,
M = percentage of moisture,
A = percentage of ash, and
S = percentage of sulfur.

Above quantities are all on the inherent moisture basis. This basis refers to coal containing its natural inherent or bed moisture but not including water adhering to the surface of the coal.

***recovery factor method.***—Only a part of the coal in any deposit can be extracted when mined. The coal not extracted during underground mining, strip mining, or auger mining; the coal that becomes a part of a underground or strip-mine waste pile; or the coal that is not removed adjacent to a strip-mine or underground-mine boundary is considered as lost-in-mining unless sufficient tonnages are left unextracted so that additional mining or recovery can be foreseen.

If it is not feasible or possible to calculate the reserves of an area using an economic analysis, a reasonable approximation of the reserves can be determined by using the *recovery factor method* described hereafter.

Each operating mine has a unique percentage of coal that is recovered. This percentage is termed the recovery factor of the mine and is obtained from the following formula:

$$RF = \frac{Y \times 100}{X}$$

where

$RF$ = Recovery factor or percent coal estimated extractable during mining,
$X$ = The total tonnage of coal estimated in the ground,
$Y$ = The tonnage of coal estimated to be recoverable during mining.

A recovery factor can be applied to a reserve base to obtain an estimate of the reserves of an area. Such use of a recovery factor is appropriate when there is a paucity of geologic data for estimating the tonnage of potentially extractable coal.

It is difficult to estimate accurately the recoverable coal in a very large area such as a field, region, province, basin, State, or the Nation because it is impossible to determine how much coal in the area will not be mined for legal or environmental reasons, what method

or methods of mining will be used, and what the average recovery factor will be for all mining methods.

A reserve base and reserves have been estimated by industry for most operating mines in the United States. Generally, data that can be used to compute recovery factors for individual mines are closely held by the operators; therefore, there is little publicly available information to guide estimators in determining local, regional, and national recovery factors. Commonly, estimators must extrapolate recovery factors from experience gained in a few mines by assuming that (1) geologic conditions controlling mining will be similar, and (2) success in the recovery of coal in unmined areas will be similar to that of mined areas utilizing the same mining method. Such extrapolation of recovery factors from a few well known mined areas to less well known or unknown areas requires experience regarding the geology, the mining method or methods to be employed, and an awareness of the difficulties, geologic and otherwise, that affect the estimation of reserves. Area, quadrangle, township, field, basin, province, county, State, and national recovery factors can be determined by using formulas after determining the mean recovery factor in percent for many mines, ascertaining the quantity of reserve base coal in the area of study, and ascertaining the total quantity of coal that is restricted from mining for any legal, environmental or technologic reason. These formulas are:

$$Z = 100 \frac{X}{Y}$$

$$NRF = W(100 - Z)$$

where

$X$ = tonnage of coal restricted from extraction for any legal, environmental, or technologic reason,

$Y$ = tonnage of coal included in the reserve base category of a large area,

$Z$ = restricted coal (percent),

$W$ = recovery factor percent obtained from local mines, and

$NRF$ = National, State, or large area recovery factor in percent applied to all coal including restricted.

In the United States, recovery factors for underground mining as determined from mine maps of abandoned and operating mines generally range from about 35 to about 70 percent and average about 50 percent. Similarly, recovery factors for abandoned and operating surface mines range from about 70 to 95 percent and average about 80 percent. These local recovery factors are valid for individual mines but are not valid for large areas because they fail to consider the coal lost-in-mining such as (1) the coal that will not be mined between properties, and (2) coal in overlying and underlying beds rendered usuitable for future mining by past underground mining. Further, the local recovery factors do not consider the coal that is restricted or prohibited from mining, such as the coal underlying national parks and wild life sanctuaries; coal that is too deep and too thin to be mined because of excessive costs; and coal that cannot be mined because of unsolved technologic, geologic, or engineering problems.

The authors recommend applying a recovery factor of 50 percent to the reserve base when computing underground and surface mining reserves of large areas. However, if actual local recovery factors have been calculated, the procedure outlined with the two formulas should be implemented for smaller areas.

***remaining resources.***—The resources remaining in the ground after prior mining. These resources include identified and undiscovered resources and include coal lost-in-mining whose attributes indicate possible future recovery. See ***resources***, for thickness of coal and overburden criteria, and figure 3.

***reserve base.***—A tonnage estimate for this category of coal consists of the sum of the estimates for measured and indicated reserves, marginal reserves, and a part of the measured and indicated subeconomic resources (the coal that has or will be lost-in-mining). The *reserve base* is the same as the demonstrated reserve base. The term *reserve base* is preferred for reports of the U.S. Geological Survey. The criteria for the *reserve base* include bituminous coal and anthracite 28 inches (70 cm) or more thick, subbituminous coal 5 feet (1.5 m) or more thick that occurs at depths to 1,000 feet (300 m), and lignite 5 feet (1.5 m) or more thick that occurs at depths to 500 feet (150 m).

*Discussion*: Individual reserve bases, where needed and appropriate, are to be determined by categories of reliability, thicknesses of coal and overburden; rank, chemical constituents, ash content, heat value, and potential usage. Additionally, estimated individual reserve base estimates are to be summed into totals for each township, quadrangle, coal field, basin, region, province, township and range, county, State, and the Nation. Assignment of coal to a reserve



Stagg Dec. -- Exhibit 2
APP. III 664

base is controlled by physical and chemical criteria such as categories of reliability, thicknesses of coal and overburden, rank of coal, and knowledge of depositional patterns of coal beds and associated structural features. Changing economic, technologic, and environmental considerations do not control assignment of coal to a reserve base. In contrast, the discrimination of reserves is largely controlled by economic factors such as judgments of cost, profit, and supply of and demand for coal. Reserve discrimination is controlled secondarily by advances or differences in mining, preparation and transportation technologies, and by environmental regulations, laws, and judicial rulings.

The physical and chemical criteria used to assign coal to a reserve base category have been used already to evaluate many coal beds that are currently mined in the United States. These evaluations indicate coal assigned to a reserve that is derived from a physically-chemically defined *reserve base* can be expected to be economically minable with a high degree of confidence. In a few places, however, where the thickness of a coal bed or associated rock conditions are exceptionally variable or severe, the varying tonnages of coal classified as a reserve from a physically and chemically defined *reserve base* may or may not prove to be extractable at a profit.

Changes in environmental laws and regulations generally affect the tonnages of coal assigned to the various categories of the *reserve base*; however, assessments of these changes have not been made.

***reserves.***—Reserve tonnage estimates are to be determined by summing the recoverable quantities of coal in the reserve base for each rank of coal and are assigned to the following categories: (1) thickness of overburden—0 to 500 feet (0 to 150 m) and 500 to 1,000 feet (150 m to 300 m); and (2) thickness of coal—28 to 42 inches (70 to 105 cm), 42 to 84 inches (105 to 215 cm), 84 to 168 inches (215 to 430 cm), and more than 168 inches (>430 cm) for anthracite and bituminous coal; and 5 to 10 feet (1.5 to 3.0 m), 10 to 20 feet (3.0 to 6.0 m), 20 to 40 feet (6.0 to 12.0 m), and more than 40 feet (>12.0 m) for subbituminous coal and lignite. (See specific instruction No. 3, p. 34.) *Reserves* must be considered as economically producible at the time of classification, but facilities for extraction need not be in place and operative. In addition, categories based on potential mining methods (surface and underground); chemical constituents such as sulfur, phosphorous and ash content; heat value; and usage such as metallurgical, steam, petrochemical, gasification, and liquefaction are desirable. *Reserves* and marginal reserves are estimated by determining the amount of coal in each reserve base category that can be extracted at the time of classification (*reserves*), and the amount that borders on being extractable at a profit (marginal reserves). These two amounts and the amount that will be lost-in-mining, when summed, are equal to the reserve base. The estimates of each reserve category are to be totaled into quadrangle, township, field, basin, region, province, county, and State estimates, and into a national total, and then the various estimates for all categories are to be totaled similarly to reach an inclusive estimate of all *reserves*.

*Reserves* are derived from the reserve base, which includes bituminous coal and anthracite 28 inches (70 cm) or more thick, subbituminous coal 5 feet (1.5 m) or more thick that occurs at depths to 1,000 feet (300 m), and lignite 5 feet (1.5 m) or more thick that occurs at depths to 500 feet (150 m). *Reserves* also include thinner and (or) more deeply buried beds of these ranks of coal that are currently being mined.

***resources.***—Tonnage estimates for coal resources are determined by summing the estimates for identified and undiscovered deposits of coal that are 14 inches (35 cm) or more thick for anthracite and bituminous coal and under less than 6,000 feet (1,800 m) of overburden, and 30 inches (75 cm) or more thick for lignite and subbituminous coal and under less than 6,000 feet (1,800 m) of overburden.

***speculative resources.***—As of publication of this circular, there are no speculative resources of coal estimated for the United States. However, if it is desirable to make such estimates, the definition of Speculative Resources (p. 20) and the criteria for ***resources*** will be followed, and the geologic evidence supporting the estimates and methods of quantification will be made available publicly.

***subbituminous coal inferred reserves.***—Tonnage estimates for this class of coal are determined by summing the recoverable quantities of coal in the inferred reserve base and are assigned to the same categories of thickness of coal and overburden described for ***subbituminous coal reserves***. This class of coal may be divided into the same rank groups as described for ***subbituminous coal reserves***. Inferred reserves must be considered as economically producible at the time of classification. However,

facilities for extraction need not be in place and operative.

***subbituminous coal marginal and inferred marginal reserves.***—Tonnage estimates for these classes of coal are determined by summing the marginally recoverable quantities of coal in the reserve base and inferred reserve base, respectively, and are assigned to the same categories of thicknesses of coal and overburden described for ***subbituminous coal reserves***. These classes of coal may be divided into the same rank groups as described for ***subbituminous coal reserves***. Marginal and inferred marginal reserves must be considered uncertain as to their economic producibility at the time of classification. Facilities for extraction need not be in place and operative.

***subbituminous coal reserves.***—Tonnage estimates for this class of coal are determined by summing the recoverable quantities of coal in the reserve base and are assigned to the following categories: (a) thickness of coal—5 to 10 feet (1.5 to 3.0 m), 10 to 20 feet (3.0 to 6.0 m), 20 to 40 feet (6.0 to 12.0 m), and more than 40 feet (>12.0 m) (see specific instruction No. 3, p. 34); and (b) thickness of overburden—0 to 500 feet (0 to 150 m) and 500 to 1,000 feet (150 to 300 m). Such reserve estimates may be divided into subbituminous A, B, and C rank groups. Reserves assigned to this coal class must be considered as economically producible at the time of classification, but facilities for extraction need not be in place and operative.

***subbituminous coal reserve base and inferred reserve base.***—See ***reserve base*** for thickness of coal and thickness of overburden categories.

***subbituminous coal resources.***—Tonnage estimates for this class of coals are determined by summing the estimates for identified and undiscovered subbituminous coal resources. The same thickness categories as for subbituminous coal reserves are to be used with the addition of a 30 inches-5 feet (75 cm-1.5 m) category (see specific instruction No. 3, p. 34), and the following overburden categories are to be recognized: 0 to 500 feet (0 to 150 m); 500 to 1,000 feet (150 to 300 m); 1,000 to 2,000 feet (300 to 600 m); 2,000 to 3,000 feet (600 to 900 m); and 3,000 to 6,000 feet (900 to 1,800 m). Such resource estimates may be divided into subbituminous coal A, B, and C rank groups.

***subeconomic resources and inferred subeconomic resources.***—Tonnage estimates for these classes of coal are determined by summing the estimates for measured, indicated, and inferred resources that do not meet the criteria for assignment to the reserve base or inferred reserve base because they are too thin to mine, are too deeply buried to mine, or are those parts of the reserve base or inferred reserve base that have been or will be lost-in-mining but whose attributes indicate future recovery may become feasible. Included are all measured, indicated, and inferred reliability categories of bituminous coal and anthracite beds 14 to 28 inches (35 to 70 cm) thick, all subbituminous coal beds 30 to 60 inches (75 to 150 cm) thick that are less than 1,000 feet (300 m) below the surface, and all lignite beds 30 to 60 inches (75 to 150 cm) thick that are less than 500 feet (<150 m) below the surface, unless the coal in these beds will be recovered in the process of extracting coal from thicker beds. Also included are all beds of bituminous coal and anthracite 14 inches (35 cm) or more thick and beds of subbituminous coal 30 inches (75 cm) or more thick that occur at depths between 1,000 and 6,000 feet (300 and 1,800 m) and lignite beds 30 inches (75 cm) or more thick and more than 500 feet (>150 m) below the surface.

***thickness of coal for resource calculations.***—The thickness of coal used for resource calculations is the net thickness of coal in a bed excluding all partings more than 3/8 inch (>1 cm) thick. Beds and parts of beds made up of alternating layers of thin coal and partings are omitted from calculations if the partings comprise more than one-half of the total thickness. Also, benches of anthracite and bituminous coal less than 14 inches (35 cm) thick and benches of subbituminous coal and lignite less than 30 inches (75 cm) thick are omitted from calculations if they lie above or below partings that may deter their mining. Coal and coaly material containing more than 33 percent ash is excluded from resource and reserve estimates unless the ash is largely in associated partings so that the coal is cleanable to less than 33 percent ash. (See **parting**, p. 15, and specific instruction No. 13, p. 36.)

***undiscovered resources.***—Tonnage estimates for this category of resources are based (1) on knowledge of the geologic character, habit, and pattern of a coal bed or coal zone in an area or region or (2) on speculative geologic data. Estimates are made by summing the tonnage estimates for coal assigned to the hypothetical and speculative resources reliability categories. Included are hypothetical and speculative resources of bituminous coal and anthracite in beds 14 inches (35 cm) or more

thick and hypothetical and speculative resources of subbituminous coal and lignite in beds 30 inches (75 cm) or more thick presumed to occur in mapped areas and in unmapped or unexplored areas to depths of 6,000 feet (1,800 m).

## GUIDELINES FOR ESTIMATING COAL RESOURCES

These guidelines were prepared so that coal-resource workers will have logical and uniform procedures to follow. They combine the best features of the procedures used in preparing many previously published estimates of State and national coal resources with additions and modifications from numerous conferences with experienced coal resource estimators.

These guidelines are aimed at producing a uniformity of procedures so that coal-resource estimates prepared by various individuals and groups can be compared and (or) combined into meaningful totals for a quadrangle, township and range, coal field, basin, region, province, county, state, nation, continent, and (or) the world.

Some statements in the guidelines obviously are not rigidly applicable to all coal beds or coal-bearing areas. Where such shortcomings are perceived, a logical procedure is to develop new guidelines to effect appropriate changes in methodology so that they can be studied, criticized, and accepted or rejected by others.

The following statements are to be strictly adhered to by all coal resource specialists in the U.S. Geological Survey: *(1) All tables of coal resource or reserve estimates must contain a date and appropriate authorship information; and (2) each table of coal resource or reserve estimates must show where supporting basic data were located at the time of estimation.*

## GENERAL GUIDELINES FOR CLASSIFICATION OF COAL RESOURCES

These general guidelines are required for uniform classification and reporting of coal into the different resource categories. They are modeled after the guidelines in Circular 831 (U.S. Geological Survey, 1980, p. 3–4) for all minerals.

1. All naturally occurring concentrations of coal can be distributed into one or more of the classification categories.
2. Where the term "reserves" is used without a modifying adjective, for example, marginal, indicated, restricted, low-sulfur, or inferred, it is to be considered synonomous with the demonstrated-economic category.
3. Quantities and qualities of coal may be expressed in a variety of terms and units to suit different purposes but must be clearly stated and defined.
4. A reserve base is a resource category delineated only by physical and chemical criteria. A major purpose for the recognition and discrimination of a reserve base is to aid in long-range public and commercial planning. A reserve base estimate for specific rank, thicknesses of coal and overburden, quality, usage, geologic formation, age, depositional environment, and many other factors can be specified for any given deposit or area, or for the Nation. The position of the lower boundary of a reserve base is intended to extend into the subeconomic category. The intention of this extension is to define quantities of in-place material, parts of which may become economic depending on the extraction plan finally utilized. As a result of any given extraction plan, the reserve base can be subdivided into component parts—reserves, marginal reserves, and a remnant of subeconomic resources. For the purpose of Federal (USGS) assessment, criteria for the reserve base are listed on page 29 of this report.
5. Undiscovered resources should be subdivided in accordance with the definitions of hypothetical and speculative resources or they may be subdivided in terms of relative probability of occurrence (see figs. 1 and 2).
6. Inferred reserves and the inferred reserve base represent postulated extensions of reserves and the reserve base. They are identified resources but are quantified with a relatively low degree of certainty. Postulated quantities of resources based on geologic inference alone should be assigned to the undiscovered categories.
7. Locally, limited quantities of coal may be produced from beds that are of insufficient thickness or are too deeply buried to be classified as reserves. This situation arises when production facilities are already established or when favorable local circumstances, such as particular coal qualities or removal of overburden for other purposes, make it possible to produce coal that otherwise could not be extracted profitably. Where such production is occurring, the quantity of in-place coal (including coal for in situ gasification) shall be included in a reserve base and the quantity that is potentially producible shall be documented as reserves. The profitable production of such coal, however, should not be used as a rationale to assign a reserves classification to coal in other areas having similar overburden, thickness of coal, and qualities.
8. Coal resources classified as reserves must be considered as economically producible at the time of

classification. Conversely, coal not currently producible at a profit cannot be classified as reserves. However, there are situations in which mining plans are being made, lands are being acquired, or mines and plants are being constructed to produce coal that does not meet economic criteria for reserve classification under current costs and prices but that would do so under reasonable future projections and expectations. The marginal reserve category applies to such situations. When economic production appears certain, coal classified as marginal reserves will be reclassified as reserves. Marginal reserves also may include any other coal whose economic producibility borders on being profitable.

9. Tonnage of coal that is too impure, too thin, too deep, or for other reasons not considered to be potentially economic may be estimated, but is not to be classified as a resource. These tonnages may be classified in the box labeled "other occurrences" in figures 1, 2, and 3.
10. Rank classes of coal, for example, bituminous coal as distinct from lignite, should be separately quantified.
11. The amount of cumulative production is not a part of the remaining coal resources. However, an understanding of what has been produced in the past is important to resource understanding, both in terms of the amount of production and the amount of coal remaining in place. Separate accounting for cumulative production should be made for each report area, county, State, and the Nation.
12. By-passed coal in large blocks left in the ground during mining, or planned to be left in the ground during current or future extraction, should be recorded in an appropriate resource category depending upon its economic recovery potential. Coal lost-in-mining should also be recorded in an appropriate resource category if there is a potential for further recovery.
13. In classifying reserves and resources it may be necessary to recognize locally that some coal deposits derive their economic viability from coproduct or byproduct relationships with other commodities.
14. Factors other than economic and geologic considerations, including legal, regulatory, environmental, and political concerns, may restrict or prohibit the utilization of all or part of a coal deposit. Reserve and resource quantities known to be restricted should be recorded as such in an appropriate category.
15. This classification system allows for the presentation of more subdivisions than will commonly be reported or for which data are available. Where appropriate, subdivisions may be aggregated or omitted.
16. Data supporting resource estimates are to be documented and preserved.

## SPECIFIC INSTRUCTIONS

### 1. RANK OF COAL

Where coal of more than one rank class or rank group is covered by an individual report, the resource data shall be reported separately for each major rank class and when possible for each rank group listed below:

| *Class* | *Rank group* | *Abbreviation* |
|---|---|---|
| Anthracite | Meta-anthracite | ma |
| Do | Anthracite | an |
| Do | Semianthracite | sa |
| Bituminous coal | Low-volatile bituminous coal | lvb |
| Do | Medium-volatile bituminous coal | mvb |
| Do | High-volatile A bituminous coal | hvAb |
| Do | High-volatile B bituminous coal | hvBb |
| Do | High-volatile C bituminous coal | hvCb |
| Subbituminous coal | Subbituminous A coal | subA |
| Do | Subbituminous B coal | subB |
| Do | Subbituminous C coal | subC |
| Lignite | Lignite A | ligA |
| Do | Lignite B | ligB |

Abbreviations can be used wherever appropriate in reports and tables.

### 2. OVERBURDEN

Tonnage estimates shall be reported according to thickness of overburden:

| *Mandatory underground mining categories:* | *Mandatory and optional surface mining categories*[1]: |
|---|---|
| 0 to 500 feet (0 to 150 m) | 0 to 500 feet (0 to 150 m) mandatory use |
| 500 to 1,000 feet (150 to 300 m) | 0 to 100 feet (0 to 30 m) optional use |
| 1,000 to 2,000 feet (300 to 600 m) | 100 to 200 feet (30 to 60 m) optional use |
| 2,000 to 3,000 feet (600 to 900 m) | 0 to 200 feet (0 to 60 m) optional use |
| 3,000 to 6,000 feet (900 to 1,800 m) | 200 to 500 feet (60 to 150 m) optional use |
| *Optional other occurrence category:* | |
| >6,000 feet (>1,800 m) | |

[1]Use of optional surface mining categories requires the complete coverage of the 0-500 feet (0-150 m) category. Other categories may be used if they are in increments of 100 feet (30 m) and do not exceed 500 feet (150 m).



Stagg Dec. -- Exhibit 2
APP. III 668

Resources of currently and potentially strippable and underground minable coal beds and coal zones shall be computed for the 0–500 feet (0–150 m) overburden category. Use of the surface mining optional categories allows tonnage estimates to be related to overburden. When optional categories are used, the sum of their tonnage estimates must be equal to the tonnage estimate for the 0–500 feet (0–150 m) category.

In addition, other criteria such as the ratio of overburden to coal thickness or the ratio of cubic yards of overburden to tonnage of coal may be used to outline and evaluate strippable coal deposits. Such departures from the standard categories and criteria are advisable only where there is adequate data.

### 3. THICKNESS OF COAL CATEGORIES

Tonnage estimates shall be reported by rank and thickness of coal:

| *Anthracite and bituminous coal* | *Subbituminous coal and lignite* |
|---|---|
| 14 to 28 inches (35 to 70 cm)[1] | 2.5 to 5 feet (75 to 150 cm)[1] |
| 28 to 42 inches (70 to 105 cm) | 5 to 10 feet (150 to 300 cm) |
| 42 to 84 inches (105 to 210 cm) | 10 to 20 feet (300 to 600 cm) |
| 84 to 168 inches (210 to 420 cm) | 20 to 40 feet (600 to 1,200 cm) |
| 168 inches or thicker (420 cm + ) | 40 feet or thicker (1,200 cm + ) |

[1]Centimeter thicknesses may be reported in meters.

### 4. SIZE OF UNIT AREA

For future planning by Federal and State governments, industry, and the public, coal resources such as identified resources, reserve base, and reserves, are to be estimated for relatively small areas. Unit areas the size of townships, 7.5-minute quadrangles, and 15-minute quadrangles generally are satisfactory. For specific purposes such as tract assessment, evaluation, and management, however, it may be desirable and (or) necessary to report estimates for areas as small as an individual land section, or smaller.

In addition, there are many requirements for estimating the remaining tonnages and type of coal for each coal-bearing county, State, and the Nation. Although tonnage estimates for most currently known coal-bearing counties and States exist, many are inadequate and out of date. Numerous requests for information emphasize the need for modern reliable county and State estimates. Such modern estimates are to be prepared as information becomes available and can be assembled. The unit area for such re-evaluations is logically a completed county, the smallest unit universally employed by State and National agencies. Therefore, all resource estimates regardless of size of area (except for State and national estimates) must be reported by the county in which they occur.

### 5. MAJOR CATEGORIES OF RESOURCES

Estimates of the total coal tonnages in the following resource categories are required, where data are available, for adequate inventorying of county, State, and national coal resources: measured, indicated, inferred, and hypothetical resources; reserve base and inferred reserve base; and original resources and remaining resources. Additional divisions of total resource estimates are not required but are desirable to document more thoroughly the quantities of coal available for particular uses.

### 6. COAL BED MAPS

A map of each coal bed or coal zone known to contain coal resources must be prepared to document the estimate for coal resources. A coal bed map will show (1) the trace of a bed's outcrop; (2) all points where the thickness of coal was measured at outcrops and other surface exposures; (3) all wells, drill holes, and subsurface points where the thickness of coal was measured; (4) county, State, and national boundaries; (5) land lines (townships and ranges) and latitude and longitude coordinates; (6) boundaries of Federal and State Parks, forests, wildlife refuges, grasslands, military bases, and areas known to be environmentally or legally restricted from mining; (7) reliability categories; (8) isopachs of thicknesses of coal and overburden; (9) structure contours; (10) areas where coal is absent because of erosion or nondeposition; (11) structural features affecting coal, such as fold axes and traces of faults; and (12) boundaries of prior surface and subsurface mining. Information derived from proprietary data can be deleted where required by the author in preparing a bed map for publication. Such proprietary information may include, for example, points of thicknesses of coal beds and overburden, drill-hole locations, mine boundaries, and other data furnished by mining companies or land proprietors. Coal beds may be so numerous in some areas that only selected bed maps of the major deposits would be published, even though bed maps of all coal beds would be prepared in order to estimate the resources.

Figures 9 through 23 show how to prepare parts of a coal bed map. Tables 4 through 7 show listings of areas of reliability by thicknesses of coal and overburden categories derived from figures 9 through 23. The areal

interrelations of data depicted on a coal bed map define a series of areas, each of which represent a separate coal resource category. The areal extent, average thickness of coal, and the depth, rank, and weight of coal per unit-volume in each area must be determined in order to estimate the tonnages of coal underlying each area.

### 7. THICKNESS OF COAL MEASUREMENTS

The stratigraphic thickness of coal is measured at outcrops, in trenches and prospect pits, at mine faces either underground or in surface pits, and in drill holes by direct measurement or geophysical logging. (See "Geophysical Logs* * *," p.46.) *Measurements may be made in inches or in feet and inches, in feet and tenths of feet, or in meters and centimeters.* Partings in a coal bed greater than 3/8 inch (1 cm) should be excluded from the thickness measurements of a coal bed when estimating coal resources (see ***thickness of coal for resource calculations***, p. 31, and specific instruction No. 3, p. 34) but should be recorded as stratigraphic information. *Field measurements of the thicknesses of coal beds should be made to the nearest 1 inch, tenth of a foot, or metric equivalent. Thicknesses determined from core and drill-hole logs and from geophysical logs should be reported to the smallest practical unit of measurement. The weighted average thickness of a coal bed based on field measurements in an area should be reported to the nearest inch, tenth of a foot, or metric equivalent.* An average thickness should be determined by using all measurements of coal, by the thickness gradients between measurements, and by isopaching. The thickness of coal at specific points should be recorded on coal bed maps, and then the bed should be isopached using the points of measurements and gradients between the points. An isopach should be drawn along each of the standard coal thickness category limits pertinent to the rank and thickness of coal in the area to be estimated. The weighted average thickness of an area of coal is calculated by estimating the size of each isopach unit according to the percent or proportion of the area covered by the unit. Where mining has been extensive, the thickness of coal in unmined areas can be extrapolated from data on thicknesses of coal obtained from mine maps and from adjacent mines.

### 8. DISTRIBUTION OF COAL BED THICKNESS MEASUREMENTS

The distribution of data points is exceedingly important in the estimation of coal resources because distribution (including spacing) is universally considered as the ultimate control governing the reliability, accuracy, and precision of any estimation. In most areas the coal resource worker must rely on existing outcrops, trenches, prospect holes, mine workings, and drill-hole data. If drilling is possible, a drilling pattern should be established, on the basis of geologic knowledge, to supplement the existing data so as to raise the assignment of coal resources to a higher degree of reliability.

### 9. MEASUREMENT OF AREAS

Coal-bearing areas, as determined from coal bed maps (see figs. 9–23) are to be measured to a precision of 2 percent or less. Such determinations may be made with a planimeter, with graph paper, with equally spaced dots, or with a computer. The most common instrument used for area determinations is the polar planimeter. In recent years the digital electronic planimeter has become increasingly popular. Prior to determining areas with a planimeter, a planimeter factor for acres or hectares, which depends upon the scale of the map used, must be ascertained. This is done according to instructions that accompany the planimeter. A similar factor must be determined if the graph paper technique of determining acreages is employed. After either factor is ascertained, the user is prepared to start measuring areas on the map and to convert the measurements using the appropriate planimeter or graph paper factor into acres or hectares.

On many 7.5-minute quadrangles, several dozen to several hundred areas must be measured that are based on the many parameters into which coal-bearing areas can be categorized. These parameters may include thicknesses of coal and overburden; distance from points of coal thickness measurements (reliability categories); quality; physical characteristics; rank, land ownership by Federal, State, Indian, and local governments, companies, individuals, and other nations; county, State, and townships and ranges of the land classification system; quadrangle, coal field, basin, region, and province; legally and environmentally restricted areas, and others as desired.

As the areas are measured, mean results ascertained by averaging the planimeter or graph paper readings are recorded so that each area's acreage can be computed.

A planimeter is accurate in measuring map areas ranging from several square inches to 20–30 square inches. Generally, planimetric measurements are repeated several times and then averaged. However, if readings are in disagreement by more than 2 percent, they should be repeated until an agreement of 2 percent, or less, is achieved. Map areas of less than 1 square inch

commonly are not as precisely measureable with a planimeter as are larger map areas and must be remeasured and the planimeter vernier read many times to obtain an agreement within a 2-percent error. Repetition of planimetric measurements with only two vernier readings, one at the beginning and one at the end, can be accomplished by continuously tracing the borders of the area being measured a predetermined number of times in a manner similar to the repetitive turning of angles with a transit by a surveyor. The difference between the two readings should be divided by the number of times the borders are traced; the answer multiplied by the planimeter factor is the size of the area. This repetitive measurement of an area is a good method of obtaining precise planimetric readings.

## 10. WEIGHT OF COAL PER UNIT VOLUME

A tonnage estimate for any coal deposit can be made if the thickness of coal, areal extent, and weight of coal per unit volume are known. The weight of coal per unit volume (density) or specific gravity varies with rank, ash content, and the amount of each macerals group (such as vitrinite, inertinite, and exinite) in the coal. Ideally the density of coal in a deposit should be determined from numerous specific gravity determinations on unbroken coal, but there are rarely sufficient determinations to characterize a deposit. Therefore, it is recommended that tonnage calculations be based either on the average specific gravity or the average weight of unbroken coal per unit volume of the different ranks shown in table 2.

## 11. CALCULATION OF COAL RESOURCES

After the area underlain by coal, the average thickness of coal, and the weight of coal per unit volume for each category shown on a coal bed map have been determined, the tonnage can be estimated. The tonnage is estimated by the following formula:

$A \times B \times C$ = tonnage of coal where
- $A$ = weighted average thickness of coal in inches, feet, centimeters, or meters,
- $B$ = weight of coal per appropriate unit volume in short or metric tons, and
- $C$ = area underlain by coal in acres or hectares.

## 12. ROUNDING OF TONNAGE ESTIMATES

The rounding of tonnage figures shall be done only after all calculations have been completed using data for areas (acres or hectares), coal thicknesses, and weight of coal per unit volume and summed for each coal category. The tonnage estimates for each coal category are then rounded to significant numbers so as to not eliminate tonnage estimates for small areas of measured and indicated coal. For example, the tonnage estimates for small areas such as A, B, C, F, G, H, K, M, O, P, Q, and R in figure 17 and A, B, C, D, E, F, G, H, L, Q, W, Y, AA, HH, and OO in figure 19 are not rounded out of the totals and are included in the summing of the total coal resources for all areas in figures 17 and 19. After summing, the resultant total coal resources estimates for a whole map area (a quadrangle, county, or basin) are not rounded because their component parts have been rounded.

## 13. ESTIMATION OF RESOURCES IN THE VICINITY OF WHERE A COAL BED BIFURCATES INTO TWO OR MORE TONGUES

Resource estimation is difficult in those localities where a coal bed bifurcates or splits into tongues, each of which exceeds the minimum thickness for resource estimation. The difficulty is caused by the necessity to delineate a boundary between the area where the resources of the main coal bed are estimated and the areas where the resources of the tongues are individually estimated.

As stated in the glossary, a **parting** is "a layer or stratum of non-coal material in a coal bed which does not exceed the thickness of coal in either the underlying or overlying benches" of coal. Where the non-coal material exceeds the thickness of either the underlying or overlying parts of the coal bed, the coal bed is considered for the purpose of resource estimation to have split into two coal beds (each of which is depositionally a tongue from a thicker main coal bed).

In estimating resources in such a geologic situation, it is necessary to delineate on a coal bed map the areas where resources will be separately calculated; to do so, a line is used to connect all points where one of the tongues becomes thinner than the intervening parting. It is also necessary to locate on the coal bed map all points where the thickness of the main coal bed and the tongues were measured. Measured, indicated, and inferred reliability circles should be drawn on the bed map from each point of thickness of coal measurement on the main bed and the tongues. The circles should be drawn, according to the appropriate distance for each reliability category, across the boundary line for resource estimation. After the circles are drawn, the thickness variations of the main coal bed and each tongue (bed) are to be isopached separately. Tonnage estimates should then be

calculated for each tongue (bed) and the main bed using procedures outlined elsewhere in this report for separate coal beds.

## ESTIMATION OF HYPOTHETICAL RESOURCES

The estimation of hypothetical coal resources in areas where geologic, thickness, rank, and areal size data are sparse or absent is necessary to promote exploration for poorly known and undiscovered coal areas. Currently about 2.24 trillion short tons of the Nation's 3.68 trillion tons of remaining coal resource inventory are classified as undiscovered (hypothetical) (Averitt, 1975). Much additional unknown coal may be concealed in the central parts of basins and is not as yet included in the Nation's coal inventory. This additional unknown coal must be identified, as must the 2.24 trillion tons currently remaining in the inventory, because knowledge of the quantity, quality, and rank of the unknown and hypothetical coal could influence the Nation's energy usage plans. Therefore, a question commonly asked by government and industry estimators responsible for inventorying coal resources is: How do you estimate resources where there are no nearby thickness, depth, and rank data? Another way of stating this question is: How do you estimate the resources of central parts of poorly explored or unexplored basins?

The problem of estimating hypothetical resources in the central parts of basins and elsewhere has been approached by (1) not attempting to calculate them; (2) assuming that the centers of the basins or coal-bearing areas where control is lacking are barren of coal; (3) assuming that the better known marginal areas of coal-bearing basins are representative of the average quantity of coal per square mile in the central parts of the basins; (4) assuming an average thickness of coal and applying this factor to the volume of coal-bearing rocks in an area; and (5) making an outright guess. None of these solutions are satisfactory. A sixth solution has been to extrapolate measurement data from surrounding areas into the unknown area. This approach is better than the others but commonly is inadequate because it does not consider geologic factors that would control unsystematic distribution of coal in an unknown area.

The following discussion describes two methods, based on geologic principles, for estimating hypothetical resources. Both are acceptable if the supporting basic geologic and measurement data are documented and presented for evaluation. These alternative approaches can be termed the "extrapolated bed map method" and the "extrapolated coal zone method." Both methods are based on the extrapolation of geologic knowledge and measurement data into an area of unknown coal resources. In some problem areas, a mix of the two methods may be desirable.

Much of the data called for in the descriptions of the extrapolated bed map and extrapolated coal zone methods will not be available in many areas where hypothetical resources must be estimated. The descriptions of the methods are written for the ideal amount of control adjacent to an unknown area; thus, the methods will have to be modified on the basis of the type, availability, and amount of control data.

### EXTRAPOLATED BED MAP METHOD

Step 1.—Assemble all available geologic data in the areas adjacent to the unknown area for the coal bed whose resources are to be estimated.

Step 2.—Assemble and plot on a base map all pertinent data on thicknesses of coal and overburden, quality of coal, reports of coal in drill holes and wells, and rank of coal.

Step 3.—Analyze all data collected in steps 1 and 2 to ascertain trends of coal deposition by (a) constructing isopach maps of the coal bed in known areas; (b) constructing isopleth maps of heat values, ash contents, and contents of trace elements that may be related to sources of sediment; and (c) identifying trends of persistent thick or thin coal, or other parameters of coal.

Step 4.—Identify depositional and erosional trends and features in the known areas of rocks adjacent to the coal bed and in the coal bed itself that may indicate ancestorial through-flowing rivers in swamps, coastal environments, unconformities, directions of delta building, paleogeomorphic locations of swamps on a coastal plain or delta, and directions and distances to sediment sources. Plot all pertinent data on a map.

Step 5.—Extend stratigraphy from known areas into and across the unknown area by utilizing all surface and subsurface information. Collect surface stratigraphic data and existing petroleum and water well information. Evaluate and analyze all data and determine best correlations so that coal bed extensions and correlations can be made. Determine from available data probable geologic model of deposition. Plot all data on the map of step 4.

Step 6.—Construct structure sections across the unknown area so that changes in the thickness of overburden and rank of the coal bed can be considered and (or) postulated.

Step 7.—Construct a structure contour map of the coal bed in the unknown area.

Step 8.—Combine all pertinent data from steps 2, 3, 4, 5, and 7 onto a single coal bed map.

Step 9.—Fill in the unknown area by projecting pertinent coal and other data across or through the unknown area. This projection should include isopachs for thicknesses of coal and overburden, isopleths for rank and (or) heat values, predicted erosional channels cutting through the coal, and other stratigraphic, depositional, or structural features affecting the coal bed.

Step 10.—Place land lines and boundaries of political subdivisions on the map.

Step 11.—Define areas of hypothetical coal by plotting the outer limits of inferred coal as determined from points of thickness control in the known areas. Determine acreages of hypothetical coal for the following resource categories: thicknesses of coal and overburden; rank; quadrangle; townships and ranges; counties; and State.

Step 12.—Determine the average coal bed thickness for each acreage unit in each category.

Step 13.—Calculate and sum estimated tonnages for each category, round estimated tonnages to significant figures as per specific instruction No. 12, p. 36, and sum into a final hypothetical tonnage. These estimated tonnages and the total summed tonnage probably represent the best information that can be estimated for a bed that extends from a known area into an unknown area where control points are absent or sparse.

### EXTRAPOLATED COAL ZONE METHOD

If the procedure for an extrapolated bed map analysis of hypothetical coal resources is impractical because of time limitations or sparsity of data it is suggested that the approach to estimating hypothetical resources be by an extrapolated coal zone method.

Step 1.—Determine if a coal zone exists by analyzing the available data.

Step 2.—Assemble and plot on a base map all available geologic data in areas adjacent to the unknown area.

Step 3.—Construct an isopach map of the cummulative thicknesses of all coal beds in the coal zone (less partings) that exceed 14 inches for anthracite and bituminous coal beds and 30 inches for lignite and subbituminous coal beds in known areas.

Step 4.—Identify trends and geologic features in the rocks of the coal zone in the known area that may indicate persistent ancient through-going rivers, coastal environments, unconformities, directions of sediment transport, intertonguing sediments and coal beds, regressions and transgressions, and so on. Plot pertinent data on a map.

Step 5.—Extend stratigraphy of the coal zone and related rocks into and across the unknown area on the map of step 4 by utilizing all surface and subsurface data. Determine geologic model of deposition of the coal zone. Construct stratigraphic diagram of the coal zone and fit diagrammatic data to the map.

Step 6.—Construct structure sections across the unknown area so that thickness of overburden and rank changes of coal zone can be considered and (or) postulated.

Step 7.—Construct a structure contour map of the coal zone in the unknown area.

Step 8.—Combine all pertinent data from steps 2, 3, 4, 5, and 7 onto a single coal zone map.

Step 9.—Fill in unknown area by projecting pertinent coal zone and other data across or through unknown area.

Step 10.—Place land lines and boundaries of political subdivisions on map.

Step 11.—Define areas of hypothetical coal by plotting an outer limit of inferred coal as determined from points of thickness control in the known areas. Determine acreages of hypothetical coal for the following categories: thicknesses of overburden, cummulative thicknesses of coal, rank, quadrangle, townships and ranges, counties, and State.

Step 12.—Calculate and sum tonnages for each category after determining a cummulative thickness of coal for each acreage unit in each category and calculating tonnage. Round tonnages to significant figures as per specific instruction No. 12, p. 36, and sum into a total hypothetical tonnage amount.

The extrapolated coal zone solution for hypothetical coal eliminates the estimation of tonnages for many individual beds and, in the view of some workers, provides a more valid estimate than the bed-by-bed approach. Despite this view, the bed-by-bed method is herein recommended for use where practicable and (or) feasible.

## EXAMPLES ILLUSTRATING THE BASIC GEOMETRIC PRINCIPLES OF CONSTRUCTING COAL RESOURCE BED MAPS

Coal resource estimation systems on a worldwide basis generally lack illustrations amplifying written instructions as to how to calculate coal resources.

The following illustrations are intended to bridge this gap and to show how coal resources data are utilized to construct bed maps. Many more illustrations could be prepared, but the accompanying figures are believed to be representative.

Figure 9 illustrates how to determine areas of reliability (areas based on distance of from points of thickness measurements—measured, indicated, inferred, and hypothetical coal) where a coal bed has been mapped on the surface and the thickness of coal has been measured




FIGURE 9.—Determination of areas of reliability using coal thickness data only at points of measurement along outcrop line. Radii origins are at points of thickness measurement.

at five points. The solid outcrop line indicates where the bed has been mapped with assurance as to its intersection with the ground surface; the dashed line indicates uncertainty as to the exact location. Utilizing radii originating at the points of thickness measurements, arcs are constructed at appropriate distances according to the criteria for the measured, indicated, inferred, and hypothetical reliability categories. The arcs enclose areas theoretically underlain by coal for each reliability category.

Figure 10 uses the same coal bed outcrop as figure 9 and shows the effect of additional thickness information from drill-hole measurements and a small mine. A comparison of figures 9 and 10 illustrates how the additional data derived from drill-holes and mining expand the areas designated in figure 10 as measured and indicated and modify the inferred and hypothetical areas.

The objective of figure 11 is to show how drill-hole data combined with outcrop data on a continuously exposed strip-mined coal bed result in the coalescing of measured and indicated coal and in an expansion of the area of the inferred reliability category. It also shows how a single point of thickness of coal measurement defines an area of measured, indicated, and inferred coal.

The primary objective of figure 12 is to show how to construct a minimum thickness-of-coal isopach (14 inches) based solely on outcrop data. A secondary objective is to illustrate how to locate a coal outcrop and boundaries such as county lines on a bed map from a geologic map. Generally, as a bed thins along an outcrop, it is increasingly more difficult to trace. Figure 12 illustrates a simple, nearly straight coal bed outcrop with three thickness-of-coal measurements. The three measurements are all thicker than the 14-inch minimum thickness of coal considered when calculating anthracite and bituminous coal resources. The thickness gradients between the 26-inch and each of the 20-inch points of measurement of coal are extrapolated along the crop line to the east and west of the 20-inch measurements to points *A* and *B* where the coal gradients predict coal thicknesses of 14 inches. A straight line is then drawn between the predicted 14-inch points *A* and *B* on the crop line and subsequently is bisected at mid-point *O*. An arc *AB* is drawn between the predicted 14-inch points using either *AO* or *BO* as a radius. The arc *AB* locates the 14-inch isopach according to the available data on thickness and length of outcrop.

Figure 13 displays areas of reliability, thickness-of-overburden contours, political subdivisions, and a completed coal bed map ready for determinations of acreages and weighted average thickness of coal in each area. Areas *A* to *P* are ready for planimetry of acreages, for calculation of coal tonnages after weighted average thickness of coal for the areas are determined, and for subsequent entry on tonnage tables according to their assignment to a thickness of coal, thickness of overburden, reliability category, and to a county. Table 4 lists the areas of reliability by thickness of overburden category, by a single thickness of coal category, and by counties. To avoid confusion, figure 13 and table 4 were constructed with only one thickness of coal category, 14 to 28 inches. Subsequent figures are more complicated because more thickness categories are introduced.

Figures 14 and 15 show a diagram of a ridge underlain by coal; they also show the geometric method of determining the 14-inch minimum thickness of bituminous coal isopach and the areas of reliability constructed from the points of thickness of coal measurement. The 28- and 42-inch coal isopach lines were constructed by using the gradients between the various thicknesses of coal measurements. This method of determining the area of coal under a ridge is commonly necessary when thickness measurements are sparse and an estimation of coal resources beneath a ridge is required. Table 5 enumerates the areas assigned to the varous thicknesses of coal and overburden and reliability categories.

Figures 16 and 17 and table 6 show how to construct the 14-inch minimum thickness limit of anthracite or bituminous coal resources, other coal isopachs, and the areas of reliability and overburden isopachs for a simple valley reentrant in a coal bed outcrop. Figures 16 and 17 and table 6 are important because they show how to treat a valley reentrant in a coal outcrop characterized by minimal thickness data.

Figures 18 and 19 and table 7 show how to determine the location of the minimum coal isopach (14 inches for bituminous coal) in a valley and ridge underlain by a coal bed that is locally less than the minimum thickness. Figure 19 also illustrates the areas of reliability, overburden categories, and coal isopachs. The location of the minimum coal isopach (14 inches) on a ridge which has thickness data on only one side is a common problem facing geologists estimating coal resources.

One of the most difficult problems in estimating resources of coal is where the beds are moderately to steeply dipping or are highly deformed. A simplified problem is illustrated in figures 20*A*, *B*, and *C* by a bed that dips uniformly 30° into the subsurface. The problem as illustrated can be solved by two methods. The first method is to estimate all areal resource tonnages in the plane of the coal bed and then to project all pertinent areal categories to the ground surface. For example, the measured, indicated, inferred, and hypothetical reliability circles, coal isopachs, overburden contours,




FIGURE 10.—Determination of areas of reliability from points of measurement on the outcrop line, supplemented by mine and drill-hole data.




FIGURE 11.—Determination of areas of reliability using coal thickness measurements taken along a continuously exposed, strip-mined bed, supplemented by drill-hole data.

and structure contours should be drawn in the plane of the coal bed (fig. 20*A*). Then the areas of each of these categories are planimetered and coal tonnages estimated. This procedure provides an adequate estimate of coal tonnages for all values of dip. However, it is difficult to project the areas from the plane of the coal bed to the surface area overlying any particular category (fig. 20*B*). Although this method gives an adequate tonnage estimate, it distorts the ground surface depiction of areal categories (fig. 20*C*).

The second method is to draw the areal boundaries of the various categories on a surface map, measure the areas underlain by the various categories, and estimate the coal tonnages for each category. After estimation of the resources as if they were flat-lying, the estimates are divided by the cosine of the dip. The resultant answer is the tonnage in the plane of the bed. This method will provide correct tonnage estimates in each resource category underlying the surface but will horizontally exaggerate the areas of measured, indicated, and inferred coal and should be used only where the dip is more than 10° and less than 30°. For dips above 30°, it is recommended that resource estimates be made by the first method. For dips less than 10°, all estimation of resources should be done as if the bed was flat-lying.

The authors suggest that geologists involved with estimating the coal resources of highly deformed areas consult with coal geologists who have worked on similar areas and estimation problems. Currently, resource problems in highly deformed areas have not been solved




FIGURE 12.—Determination of minimum thickness isoline of 14-inch thick anthracite or bituminous coal using data from a nearly straight outcrop line. *A* and *B* are located on the outcrop line where the coal thickness as extrapolated from the points of measurement are predicted to be 14 inches. Line *AB* connecting the points of predicted 14-inch coal is bisected at *O*. The radius *AO* or *BO* is then used to construct arc *AB*, the 14-inch isopach or predicted limit of 14-inch-thick coal. This figure also shows the location of the outcrop line and a county boundary on a coal bed map as derived from a geologic map.

except locally for small areas. Although methods have been developed, they are generally very time consuming and as yet unproven by mining.

Figure 21 illustrates a coal bed that has been mined from shafts at some distance from outcrops. All data are derived from the mines or drill holes. The figure shows measured, indicated, inferred, and hypothetical coal; county lines; thickness of coal measurements; coal thickness categories; and the 0–200 feet, 200–300 feet, and the 300–500 feet overburden categories. It also shows a




FIGURE 13.—Same basic diagram as figure 12. Shows determination of areas of reliability and 500–, 1,000– and 2,000–foot overburden contours which were obtained by subtracting elevations of bed from surface elevations. Bed elevations were obtained from a topographic map, from the outcrop of a coal bed, and from structure sections utilizing dips. Areas of reliability determined by using 1/4–mile radius (measured), 3/4–mile radius (indicated), 3–mile radius (inferred), and more-than-3-mile radius (hypothetical) from measurement points. Individual areas of reliability are identified by letters *A* through *U*.

national park, a national bird refuge, a State park, and a large lake, all of which merit assignment of the underlying coal in those areas to restricted categories.

Figure 22 demonstrates a small coal basin where many resource classification categories are distinguished, including two large areas of hypothetical coal. The figure also shows two coal beds that intertongue with an intervening linear sandstone body. The coal beds have been strip-mined at six localities and underground mined at three localities. The coal beds have been tested by 15 drill holes which revealed the existence of two coal beds separated by sandstone. Numerous surface measurements of coal thickness support the widespread extent of at least one bed, and three measurements revealed the relations of two coal beds with the sandstone body. A bed map of the basin revealed two




FIGURE 14.—A ridge showing construction of accepted 14-inch minimum thickness limit of a bituminous coal bed. Point *C* is the most distant point of outcrop on the ridge from end points *A* and *B*. Accepted 14-inch thickness of coal limit comprises an arc *AB*. Construction of arc *AB* is as follows: from midpoint *O* of line *AB*, draw line *OC* to furthest point on outcrop. Swing arcs from *A* and *B* with a radius of *OC*. The intersection of the arcs is point *O'*. From *O'* draw arc *AB* using either *AO'* or *BO'* as the radius.

TABLE 4.—*Areas of reliability from figure 13 listed by overburden and coal thickness categories, and by counties*

[Tonnage estimated for each area could be determined (1) by planimetering each area for acreage, and (2) by multiplying acreage by proper weight of coal per acre-inch by the average thickness of coal in the area. Average thickness of coal would be obtained by isopaching coal thickness as shown on figure 13 ]

| Geologic assurance category | Coal thickness: 14 to 28 inches | Coal thickness: 28 to 42 inches |
|---|---|---|
| | 0 to 500 feet overburden: | |
| Measured | *A, B, C* | None |
| Indicated | *D, E, F* | Do. |
| Inferred | *G, H, I, J, K* | Do. |
| | 500 to 1,000 feet overburden: | |
| Indicated | *L, M, N* | None |
| Inferred | *O, P* | Do. |
| | 1,000 to 2,000 feet overburden: | |
| Inferred | *Q, R* | None |
| | 2,000 to 3,000 feet overburden: | |
| Inferred | *S, T* | None |
| Hypothetical | *U* | Do. |

| Political division | |
|---|---|
| Holmes County | Dead Bull County |
| *A, F, G, H, N, O, R, S, U* | *B, C, D, E, I, J, K, L, M, P, Q, T* |

coal-bearing areas separated stratigraphically and areally by an intervening sandstone body. The completed bed map in figure 22 allows the segregation and subsequent estimation of the resources of the two coal beds into a large number of categories enumerated in the caption for the figure. The two coal beds are subdivided by their heat values on a moist, mineral-matter-free basis into lignite and subbituminous coal. The 8,300-Btu isolines that represent the boundary between subbituminous coal and lignite are drawn so that tonnage estimates can be made for proper rank classification.

Figure 23 depicts a large but simple subbituminous coal and lignite basin that contains predominantly hypothetical resources traversed by three synclines and two anticlines. The total thickness of coal at each point of surface measurement and in each drill hole penetrating the coal zone is obtained by summing the thicknesses of all coal beds that are thick enough to be considered as resources (2.5 feet, or 75 cm). These thicknesses are isopached at 40-foot thick increments, and the overburden, heat value, and reliability categories are plotted



Stagg Dec. -- Exhibit 2
APP. III 680




FIGURE 15.—Same ridge shown in figure 14 with the addition of an isolated butte containing bituminous coal. Shows determination of areas of reliability; 14-, 28-, and 42-inch coal isopachs, and 500-foot overburden contour. Categories defined by intersections of lines separating areas of reliability, thickness of coal, and thickness of overburden are labelled *A* through *R*. Overburden contour was computed from dips and by subtracting bed elevations from surface topographic elevations.

on the map. Estimates of coal tonnage should be calculated for each rank category. The total tonnage estimate for hypothetical resources in the example is the sum of each of these estimates. Generally, the size of the thickness of coal increments is left to the geologist to determine. Figure 23 is appropriate to an analysis based on a coal-zone approach to estimation of hypothetical resources as outlined on p. 37–38.

Figures 24 and 25 show suggested forms for recording coal resource data. These forms, or similar forms, are necessary for recording coal bed names; overburden and thickness of coal categories; planimeter readings; calculated areas; and weighted average thickness of coal for the area being calculated. The forms also provide columns for tabulating tonnage estimates in the measured, indicated, and inferred reliability categories, by coal thickness categories, and miscellaneous information such as planimeter factor, persons responsible for steps of work, and total tonnages by thickness and overburden categories. The data recorded on such forms and the calculations made therefrom represent the culmination of coal resource work starting in the field and continuing through the preparation of bed maps such as those in figures 9 through 23. The forms for data entry and calculation should be designed with care so the data entered on the forms from accompanying bed maps contain the necessary information for estimating all types of coal resources and reserves. This information can be combined with other information such as pertinent data on costs, transportation, and marketing to provide a documented analysis of the coal resources/reserves in a coal bed, field, region, basin, province, county, State, and (or) the Nation.

## GEOPHYSICAL LOGS AS A SOURCE OF COAL BED DATA

Geophysical well logs have been invaluable in the search for oil and gas because they provide rapid, economical, and detailed information on the thickness, lithologic characteristics, fluid content, correlation,




FIGURE 16.—A simple valley reentrant in a bituminous coal bed outcrop. Shows determination of 14-inch coal isopach and limit of area to be planimetered for underlying coal. The 14-inch coal thickness points were obtained by extrapolating data from points of measurement along outcrop line. Projected limits of coal resource isopach (14-inch coal) and area to be calculated are determined by constructing: (1) an arc *BB'* with origin at *C* drawn from *B* to the extension at *B'* of line *AC* and *CB*; and (2) final segment of arc *AB'* is drawn with origin at midpoint *O* of line *AB'*.

TABLE 5.—*Areas of reliability from figure 15 listed in proper overburden and coal thickness categories*

| Geologic assurance category | Coal thickness | | |
|---|---|---|---|
| | 14 to 28 inches | 28 to 42 inches | 42 to 84 inches |
| | 0 to 500 feet overburden: | | |
| Measured | *A, D, E* | *B, Q* | *C, R* |
| Indicated | *J, K, L* | *I, H* | *G, D* |
| Inferred | *O* | *N* | *M* |
| | 500 to 1,000 feet overburden: | | |
| Inferred | *P* | None | None |

structure, and depth of strata penetrated by a well. Such logs have been run in many thousands of oil and gas exploratory, discovery, and producing wells that have penetrated coal-bearing strata in many regions of the country.

Geophysical logs can be used to identify coal beds and to quantify their resources because coal has several unique physical properties including low natural radioactivity, low density, and high resistance to electrical currents; these properties contrast with those of most




FIGURE 17.—Same diagram as figure 16. Shows determination of areas of reliability; 500–, 1,000–, and 2,000–foot overburden contours; and 14–inch, 28–inch, and 42–inch coal isopachs. Overburden contours were determined from surface elevations on a topographic map and by subtracting bed elevations utilizing structure sections, and dips. Coal isopachs were determined from points of coal thickness measurement and 14–inch limit of coal. Areas of reliability were determined by using 1/4–mile radius (measured), 3/4–mile radius (indicated), 3–mile radius (inferred), and more-than-3-mile radius (hypothetical) from points of thickness of coal measurement. Individual areas of resource categories are identified by letters *A* through *DD*.

other rocks in the coal-bearing sequence. Thus, geophysical logs can provide information on the existence, continuity, thickness, and correlation of shallow to deeply buried coal beds in known coal-bearing areas that have not yet been fully explored and in the future may provide information in areas not previously thought to contain coal. Most of these logs are available to the public through commercial companies and may be studied at State geological surveys or at similar agency offices in some States.

Caution should be used in evaluating and interpreting the existence, thickness, and correlation of coal beds from the geophysical logs of oil and gas exploratory and production wells for two reasons. First, if only one type of log is available, other rock types may be misidentified as coal, for example, highly resistive limestone on a resistivity log or pure quartz sandstone on a natural radioactivity log. However, this problem can be mitigated by a thorough knowledge of the coal-bearing strata in the area under investigation and by an under-




FIGURE 18.—A valley and ridge with part of coal bed less than minimum thickness but within determined 14-inch limit as illustrated in figure 16. Determined limit comprises the outcrop line from *A* to *B* and from *B* to *D* along the arc *B* through *D* to intersect projection of line *AC* at *G*. Radius *CD* is obtained from distance to nearest point of outcrop line, *D*, below minimum thickness. Arc *BF* using radius from line *BC* includes coal on outcrop line below minimum thickness and therefore is not acceptable. Arc *AG* is drawn from midpoint *O'* of line *AG*. Arc *EDG* is drawn from *C* to extend arc *AG*.

TABLE 6.—*Areas of resource categories from figure 17 listed in proper reliability and thickness of coal and overburden categories*

[Tonnage estimate for each area could be determined (1) by planimetering each area for acreage, and (2) by multiplying acreage by proper weight of coal per acre-inch by the average thickness of coal in the area. Thickness of coal for each area is obtained by referring to coal thickness isopachs]

| Geologic assurance category | Coal thickness | | |
|---|---|---|---|
| | 14 to 28 inches | 28 to 42 inches | 42 to 84 inches |
| | 0 to 500 feet overburden: | | |
| Measured | *A, G, H* | *B, F* | *C* |
| Indicated | *I, N* | *E, J, L, M* | *K* |
| Inferred | *O, R* | *P, Q* | None |
| | 500 to 1,000 feet overburden: | | |
| Indicated | *S, V* | *T, D, U* | None |
| Inferred | *W, Y* | *X* | Do. |
| | 1,000 to 2,000 feet overburden: | | |
| Inferred | *Z* | *AA* | None |
| Hypothetical | *DD* | None | Do. |
| | 2,000 to 3,000 feet overburden: | | |
| Inferred | *BB* | None | None |
| Hypothetical | *CC* | do. | Do. |

standing of how these strata are recorded on a log. For example, if limestone beds are not present in the coal-bearing sequence and if all sandstone beds are more radioactive than the coal beds, problems of lithologic identification are nonexistent. If several log types are available, the coal generally can be identified with confidence despite other strata with similar log characteristics in the sequence. Second, some oil and gas logs are not suitable for identifying coal beds for reasons that are not always clear because they give readings that either mask coal beds, indicate coal beds where none are present, or are ambiguous. Here again, a knowledge of the stratigraphic positions of coal beds in coal-bearing sequences will aid identificaiton of unsuitable logs. Because coal thicknesses interpreted from geophysical logs are considered as points of measurement for calculating coal resources, it is advisable to use only those coal thicknesses that are determined with confidence.

The geophysical log types generally used in coal bed recognition and stratigraphic identification and rank,




FIGURE 19.—Same diagram as figure 18. Shows determination of areas of reliability; 500-foot, 1,000-foot, 2,000-foot, and 3,000-foot overburden contours; and 14-inch, 28-inch, and 42-inch bituminous coal isopachs. Overburden contours are determined by subtracting bed elevations from surface topographic map elevations. Bed elevations are determined by utilizing structure sections and dips. Coal isopachs are obtained from points of coal thickness measurement and 14-inch limit of coal. Areas of reliability determined by using 1/4-mile radius (measured), 3/4-mile radius (indicated), 3-mile radius (inferred), and more-than-3-miles radius (hypothetical) from points of coal thickness measurement. Areas of resource categories are identified by letters *A* through *OO*.

quality, and thickness evaluations are the electrical, gamma ray, density, neutron, and acoustic velocity. The following discussion of log types is concerned principally with geophysical logs of oil and gas exploratory wells. It should be noted that coal exploration programs increasingly have become reliant on coal-oriented geophysical logs, which provide important data on thickness, depth, and correlation of coal beds, and locally on the composition of coal. A carefully chosen suite of coal-oriented logs can provide positive recognition of coal, identification of specific coal beds, and precise coal thickness measurements (Vaninetti and Thompson, 1982). Such suites are used currently to supplement information obtained from core holes, driller's logs, and examination of drill cuttings. They are useful especially where core or sample recovery of coal was incomplete. The ease and accuracy of recognizing, identifying, and evaluating coal beds with coal-oriented logs strongly contrasts with the difficulty of performing the same interpretations using the higher speed and less accurate geophysical logs of oil and gas wells, which generally are run at different instrument settings and with different equipment. Most oil and gas geophysical logs are recorded at a scale of 1 inch equals 50 feet, with selected

sections recorded at the larger scale of 1 inch equals 20 feet, which is reduced for commercial sale to 1 inch equals 100 feet and 1 inch equals 40 feet, respectively.

### ELECTRIC LOGS

By far the most common geophysical logs run in oil and gas exploratory wells are electric logs. Prior to the 1950's, conventional electrical logging surveys consisted of one measurement of the spontaneous potential (SP) and three measurements of apparent electrical resistivity of the rocks adjacent to the bore hole (fig. 26). These rock properties were measured only in the uncased part of a well that was filled with water or a water-based mud. The diameter of the well and the effect of adjacent rocks combined to give confusing curves on older electric logs. In solving this problem, a new family of resistivity curves, the focusing-electrode and the induction logs, came into use in the late 1950's. These logs provide better resolution of the coal beds than the older conventional logs and permit more accurate coal thickness measurements.

### SP LOG

The spontaneous potential (SP) log measures the difference in electrical potential between rock types, and the resulting curve is recorded on the left-hand side of the log as a single trace. This curve generally reflects the invasion of drilling fluid into the rocks, so a permeable sandstone bed tends to record as a large deflection to the left of the log response for shale (figs. 27 and 28). There are many exceptions to this generalization as shown by the deflections caused by high-porosity coal beds (see fig. 29, SP curve). There are also many wells where the SP curve is nearly featureless in a coal-bearing section and the porosity is recorded the same as shale (fig. 28*A* and *B*).

### NORMAL AND LATERAL LOGS

Three types of resistivity curves are recorded on the right side of a geophysical log. These are the 16-inch normal (short normal); the 64-inch normal (long normal); and the 18-foot, 8-inch or 24-foot lateral (lateral); the names referring respectively to the spacing and to the configuration of the electrodes in the probe. These curves record the resistance of rock types to the flow of an electric current. Because most coal beds are highly

TABLE 7.—*Areas of resource categories from figure 19 listed in proper reliability and thickness of coal and overburden categories*

[Average thickness of coal in each area can be determined by utilizing coal isopachs]

| Geologic assurance category | Coal thickness: 14 to 28 inches | 28 to 42 inches | 42 to 84 inches |
|---|---|---|---|
| | 0 to 500 feet overburden: | | |
| Measured | *A, F, G, H* | *B, E* | *C, D* |
| Indicated | *I, MM* | *I, J, P* | *K* |
| Inferred | *CC, Y, S* | *AA, Z* | *W* |
| | 500 to 1,000 feet overburden: | | |
| Indicated | *L, R, M* | *N, Q* | *O* |
| Inferred | *U, BB* | *V, X* | *T* |
| | 1,000 to 2,000 feet overburden: | | |
| Inferred | *DD, FF* | *EE* | None |
| Hypothetical | *GG, JJ* | None | Do. |
| | 2,000 to 3,000 feet overburden: | | |
| Inferred | *LL, II* | *HH* | *OO* |
| Hypothetical | *NN* | None | None |
| | 3,000 to 6,000 feet overburden: | | |
| Hypothetical | *KK* | None | None |

resistant to the flow of an electric current compared with most adjacent rocks, resistivity curves generally show a large deflection opposite a coal bed. In the short and long (16-inch and 64-inch, respectively) normal curves, however, coal beds thinner than the electrode spacing show a "reverse" (low resistivity) curve bounded by two small peaks (fig. 28*A* and *B*, No. 6 coal). The lateral curve shows a large deflection opposite thin coal beds and a low deflection below the bed. The lateral curve is of little value in the measurement of the thickness of coal beds because it is asymmetric and generally offset from the coal bed. Nevertheless, this curve can be useful in correlating coal beds (fig. 28*A* and *B*).

### FOCUSING-ELECTRODE AND INDUCTION LOGS

Focusing-electrode logs (for example, lateral logs) use special electrodes to send a narrow focused electric current horizontally into adjacent rocks. This results in a resistivity curve that has good resolution of thin resistive beds such as coal (figs. 29 and 30). These focusing and lateral logs measure the conductivity (inverse of resistivity) and the resistivity of rocks by means of induced alternating currents. Commonly, an induction log is run in conjunction with a SP and 16-inch normal log (fig. 27). The induction log is recorded simultaneously as two curves, conductivity and resistivity. The conductivity curve is hyperbolic, which compresses the parts of the curve characterized by low conductivity.




FIGURE 20.—Diagrams showing *A*, Coal categories in plane of coal bed. *B*, Structure section *OC* showing relations between features measured in plane of bed and ground surface when bed dips 30°. *C*, Coal categories as viewed projected to the ground surface from plane of coal bed. Note contraction of category areas towards the outcrop as compared to plane of coal bed; contraction is due to dip.

The resistivity curve, however, is not compressed, so it can be compared directly to the short normal curve and can be used for measurement of the thickness of a coal bed. Combinations of induction and focusing-electrode logs are also common.

### DISCUSSION OF ELECTRIC LOGS

With the exception of some high-moisture-content lignites, most coal beds are responsible for high-resistivity deflections on resistivity curves. However, some other rock types such as limestone or resistive sandstones also show high-resistivity deflections and may be mistaken for coal. Limestone is indistinguishable from coal on most electric logs. Fortunately, limestone beds are absent in many regions. In the Midcontinent region, however, limestone is abundant in the coal-bearing sequence and generally can be differentiated from coal only by use of supplementary logs (see fig. 31) or by examination of closely spaced samples of drill cuttings.

Resistive sandstone beds that are permeable generally can be differentiated from coal beds because of their large deflections on a SP log (figs. 26, 27, and 28). Where a SP log is featureless or ambiguous, a knowledge of the lithology of a coal-bearing sequence can help differentiate coal from sandstone. For example, in the Powder River basin of Montana and Wyoming, many sandstone beds are gradational with adjacent low resistivity shale beds, whereas the shale beds are in sharp contrast with adjacent high-resistivity coal beds. As a result, the resistivity curves delineating coal beds are more nearly parallel than the curves representing the contacts of sandstone beds.

### GAMMA RAY LOG

The gamma ray log records the natural gamma radiation from rocks adjacent to a drill hole. Coal generally has low natural radioactivity as compared with other rocks, particularly shale, in a coal-bearing sequence (figs. 29, 30, and 31). In some coal-bearing regions, limestone and sandstone may have similar low natural radioactivity (for example, Midcontinent or Appalachian regions) so that in those regions supplemental logs such as density or acoustic velocity are needed to identify coal. In other regions, gamma ray logs alone are sufficient to identify coal beds as, for example, in the Fruitland Formation (Fassett and Hinds, 1971) and in the Northern Great Plains where no other rock types in the Tertiary coal-bearing sequence, including limestone, are known to have as low a natural radioactivity as coal. Even in areas where a gamma ray log is diagnostic of coal, a few oil and gas well gamma ray logs are useless because their time constant is so long and their sensitivity is so low that a coal bed either cannot be detected or its boundaries are obscured. Locally some coal beds are uraniferous; consequently, a high radioactivity is recorded on gamma ray logs. These uranium-bearing coal beds usually can be identified by using other logging methods.

A gamma ray log is the most versatile of the geophysical logs for the following reasons: (1) it does not require fluid in the hole; (2) it is not sensitive to small variations in hole diameter; and (3) it can be used to detect coal beds through well casing. In fact, near-surface gamma ray logs of cased oil and gas wells are a prime source of data for identifying and measuring the thickness of shallow coal beds in the Northern Great Plains region.

The gamma ray logs can detect shale partings in a coal bed, but generally the thickness of thin partings is exaggerated. In the Powder River basin of Montana, there is an example where the gamma ray log records a 0.3-foot shale parting at the same thickness as a 2-foot parting.

### DENSITY LOG

A gamma-gamma density log records the bulk density of rocks adjacent to a drill hole by measuring the induced gamma rays emitted by the rocks after bombardment by a gamma ray source encased in a probe and lowered into the drill hole. The denser the adjacent rocks, the more gamma rays are absorbed and not returned to a detector in the probe where they are measured in grams/cm$^3$. Most ranks of coal are low in density (about 0.7 to 1.8 grams/cm$^3$) compared to adjacent rocks; therefore, a density log is an excellent tool for coal-bed evaluation. The density log is capable of identifying detailed variations in the density of rocks. Density logs from oil and gas wells are commonly run at 30 feet per minute, are recorded at 1 inch equals 20 feet, and then are reduced to 1 inch equals 100 feet. At this scale and speed, thin coal beds and partings can be detected and their thicknesses accurately measured (fig. 30). Unfortunately, density logs must be run in uncased holes and are strongly affected by differences in hole diameter; thus, the curve recorded for a caved or enlarged part of a well may simulate the curve of a coal bed. A caliper log, which measures the diameter of a well, is generally run in conjunction with these logs so that the proper interpretation and correction can be made.




FIGURE 21.—Flat-lying bituminous coal bed with data only from underground mined areas and drill holes. Note pattern areas of reliability around each drill hole and paralleling the boundaries of mined areas and the tunnel that connects the mines. Numerous thickness of coal measurements along tunnel and mine boundaries are not shown. Coal tonnages and acreages should be reported separately for each resource category, as determined by areas of reliability; the 0–200 foot, 200–300 foot, 300–500 foot, and >500-ft

Density logs should be used in conjunction with other logs to avoid mistaking spurious low-density readings for coal. These logs are generally recorded simultaneously with a gamma ray log, which resolves most uncertainties of rock identification.

### NEUTRON LOG

The neutron log, which is similar to the density log, records the varying intensity of gamma rays resulting from inducing neutrons into rocks adjacent to a drill hole by a probe containing a radioactive source. In general, the number of gamma rays and neutrons detected as they return to a detector in the probe are inversely proportional to the hydrogen ion content of a particular rock type. The curve recorded by the detector of returning gamma rays and neutrons can be interpreted to indicate the relative fluid content of the rocks and therefore their porosity and permeability. This log is commonly called the porosity index. The curve of the neutron log records high readings adjacent to permeable fluid-filled rocks because of their high hydrogen contents, but it also records high adjacent to a coal bed because of its high carbon content (fig. 31). A clay with high-moisture content will also record high reading on this curve. Therefore, a high-moisture clay adjacent to a coal bed can obscure the contact between the clay and coal and record a spurious thickness of coal. Other types of logs such as the density or gamma ray will allow a more accurate measurement of the thickness of coal. Neutron logs are also strongly affected by caved or oversized diameter holes; therefore, neutron logs should be used in conjunction with caliper logs.

### ACOUSTIC VELOCITY LOG

Acoustic velocity logs record the velocity of pulsed sonic waves generated in a probe, transmitted into rocks surrounding the probe in a drill hole, and reflected to receivers in the probe. The results are recorded as the inverse of velocity—that is, the time in microseconds for the waves to travel 1 foot (interval transit time). The velocity of the sonic wave depends both upon the lithology and the porosity of the rock type being penetrated. If the rock type is known, therefore, the acoustic velocity log can be used as a measure of porosity. A decrease in velocity (increase in interval transit time) can be interpreted to be the result of an increase in porosity. Coal generally has a longer interval transit time (lower velocity) than adjacent rocks. Because an acoustic velocity log can record velocity changes in great detail, it is commonly recorded on an expanded scale (1 inch = 20 feet) along with a gamma ray and caliper log. However, its value as a tool for identifying coal beds is dependent on the nature of the coal-bearing sequence. An acoustic velocity log is an excellent tool in deeply buried rocks such as the Tertiary rocks of southwest Wyoming. Acoustic velocity logs can be used to delineate coal beds with precision (see fig. 29). They are of lesser value where the same rocks are near the surface, are poorly consolidated, or are fractured because the many spurious low-velocity deflections are recorded. Such logs are everywhere useful in distinguishing coal from limestone, which has a much shorter interval transit time.

### MEASUREMENT OF THE COAL BED THICKNESS

The measurement of thickness of coal beds on geophysical logs requires the identification of the top and base of the coal beds by either of the following methods: (1) point of inflection method (the points where curves change direction), or (2) midpoints of inflection method (arbitrary points located midway between the points of inflection). The points of inflection method is used for measuring the thickness of coal on gamma ray logs, on resistivity logs, and for thin beds on density, neutron, and acoustic velocity logs. It is important to understand that the thickness of coal measured on the short normal and long normal resistivity curves is less than the true thickness of the coal bed by the amount of the electrode spacing; that is, 16 inches less for the short normal curve, and 64 inches less for the long normal curve. The midpoints of inflection method is used to identify the top and base of thick coal beds on the density, neutron, and acoustic velocity logs (see figs. 26, 27 29, and 30 for examples). In general, the SP, long normal resistivity, lateral resistivity, and induction curves are not suitable for accurate measurement of the thickness of coal beds.

The precision and accuracy of coal bed thickness measurements on geophysical logs are dependent on several factors, such as the speed of logging, the scale at

overburden categories; counties; areas underlying the lake; State and national parks and the National Wildlife Refuge; and each township and range. The 200-, 300-, and 500-foot overburden contour lines and the coal isopachs were constructed to define depth of burial and average thickness of coal in each areal category. Explanation for patterns of resource categories is in figure 19.




FIGURE 22.—A small coal basin containing two coal beds that thin out into sandstone by intertonguing. Area of intertonguing sandstone and coal beds trends slightly west of north and is marked by absence of coal beds or by coal too thin to mine. Note 8,300 Btu isolines trending about east-west. Isolines mark approximate areal boundaries between lignite A and subbituminous C coal as defined by heat value on a moist, mineral-matter-free basis. Coal tonnages should be computed as follows: by demonstrated, inferred, and hypothetical categories; by mined out (underground and strip); by 0–500 feet




FIGURE 23.—A large, simple coal basin containing a large quantity of subbituminous coal and lignite. Coal occurs in a zone as thick as 500 feet. Information on coal zone is derived from two strip mines, 20 exposed localities where coal-bearing rocks can be measured, described, and correlated, and numerous oil and gas wells for which there are drill cuttings, cores, and (or) geophysical logs. Demonstrated, inferred, and hypothetical areas of reliability are based on points of control from the surface exposures and wells. Townships and ranges and rank differences are not shown on map because of density of detail. Coal should be categorized and tonnages estimated by States; counties; townships and ranges; rank; demonstrated, inferred, and hypothetical areas of reliability; 0–500 feet (0–150 m), 500–1,000 feet (150–300 m), 1,000–2,000 feet (300–600 m), 2,000–3,000 feet (600–900 m), and 3,000–6,000 feet (900–1,800 m) categories of overburden; thickness of coal in coal zone; and coal underlying Indian reservations, military reservations, national grasslands, national mineral reservations, and State park categories. Coal beneath Indian reservations, towns, lakes, and alluvial valleys could be tabulated separately from other coal resources and those that are restricted so labeled. Cumulative total thickness of coal at a point of surface measurement or well is the summing of all coal in beds greater than 2.5 feet thick.

which the log is recorded, the type of log, the type of equipment, and the instrument settings as well as the ability of the user to pick the correct top and base of a coal bed.

Density, neutron, gamma ray, and acoustic velocity logs in oil and gas wells are recorded at speeds of 30 to 60 feet per minute and at a scale of 1 inch equals 20 feet. Such logs generally permit the measurement of the thickness of coal beds within an error of ±1 foot and allow identification of coal beds as thin as about 2 feet. A suite of logs run in a coal exploratory drill hole at slow speeds of 15 feet or less per minute and recorded at 1 inch equals 10 feet or less, with a standard mineral probe and recording instruments set for coal identification, can measure coal beds as thin as ±0.5 foot. The use of special equipment and slower logging speeds can improve the precision of thickness measurements.

Resistivity logs of oil and gas wells generally are run at higher speeds of about 100 feet per minute and are recorded at 1 inch equals 50 feet, with the result that coal beds thinner than about 2 feet cannot be identified or measured as to thickness. Some of the focusing electrode logs recorded at 1 inch equals 20 feet may permit greater precision. In contrast with oil and gas logs, logs

(0–150 m), 500–1,000 feet (150–300 m), 1,000–2,000 feet (300–600 m), and 2,000–3,000 feet (600–900 m) overburden categories; by 30–60 inches (75–160 cm), 60–96 inches (150–240 cm), 96–120 inches (240–300 cm), and 120–240 inches (300–600 cm) thickness of coal categories; by rank of coal (lignite A and subbituminous C), and by townships and ranges, counties, coal field, basin, and State.

Coal reserves or resources of ____________ Township, Range _________, Quadrangle ________, Field ________, County, State of ____________

Formation_______, Member ________, Rank of Coal_________, Sulfur Content_______, Ash Content_______, Heat Value (Btu Cal) ____

| Name of Bed | Overburden Range (feet) | Planimeter Reading | Area (Acres) | Weighted Average Thickness (inches) | Remaining or Original Tonnage (millions of short tons)[1] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Measured (inches) | | | | Indicated (inches) | | | | Inferred (inches) | | | |
| | | | | | 14-28 | 28-42 | 42-84 | 84-168 | 14-28 | 28-42 | 42-84 | 84-168 | 14-28 | 28-42 | 42-84 | 84-168 |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | Column total | | | | | | | | | | | | |

Planimeter factor ________________

Short or metric tons per acre-inch ________________ Total Measured __________ Total Indicated __________ Total Inferred __________

Planimetered by __________ Total 14-28" __________ Total 28-42" __________ Total 42-84" __________ Total 84"+ __________

Calculated by ________________ Total 0-500' __________ Total 500-1,000' __________ Total 1,000-2,000' ____

Checked by ________________ Total 2,000-3,000' __________ Total 3,000-6,000 __________

Grand Total __________

[1]Categories for hypothetical and speculative coal may be added.

FIGURE 24.—Suggested type of form for recording data and computed tonnages for a mine, area, coal bed, quadrangle, township and range, coal field, basin, region, province, county, State or political province, and the Nation.

FIGURE 25.—Suggested format for tabulating data and calculating tonnages with headings left to judgment of estimator.




FIGURE 26.—Early conventional electric log (1957) of the Owanah Kendrick No. 1 well in Big Horn County, Montana, showing response of subbituminous coal beds in the Paleocene Fort Union Formation. Short normal peak at 320 feet (1) looks like a coal bed, but is identified as limestone on the acoustic velocity log of a nearby hole. Noteworthy are long normal reversals (2) where the resistive bed is thinner than the electrode spacing of 64 inches, and the high lateral resistivity response opposite a thin resistive bed (3), with low response just below bed, and at where the long normal curve indicates that the bed is 4 feet thinner than does the short normal curve (4) because of the difference in electrode spacing. Note also the large SP response of the sandstone beds compared to coal.




FIGURE 27.—Induction and conductivity geophysical logs (1960) of the Hose-Austin Drilling Company, Bones Brothers No. 1 well, Rosebud County, Montana, showing response of subbituminous coal in Paleocene Fort Union Formation.

of the "single point" resistivity type in coal exploration drill holes can provide precision similar to those of radiation-type logs.

### COMPOSITION AND RANK OF COAL

Geophysical logs can also provide information on the composition and rank of coal. High-ash or shaly zones (partings) in coal generally are recorded on logs by curves indicating that they are more radioactive, more dense, and less resistive than purer coal. High-rank coal is more dense and has a shorter interval travel time in sonic logs than low-rank coal. Efforts have been made to quantify compositional factors of coal, such as moisture and ash content, using geophysical logs. Bond and others (1971) report that in the Illinois basin an experimental program using computer processed data from logs of coal exploratory drill holes produced excellent determinations of moisture and ash in coal. However,




FIGURE 28.—Examples of oil- and gas-well geophysical logs from western Kentucky that can be used for coal bed correlations and coal resource evaluations.

attempts to quantify coal composition using geophysical logs from wells in the Northern Great Plains have had erratic results.

## STRATIGRAPHY AND STRUCTURE

Geophysical logs that have been properly related to a known stratigraphic section can be used to correlate coal beds and determine their structure. In many areas a coal bed and adjacent rocks are recorded on geophysical logs as a unique curve, or sets of curves, that can be recognized on logs of drill holes throughout a large area (see fig. 28, No. 9 coal bed). Recognition of "signature" curves permits correlation of stratigraphic units across any area where the lithology remains reasonably constant and in some places allows correlation throughout a coal basin. Properly correlated logs can provide the necessary data to construct coal bed maps that show structure, thickness of coal, and thickness of overburden.

Geophysical logs are also useful in studying the ancestoral sedimentary environments of coal beds. In the Appalachian coal region, Wanless and others (1963) used electric logs of oil and gas wells augmented by drill-hole and outcrop data to identify and map sedimentary environments of some coal-bearing rocks of Pennsylvanian age. Daniels and Scott (1980; 1982) in Kentucky and in Montana used geophysical logs of coal drill holes to refine their interpretations of drillers' lithologic logs in a study of ancestoral sedimentary swamp environments of Pennsylvanian and Tertiary rocks.

## SUMMARY

Geophysical logs of oil and gas wells are the source of abundant data on coal beds, but the value of any of these logs in any particular coal area or basin depends in large part on a knowledge of the coal-bearing rocks and of how the data are recorded on the curves of the geophysical logs. Consequently, it is advisable for those planning to use geophysical logs for coal interpretation to study the logs of drill holes in an area where the lithology is known to determine the reaction of logging equipment to various rock types. Use of a suite of several types of logs is recommended for the best results.

It is important to recognize and discard poor quality or ambiguous logs so that erroneous data is not used in calculating coal resources.




FIGURE 29.—SP, gamma ray, acoustic velocity (sonic), normal resistivity, and induction conductivity logs (1971) from the Davis Oil Grady Fed No. 1-2 well, Sweetwater County, Wyoming, showing response of subbituminous(?) coal beds in the Paleocene Fort Union Formation.

## INTENDED AUDIENCE

This circular was prepared for two audiences: (1) coal resource specialists, coal geologists, and coal-mining engineers; and (2) the public, Congress, and many State and Federal agencies who desire more than a casual knowledge about the need for and procedures of coal resource classification.

The definitions, criteria, guidelines, and illustrations are designed to aid coal geologists and engineers in preparing their reports by providing guidance in calculating, categorizing, and describing the coal resources/reserve base/reserves they are evaluating. The description of geophysical log usage also should provide aid in obtaining and using subsurface information on the areal extent, thickness, and correlation of coal beds and should open up a vast and generally untapped data source for most coal geologists. Adherence to the categories of resource assignment, to the definitions, and to the criteria can result in more accurate, precise, explicit, and consistent reports.

The classification system and terminology described in this circular are equally applicable to hand and computer system determinations of resources and reserves. The illustrations are applicable to manual methods of coal resource/reserve base/reserve tonnage estimations. Computer programs have been designed that will yield similar tonnage estimates of coal resources. Those wishing to inquire about the computer software and methodologies should write to Chief, Branch of Coal Resources, 956 National Center, U.S. Geological Survey, Reston, Virginia 22092.




FIGURE 30.—SP, gamma ray, density, dual induction-lateral log, and neutron logs (1978) from Getty Tri-County No. 1 well, Rosebud County, Montana, showing response of subbituminous coal in the Paleocene Fort Union Formation.

## REFERENCES


American Society for Testing and Materials, 1981, Annual book of ASTM standards; part 26, gaseous fuels; coal and coke; atmosphere analysis: Philadelphia, Pennsylvania, p. 181–399.

Averitt, Paul, 1975, Coal resources of the United States, January 1, 1974: U.S. Geological Survey Bulletin 1412, 131 p.

Bond, L. O., Alger, R. P., and Schmidt, A. W., 1971, Well log applications in coal mining and rock mechanics: Transactions of the Society of Mining Engineers, AIME, v. 250, p. 355–362.

Daniels, J. J., and Scott, J. H., 1980, Computer-assisted interpretation of geophysical well logs in a coal depositional environment, Illinois basin, Kentucky: U.S. Geological Survey Bulletin 1509, 44 p.

———1982, Automated lithographic interpretation from geophysical well logs in a coal depositional environment, Carbon County, Wyoming, *in* Gurgel, K. D., editor, Proceedings, Fifth Symposium on the geology of Rocky Mountain coal 1982: Utah Geological and Mineral Survey, Bulletin 118, p. 220–232.

Fassett, J. E., and Hinds, J. S., 1971, Geology and fuel resources of the Fruitland Formation and Kirtland Shale of the San Juan Basin, New Mexico and Colorado: U.S. Geological Survey Professional Paper 676, 76 p.

Swanson, V. E., and Huffman, Claude, Jr., 1976, Guidelines for sample collecting and analytical methods used in the U.S. Geological Survey for determining chemical composition of coal: U.S. Geological Survey Circular 735, 11 p.

Trumbull, J. V. A., 1960, Coal fields of the United States, exclusive of Alaska—sheet 1: U.S. Geological Survey Map, scale 1:5,000,000.

U.S. Geological Survey, 1976, Coal resource classification system of the U.S. Bureau of Mines and U.S. Geological Survey: Bulletin 1450-B, 7 p.

———1980, Principles of a resource/reserve classification for minerals: U.S. Geological Survey Circular 831, 5 p.

Vaninetti, Jerry, and Thompson, R. M., 1982, Geophysical well-logging and related subsurface data useful in coal exploration and development program: American Association of Petroleum Geologists, 34 p., 82 figs.




FIGURE 31.—Five geophysical logs of a coal exploration drill hole in the Illinois basin (Midcontinent region) showing response of bituminous coal and limestone of Pennsylvanian age on gamma ray, density, neutron, acoustic velocity (sonic), and lateral logs. Modified from Bond, Alger, and Schmidt (1971).

Wanless, H. R., Tubb, J. B., Jr., Gednetz, D. E., and Weiner, J. L., 1963, Mapping sedimentary environments of Pennsylvanian cycles: The Geological Society of America Bulletin, v. 74, no. 4, p. 437–486.

Weast, R. C., editor, 1971, Handbook of Chemistry and Physics: The Chemical Rubber Company, Cleveland, Ohio, p. F-239–264.

Wood, G. H., Jr., Culbertson, W. C., Kehn, T. M., and Carter, M. D., 1982, Coal resources classification system of the United States Geological Survey, 1982, *in* Gurgel, K. D., editor, Proceedings, Fifth Symposium on the geology of Rocky Mountain coal 1982: Utah Geological and Mineral Survey, Bulletin 118, p. 233–238.

# THE SME GUIDE FOR REPORTING EXPLORATION RESULTS, MINERAL RESOURCES, AND MINERAL RESERVES

## (The 2005 SME Guide)

**SUBMITTED BY:**

**THE SEC RESERVES WORKING GROUP**
**THE RESOURCES AND RESERVES COMMITTEE**

**TO:**

**THE BOARD OF DIRECTORS**
**OF**
**THE SOCIETY FOR MINING, METALLURGY AND EXPLORATION, INC.**

**8307 SHAFFER PARKWAY**
**LITTLETON, COLORADO 80127**
**PHONE: (303) 973-9550**
**FAX: (303) 973-3845**
**E-MAIL: sme@smenet.org**

**April 2005**

# Foreword

i. The April 2005 SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves (the 2005 SME Guide) has been adopted by the Society for Mining, Metallurgy, and Exploration, Inc. (SME) and is therefore strongly recommended to be used by members of this organization.

ii. The Guide is recommended as a minimum standard for reporting Exploration Results, Mineral Resources and Mineral Reserves for public and private purposes. In terms of the Guide, a Public Report is a report on Exploration Results, Mineral Resources or Mineral Reserves prepared for the purpose of informing the general public.

iii. In this Guide, important terms and their definitions are highlighted in **bold** text. The guidelines are written using regular font. Paragraphs with border on the left side and written in *italics* give directions on how to interpret definitions and guidelines.

iv. THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (U.S. SEC) REGULATES THE REPORTING OF EXPLORATION RESULTS, RESOURCES AND RESERVES BY ORGANIZATIONS, INDIVIDUALS OR COMPANIES ("ENTITIES") SUBJECT TO THE FILING AND REPORTING REQUIREMENTS OF THE U.S. SEC. DECISIONS AS TO WHEN AND WHAT INFORMATION SHOULD BE PUBLICLY REPORTED ARE THE SOLE RESPONSIBILITY OF THE ENTITY OWNING THE INFORMATION, AND ARE SUBJECT TO U.S. SEC RULES AND REGULATIONS. THESE RULES AND REGULATIONS VARY FROM TIME TO TIME, AND AT ANY GIVEN TIME MAY NOT BE CONSISTENT WITH THE CONTENT OF THIS GUIDE. THE ADVICE OF SECURITIES COUNSEL SHOULD BE SOUGHT IN PREPARING FILINGS FOR THE U.S. SEC OR OTHER SECURITIES REGULATORY AUTHORITIES, AND IN PREPARING OTHER PUBLIC DISCLOSURES.

v. It is recognized that further review of the Guide will be required from time to time. Constructive suggestions are solicited from all users of this Guide. Comments should be sent directly to:

Chairman, Resources and Reserves Committee
Society for Mining, Metallurgy and Exploration, Inc.
8307 Shaffer Parkway
P.O. Box 277002
Littleton, CO 80127-7002
U.S.A.

# Table of Contents


| | Clause Number from | Clause Number to |
|---|---|---|
| Foreword | i | v |
| Table of Contents | - | - |
| History | 1 | 2 |
| Governing Principles | 3 | 3 |
| Scope | 4 | 5 |
| Competence and Responsibility | 6 | 11 |
| Reporting Terminology | 12 | 12 |
| Public Reporting – General | 13 | 17 |
| Reporting of Exploration Results | 18 | 20 |
| Reporting of Mineral Resources | 21 | 30 |
| Reporting of Mineral Reserves | 31 | 39 |
| Mineral Reserves Declaration Report | 40 | 46 |
| Mineral Reserves and Commodity Pricing | 47 | 52 |
| Reserves Sensitivity Test | 53 | 53 |
| Permitting and Legal Requirements | 54 | 55 |
| Reporting of Mineralized Fill, Pillars, Low-Grade Mineralization, Stockpiles, Dumps and Tailings | 56 | 56 |
| Reporting of Exploration Results for Coal, Coal Resources and Coal Reserves | 57 | 62 |
| Reporting of Exploration Results, Mineral Resources and Mineral Reserves for Industrial Minerals | 63 | 66 |
| Reporting of Exploration Results, Mineral Resources and Mineral Reserves for Diamonds and Other Gemstones | 67 | 70 |
| TABLE 1. Checklist of Assessment Criteria | | |

## History

1. In 1988, at the request of members of the Society for Mining, Metallurgy, and Exploration (SME), Inc., the President of SME formed Working Party #79, Ore Reserve Definition, with the mission to develop guidelines for the public reporting of exploration results, resources, and reserves. A Subcommittee was appointed by the Working Party to draft these guidelines and submit recommendations to SME. The Subcommittee's recommendations were published by SME in the April 1991 issue of "Mining Engineering", and as a document entitled "A Guide for Reporting Exploration Information, Resources, and Reserves" (the SME Guide) in January 1992. Work continued on an ad-hoc basis until 1996, when Working Party #79 was renamed the SME Resources and Reserves Committee and became a standing committee.

   In 1994, the Council of Mining and Metallurgical Institutions (CMMI) started a concerted international effort to create a set of international definitions for reporting mineral resources and mineral reserves. An ad-hoc International Definitions Group was formed, with representatives from mining and metallurgical institutions from the United States (SME), Australia (AusIMM), Canada (CIM), the United Kingdom (IMM) and South Africa (SAIMM). A major breakthrough came on October 18, 1997 when the CMMI International Definitions Group met in Denver, Colorado and reached a provisional agreement (the Denver Accord) on definitions of mineral resources and mineral reserves. Concurrently, and since 1992, the United Nations Economic Commission for Europe (UN-ECE) was developing an international framework classification for mineral resources and mineral reserves. Starting in October 1998, joint meetings were held in Geneva between the CMMI International Definitions Group and the UN-ECE Task Force, resulting in agreement to incorporate the CMMI definitions into the UN framework classification.

   In 2002, the Combined Reserves International Reporting Standards Committee (CRIRSCO) was formed, replacing the CMMI International Definitions Group with the mission to continue coordination between member countries, of the development of international standards for the definition and reporting of exploration results, mineral resources and mineral reserves. Chile joined CRIRSCO and developed the first non-English reporting code which follows the international definitions.

   The international resources and reserves definitions have been accepted as part of national reporting codes and guidelines by the regulating agencies of Australia (1989), South Africa (2000), Canada (2001), and Chile (2004).

2. The SME Guide, first published in 1992, was updated in 1999 when the requirement was introduced that the reporting of mineral resources and reserves be made by a Competent Person. The SME Guide was recommended to be used by members of SME. However, some key aspects of the SME Guide were not consistent with requirements of the U.S. Securities and Exchange Commissions (U.S. SEC) which are based on the SEC Industry Guide 7. While the SME Guide was accepted by a

**Stagg Dec. -- Exhibit 3**
**APP. III 706**

number of U.S. and international mining and consulting companies, its usefulness remained limited.

To resolve the differences between the SME Guide and the U.S. SEC rules and regulations, SME opened a dialogue with the U.S. SEC and started a renewed effort to better define the industry position with respect to a number of critical issues. In February 2004, SME formed a consortium of mining, consulting and financial auditing organizations known as the SEC Reserves Working Group (the Working Group), whose members formed the SME Resources and Reserves Committee. The Working Group recommendations were included in this Guide and submitted to the SEC for their consideration in April 2005. The most significant changes include improved definition of the terms Mineral Resources and its subdivisions (Measured, Indicated and Inferred Mineral Resources), and clarification of the technical, economic, legal and permitting requirements which must be satisfied before a reserve can be declared. A section has been added defining the commodity prices which can be used for reserve estimation and reporting, and how price sensitivity should be measured during periods of low prices. Documentation requirements are clarified, including the requirement for a Mineral Reserves Declaration Report. The role of the Competent Person is reemphasized.

## Governing Principles

3. This Guide was written taking into account industry good practices and the mission of the U.S. Securities and Exchange Commission (SEC) which is to protect investors and maintain the integrity of the securities markets. All investors, whether large institutions or private individuals, should have access to certain basic facts about an investment prior to buying it. The SEC requires public companies to disclose meaningful financial and other information to the public, which provides a common pool of knowledge for all investors to use to judge for themselves if a company's securities are a good investment. Only through the steady flow of timely, comprehensive and accurate information can people make sound investment decisions. To meet the SEC's requirements for disclosure, a company must make available all information, whether it is positive or negative, that might be relevant to an investor's decision to buy, sell, or hold the security.

The main principles governing the development and application of this Guide are transparency, materiality and competence.

- ***Transparency*** requires that the reader of a public report is provided with sufficient information, the presentation of which is clear and unambiguous, so as to understand the report and not to be misled.
- ***Materiality*** requires that a public report contains all the relevant information which investors and their professional advisers would reasonably require, and reasonably expect to find in a public report, for the purpose of making a reasoned and balanced judgment regarding the exploration results, mineral resources or mineral reserves being reported.

**Stagg Dec. -- Exhibit 3**
**APP. III 707**

- ***Competence*** requires that the public report be based on work that is the responsibility of suitably qualified and experienced persons who are subject to an enforceable professional code of ethics and rules of conduct.

The following additional principles were also taken into account:

- ***Consistency between Financial and Technical Reports***: Financial reports take into account mineral resources and mineral reserves and are based on assumptions concerning commodity prices, exchange rates, and other parameters of significance. To be clear and unambiguous technical and financial information should be published on a comparable basis.
- ***Consistency between Financial Markets***: For global companies, transparency can only be achieved if information is reported on a consistent basis in all financial markets. Only then can the information supplied to all investors be identical, clear and unambiguous.

## Scope

4. <u>Public reporting:</u> The Guide is recommended as a minimum standard for reporting Exploration Results, Mineral Resources and Mineral Reserves for public and private purposes. In terms of the Guide, a Public Report is a report on Exploration Results, Mineral Resources or Mineral Reserves, prepared for the purpose of informing the general public.

*Public reports include, but are not limited to: company Annual Reports, quarterly reports, press releases, reports which the U.S. SEC requests companies to publish on a yearly, quarterly or other basis, and other reports. It is recommended that the Guide apply to the following reports if they have been prepared or are likely to be used for informing the general public: information memoranda, expert reports and technical papers reporting on Exploration Results, Mineral Resources or Mineral Reserves.*

5. <u>Use of the Guide:</u> Public companies should provide all relevant and material information, necessary for an intelligent layman to make a reasonable and balanced assessment of the Exploration Results, Mineral Resource or Mineral Reserve being reported.

*While every effort has been made within the Guide to cover most situations likely to be encountered in the reporting of Exploration Results, Mineral Resources and Mineral Reserves, there will inevitably be occasions when doubt exists as to the appropriate procedure to follow. In such cases, users of the Guide and those compiling reports under the Guide should be guided by its intent, which is to provide a minimum standard for reporting and to ensure that such reporting contains all information which investors and their professional advisers would reasonably require, and reasonably expect to find in the report, for the purpose of making a reasoned and balanced judgment regarding the Exploration Results, Mineral Resource or Mineral Reserve reported.*

*Table 1, included at the end of the Guide, supplies an outline of items that should be considered when evaluating a project. The importance of each item will vary with the project and it is recognized that, for some projects, other items may be relevant which are not on the list. The Table should be considered a guide to facilitate a rational and orderly approach to evaluation. However, the need remains for*

*exploration and mining professionals to make difficult decisions, such as the classification of material as a Mineral Resource or a Mineral Reserve. Decisions remain a matter of professional judgment based on knowledge, experience, and industry practices.*

*The relative importance of the items in Table 1 will vary with each project depending on the geological environment and technical constraints, as well as economic and legal conditions pertaining at the time of evaluation. When evaluating a project, the relative importance of each item should be weighed. All relevant information must be given careful consideration before deciding which information should be reported to the public.*

*Where a particular report addresses only some of the items in Table 1, the report should disclose its limited scope and should refer to other information required for a complete evaluation of the Exploration Results, Mineral Resource or Mineral Reserve being reported. While such limited scope reports are commonly prepared as part of the overall preparation of an evaluation, such reports may contain information warranting public disclosure independent of the results of other studies and the authors of such reports should be aware of their responsibilities with respect to public disclosure.*

*Public disclosure may be required of factors most likely to affect the accuracy of estimates made in the report. The authors of reports should both identify and evaluate these important factors within their reports.*

*For a variety of reasons, including the need for confidentiality, some data used to evaluate a project need not be made public. However, the public can reasonably assume that all necessary information is available to support public statements at the time they are made. Regulators including the SEC may require copies of all supporting documents on a confidential basis even if such documents are not made public.*

*Demonstrating feasibility of economic extraction is not required before reporting Exploration Results or Mineral Resources. However, particular attention should be given to all relevant information that increases or decreases the chances that the project will result in economic extraction. Demonstrating feasibility of economic extraction is required before reporting Mineral Reserves.*

*It is recognized that estimates of Exploration Results, Mineral Resources, and Mineral Reserves, being predictions of what will occur in the future based on imperfect knowledge of the present, are inherently forward-looking statements, and will be imprecise to some degree. It is also recognized that different individuals analyzing the same data may arrive at somewhat differing interpretations and conclusions. The fact that a Mineral Reserve estimate is misclassified or proven inaccurate at a later date, when additional information becomes available or economic conditions have changed, does not necessarily mean that the estimate was not made in good faith by a competent person taking into account the information available at the time. Statements concerning Exploration Results, Mineral Resources and Mineral Reserves must have a reasonable basis and be made in good faith.*

## Competence and Responsibility

6. Any Public Report concerning an entity's Exploration Results, Mineral Resources and Mineral Reserves is the responsibility of the entity's management. Any such report must be based on, and fairly reflect the information and supporting documentation prepared by a Competent Person or Persons, as defined below.

An entity issuing a Public Report shall make publicly available on request the name(s) of the Competent Person or Persons, state whether the Competent Person is a full time employee of the entity, and, if not, name the Competent Person's employer and its relationship with the entity.

Issuance of the Public Report requires the written consent of the Competent Person or Persons as to the form and context in which it appears. The Competent Person must read and approve the entity's public disclosure of information prepared by the Competent Person, and the use of his/her name in connection with that disclosure.

*The requirement for, and the naming of, a Competent Person is aimed at increasing the quality of the information being released and add to investors confidence. These guidelines only require that the name of the Competent Person be made available on request. However, whenever Exploration Results, Mineral Resources or Mineral Reserves are publicly reported, it is recommended that the name of the Competent Person be disclosed.*

7. Documentation detailing Exploration Results, Mineral Resources and Mineral Reserves estimates, on which a Public Report on Exploration Results, Mineral Resources, and Mineral Reserves is based, must be prepared by, or under the direction of, and signed by, a Competent Person or Persons. If the Competent Person is an employee, officer, director or associate of a company whose principal business is the provision of engineering or geoscientific services, the documentation must also be signed by that company.

8. **A '<u>Competent Person</u>' is a Member or Fellow of an approved institution in the U.S. with an enforceable code of ethics[1], or of a 'Recognized Overseas Professional Organization' ('ROPO') included in a list promulgated by the SME from time to time.**

   **A Competent Person is an engineer, geoscientist or other mining professional who must have a minimum of five years experience which is relevant to the style of mineralization and type of deposit under consideration and to the activity which that person is undertaking.**

   **If the Competent Person is preparing a report on Exploration Results, the relevant experience must be in exploration. If the Competent Person is estimating, or supervising the estimation of Mineral Resources, the relevant experience must be in the estimation, assessment and evaluation of Mineral Resources. If the Competent Person is estimating, or supervising the estimation of Mineral Reserves, the relevant experience must be in the estimation, assessment, and economic evaluation of Mineral Reserves.**

---

[1] On February 27, 2005, SME approved the formation of a new class of Registered Members who will be subject to an enforceable code of ethics. SME will start accepting Registered Members not later than January 1, 2006. The Competent Person requirements will become fully effective for public reports submitted as of December 31, 2006.

**Stagg Dec. -- Exhibit 3**
**APP. III 710**

*The key qualifier in the definition of a Competent Person is the word 'relevant'. Determination of what constitutes relevant experience can be a difficult area and common sense has to be exercised. Different experience is required to evaluate coal, base metal, industrial mineral, iron ore, sand and gravel, or gold deposits. Other differences are less obvious. In estimating Mineral Resources for vein gold mineralization, experience in a high-nugget, vein-type mineralization such as tin, uranium etc. will probably be relevant whereas experience in (say) a low grade disseminated gold deposit may not be. To qualify as a Competent Person in the estimation of Mineral Reserves for alluvial gold deposits, considerable (probably at least five years) experience in the evaluation and economic extraction of this type of mineralization would be needed. This is due to the characteristics of gold in alluvial systems, the particle sizing of the host sediment, and the low grades involved. Experience with placer deposits containing minerals other than gold may not necessarily provide appropriate relevant experience.*

*The key word 'relevant' also means that it is not always necessary for a person to have five years experience in each and every type of deposit in order to act as a Competent Person if that person has relevant experience in other deposit types. For example, a person with (say) 20 years experience in estimating Mineral Resources for a variety of metalliferous hard-rock deposit types may not require as much as five years specific experience in (say) porphyry copper deposits in order to act as a Competent Person. Relevant experience in the other deposit types could count towards the experience in relation to porphyry copper deposits.*

*In addition to experience in the style of mineralization, a Competent Person taking responsibility for the compilation of Exploration Results or Mineral Resource estimates should have sufficient experience in the sampling and analytical techniques relevant to the deposit under consideration to be aware of problems which could affect the reliability of data. Some appreciation of extraction and processing techniques applicable to that deposit type may also be important.*

9. Persons being called upon to act as Competent Persons should be clearly satisfied in their own minds that they could face their peers and demonstrate competence in the commodity, type of deposit and situation under consideration. If doubt exists, the person should either seek opinions from appropriately experienced colleagues or should decline to act as a Competent Person.

*Estimation of Mineral Resources may be a team effort (for example, involving one person or team collecting the data and another person or team preparing the estimate). Estimation of Mineral Reserves is very commonly a team effort involving several disciplines. It is recommended that where there is a clear division of responsibility within a team, each Competent Person and his or her contribution should be identified, and responsibility accepted for that particular contribution. However, the definitions have been specifically written to allow an appropriate degree of latitude for companies to define the organizational structure in which they apply the role of the Competent Person. If only one Competent Person signs the Mineral Resource or Mineral Reserve documentation, that person is responsible and accountable for the whole of the documentation under the Code. It is important in this situation that the Competent Person accepting overall responsibility for a Mineral Resource or Mineral Reserve estimate and supporting documentation prepared in whole or in part by others, is satisfied, in its professional opinion, that the work of the other contributors is reliable.*

*A Competent Person may be an employee of the entity reporting Exploration Results, Mineral Resources or Mineral Reserves, or an independent consultant. When the Competent Person's recommendations are likely to have material consequences (such as development of a new mining or processing facility, or significant decreases or increases in reserves), it is recommended that these*

*recommendations be independently reviewed before the recommendations are finalized. The independent reviewer should qualify as a Competent Person in the context of the project being reviewed.*

10. Complaints made in respect of the professional work of a Competent Person will be dealt with under the disciplinary procedures of the professional organization to which the Competent Person belongs.

11. When a U.S.-listed company with overseas interests wishes to report overseas Exploration Results, Mineral Resource or Mineral Reserves, estimates prepared by a person who is not a member of an appropriate U.S. institution or a Recognized Overseas Professional Organization (ROPO), it is necessary for the company to nominate a Competent Person or Persons to take responsibility for the Exploration Results, Mineral Resources or Mineral Reserves estimate. The Competent Person or Persons undertaking this activity should appreciate that they are accepting full responsibility for the estimate and supporting documentation and should not treat the procedure merely as a 'rubber-stamping' exercise.

*Rules, regulations or guidelines concerning the Competent Person differ from country to country. When Exploration Results, Mineral Resources or Mineral Reserves are reported in the United States or in countries other than the United States, it is the responsibility of the Competent Person and the entity making a public report to ensure that the applicable rules, regulations and guidelines are followed.*

## Reporting Terminology

12. Public reports dealing with Exploration Results, Mineral Resources and/or Mineral Reserves must only use the terms set out in Figure 1.

**The term '<u>Modifying Factors</u>' is defined to include mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors**

*Figure 1 sets out the framework for classifying exploration results, tonnage and grade estimates and contained or recoverable minerals as applicable. This classification reflects different levels of geoscientific knowledge and different degrees of technical and economic evaluation. Mineral Resources can be estimated mainly on the basis of geoscientific information with some input from other disciplines. Mineral Reserves, which are a modified sub-set of the Indicated and Measured Mineral Resources, require consideration of those factors affecting extraction, including mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors, and should in most instances be estimated with input from a range of disciplines.*

*In certain situations, Measured Mineral Resources could convert to Probable Mineral Reserves rather than to Proven Mineral Reserves because of uncertainties associated with modifying factors which are taken into account in the conversion from Mineral Resources to Mineral Reserves. This relationship is shown by the broken arrow in Figure 1. In such situations, these modifying factors should be fully explained.*

*In certain situations, previously reported Mineral Reserves could convert back to Mineral Resources because of new information according to which a Mineral Reserve can no longer be reported. The*

*resulting two-way relationship is shown by the two-headed arrows in Figure 1. The modifying factors which resulted in reclassification of a Mineral Reserve should be fully explained.*

**Figure 1 – General Relationship between Exploration Results, Mineral Resources and Mineral Reserves**




## Public Reporting – General

13. Public Reports concerning an entity's Exploration Results, Mineral Resources or Mineral Reserves should include a description of the style and nature of mineralization.

14. An entity must disclose relevant information concerning the status and characteristics of a mineral deposit which could materially influence the economic value of that deposit. To meet disclosure obligations, an entity may be required to promptly report any material changes in its Mineral Resources or Mineral Reserves.

15. An entity must review and publicly report on its Mineral Resources and Mineral Reserves at least annually.

16. Throughout the Guide, where appropriate, "quality" may be substituted for "grade" and "volume" may be substituted for "tonnage".

17. Units used for reporting Mineral Resources or Mineral Reserves should be those generally applicable within the industry and within the jurisdiction where reporting takes place, for the mineral being reported.

## Reporting of Exploration Results

18. **'Exploration Results' include data and information generated by exploration programs that may be of use to investors. The Exploration Results may or may not be part of a formal declaration of Mineral Resources or Mineral Reserves.**

    The reporting of such information is common in the early stages of exploration when the quantity of data available is generally not sufficient to allow any reasonable estimates of Mineral Resources.

    If an entity reports Exploration Results in relation to mineralization not classified as a Mineral Resource or a Mineral Reserve, then estimates of tonnages and average grade must not be assigned to the mineralization unless the situation is covered in Clause 20 below, and then only in strict accordance with the requirements of that clause.

    *Examples of Exploration Results include results of outcrop sampling, assays of drill hole intercepts, geochemical results and geophysical survey results.*

19. Public reports of Exploration Results must contain sufficient information to allow a considered and balanced judgment of their significance. Reports must include relevant information such as exploration context, type and method of sampling, sampling intervals and methods, relevant sample locations, distribution, dimensions and relative location of all relevant assay data, data aggregation methods, land tenure status plus information on any of the other criteria listed in Table 1 that are material to an assessment.

    Public reports of Exploration Results must not be presented so as to unreasonably imply that potentially economic mineralization has been discovered. If true widths of mineralization are not reported, an appropriate qualification must be included in the public report.

Where assay and analytical results are reported, they must be reported using one of the following methods, selected as the most appropriate by the Competent Person:

- Either by listing all results, along with sample intervals (or size, in the case of bulk samples), or
- By reporting weighted average grades of mineralized zones, indicating clearly how the grades were calculated.

Reporting of selected information such as isolated assays, isolated drill holes, assays of panned concentrated or supergene enriched soils or surface samples, without placing them in perspective is unacceptable.

*Table 1 is a check list and guideline to which those preparing reports on Exploration Results, Mineral Resources and Mineral Reserves should refer. The check list is not prescriptive and, as always, relevance and materiality are overriding principles which determine what information should be publicly reported.*

20. It is recognized that it is common practice for a company to comment on and discuss its exploration in terms of target size and type. Any such information relating to exploration targets must be expressed so that it cannot be misrepresented or misconstrued as an estimate of Mineral Resources or Mineral Reserves. The terms Resource or Reserve must not be used in this context. Any statement referring to potential quantity and grade of the target must be expressed as ranges and must include (1) a detailed explanation of the basis of the statement, and (2) a proximate statement that the potential quantity and grade is conceptual in nature, that there has been insufficient information to define a Mineral Resource and that it is uncertain if further exploration will result in the determination of a Mineral Resource.

## Reporting of Mineral Resources

21. **A '<u>Mineral Resource</u>' is a concentration or occurrence of material of economic interest in or on the Earth's crust in such form, quantity, and quality that there are reasonable prospects for eventual economic extraction. The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge. Mineral Resources are sub-divided, in order of increasing geological confidence, into Inferred, Indicated and Measured categories.**

**Portions of a deposit that do not have reasonable prospects for eventual economic extraction must not be included in a Mineral Resource.**

*The term "Mineral Resource" covers mineralization (including, in certain instances, dumps and tailings) which has been identified within reasonable limits and estimated through exploration and sampling and within which Mineral Reserves may be defined by the consideration and application of Modifying Factors.*

**Stagg Dec. -- Exhibit 3**
**APP. III 715**

*The term "reasonable prospects for eventual economic extraction" implies a judgment (albeit preliminary) by the Competent Person with respect to the technical and economic factors likely to influence the prospect of economic extraction, including the approximate mining parameters. In other words, a Mineral Resource is not an inventory of all mineralization drilled or sampled, regardless of cutoff grade, likely mining dimensions, location, or continuity. It is a realistic inventory of mineralization which, under assumed and justifiable technical and economic conditions, might become economically extractable.*

*The term "reasonable prospect" implies that Measured, Indicated, and Inferred Mineral Resources are constrained within pit shells or cones for open pit mines, or constrained to coherent zones which support mining, processing and development cost estimates for underground extraction. A deposit model is required, which may be a computer-generated block model or a model based on cross- or long-sections. Economic tests should be documented in technical studies, but the disclosure of resources should not require formal detailed technical and economic studies such as those required for reserve disclosure. Economic criteria should be applied equally to all categories of resources (Measured, Indicated and Inferred).*

*When publishing Mineral Resources, a statement should be made that, while the estimate of Mineral Resources is based on the Competent Person's judgment that there are reasonable prospects for eventual economic extraction, no assurance can be given that Mineral Resources will eventually convert to Mineral Reserves. Consideration should also be given to publication of the reasons why a reported Mineral Resource was not reported as a Mineral Reserve.*

*Commodity prices used in resource reporting should be based on the company's long-term view of the likely range of commodity prices. If prices used for resource estimation differ from the company's long term view as used for reserve reporting, these differences should be documented and justified.*

*Publication of Mineral Resources is recommended but not required. It is also recommended that, when publicly disclosing mineral resources, material assumptions made to estimate these resources are also disclosed. This may include disclosure of commodity price assumptions to the extent that this is customary and does not place the company at a competitive disadvantage. It is recognized that in some cases, such as when a product is sold under long term contract whose terms must be kept confidential, there might be valid commercial reasons for non-disclosure. There are also circumstances where disclosure of long term price assumptions used for business planning and reserve reporting can be detrimental to the company, such as when bidding for sales contracts or property acquisition. If prices are not published, the reasons for doing so must be documented. This documentation may be treated as confidential but should be available for review by auditors or regulators when required.*

*Cutoff grades or other quality parameters determined by the Competent Person should be used to exclude material for which there is no reasonable prospect for eventual economic extraction. Mineral Resource estimates may include material below the selected cutoff grade to ensure that the Mineral Resources comprise bodies of mineralization of adequate size and continuity to show reasonable prospects for eventual application of a feasible mining method.*

*Where considered appropriate by the Competent Person, the confidence in estimates of tonnage, grade, quality, physical characteristics and deleterious elements that may affect the ability to recover, beneficiate or produce a saleable product must be considered in determining whether a resource can be reported and in classifying the resource as Inferred, Indicated or Measured*

*All material assumptions made in determining the reasonable prospects for eventual economic extraction must be documented and justified.*

**Stagg Dec. – Exhibit 3**
**APP. III 716**

*Interpretation of the word "eventual" in this context may vary depending on the commodity or mineral involved. For example, for some coal, iron ore, bauxite and other bulk minerals or commodities, it may be reasonable to envisage eventual economic extraction as covering time periods in excess of 50 years. For many gold deposits, application of the concept would normally be restricted to much shorter periods of time, but for Witwatersrand gold deposits long periods do apply. Interpretation is the responsibility of the Competent Person.*

*Any adjustment made to the data for the purpose of making the Mineral Resource estimate, for example by cutting or factoring grades, should be clearly documented and justified.*

*Certain reports (e.g., inventory reports, exploration reports to a government and other similar reports not intended primarily for providing information for investment purposes) may require full disclosure of all mineralization, including some material that does not have reasonable prospects for eventual economic extraction. Such estimates of mineralization would not qualify as Mineral Resources by this definition.*

*Mineralized stope fill, mineralized in situ remnants, shaft and stope pillars left for ground support purposes, and stockpiles of mineralized material, old dumps and tailings can be considered when reporting Mineral Resources if they present reasonable prospects for eventual economic extraction.*

22. **An '<u>Inferred Mineral Resource</u>' is that part of a Mineral Resource for which the overall tonnages, grades and mineral contents can be estimated with a reasonable level of confidence. It is based on geological evidence and apparent geological and grade continuity after applying economic parameters. It is derived from information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes, and which in some way is limited or of uncertain quality and reliability. An Inferred Mineral Resource has a lower level of confidence than that applying to an Indicated Mineral Resource.**

**The term 'overall' means within that part of the deposit for which Measured, Indicated and Inferred Mineral Resources are reported.**

*The category is intended to cover situations where a mineral concentration or occurrence has been identified and limited measurements and sampling completed, but the data are sufficient to allow the inference of geological and grade continuity. Commonly, it would be reasonable to expect that the majority of Inferred Mineral Resources would upgrade to Indicated or Measured Mineral Resource with continued exploration/delineation drilling or other sampling. However, due to the uncertainty of Inferred Mineral Resources it should not be assumed that such upgrading will always occur.*

*Confidence in the estimate is sufficient to allow the application of assumed but not verified technical and economic parameters for conceptual planning. However, confidence is usually not sufficient to allow the results of the application of these technical and economic parameters to be used for incremental planning and production scheduling. For this reason, there is no direct link from an Inferred Mineral Resource to any category of Mineral Reserves (see Figure 1). Caution should be exercised if this category is considered in technical or economic studies.*

*Inferred Mineral Resources should exclude material for which there is insufficient data to allow the inference of geological or grade continuity. Inferred Mineral Resources are intended to be sufficiently*

**Stagg Decl. - Exhibit 3**
**APP. III 717**

*defined that overall tonnages, grades and mineral contents can be estimated with a reasonable level of confidence.*

23. **An '<u>Indicated Mineral Resource</u>' is that part of a Mineral Resource for which overall tonnages, densities, shapes, physical characteristics, grades and mineral contents can be estimated with high levels of confidence, and local tonnages, densities, shapes, physical characteristics, grades and mineral contents can be estimated with reasonable levels of confidence. An Indicated Mineral Resource is based on exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings, and drill holes. The locations are too widely or inappropriately spaced to confirm geological continuity and grade continuity but are spaced closely enough for continuity to be assumed. An Indicated Mineral Resource has a lower level of confidence than that applying to a Measured Mineral Resource, but has a higher level of confidence than that applying to an Inferred Mineral Resource.**

**The term 'overall' means within that part of the deposit for which Measured, Indicated and Inferred Mineral Resources are reported. The term 'local' means within selected parts of the deposit related to mining increments which are suitable for development of mine plans and financial analyses.**

*A deposit or part of a deposit may be classified as an Indicated Mineral Resource when the nature, quality, amount and distribution of data are such as to allow the Competent Person determining the Mineral Resource to confidently interpret the geological framework and to assume continuity of mineralization. Confidence in the estimate is sufficient to allow the appropriate application of technical and economic parameters to prepare incremental plans and production schedules and to enable an evaluation of economic viability. Overall confidence in the estimates is high while local confidence is reasonable. The Competent Person must recognize the importance of the Indicated Mineral Resource category to the advancement of the feasibility of the project. An Indicated Mineral Resource estimate is of sufficient quality to support detailed technical and economic studies leading to a Mineral Reserves Declaration Report which can serve as the basis for major development decisions.*

24. **A '<u>Measured Mineral Resource</u>' is that part of a Mineral Resource for which both overall and local tonnages, densities, shapes, physical characteristics, grades and mineral contents can be estimated with a high level of confidence. It is based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings, and drill holes. The locations are spaced closely enough to confirm geological and grade continuity.**

**The term 'overall' means within that part of the deposit for which Measured, Indicated and Inferred Mineral Resources are reported. The term 'local' means within selected parts of the deposit related to mining increments which are suitable for development of mine plans and financial analyses.**

*A deposit or part of a deposit may be classified as a Measured Mineral Resource when the nature, quality, amount and distribution of data are such as to leave no reasonable doubt, in the opinion of the*

*Competent Person determining the Mineral Resource, that the tonnage and grade of production planning and scheduling increments can be estimated within close limits and that any variation from the estimate would not significantly affect potential economic viability of individual increments. This category requires a high level of confidence in, and understanding of, the geology and controls of the mineral deposit. A Measured Mineral Resource estimate is of sufficient quality to support detailed technical and economic studies leading to a Mineral Reserves Declaration Report which can serve as the basis for major development decisions.*

25. The choice of the appropriate category of Mineral Resource depends upon the quantity, distribution and quality of data available, the level of confidence that attaches to those data, and the appropriateness of the estimation methodology applied. The appropriate Mineral Resource category must be determined by the Competent Person.

*Mineral Resource classification is a matter for skilled judgment and the Competent Person should take into account those items in Table 1 which relate to confidence in Mineral Resource estimation.*

*In deciding between Measured Mineral Resource and Indicated Mineral Resource, the Competent Person may find it useful to consider, in addition to the phrases relating to geological and grade continuity in Clauses 25 and 26, the phrase in the guideline to the definition for Measured Mineral Resource: ".... any variation from the estimate would not significantly affect potential economic viability of individual increments".*

*In deciding between Indicated Mineral Resource and Inferred Mineral Resource, the Competent Person may wish to take into account, in addition to the phrases relating to geological and grade continuity in Clauses 25 and 26, the guideline to the definition for Indicated Mineral Resource: "Confidence in the estimate is sufficient to allow the appropriate application of technical and economic parameters to prepare incremental plans and production schedules and to enable an evaluation of economic viability", which contrasts with the guideline to the definition for Inferred Mineral Resource: "Confidence in the estimate is sufficient to allow the application of assumed but not verified technical and economic parameters for conceptual planning. However, confidence is usually not sufficient to allow the results of the application of [these] parameters to be used for incremental planning and production scheduling... Caution should be exercised if this category is considered in technical or economic studies".*

26. Mineral Resource estimates are not precise calculations, being dependent on the interpretation of limited information on the location, shape and continuity of the occurrence and on the available sampling results. Reporting of tonnage and grade figures should reflect the order of accuracy of the estimate by rounding off to appropriately significant figures and by qualification with terms such as 'approximately'.

*Depending on the accuracy of the estimate, rounding to the second or third significant figure should be sufficient. For example, 10,863,425 tons at 8.23 per cent could be stated as 11 million tons at 8.2 percent or 10.9 million tons at 8.23 percent. In order to emphasize the imprecise nature of a Mineral Resource or Mineral Reserve estimate, it is recommended that the final result always be referred to as an estimate not a calculation.*

*Competent Persons are encouraged, where appropriate, to discuss the relative accuracy and/or confidence of the Mineral Resource estimates. The statement should specify whether it relates to over-all or local estimates, and, if local, state the relevant tonnage or volume. Where a statement of the*

*relative accuracy and/or confidence is not possible, a qualitative discussion of the uncertainties should be provided.*

27. Mineral Resource reports must specify one or more of the categories of "Inferred", "Indicated" and "Measured". Reports must not contain Inferred Mineral Resource figures combined with either of the other two categories. The Measured and Indicated categories can be combined only if also reported separately. A Mineral Resource must not be reported in terms of contained metal unless corresponding tonnage and grade figures are also presented. Mineral Resource figures must not be aggregated with Mineral Reserve figures.

In situations where both Mineral Resource and Mineral Reserve figures are reported (such as tonnage, grade, mineral content), the Mineral Resource figures must not include any material reported as a Mineral Reserve.

28. Table 1 provides, in a summary form, a list of the main criteria which should be considered when preparing reports on Exploration Results, Mineral Resources and Mineral Reserves. These criteria need not be discussed in a public report unless they materially affect estimation or classification of the Mineral Resources.

*It is not necessary, when publicly reporting, to comment on each item in Table 1, but it is essential to discuss any matters which might materially affect the reader's understanding or interpretation of the results or estimates being reported. This is particularly important where inadequate or uncertain data affect the reliability of, or confidence in, a statement of Exploration Results or an estimate of Mineral Resources and/or Mineral Reserves; for example, poor sample recovery, poor repeatability of assay or laboratory results, limited information on tonnage factors etc.*

*Mineral Resource estimates are sometimes reported after adjustment by cutting of high grades, the application of factors such as dilution, mine or mill "call factors", and similar modifying factors. If any of the data are materially adjusted or modified for the purpose of making the estimate, this should be clearly stated in a public Mineral Resource report and the nature of the adjustment or modification described.*

*If there is doubt about what should be reported in order to ensure full disclosure, it is better to err on the side of providing too much information rather than too little.*

29. The words 'ore' and 'reserves' must not be used in stating Mineral Resource estimates as the terms imply technical feasibility and economic viability and are only appropriate when all relevant mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors have been considered. Reports and statements should continue to refer to the appropriate category or categories of Mineral Resources until technical feasibility and economic viability have been established. If re-evaluation indicates that the Mineral Reserves are no longer viable, the Mineral Reserves must be reclassified as Mineral Resources or removed from Mineral Resource/Mineral Reserve statements altogether.

*It is not intended that reclassification from Mineral Reserves to Mineral Resources should be applied as a result of changes expected to be of a short term or temporary nature, or where management has made a deliberate decision to operate on a non-economic basis. Examples of such situations might be*

**Stagg Dec. -- Exhibit 3**
**APP. III 720**

*a commodity price drop expected to be of short duration, mine emergency of a non-permanent nature, transport strike etc.*

30. As a minimum, the Competent Person should review Mineral Resource supporting documents on an annual basis. Reports must be updated if there are significant changes in technical and economic parameters.

*If such review results in material changes in, or reclassification of Mineral Resources, timely disclosure may be required.*

## Reporting of Mineral Reserves

31. **A '<u>Mineral Reserve</u>' is the economically mineable part of a Measured and/or Indicated Mineral Resource. It includes diluting materials and allowances for losses which may occur when the material is mined. Appropriately detailed assessments and studies have been carried out and include consideration of and modification by realistically assumed mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors. These assessments demonstrate at the time of reporting that extraction could reasonably be justified. Mineral Reserves are sub-divided in order of increasing confidence into Probable Mineral Reserves and Proven Mineral Reserves.**

**Before a Mineral Reserve is publicly reported, a Mineral Reserves Declaration Report must be prepared as defined later in this Guide. This report must contain a description of the appropriately detailed assessments and studies that have been carried out to demonstrate that extraction could reasonably be justified.**

*Mineral Reserves are those portions of Mineral Resources which, after the application of all mining factors, result in an estimated tonnage and grade which, in the opinion of the Competent Person making the estimates, can be the basis of a viable project after taking account of all relevant mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors. Mineral Reserves are inclusive of diluting material which will be mined and delivered to the treatment plant or equivalent.*

*The term "economic" implies that extraction of the Mineral Reserve has been established or analytically demonstrated to be viable and justifiable under reasonable investment and market assumptions. The term "Mineral Reserve" need not necessarily signify that extraction facilities are in place or operative or that all governmental approvals have been received. It does signify that there are reasonable expectations of timely approvals.*

*It should be noted that the Guide does not imply that an economic operation must have Proven Mineral Reserves. Situations arise where Probable Mineral Reserves alone may be sufficient to justify extraction, as for example with some alluvial tin or gold deposits. This is a matter for judgment by the Competent Person and the management of the entity owning the information.*

*The terms "Ore Reserves" and "Mineral Reserves" can be used interchangeably where it is customary to do so, usually for metallic deposits and some industrial minerals.*

**Stagg Dec. – Exhibit 3**
**APP. III 721**

*Public disclosure of Mineral Reserves is allowed only after completion of a Mineral Reserves Declaration Report as defined later in this Guide.*

32. **A '<u>Probable Mineral Reserve</u>' is the economically mineable part of an Indicated and, in some circumstances, Measured Mineral Resource. It includes diluting materials and allowances for losses which may occur when the material is mined. Appropriate assessments and studies have been carried out, and include consideration of and modification by realistically assumed mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors. These assessments demonstrate at the time of reporting that extraction could reasonably be justified.**

*A Probable Mineral Reserve has a lower level of confidence than a Proven Mineral Reserve but is of sufficient quality to serve as the basis for a decision on the development of the deposit.*

33. **A '<u>Proven Mineral Reserve</u>' is the economically mineable part of a Measured Mineral Resource. It includes diluting materials and allowances for losses which may occur when the material is mined. Appropriately detailed assessments and studies have been carried out and include consideration of and modification by realistically assumed mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors. These assessments demonstrate at the time of reporting that extraction is reasonably justified.**

*A Proven Mineral Reserve represents the highest confidence category. The style of mineralization or other factors could mean that a Proven Mineral Reserve cannot be demonstrated in some deposits. Competent Persons should be aware of the consequences of declaring a Proven Mineral Reserve before satisfying themselves that all of the relevant resource parameters and modifying factors have been established at a similarly high level of confidence. Subsequent retraction of a publicly reported Proven Mineral Reserve can lead to investor uncertainty and lack of corporate confidence.*

34. The choice of the appropriate category of Mineral Reserve is determined primarily by the classification of the corresponding Mineral Resource and after considering any uncertainties in the modifying factors. Allocation to the appropriate category must be made by the Competent Person.

*The Guide provides for a direct relationship between Indicated Mineral Resources and Probable Mineral Reserves and between Measured Mineral Resources and Proven Mineral Reserves. In other words, the level of geoscientific confidence for Probable Mineral Reserves is the same as that required for the determination of Indicated Mineral Resources and for Proven Reserves is the same as that required for the determination of Measured Mineral Resources.*

*The Guide provides for a two-way relationship between Measured Mineral Resources and Probable Mineral Reserves. This is to cover the situation where uncertainties associated with any of the modifying factors considered when converting Mineral Resources to Mineral Reserves may result in there being a lower degree of confidence in the Mineral Reserves than in the corresponding Mineral Resources.*

**Stagg Dec. -- Exhibit 3**
**APP. III 722**

*If the uncertainties in the modifying factors that prevented the Measured Mineral Resource being converted to a Proven Mineral Reserve are removed, then the Measured Mineral Resource may be converted to a Proven Mineral Reserve. No amount of confidence in the modifying factors for conversion of a Mineral Resource into a Mineral Reserve can override the upper level of confidence which exists in the Mineral Resource. Under no circumstances can an Indicated Mineral Resource be converted to a Proven Mineral Reserve, unless new information first justifies conversion to a Measured Mineral Resource. Under no circumstances can an Inferred Mineral Resource be converted to a Mineral Reserve unless first converted to an Indicated or Measured Mineral Resource.*

*Application of the category of a Proven Mineral Reserve implies the highest degree of confidence in the estimate.*

*Refer also to corresponding Clause in this Guide regarding classification of Mineral Resources.*

35. Mineral Reserve estimates are not precise calculations. Tonnage and grade figures in reports should be expressed so as to convey the order of accuracy of the estimates by rounding off to appropriately significant figures.

*To emphasize the imprecise nature of a Mineral Reserve the final result should always be referred to as an estimate, not a calculation.*

*Competent Persons are encouraged, where appropriate, to discuss the relative accuracy and/or confidence of the Mineral Reserve estimates. The statement should specify whether it relates to over-all or local estimates, and, if local, state the relevant tonnage or volume. Where a statement of the relative accuracy and/or confidence is not possible, a qualitative discussion of the uncertainties should be provided.*

*Depending on the accuracy of the estimate, rounding to the second or third significant figure should be sufficient. For example, 10,863,425 tons at 8.23 per cent could be stated as 11 million tons at 8.2 percent or 10.9 million tons at 8.23 percent. In order to emphasize the imprecise nature of a Mineral Resource or Mineral Reserve estimate, it is recommended that the final result always be referred to as an estimate not a calculation.*

36. Mineral Reserve reports must specify one or both of the categories of 'Proven' and 'Probable'. Reports that combine Proven and Probable Mineral Reserve figures must provide estimates for each category if this information is material. Reports must not present contained metal figures unless corresponding tonnage and grade figures are also presented.

37. When reporting a Mineral Reserve, tonnages, grades and mineral or metal contents must be reported after taking into account mining loss and mining dilution. Metal contents can be reported after also taking into account processing recoveries. If processing recoveries are not taken into account, the percentage expected to be recovered or lost during processing must be reported.

38. In situations where figures for both Mineral Resources and Mineral Reserves are reported, a clarifying statement must be included in the report which clearly indicates that the Mineral Resources do not include any material reported as Mineral Reserves.

*An appropriate form of clarifying statement may be:*

> *"The Mineral Resources do not include material reported as Mineral Reserves."*

*It is strongly recommended that, if there is a significant difference between a Mineral Reserve and the Mineral Resource from which this Mineral Reserve was estimated, an explanation of the reasons for the difference should be included in the report. This will assist the reader of the report in making a judgment of the likelihood of the remaining Mineral Resources eventually being converted to Mineral Reserves.*

*When converting Mineral Resources to Mineral Reserves, Mineral Reserves may incorporate material (dilution) which may not have been included in the original Mineral Resource. This fundamental difference between Mineral Resources and Mineral Reserves should be explained if of material significance.*

*Remaining Mineral Resources must be reported separately from Mineral Reserves because the resulting total may be very misleading in economic terms and may be misunderstood or, more seriously, misused to give a false impression of the prospectivity of a project.*

*Public reporting of tonnage and grade estimates other than Mineral Resources and Mineral Reserves is not permitted under the Guide. Other estimates may be useful for an entity in its internal calculations and evaluation processes, but their inclusion in public reports could cause confusion.*

*In preparing the Mineral Reserve statement, the relevant Mineral Resource statement on which it is based should first be developed. This should be reconciled with the Mineral Resource statement estimated for the previous comparable period and differences (due, for example, to mine production, exploration, etc.) identified. The application of appropriate factors to the Mineral Resource can then be made to develop the Mineral Reserve statement which can also be reconciled with the previous comparable Mineral Reserve statement. Mining companies are encouraged to reconcile estimates whenever possible in their reports. A detailed account of differences between Mineral Reserves and corresponding Mineral Resource figures is not essential, but sufficient comment should be made to enable significant variances to be understood by the reader.*

*Mineral Reserve estimates are sometimes reported after adjustment by cutting of high grades, the application of factors such as dilution, mine or mill "call factors", and similar modifying factors. If any of the data are materially adjusted or modified for the purpose of making the estimate, this should be clearly stated in a public Mineral Reserve report and the nature of the adjustment or modification described.*

39. As a minimum, the Competent Person should review Mineral Resource and Mineral Reserve supporting documents on an annual basis. Reports must be updated if there are significant changes in technical and economic parameters.

*If such review results in material changes in, or reclassification of Mineral Resources, timely disclosure may be required. In operating mines, reconciliation reports which compare mined resources and reserves with actual production, should be reviewed annually.*

**Stagg Dec. -- Exhibit 3**
**APP. III 724**

## Mineral Reserves Declaration Report

40. Public disclosure of Mineral Reserves is allowed only after completion of a technical and economic study whose results and supporting documentation form a 'Mineral Reserves Declaration Report'. The Competent Person is responsible for the content of the Mineral Reserves Declaration Report and supporting documentation.

*The content of a Mineral Reserves Declaration Report will vary depending on the project being studied. It is the responsibility of the Competent Person to determine that all applicable subjects are taken into account when preparing the report. A checklist of assessment criteria is given in Table 1. It is the responsibility of the Competent Person to determine which ones of these criteria and which additional criteria should apply to a particular project. The relative importance of these criteria will vary with the particular project and the legal and economic conditions pertaining at the time of determination.*

*The Mineral Reserves Declaration Report can be a single document in which all assessment criteria deemed applicable by the Competent Person are analyzed, or a summary document which contains supporting documentation by reference only. The Competent Person takes responsibility for the content of the Mineral Reserves Declaration Report and all supporting documentation included by reference.*

41. **A '<u>Mineral Reserves Declaration Report</u>' is the result of a properly defined, adequately scoped, and professionally executed study of the viability of a mineral project. The study must have advanced to the stage where mining and mineral processing methods are defined and permitting is determined to be feasible. Realistic production and/or sales schedules must have been developed for the life of the project, including estimates of capital and operating costs. For projects with very long life the study must be sufficient to justify investments needed for current and planned production, as well as ongoing investments which will be needed to maintain long-term operations.**

**For new projects, the study must include a financial analysis, based on realistically assumed mining, metallurgical, economic, marketing, legal, environmental, social and governmental factors, that is sufficient for a Competent Person, acting reasonably, to determine if all or part of the Measured and Indicated Mineral Resource may be converted to a Mineral Reserve.**

**For addition of Mineral Reserves to an existing operation or project, the study must be thorough enough to ensure that, in the opinion of the Competent Person, the previously declared Mineral Reserve combined with the new addition can be reported as a Mineral Reserve.**

*In making a Mineral Reserves declaration, it is implicit that the Mineral Reserves Declaration Report and associated studies conclude that, in the opinion of the Competent Person, the material disclosed meets the requirements of technical and economic viability and that, in the opinion of the entity reporting the Mineral Reserves, development of the Mineral Reserves would meet reasonable investment criteria when compared to alternative investments with similar risk.*

**Stagg Dec. -- Exhibit 3**
**APP. III 725**

*In the case of a new mine, the Mineral Reserves Declaration Report will comprise, either in its entirety or by reference, a comprehensive suite of documents, produced under the supervision of a Competent Person, which support the reserve estimates being published. It is the Competent Person's responsibility to ensure that the documentation is sufficiently complete, accurate and cohesive as a whole to demonstrate the required confidence to enable public disclosure of the Mineral Reserves.*

*In the case of an operating mine, where existing reserves and mining experience lend greater confidence to the estimation of contiguous or nearby reserves, ensuring that the work done addresses all the issues required to establish a Mineral Reserve remains the responsibility of a Competent Person. The work must be supported by a Mineral Reserves Declaration Report covering, either directly or by reference, all of the relevant factors but with selective modification and allowances based on operating data and the inclusion of the new reserves in an overall project mining plan.*

*In the case of an operating mine or a mine with historical operation, if sufficient data is available, a reconciliation report should be included in the Minerals Reserves Declaration Report. A reconciliation report is a report which, for a defined time period or volume mined, compares actual production (as estimated from ore control, mine production reports, and/or mill production reports) with expected production as determined from the deposit model used for reserve estimation.*

42. Public Reporting of a Mineral Reserve will normally indicate the intent to mine, or that a tangible asset has been defined for potential sale. Sufficient work should have been done during the study to confirm with reasonable certainty that there are no likely impediments, whether technical, economic or legal, to a mining operation being established.

*A Mineral Reserve Declaration Report must discuss and explain risk* (defined as the possibility of loss or failure), *and where possible provide further explanation of how uncertainty* (defined as incomplete knowledge which can result in either risk or opportunities) *will be handled. If representing material information, project risk must also be disclosed in terms that the lay investor can understand.*

*Where Mineral Reserves have been defined but are scheduled to be mined at a date some distance in the future (as is commonly the case in the coal industry), sufficient assurance should be available on annual basis that, in the judgment of the Competent Person, endorsed by the reporting entity, economic viability can be demonstrated and the reserves retained in inventory.*

*Once Mineral Reserves have been defined and disclosed, further optimization may take place together with other refinements designed to provide sufficiently detailed engineering to establish cost estimates, define and mitigate risks and determine an implementation plan. However, it is implicit in a reserves declaration that this phase of optimization will not materially negatively affect the quantity, quality or economic viability of the Mineral Reserves.*

*When a Mineral Reserve is published, an assurance statement must be made that the Mineral Reserve Declaration Report standard was followed.*

43. The contents of a Mineral Reserves Declaration Report may include sensitive information on product pricing strategies, marketing and sales forecasts and as such may remain confidential to the reporting entity. Where required or requested for the purposes of review or audit, the reporting entity will release this information to appropriate bodies such as the regulators or auditors on a confidential basis as supplemental information.

44. Table 1 provides, in a summary form, a list of the main criteria which should be considered when preparing reports on Exploration Results, Mineral Resources and Mineral Reserves. These criteria must be taken into account when preparing a Mineral Reserves Declaration Report, but need not be discussed in a public report unless they materially affect estimation or classification of the Mineral Reserves.

*It is not necessary, when publicly reporting Mineral Reserves, to comment on each item in Table 1, but it is essential to discuss any matters which might materially affect the reader's understanding or interpretation of the results or estimates being reported.*

45. In estimating Mineral Reserves, information on assumed metallurgical recovery factors and processing losses play a critical role. Similarly, information relating to deleterious elements and physical characteristics that affect the ability to beneficiate or sell the product is also critical. This information must be discussed in the Mineral Reserves Declaration Report and, depending on its materiality, may have to be publicly disclosed.

46. Only that part of a Mineral Resource that has been classified as a Measured or Indicated Mineral Resource can be considered for conversion to a Mineral Reserve. Under no circumstance can an Inferred Mineral Resources be converted to a Mineral Reserve unless it is first converted to an Indicated or Measured Mineral Resource. When completing production schedules and economic studies for the purpose of determining whether a Mineral Reserve can be publicly reported, no material other than Measured and Indicated Mineral Resources should be considered.

## Mineral Reserves and Commodity Pricing

47. Commodity prices used for the determination of Mineral Reserves should be based on forward-looking estimates reflecting management's reasonable and supportable short- and long-term expectations as supported by all available evidence. The basis for the selected prices must be justified and supported by appropriate documentation. The Competent Person must ascertain that these prices are consistent with historical prices or with sales agreements and marketing determinations.

48. For current mining operations, the price profile used for Mineral Reserve estimation can reflect current market conditions for short-term forecasts, while trending with time upward or downward toward the long-term price estimates based on management's expectations. For undeveloped Mineral Reserves, management should use their long-term price expectations.

49. For commodities sold under existing contracts, Mineral Reserves should be determined based on contract terms. For Mineral Reserves whose production would extend beyond the quantities specified in existing contracts, reasonable and supportable assumptions should be made to determine the prices applicable for the estimation and reporting of these Mineral Reserves.

50. To demonstrate the economic feasibility of a Mineral Reserve, the estimated prices, combined with other engineering parameters and modifying factors, must be applied to only Measured and Indicated Mineral Resources.

*Mineral Reserves being the economically mineable part of a Measured or Indicated Mineral Resource, appropriate assessments must demonstrate at the time of reporting that extraction is reasonably justified. This requires that assumptions are made concerning the price of the commodity or product that will be sold when the mine is in production.*

*Mineral Reserves are estimated and published to supply information to investors concerning the value of the deposit and the risk which may be associated with its development. Mineral Reserves are used by management, in conjunction with Mineral Resources, for short-term, long-term and strategic planning. They play a critical role in accounting, including impairment testing, fair value accounting, calculation of depreciation, depletion and accumulated retirement obligation provision rates. To supply investors with information which is consistent with management's plans and financial reporting, commodity prices used for the determination of Mineral Reserves should be based on forward-looking estimates reflecting management's reasonable and supportable expectations as supported by all available evidence.*

*Management's price expectations must be reasonable and supportable. Most commodities, whether sold using publicly quoted prices (e.g., base metals and precious metals) or under long term contract (e.g., coal and iron ore), experience long term price cycles. Price expectations should reflect current prices as well as long-term trends. Overly optimistic or pessimistic price expectations could result in significant over or underestimation of reserves. It is the responsibility of management and the Competent Person to determine whether the prices used for reserve estimation are reasonable and supportable, given all available information.*

*During periods of low prices, a mining company may choose to temporarily curtail operations and save the asset until prices recover. When such actions are taken, this information must be publicly disclosed. In such circumstances, previously published Mineral Reserves may not have to be written off, provided, in the opinion of management and the Competent Person higher future prices can be reasonably and supportably assumed. As discussed below, whenever applicable a Reserve Sensitivity Test must be performed as part of the Mineral Reserves estimation process, whose results will assist investors in determining the risk associated with a project in periods of low commodity prices.*

51. The forward price profile used to estimate Mineral Reserves, including expected short-term and long-term prices, and justification of these prices, must be documented. This documentation must be included in the Mineral Reserves Declaration Report.

*It is likely that part or all of the price profile documentation will contain sensitive information which should be treated as confidential. Where required or requested for the purposes of review or audit, this information may be released to appropriate bodies such as the U.S. SEC or auditors on a confidential basis as supplemental information.*

*The documentation supporting management's expectations may include: comparison of prices with historical and current prices and forward curves, contracts and market considerations, currency exchange rates where applicable, third party sources, and supplemental information.*

52. Public disclosure of prices used for Mineral Reserve estimation is recommended but not required. When commodity prices are disclosed, disclosure can be as a single

price estimate equal to that used for reserve determination, or as a range of prices within which no material change in reserves would occur. Whether or not commodity prices used to estimate reserves are published, the overall methodology used to determine those prices should be disclosed. Such disclosure should be in a form which helps investors determine whether, in their own opinion, prices used represent reasonable views of future prices.

*It is recognized that in some cases, such as when a product is sold under long term contract whose terms must be kept confidential, there can be valid commercial reasons for non-disclosure. There are circumstances where disclosure of long term price assumptions used for business planning and reserve reporting can be detrimental to the company and the investors, such as when bidding for sales contracts or property acquisitions. If prices are not published, the reasons for doing so must be documented. This documentation may be treated as confidential but should be available for review by auditors or regulators when required.*

## Reserves Sensitivity Test

53. When estimating Mineral Reserves, and if historical commodity prices are available, a **'Reserves Sensitivity Test'** must be conducted. The objective is to assess and report the sensitivity of the Mineral Reserves to recent fluctuations in commodity prices. This test is conducted based upon the realization of a positive non-discounted cumulative forward-looking cash flow at a **'Test Price'** equal to the average commodity price which prevailed during the most recent last three-years. The Test Price must be calculated as of the end of the financial year of the reporting entity, or within six months prior to the end of the financial year.

If the commodity price(s) used to develop the reserves is higher than the most recent three-year average price(s), the reporting entity should determine if mining the reserves at the most recent three-year average commodity price(s) generates non-discounted, forward-looking positive cumulative cash flow for each operating unit. If not, the reporting entity should disclose for those operating units (whether in production, proposed or curtailed) the commodity price(s) that is required to achieve positive cumulative cash flow.

It is recognized that there are commodities for which historical prices which reflect the value of the product sold (or to be sold) are not publicly available. In such circumstances, a Test Price cannot be calculated and a Reserves Sensitivity Test is not required.

*A Test Price can usually be calculated for base metals and precious metals as such prices are quoted on international exchanges. There are other commodities for which publicly quoted prices may not be available or may not represent the value of the product sold or to be sold. In such cases, a Reserves Sensitivity Test cannot be meaningfully completed. The lack of necessary price information must be documented in the Mineral Reserves Declaration Report.*

*If a Mineral reserve is reported using a price lower than the test price, the forward-looking discounted cash flow must be positive, and the Reserve Sensitivity Test (based on an undiscounted cash flow) need not be performed.*

**Stagg Dec. -- Exhibit 3**
**APP. III 729**

*When applicable, a statement should be made that a Reserves Sensitivity Test was completed, or that such a test was not applicable. The test results must be included in the Mineral Reserves Declaration Report. The Reserves Sensitivity Test should be applied to each mine or each reporting unit, in accordance with the format used in publicly reporting the Mineral Reserves. The test results should be listed separately for each mine or reporting unit which failed to pass the test. Mines or reporting units which successfully passed the test can be reported as a group.*

*If the Reserve Sensitivity Test was applied and failed during the current and previous reporting years, this should be taken into account to determine whether continued declaration of reserves is justified. Even if reserves can still be declared, the Competent Person may recommend additional disclosure*

*When exchange rates must be taken into account to complete the Reserves Sensitivity Test, the average exchange rate which prevailed during the last three years should be used. When conducting the Reserves Sensitivity Test, all prices and costs must be on a constant price (un-escalated) basis.*

## Permitting and Legal Requirements

54. For a mineral deposit to be considered a Mineral Reserve, it is required that legally enforceable mineral title sufficient to allow exploration, development and extraction is controlled by the reporting entity at the time of determination. If the reporting entity is leasing or sub-leasing the mineral, the lease or sub-lease should be from an entity which has control of the necessary mineral titles. There must be no known material obstacles to mining, such as those which have caused shut down of mines or processing plants, or failure to get permits to operate. There must be a reasonable expectation that all permits, ancillary rights and authorizations required for mining, and to the extent applicable processing, can be obtained in a timely fashion, and maintained for ongoing operations.

*The reporting entity must complete a review of all legal and permitting requirements and document the results of this review. Local environmental laws and processes must be taken into account. To demonstrate reasonable expectation that all permits, ancillary rights and authorizations can be obtained, the reporting entity must show understanding of the procedures to be followed to obtain such permits, ancillary rights and authorizations. Demonstrating earlier success in getting the necessary permits can be used to document the likelihood of success. If permits are required, but there is no defined procedure to obtain such permits, reasonable expectation of success may be questioned.*

*Information which materially increases or decreases the risk that the necessary legal rights or permits will be obtained must be publicly disclosed. It is recognized that the legal and permitting environment may change over time and that such changes could have an impact on reserve determination. If it is determined that obstacles arise or are eliminated, the reserve estimates must be adjusted accordingly.*

*It is recognized that some permits cannot be obtained until after a reserve has been declared. There might be sound business reasons why obtaining some permits should be postponed. It is also recognized that waiting for all permits to be on hand could result in critical information not being released to the investors in a timely fashion.*

*Documentation should include a brief description of the title, claim, lease or option under which the reporting entity has or will have the right to hold or operate the property, indicating any conditions which*

**Stagg Dec. -- Exhibit 3**
**APP. III 730**

*the registrant must meet in order to obtain or retain the property. If held by leases or options, the expiration dates of such leases or options should be stated. If extension of leases or options will be needed to mine the reserves, there should be reasonable expectation that such extension will be granted.*

*Information relating to this review of legal and permitting issues must be documented in a report. This report must be included in the Mineral Reserves Declaration Report either in full or by reference. The content of this report may remain confidential to the reporting entity. However, when required, it may be released to regulators or auditors on a confidential basis.*

55. If the reporting entity has title in a mineral deposit which meets all the reserve criteria, and licenses, leases, or subleases the reserves to another entity for economic consideration, the Mineral Reserves that have been licensed, leased, or subleased, must be reported by the reporting entity (the lessor) as a subset of the entity's total Mineral Reserves.

If the reporting entity has licensed, leased, or subleased Mineral Reserves from another entity, the Mineral Reserves that have been licensed, leased, or subleased, must be reported by the reporting entity (the lessee) as a subset of the entity's total Mineral Reserves.

*This requirement for additional disclosure is particularly relevant to mineral holding companies whose business is leasing mineral properties.*

## Reporting of Mineralized Fill, Pillars, Low-Grade Mineralization, Stockpiles, Dumps and Tailings

56. The Guide applies to the reporting of all potentially economic mineralized material including mineralized fill, pillars, low-grade mineralization, stockpiles, dumps, and tailings.

*For the purposes of the Guide, mineralized stope fill and stockpiles of mineralized material can be considered to be similar to in situ mineralization when reporting Mineral Resources and Mineral Reserves. Consequently the Competent Person carrying out the assessment of the fill or stockpiles must use the bases of classification outlined in the Guide. In most cases, the opinion of a mining engineer should be sought when making judgments about the mineability of fill, remnants and pillars.*

*If there are not reasonable prospects for the economic extraction of a particular portion of the fill or stockpile, then this material cannot be classified as either Mineral Resources or Mineral Reserves. If some portion is currently sub-economic but there is a reasonable expectation that it will become economic, then this material may be classified as a Mineral Resource. Such stockpile material may include old dumps and tailings dam material. If technical and economic studies have demonstrated that economic extraction could reasonably be justified under realistically assumed conditions, then the material may be classified as a Mineral Reserve.*

*The above guidelines apply equally to low-grade in-situ mineralization, sometimes referred to colloquially as "mineralized waste" or "marginal-grade material", and often intended for stockpiling and treatment towards the end of mine life. For clarity of understanding, it is recommended that tonnage*

*and grade estimates of such material be itemized separately in public reports, although they may be aggregated with total Mineral Resource and Mineral Reserve figures.*

*Stockpiles are defined to include both surface and underground stockpiles, including broken ore in stopes, and can include ore currently in the ore storage system. Mineralized material in the course of being processed (including leaching), if reported and of material importance, should be reported separately together with the basis for estimation.*

*Mineralized remnants, shaft pillars and mining pillars which are potentially mineable are in situ mineralization and consequently are included in the Guide definitions of Mineral Resources and Mineral Reserves.*

*Mineralized remnants, shaft pillars and mining pillars which are not potentially mineable must not be included in Mineral Resource and Mineral Reserve statements.*

## Reporting of Exploration Results for Coal, Coal Resources and Coal Reserves

57. The clauses in this section of the Guide address matters that relate specifically to the Public Reporting of Mineral Resources and Mineral Reserves for coal. Coal is generally sold on the basis of product specifications and market acceptance. Such factors as quality and marketability are therefore important and should be carefully considered before declaring coal resources or coal reserves. Unless otherwise stated, all other clauses in this Guide, including Figure 1 and Table 1, apply to Exploration Results, Mineral Resources and Mineral Reserves for coal.

*When reporting information and estimates for coal deposits, the key principles and purpose of the Guide apply and should be borne in mind. Because of coal specific characteristics – including geological continuity over large areas, the strategic value of controlling very long term reserves, and product pricing highly dependent on deposit location and coal quality – the most significant requirements which must be satisfied before a resource or a reserve is declared are not necessarily the same for coal as they are for other minerals.*

58. The terms 'Mineral Resource' and 'Mineral Reserve', and the subdivisions of these terms as illustrated on Figure 1, apply also to coal reporting, but if preferred by the reporting entity, the terms 'Coal Resource' and 'Coal Reserve' and the appropriate subdivisions may be substituted.

*When assessing criteria listed in this Guide which may be applicable to coal, the term 'grade' should generally be considered equivalent to 'coal quality'.*

59. As for all minerals, it is the responsibility of the Competent Person to determine in each particular situation which specific requirement must be satisfied before a Coal Resource or a Coal Reserve can be declared. The Competent Person should determine which evaluation criteria in Table 1 are applicable, which additional evaluation criteria should be taken into account if any, and the materiality of such criteria.

**Stagg Dec. -- Exhibit 3**
**APP. III 732**

*Many criteria listed in Table 1 which may be critical to the evaluation of other mineral deposits, such as base metals or precious metals, will not apply to the evaluation of coal deposits. Such criteria as coal quality, cost to markets including transportation cost, location and quality of competing coal reserves, and ability to compete with such reserves to access the market, are important and should be carefully considered before declaring a Coal Reserve.*

*Geological similarity between neighboring coal deposits can greatly simplify demonstration of a new Coal Resource, as well as reduce the technical and economic study requirements needed to demonstrate a Coal Reserve next to an operating mine. Geological similarity must be demonstrated by means of drill holes, mapping or other deposit-specific geoscientific evidence to a suitable level of confidence required to declare Measured and/or Indicated Resources. Mere inference of the continuity of coal thickness and quality from an operating mine onto a neighboring block or property is not sufficient to declare Measured and Indicated Resources and subsequently a Reserve.*

*Demonstration of geological similarity or analogy with an operating mine is usually not sufficient to demonstrate technical and economic feasibility. Factors such as access to the deposit and permitting constraints are likely to be project specific. It is the responsibility of the Competent Person to ascertain that there is sufficient information to demonstrate geological similarity and to determine which additional factors must be taken into account to demonstrate technical and economic feasibility with a reasonable level of confidence.*

*When a coal deposit is scheduled to be mined at a date some distance in the future, declaration of a Coal Reserve implies reasonable expectation at the time of reporting that the necessary permits could be obtained as needed.*

60. Coal Resources and Coal Reserves should be reported as saleable product, either as run-of-mine coal or washed coal.

*For coal deposits, it is common practice to report a saleable product rather than the "as mined" product which is traditionally regarded as the Mineral Reserve for most other minerals. It is important that a clarifying statement is included to ensure that the reader is fully informed as to what is being reported. Some coal deposits may be capable of yielding products suitable for more than one application and/or specification. If considered material by the reporting entity, such multiple products should be quantified and reported.*

61. Coal Resources and Coal Reserves should be reported as Assigned or Unassigned.

*Assigned coal is coal that has been committed by the coal company to operating mine shafts, mining equipment, and plant facilities, and all coal which has been leased by the company to others. Unassigned coal represents coal that has not been committed, and which would require new mine shafts, mining equipment, or plant facilities before operations could begin on the property. The primary reason for this distinction is to inform investors which coal will require substantial capital investments before production can begin. Coal which has been leased to another company or is leased from another company must be disclosed separately.*

62. Recommendations made in this Guide, that price assumptions and sensitivity to price changes be disclosed, do not apply to coal.

*Coal is being sold in a highly competitive national and international market. Price disclosure can be viewed as price signaling and interpreted as anticompetitive. For business and legal reasons,*

**Stagg Dec. -- Exhibit 3**
**APP. III 733**

*disclosure of price assumptions made when estimating Coal Resources and Coal Reserves may be detrimental to the interest of shareholders and is usually not advisable. Other requirements concerning pricing which are included in the Guide are applicable to coal. This includes the requirement that prices be based on forward-looking estimates reflecting management's reasonable and supportable short- and long-term expectations, and that justification for such prices be documented.*

## Reporting of Exploration Results, Mineral Resources and Mineral Reserves for Industrial Minerals

63. The clauses in this section of the Guide address matters that relate specifically to the Public Reporting of industrial minerals, stone and aggregates of all forms and other bulk commodities such as borates, talc, kaolin etc. that are generally sold on the basis of their product specifications and market acceptance. Such factors as quality and marketability are therefore important and should be carefully considered before declaring Mineral Reserves. Unless otherwise stated, all other clauses in this Guide, including Figure 1 and Table 1, apply to Exploration Results, Mineral Resources and Mineral Reserves for industrial minerals.

*When reporting information and estimates for industrial minerals, the key principles and purpose of the Guide apply and should be borne in mind. Assays may not always be relevant, and other quality criteria may be more applicable. If criteria such as deleterious minerals or physical properties are of more relevance than the composition of the bulk mineral itself, then they should be reported accordingly.*

*The factors underpinning the estimation of Mineral Resources and Mineral Reserves for industrial minerals are the same as those for other deposit types covered by the Guide. It may be necessary, prior to the reporting of a Mineral Resource or Mineral Reserve, to take particular account of certain key characteristics or qualities such as likely product specifications, proximity to markets, and present access to market or ability to get access to market.*

*For some industrial minerals, it is common practice to report the saleable product rather than the "as-mined" product, which is traditionally regarded as the Mineral Reserve for base and precious metals and other minerals. It is important that, in all situations where the saleable product is reported, a clarifying statement is included to ensure that the reader is fully informed as to what is being reported.*

*Some industrial mineral deposits may be capable of yielding products suitable for more than one application and/or specification. If considered material by the reporting entity, such multiple products should be quantified either separately or as a percentage of the bulk deposit.*

64. With respect to modifying factors, the normal geological parameters may be less important in the case of industrial minerals, stone and aggregate. Such factors as quality, transportation, cost to markets, location and quality of competing reserves, and ability to compete with such reserves to access the market, are important and should be carefully considered before declaring Mineral Reserves.

65. As a general rule, a Mineral Reserve cannot be declared unless there are reasonable expectations that all permits, ancillary rights and authorizations required for mining can be obtained. For some minerals such as sand, gravel and aggregates, permitting requirements may be such that reasonable expectations can only be defined by

comparison with competing reserves. When a deposit is scheduled to be mined at a date some distance in the future, declaration of a Mineral Reserve implies reasonable expectation at the time of reporting that the necessary permits could be obtained when needed.

66. Recommendations made in this Guide, that price assumptions and sensitivity to price changes be disclosed, may not apply to all industrial minerals.

*Some industrial minerals are sold in a highly competitive local, national and/or international market. For business and legal reasons, disclosure of price assumptions may be detrimental to the interest of shareholders and may not be advisable. Other requirements concerning pricing which are included in the Guide are applicable to industrial minerals. This includes the requirement that prices be based on forward-looking estimates reflecting management's reasonable and supportable short- and long-term expectations, and that justification for such prices be documented.*

## Reporting Exploration Results, Mineral Resources and Mineral Reserves for Diamonds and Other Gemstones

67. The clauses in this section of the Guide address matters that relate specifically to the Public Reporting of Exploration Results, Mineral Resources and Mineral Reserves for diamonds and other gemstones. Unless otherwise stated, all other clauses in this Guide, including Figure 1 and Table 1, apply to Exploration Results, Mineral Resources and Mineral Reserves for diamonds and other gemstones.

*For the purposes of Public Reporting, the requirements for diamonds and other gemstones are generally similar to those for other commodities with the replacement of terms such as 'mineral' by 'diamond' and 'grade' by 'grade and average diamond value'. The term 'quality' should not be substituted for 'grade,' since in diamond deposits these have distinctly separate meanings.*

*A number of characteristics of diamond deposits are different from those of, for example, typical metalliferous and coal deposits and require special consideration. These include the generally low mineral content and variability of primary and placer deposits, the particulate nature of diamonds, the specialized requirement for diamond valuation and the inherent difficulties and uncertainties in the estimation of diamond resources and reserves.*

68. Reports of diamonds recovered from sampling programs must provide material information relating to the basis on which the sample is taken, the method of recovery and the recovery of the diamonds. The weight of diamonds recovered may only be omitted from the report when the diamonds are considered to be too small to be of commercial significance. The lower cutoff size should be stated along with the type of bottom sieve used.

*The stone size distribution and price of diamonds and other gemstones are critical components of the resource and reserve estimates. At an early exploration stage, sampling and delineation drilling will not usually provide this information, which relies on large diameter drilling and, in particular, bulk sampling.*

*In order to demonstrate that a resource has reasonable prospects for economic extraction, some appreciation of the likely stone size distribution and price is necessary, however preliminary. To*

*determine an Inferred Mineral Resource in simple, single-facies or single-phase deposits, such information may be obtainable by representative large diameter drilling. More often, some form of bulk sampling, such as pitting and trenching, would be employed to provide larger sample parcels.*

*In order to progress to an Indicated Mineral Resource, and from there to a Probable Mineral Reserve, it is likely that much more extensive bulk sampling would be needed to fully determine the stone size distribution and value. Commonly such bulk samples would be obtained by underground development designed to obtain sufficient diamonds to enable a confident estimate of price.*

*In complex deposits, it may be very difficult to ensure that the bulk samples taken are truly representative of the whole deposit. The lack of direct bulk sampling, and the uncertainty in demonstrating spatial continuity of size and price relationships should be persuasive in determining the appropriate resource category.*

69. Where diamond Mineral Resource or Mineral Reserve grades (carats per ton) are based on correlations between the frequency of occurrence of micro-diamonds and of commercial size stones, this must be stated, the reliability of the procedure must be explained and the number of stones and their weight reported by sieve size.

70. For Public Reports dealing with diamond or other gemstone mineralization, it is a requirement that a statement verifying the independence of the valuation accompany any reported valuation of a parcel of diamonds or gemstones. The valuation must be based on a report from a demonstrably reputable and qualified expert.

If a *valuation of a parcel of diamonds is reported, the weight in carats and the lower cutoff size of the contained diamonds must be stated and the value of the diamonds must be given in U.S. dollars per carat. Where the valuation is used in the estimation of diamond Mineral Resources or Mineral Reserves, the valuation must be based on a parcel representative of the size, shape and color distributions of the diamond population in the deposit.*

*Diamond valuations should not be reported for samples of diamonds processed using total liberation methods.*

# TABLE 1. Checklist of Assessment Criteria

Estimates of the value of mineral projects are expressions of judgment predicated on knowledge and experience. Such estimates are more than arbitrary determinations; they seek to attach value as a consequence of method. The methods employed must be scientifically valid, tested, using accepted scientific definitions of terms and accepted procedures, and best suited to the making of reliable estimates for the project in question. Evaluation of mineral projects requires periodic examination and evaluation of all new and existing data. The dynamic nature of the evaluation of mineral projects implies that a valid estimate made at a given time may be significantly changed when new information becomes available. Evaluation of a mineral project should consider all the criteria listed below and such additional criteria that may be viewed as significant. It is the responsibility of the Competent Person to determine which criteria listed below and which additional criteria should apply to the study of a particular project. The relative importance of the criteria will vary with the particular project and the legal and economic conditions pertaining at the time of determination. When information is publicly reported, it must be sufficient to enable an intelligent layman to make a reasonable and balanced assessment of the significance of this information. When and whether information should be publicly released is subject to current laws and regulations in the relevant jurisdictions.

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| **A. General** | | | |
| 1. Purpose of report | Statement of person for whom the report was prepared, whether it was intended as a full or partial evaluation, what work was conducted, what work remains to be done. | See Exploration Results | See Exploration Results |
| 2. Project Description | Description of commodity, magnitude of project, background, and business arrangement. | See Exploration Results | See Exploration Results |
| 3. Project Location | Description of location (country, state or province, county, township and range, easting and northing, etc.); a map showing location and access should exist. | See Exploration Results | See Exploration Results |
| 4. Property Ownership | Description of ownership of surface rights, mineral rights, access rights, leases, concessions, royalties, and other | See Exploration Results | See Exploration Results |

Stagg Dec. -- Exhibit 3
APP. III 737

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| | encumbrances and liabilities. | | |
| **B. Project Data** | | | |
| 1. Location of Project Data | Maps and cross sections or other two- or three-dimensional representation of results should exist, showing location of samples, drill holes, exploration pits, underground workings, geological data, etc. When evaluating drill hole results, consideration should be given to depth to top and bottom of mineralization, to total length and average grade of intercepts, and to the accuracy of survey information including down-hole surveys. | See Exploration Results. Particular attention should be given to drill hole and other sample survey information including down-hole surveys. If the sample locations are not well known, the effect on the resource estimates should be considered. | See Mineral Resource. The location of samples and other relevant features (property lines, mine workings, etc.) should be well-known. The location of drill hole collars should be accurate and the adequacy of the down-hole surveying technique should be reviewed and commented on. |
| 2. Geological Data | Description of the nature, detail, and reliability of geological information (rock types, structure, alterations, mineralizations, and relation to known mineralized zones, etc.). Description of geophysical and geochemical data. Reliable geological maps and cross sections should exist to support interpretations. | See Exploration Results. Particular attention should be given to drill hole logging and other sample information used in resource evaluation. Description of the thoroughness with which all significant lithologic, structural, mineralogical, alteration, or other geological or geotechnical characteristics were recorded. Significant data, or data that could materially influence the estimated quantity and quality of the resource, should be discussed. | See Mineral Resource |
| 3. Topography | General topographic map is sufficient | Topographic map in sufficient detail to assess likelihood of eventual economic feasibility. | Detailed topographic map. Aerial surveys must be checked with ground controls and surveys, particularly in areas of rugged terrain, dense vegetation or high altitude. |
| 4. Sampling | | | |

Stagg Dec. -- Exhibit 3
APP. III 738

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| a. Method | Description of sample type and sample collection method (hand, grab, trench, channel, or chip sample; core hole, rotary hole, or reverse circulation; bulk sample, etc.). Discussion of sample quality and representativeness (sample recovery, high grading, selective losses or contamination, and any other factors that may have resulted in sample biases, etc.). Discussion of whether duplicate samples or alternative methods of sampling were used to verify sample quality. If indirect methods of measurement were used (geophysical methods), these should be described, with attention given to errors in interpretation. | See Exploration Results. The quantity and quality of sample information is critical to the reliability of resource estimates. Particular attention should be given to this information. | See Mineral Resource. Adequate sampling verification techniques, including appropriate numbers of duplicates and appropriate statistical analyses of duplicates are required. |
| b. Preparation | Description of laboratory and method used for sample preparation, sub-sampling and size reduction, and likelihood of inadequate or non-representative samples (improper size reduction, contamination, etc.). Discussion of whether tests were performed to verify the suitability of sample preparation. | See Exploration Results | See Exploration Results. Verification of the suitability of sample preparation is required. |
| c. Analysis | Identification of laboratory and analytical method (fire assay, AA assay, emission spectroscopy, etc.). Discussion of precision and accuracy, including the use of check assays, quality control programs, and submission of samples to other laboratories for verification. | See Exploration Results | See Exploration Results. Verification of analytical techniques and quality control programs are required. Check sampling and assaying must have been performed by independent parties. |

Stagg Dec. -- Exhibit 3
APP. III 739

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| d. Specific Gravity and Bulk Tonnage | Generally not determined. | Discussion of how the tonnage factor was determined (assumed or measured). If assumed, which assumptions were made and on which basis. If measured, by what method and how frequently. Discussion of whether different tonnage factors were used in different parts of the deposit and why. | See Mineral Resource. The specific gravity and bulk tonnage must have been measured by methods that adequately account for void spaces (vugs, porosity, etc.) and for differences between rock and alteration zones within the deposit. |
| **C. Interpretation** | | | |
| 1. Geological Interpretation and Model | Description of geological model and inferences made from this model. Discussion of adequacy of data density and reliability, and whether the quality and quantity of information are sufficient to support statements made or inferred concerning potential for significant economic discovery. | See Exploration Results. Discussion of sufficiency of data density to assure continuity of mineralization and provide an adequate data base for the estimation procedure used. Discussion of the extent to which the interpretation is based on data or on assumptions and whether consideration was given to alternative interpretations or models. | See Mineral Resource. |
| 2. Numerical Model | Generally not determined. | Detailed description of the method used and the assumptions made to estimate tonnages and grades (section, polygon, inverse distance, geostatistical, or other method). Description of how the geological interpretation was used to control the resource estimates. Discussion of basis for using or not using grade cutting or capping. If a computer method was chosen, description of programs and parameters used. Geostatistical methods are extremely varied and should be described in detail. The method chosen should be justified. The geostatistical parameters, including the variogram, and | See Mineral Resource. |

**Stagg Dec. -- Exhibit 3**
**APP. III 740**

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| | | their compatibility with the geological interpretation should be discussed. Experience gained in applying geostatistics to similar deposits should be taken into account. | |
| **D. Extraction** | | | |
| 1. Mining | | | |
| a. Method | Description of any obvious mining factors that could have a significant impact on the project feasibility. | Description of any mining factors that could have a significant impact on the project feasibility. Discussion of possible mining methods. | Mining method(s), mine plans and production schedules defined for the life of the project. Description and justification of mining method(s) to be used. Discussion of mining rate, equipment selected, ore control methods, geotechnical and hydrological considerations, personnel requirements, dilution, and mine recovery. For open pit mines, discussion of pit slopes, slope stability, and strip ratio. For underground mines, discussion of mining method, rock mechanics considerations, mine design characteristics, and ventilation. |
| b. Costs | Generally not determined. | Stated reasonable assumptions. | Description and justification of capital and operating costs. All capital items identified. Detailed equipment list. Price quotes for all major equipment items. Major components of operating costs itemized and justified. Capital and operating budgets defined by year. |
| 2. Processing | | | |
| a. Method | Description of any obvious processing factors that could have a significant impact on the project feasibility. | Description of any processing factors that could have a significant impact on the project feasibility. Discussion of possible processing methods. | Description and justification of processing method(s) to be used, equipment, plant capacity and personnel requirements. Detailed flow sheet based |

**Stagg Dec. -- Exhibit 3**
**APP. III 741**

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| | | | on comprehensive metallurgical program. Justification of estimated recovery (proportion of material sent to the processing plant that will be recovered) by geologic zone, whether based on historical information, laboratory test, or pilot plant results. |
| b. Costs | Generally not determined. | Stated reasonable assumptions. | Description and justification of capital and operating costs. All capital items identified. Detailed equipment list. Price quotes for all major equipment items. Major components of operating costs itemized and justified. Capital and operating budgets defined by year. |
| 3. Recovery | | | |
| a. Mining | Generally not determined. | Stated reasonable assumptions. | Reported tonnages, grades and mineral contents must take into account mining dilution and losses. Description and justification of mining dilution and losses is required. |
| b. Processing | Generally not determined. | Stated reasonable assumptions. | Discussion of whether the reported tonnages and grades consist of material in place or whether processing recoveries are included. If in-place values are reported, information must be supplied concerning expected processing losses or recoveries. Justification of processing recoveries is required. |
| 4. Cutoff Grade | Generally not determined. | Justification of the cutoff grade used to report resources. | Description of methods used to calculate cutoff grades. |

Stagg Dec. -- Exhibit 3
APP. III 742

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| **E. Infrastructure** | | | |
| 1. Facilities | Generally not determined | Stated reasonable assumptions. It is reasonable to assume that necessary facilities could be built | Necessary facilities have been designed (which may include processing plant, tails dam, leaching facilities, waste dumps, road and/or rail accesses, power supply, offices, housing, security, etc.). Detailed map showing location of facilities. Construction schedule developed. |
| 2. Staffing | Generally not determined | Generally not determined | Detailed staffing plan. Training. Salary scale. |
| 3. Supplies | Generally not determined | Reasonable assumption that necessary supplies can be obtained. | All necessary supplies have been identified (electricity, reagents, fuels, etc.). Demonstration that supplies are available as needed. Requirements specified on a yearly basis. |
| 4. Hydrology | Generally not determined | Stated reasonable assumptions. | All water requirements specified and sources of water identified. Dewatering requirements estimated on the basis of data. Water disposal and quality control. |
| 5. Costs | Generally not determined | Stated reasonable assumptions. | Description and justification of capital and operating costs. All capital items identified with sufficient detail for costing. Construction schedule and capital and operating budgets defined by year. |
| **F. Environmental Compliance and Reclamation** | Description of obvious environmental factors likely to stop the project. | Description of any environmental factors that could have a significant impact on the project feasibility. Discussion of possible means of mitigation. | The necessary permits have been obtained, or there is reasonable basis to believe that all permits required for the project can be obtained in a timely manner. Description of yearly |

Stagg Dec. -- Exhibit 3
APP. III 743

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| | | | environmental compliance methods and costs, including reclamation.. |
| **G. Feasibility** | | | |
| 1. Product Valuation | Description of valuable and potentially valuable product(s) including suitability of products to market. | See Exploration Results. Stated reasonable assumptions concerning likely product value. | Description of product to be sold. Discussion of whether there exists a ready market for the product, whether contracts for the sale of the product are in place or expected to be readily obtained. Detailed description of method used to estimate the commodity price profiles used for cutoff grade calculation, economic analysis and project valuation. Demonstration that the price assumptions are reasonable and supportable. Justification of assumptions made concerning production cost and value of product. Transportation, marketing, and other costs should be considered. |
| 2. Cash Flow Analysis | Generally not applied. | Generally not applied. Consideration of order of magnitude capital cost, operating costs and revenue indicate reasonable prospect of eventual economic extraction. | Detailed cash flow analysis for the life of the project. |
| 3. Valuation Method | Generally not applied. | Stated reasonable assumptions. | Detailed description of the method used to determine the economic feasibility of the project. |
| 4. Reserve Sensitivity Test | Not applicable. | Not applicable. | Detailed description of method used and results obtained. |
| **H. Risk Analysis** | Generally not applied. | Sufficient risk assessment completed to justify reasonable prospect of eventual | Fatal flow analysis. Detailed assessment of project technical and economic risk. |

Stagg Dec. -- Exhibit 3
APP. III 744

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| | | economic extraction. | Description of actions which will be taken to mitigate risk. No significant risk of project failure. |
| **I. Resource and Reserve Assurance Classification** | Data to support estimates with a sufficient degree of assurance is lacking. Specific quantities and grades/qualities cannot be reported. | Description and justification of criteria used to classify the resource. When reported, a resource should be classified as measured, indicated, or inferred. Depending on materiality measured and indicated resources may be combined and need not be reported separately. To classify a resource as measured or indicated, there must be a reasonably high level of confidence with respect to the quality of the information used to calculate this resource, as well as the interpretation of this information. | Description and justification of criteria used to classify the reserves. Reserves are classified as proven or probable to reflect relative degrees of geological assurance. Depending on materiality, proven and probable reserves may be combined. There should not be significant uncertainty concerning the economic viability of the project. Only measured and indicated resources can be considered for inclusion in the reserve. Resources classified as inferred lack the requisite degree of assurance to be included in the reserve. |
| **J. Other Considerations** | Description of any other significant information that is likely to prevent or facilitate the economic viability of the project. Identification of work or conditions required to demonstrate the presence of a resource or to evaluate this resource. | Description of any other material information that could prevent or facilitate the economic viability of the resource. Identification of work or conditions required to convert the resource to a reserve. A resource represents material that has the potential of being of economic value. No specific economic criteria need be assumed when evaluating a resource. However, known information that significantly reduces or increases the probability of economic feasibility should be reported. | While any other material information affecting the project should be discussed, no material impediments to the profitable exploitation of the property should remain. Material uncertainties about the geology, extraction, processing, marketing, and legal requirements have been eliminated. It is not required that all permits be issued or that mining and processing facilities have been constructed. However, there should be a reasonable basis to believe that permitting and construction of the necessary facilities can be accomplished in a timely manner. |

**Stagg Dec. -- Exhibit 3**
**APP. III 745**

| Evaluation Criteria | Exploration Results | Mineral Resource | Mineral Reserve |
|---|---|---|---|
| **K. Qualification of Estimator(s)** | Name and qualification of the Competent Person(s) preparing and reviewing the foregoing. | See Exploration Results | See Exploration Results |