IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| BENCHMARK RESOURCES CORPORATION, GENTRY CORPORATION, and SUNRISE HOLDING, INC., Plaintiffs, v. THE UNITED STATES of AMERICA, Defendant. | No. 03-178L<br>Honorable Christine Odell Cook Miller |

**SECOND DECLARATION OF DOUGLAS K. SIDDELL**

I, Douglas K. Siddell, do declare and attest, upon personal knowledge, as follows:

1. I am currently the Supervisor of the Technical Group in the Knoxville Field Office (KFO) of the Office of Surface Mining Reclamation and Enforcement (OSM). I have been employed by OSM for over 27 years.

2. OSM is the office within the Department of the Interior that administers the Surface Mining Control and Reclamation Act of 1977 (SMCRA). 30 U.S.C. § 1211. KFO is, among other things, responsible for SMCRA permitting relating to surface coal mining operations in the State of Tennessee. OSM has performed this function in Tennessee since a Federal takeover of the State of Tennessee's SMCRA program in 1984.

3. KFO processed the lands unsuitable for mining petition that resulted in the Director of OSM's March 24, 1987 decision to designate portions of the Rock Creek watershed in Tennessee

as unsuitable for surface coal mining operations under section 522 of SMCRA. 30 U.S.C. § 1272. See Exhibit 4 to my prior declaration (U.S. Ex. B-4, App. I 358-69).

4. The Rock Creek watershed petitioners asked OSM to designate the watershed – the "Petition Area" – as unsuitable for all surface coal mining operations. (Although the Rock Creek Watershed is actually larger than the Petition Area, in the context of the March 24, 1987 partial designation, the terms "Petition Area" and "Rock Creek watershed" are often used interchangeably.) OSM did not grant the petition in its entirety. Instead, the Director of OSM designated:

> All surface minable reserves of the Sewanee coal seam within the Rock Creek watershed, Tennessee as unsuitable for coal mining operations using conventional overburden mixing techniques for reclamation

and

> The Hall, Middle, and Rock Creek gorges as unsuitable for all surface coal mining operations and surface disturbance incident to underground mining.

See Id. at App. I, p. 358.

5. At the request of counsel for the United States, I directed my staff to prepare a map depicting: (1) the boundaries of the Petition Area; (2) the designated gorge areas; and (3) the boundaries of the property that is the subject of this litigation (the "Wharton Property"). My staff prepared this map by: (1) scanning a map of the Wharton Property boundaries ("General Location Map Wharton Property," attached to an April 5, 2006 report prepared by Wiley Consulting LLC for Benchmark Resources Corp. ("Wiley Report")) into a digital file; (2) importing the digital file into computer software known as Autodesk Map 3D 2007; (3) superimposing the Wharton Property boundaries on a USGS quadrangle map; and (4)

superimposing the boundaries of the designated gorge areas and the Petition Area boundaries (which we maintain in our Geographical Information System) on the same quadrangle map. A copy of the map is attached to this declaration as Exhibit 1 (U.S. Ex. V-1, App. III at 596).

6. The Statement of Reasons accompanying the Director's March 24, 1987 partial designation clearly specifies that, even after the partial designation, OSM will receive and process permit applications for a variety of proposed mining operations within the Rock Creek watershed. More specifically, the Statement of Reasons explains:

> [OSM] is responsible for approving or denying applications for proposed surface coal mining operations in the Rock Creek watershed. Under this decision, [OSM] would receive and process applications for proposed surface mining operations on any coal seam within the Rock Creek watershed except the designated portions of the gorges.
>
> Applications proposing surface mining operations and underground mining operations having surface effects in the designated portions of the gorges would be denied. However, applications for underground mining operations proposed for all other areas of the Rock Creek watershed would be processed providing they comply with the requirements for the Federal Program for Tennessee.
>
> Any application for a proposed surface mining operation on the Sewanee coal seam would be required to contain a special materials handling plan and reclamation plan; otherwise that application would be denied on the basis of this decision. If [OSM] were to receive an application to surface mine the Sewanee coal in the designated area, and that application contained an approvable materials handling plan and reclamation plan, [OSM] would continue to process that application identically with all others processed under the Federal Program for Tennessee.

<u>See</u> Exhibit 4 to my prior declaration (U.S. Ex. B-4, App. I at 368).

7. In layman's terms, even after the partial designation, an applicant could apply to KFO for a permit to conduct the following mining operations:

(a) The Wharton Property outside of the Petition Area: KFO would entertain permit applications for all surface coal mining operations (including surface and underground mining). All areas outside the Petition Area are unaffected by the partial designation.

(b) The Petition Area outside of the designated gorge areas: KFO would entertain permit applications for all surface coal mining operations (including surface and underground mining) on any coal seam, as long as there would not be any surface activities, or impacts of surface activities, in the designated gorge areas. An applicant proposing to surface mine the Sewanee coal seam would have to submit a special materials handling plan and reclamation plan.

(c) The designated gorge areas: KFO would entertain permit applications for underground mining, as long as there would not be any surface activities, or impacts of surface activities, in the designated gorge areas.

OSM would process any allowable applications in the same manner as it processes all other applications under the Federal SMCRA program for Tennessee.

8. SMCRA provides that no person may engage in surface coal mining operations without a permit to conduct surface coal mining and reclamation operations issued by the appropriate regulatory authority. 30 U.S.C. § 1256(a), 1291(15). OSM is the regulatory authority in Tennessee.

9. A permit application must contain detailed information about the possible environmental consequences of the proposed mine, as well as assurances that damage to the site will be prevented or minimized during mining and substantially repaired after mining has come to an end. See, e.g., 30 U.S.C. §§ 1257, 1260, 1265.

10. OSM reviews permit applications in three phases. We first determine whether the application is administratively complete. 30 C.F.R. § 942.773(b)(2). The purpose of the administrative completeness review is to assess whether the applicant has submitted at least the minimum amount of information for us to begin our substantive technical review. Id. Once the

application is administratively complete, we begin our technical review to determine whether the proposed mining operation will meet all the substantive requirements of SMCRA and its implementing regulations. During the final phase, we address any final legal matters and render a decision on the permit application.

11. The permitting process is highly interactive, with many back-and-forth discussions between OSM staff and the applicant. During our technical review, we always issue "technical deficiency letters" to the applicant. 30 C.F.R. § 942.773(b)(6). These deficiency letters are designed to let the applicant know of potential problems with the application and typically request additional information to allow our permit review staff to determine whether the proposed mining operation is consistent with the requirements of SMCRA and the applicable regulations. Through technical deficiency letters and other communications with applicants, we actively work with applicants to modify the proposed mine plan, as necessary, in order to obtain a permit.

12. At the end of the interactive permitting process, both OSM and the applicant know with substantial certainty the extent of mining operations that will be allowed on the proposed permit area under SMCRA and its implementing regulations.

13. Since OSM instituted a Federal SMCRA program in Tennessee in 1984, OSM has granted more than 80 percent of all new permit applications that it accepted for processing and on which it rendered a final decision. (Occasionally, applicants withdraw their permit applications on their own initiative; OSM does not render final decisions on those withdrawn applications.)

14. By letter dated March 7, 2000, Mr. Darold Proctor wrote to KFO "concerning possibilities of acquiring permits for surface mines, and drift (deep) mines" on the Wharton

Property. See Affidavit of Darold Proctor, ¶ 3, Exhibit 4 to Plaintiffs' Response to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment (Plaintiffs' Response).

15. KFO responded to Mr. Proctor on March 30, 2000. See U.S. Ex. L, App. II at 435-37. In our response, we summarized the March 24, 1987 partial designation, including the information as to the types of permit applications OSM would receive and process even after the partial designation. We also enclosed a "copy of the draft application form which briefly explains the permitting process and the type of information that is required to be submitted by the applicant." The draft application was approximately 100 pages long and set forth in detail most of the informational requirements for a typical permit applicant.

16. OSM has never received a permit application from Mr. Proctor or any of the Plaintiffs in this litigation.

17. Counsel for the United States provided me with a copy of, and asked me to review, the Wiley Report, a portion of which is appended to Plaintiffs' Response as Exhibit 1.

18. On page three of his report, Mr. Wiley states: "Although the OSM designation decision states that the Sewanee coal seam, could be mined using some unconventional overburden mixing technique for reclamation, it is my opinion that a method acceptable to the regulatory authority within the watershed boundary is not economically available." It is premature to speculate what type of special materials handling plan and reclamation plan OSM might find acceptable. This type of issue would be addressed in the permitting process, and any decision would have to be based on the technical merits of a specific mine plan.

19. Mr. Wiley also states: "It is my opinion, due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, that the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas."

20. OSM's partial designation does not bar subsidence in the designated gorge areas. Pursuant to section 522 of SMCRA, 30 U.S.C. § 1272, the partial designation bars "surface coal mining operations" in the designated gorge areas. By interpretative rule, OSM has explained that subsidence due to underground coal mining is not included in the definition of "surface coal mining operations" and therefore is not prohibited in areas where surface coal mining operations are barred under section 522 of SMCRA. 30 C.F.R. § 761.200. Subsidence, however, is regulated pursuant to section 516 of SMCRA. 30 U.S.C. § 1266. The partial designation did not impose any additional restrictions on subsidence beyond the generally-applicable restrictions of section 516. Any issues related to potential subsidence in the designated gorge areas would be addressed in the permitting process.

21. As to "probable hydrologic consequences," SMCRA requires a permit applicant to submit a detailed "determination of the probable hydrologic consequences of the mining and reclamation operations" sufficient to allow the regulatory authority to assess the "probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area." 30 U.S.C. § 1257(b)(11). The issue of "probable hydrologic consequences" is necessarily part of the permitting process and would be addressed in that context. It is premature to speculate that OSM would bar any underground mining in the Rock Creek watershed due to hydrologic

consequences, and any decision on that issue would have to be based on the technical merits of a specific mine plan.

22. I have been provided a copy of, and have reviewed, Plaintiffs' Response, together with the exhibits attached to that document.

23. In his affidavit dated August 28, 2006 (attached to Plaintiffs' Response as Exhibit 4), Mr. Darold Proctor identifies three letters he purportedly sent to OSM and attaches copies of those letters to his affidavit. Mr. Proctor states that the purpose of these letters was to inquire about "administrative remedies" and asserts that he never received responses to any of these letters. Plaintiffs make similar assertions in their response brief at pages 7-8.

24. At present, OSM has not been able to verify that it received the letters Mr. Proctor claims to have sent on November 24, 2001, and January 20, 2002.

25. OSM did receive a version of the letter Mr. Proctor refers to at paragraph 8 of his affidavit. The copy attached to Mr. Proctor's affidavit is dated January 7, 2002. The version in OSM's files is dated January 4, 2002, and contains a handwritten notation that it was sent by fax to OSM on January 7, 2002. A copy of the letter received by OSM is attached to this declaration as Exhibit 2 (U.S. Ex. V-2, App. III at 597). Other than the different dates, the two letters appear to be identical.

26. OSM responded to Mr. Proctor's "letter/fax of January 4, 2002" by certified mail on February 1, 2002. A copy of OSM's responsive letter is attached to this declaration as Exhibit 3 (U.S. Ex. V-3, App. III at 598-599). In its response, OSM explained that it was "unable to determine what you meant by the phrase 'exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMCRA).'" As such, OSM did not provide a

specific response to that aspect of Mr. Proctor's letter. However, OSM's responsive letter does make clear that OSM did not interpret Mr. Proctor's letter as a request for any specific administrative relief, and, therefore, that OSM did not deny any particular administrative relief.

27. OSM also clarified that it did "not agree that any action with respect to your letter, or this response, could legally constitute an exhaustion of administrative remedies that would serve as a prerequisite to judicial review."

28. The final paragraph of OSM's response discusses judicial review of OSM's "decision to designate lands unsuitable for coal mining." In this context, it is clear that OSM viewed Mr. Proctor's letter as requesting information about administrative procedures related to the March 24, 1987 partial designation. In no way did we construe Mr. Proctor's letter as a request for us to identify any administrative remedies that would have to be exhausted before he could pursue a takings claim against the government in the U.S. Court of Federal Claims. As a regulatory agency administering SMCRA, this type of legal information is beyond our purview and expertise.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 28, 2006

DOUGLAS K. SIDDELL


Rock Creek Watershed
Tennessee
Bledsoe and Hamilton Counties
N
Designated Gorge Areas
Wharton Property
Petition Area
Wharton Property boundaries taken from April 5, 2006 report prepared by Marcus A. Wiley for Benchmark Resources Corp
Scale
0
1
2
3
4
Miles

Sent by fax 1-7-02

# Fax Cover Sheet

**BENCHMARK RESOURCES CORPORATION**
**P.O. BOX 5611**
**480-595-7636/FAX 480-595-7636**

RECEIVED 2002 JAN 11 A 10: 39

Mr. George C. Miller, Director
United States Dept. of the Interior
Office of Surface Mining
530 Gay Street S.W. #500
Knoxville, Tennessee 37902
Via Fax 865-545-4111
January 4, 2002

Dear Mr. Miller:

We respectfully request, on behalf of the co-tenants of record, Benchmark Resources Corporation and Santiago Limited, the specific procedures required to exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMRA), and the Federal program for Tennessee, 30 CFR 942:764. Also, any other Federal or State of Tennessee Statutes that are applied to the Rockcreek Watershed, Tennessee Petition Evaluation Document/Environmental Impact statement (final), 522 SMCRA Evaluation OSMRE-PF-8, and Environmental Impact Statement OSMRE-EIS-22.

The abovementioned request goes specifically to the Petition to declare the Rockcreek Watershed as unsuitable for all surface mining operations. The OSMRE failed to provide **Proper Notice and/or service to the identifiable ownership interest**, (i.e., the above-referenced co-tenants of record), by a legally binding conveyance pertaining to the mineral estate, under a large portion of the 22,858 acre Rockcreek Watershed Petition area.

Unless we hear from you to the contrary by February 9, 2002, we will assume that you are denying the requested administrative relief and that we have thereby exhausted our administrative remedies as the necessary prerequisite to seeking Judicial review.

Very truly yours,
Darold E. Proctor

Darold E. Proctor
Authorized Agent
Benchmark Resources Corporation
Gentry Corporation

# United States Department of the Interior

OFFICE OF SURFACE MINING
Reclamation and Enforcement
530 Gay St., S.W., Suite 500
Knoxville, TN 37902

FEB 1 2002

CERTIFIED MAIL
7000 1670 0008 9882 5456

Mr. Darold E. Proctor, Authorized Agent
Benchmark Resources Corporation
P.O. Box 5611
Carefree, Arizona 85377

Dear Mr. Proctor:

Thank you for your letter/fax of January 4, 2002. Your letter references a lack of "proper notice and/or service to identifiable ownership interest" for a lands unsuitable for mining petition decision for the Rock Creek Watershed, Tennessee. The Rock Creek Watershed lands unsuitable for mining (LUM) petition was originally received by the Tennessee Department of Health and Environment on September 28, 1984 and transferred to the Office of Surface Mining (OSM) on October 10, 1984. On or about August 11, 1985, we received a letter from you regarding this unsuitability proceeding and your company's mineral interests. The letter indicated that you might like to become an intervenor in the proceeding. However, our review of the record finds no further communication from you. Your letter to us in 1985 would demonstrate that you had personal, actual knowledge of the proceeding, in addition to the general public notices discussed below.

A draft petition evaluation document/environmental impact statement (PED/EIS) was available for public comment on March 21, 1986. Public notices were issued by local and regional newspapers and Federal Register and Tennessee Register announcements on March 20, 1986, along with a wide area mailing to interested parties, governmental agencies, and landowners.

Additional public notices were made after the issuance of the final PED/EIS on September 26,1986. And, after the decision to designate the petition area was issued, public notices were made in accordance with 30 CFR 942.764 and were provided on April 2, 1987.

We were unable to determine what you meant by the phrase "exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMCRA)", so we are not responding to this part of your letter.

We did not interpret your letter as requesting any specific administrative relief. Therefore, we are not denying any particular administrative relief. Also, we do not agree that any action with respect to your letter, or this response, could legally constitute an exhaustion of administrative remedies that would serve as a prerequisite to judicial review.

The applicable law allows judicial review of OSM's decision to designate lands unsuitable for coal mining, but only within restricted time limits. We certainly respect your right as a citizen to file a lawsuit to challenge OSM's actions if you choose.

Sincerely,

George C. Miller, Director
Knoxville Field Office

cc: Nick Holt, SOL