# In the United States Court of Federal Claims

No. 03-178L
(Filed November 22, 2006)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **BENCHMARK RESOURCES CORPORATION, a Colorado Corporation; GENTRY CORPORATION, a Colorado Corporation; and SUNRISE HOLDING, INC., a Delaware Corporation,** | * | Takings; motion to dismiss; motion for summary judgment; statute of limitations; regulatory requirement for notice; ripeness; compensable property interest under the Fifth Amendment. |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | * | |

James N. MacKinlay, Phoenix, AZ, for plaintiffs. Howard M. Shanker, The Shanker Law Firm, Brian R. Warnock, Warnock, MacKinlay & Associates, P.L.L.C., of counsel.

James D. Gette, Washington, DC, with whom was Assistant Attorney General Sue Ellen Wooldridge, for defendant. Daniel W. Kilduff, Office of the Solicitor, U.S. Department of the Interior, of counsel.

## OPINION

**MILLER**, Judge.

This case is before the court after argument on defendant's renewed Motion To Dismiss for Lack of Subject Matter Jurisdiction, or, in the Alternative, for Summary Judgment, pursuant to RCFC 12(b)(1) and 56. Defendant urges dismissal on the grounds that the property owners' claims are not ripe or time-barred by 28 U.S.C. § 2501 (2000 & Supp. 2006), for the failure of one plaintiff to file their complaint within the six-year statute of limitations. Alternatively, defendant moves for summary judgment on the ground that all plaintiffs cannot present a compensable property interest under the Fifth Amendment.

## FACTS

The court denied defendant's first motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) on March 17, 2005. See Benchmark Resources Corp. v. United States, 64 Fed. Cl. 526 (2005) (order denying motion to dismiss). Thereafter, plaintiffs Benchmark Resources Corporation ("Benchmark") and Gentry Corporation ("Gentry") amended their complaint on September 28, 2005, to join Sunrise Holding, Inc. ("Sunrise"), successor-in-interest to Santiago Ltd. ("Santiago"), an owner of a 50% undivided interest in the property co-owned, in part, by Benchmark, see note 1 *infra*, as a plaintiff to this action. See Pls.' First Am. Compl. filed Oct. 12, 2005.

Currently before the court are defendant's renewed motion to dismiss based upon lack of subject matter jurisdiction and defendant's motion for summary judgment regarding Sunrise. Defendant argues that plaintiffs' claims are not ripe and that Sunrise's claim was not filed within the six-year statute of limitations; in the alternative, defendant argues that plaintiffs lacked a property interest on the date of the alleged taking.

The facts concerning the claims of Benchmark and Gentry are set forth in Benchmark, 64 Fed. Cl. at 527-31, and are not repeated fully herein, as defendant's arguments regarding the issues previously raised remain more or less the same. The salient facts are not disputed.

Benchmark and Gentry, both Colorado Corporations, and Sunrise, a Delaware Corporation (collectively "plaintiffs"), seek just compensation for an alleged taking under the Fifth Amendment to the United States Constitution. Plaintiffs claim that a taking occurred when the Office of Surface Mining Reclamation and Enforcement (the "OSM") designated property in the Rock Creek Watershed of Hamilton and Bledsoe Counties in Tennessee as unsuitable for surface mining.

The subject property includes 7,000 acres lying principally in Bledsoe County, Tennessee, and mineral rights on approximately 24,000 acres in Hamilton and Bledsoe Counties, Tennessee (the "Property"). At the time of the alleged taking, a 50% undivided interest in the property and mineral rights at issue was held by Santiago, a British Virgin Islands corporation. 1/ Santiago acquired its interest in the Property by quitclaim deed from Robert D. Peloquin, executed on March 1, 1980, and filed in Franklin County, New York on

---

1/ The remaining 50% interest in the Property is held in part by plaintiffs Benchmark and Gentry, which possessed 25% and 37.5% of a 50% undivided interest in the Property at the time of the alleged taking, respectively. See Benchmark, 64 Fed. Cl. at 527. The remaining 37.5% of the 50% undivided interest was held by Cinste Energy, Ltd., and was later conveyed to Benchmark. Id. at 527 n.1.

April 14, 1980. Santiago was owned by the Kwon family of South Korea through the Bahamian-based Jenny Trust, whose beneficiary at the time of the alleged taking was a Mrs. Kim. The current beneficiary of the Jenny Trust is Sunscape, a Bahamian corporation solely owned and managed by Alex Kwon. Following the filing of the original complaint, Santiago was merged into Sunrise on January 31, 2003. Sunrise acquired Santiago's 50% interest in the Property and mineral rights at issue through this merger and currently maintains this interest. 2/

The 7,000-acre lot of the Property was owned subject to a Timber Lease agreement held by Bowater North American that was executed in 1967. Wharton's, Inc., a prior owner of the 7,000-acre lot, executed the Timber Lease with Hiwassee Land Co. ("Hiwassee"), which later was acquired by Bowater North American. The Timber Lease is listed among encumbrances and exceptions to the Warranty Deed for the Property interest held by Benchmark. The Santiago quitclaim deed to the Property recognizes the Timber Lease as an alleged encumbrance in an attachment to the deed, which is attributable to Sunrise by virtue of its merger with Santiago in 2003.

On December 28, 1977, MTB Holding Corp., an Ohio Corporation, entered into a lease agreement (the "Coal Lease") with Tennessee Partners, Ltd. ("Tennessee Partners"), a Florida Limited Partnership, covering the 7,000 acres of property and 21,600 acres of the 24,000 acres of the mineral rights at issue. The Coal Lease Recitals acknowledge MTB Holding Corp.'s prior purchase of the 28,600 acres of coal rights by virtue of a Warranty Deed from Whartons, Inc. The Coal Lease grants Tennessee Partners exclusive rights to mine coal in the 28,600 acres described in the lease for a twenty-year period, subject to the limitations of the Timber Lease to Hiwassee. The Coal Lease permits Tennessee Partners to mine "by lawful and reasonable methods, including strip mining and auguring, all coal in place from the above described property." DX A-4 at 249. The Warranty Deed by which Benchmark acquired rights to the property in question expressly acknowledges the Coal Lease encumbrance. Attachments to Santiago's quitclaim deed also identify the purchased property interest as subject to the Coal Lease, referring to the agreement by parties' names and date of execution.

The Surface Mining and Reclamation Act of 1977, 30 U.S.C. §§ 1201-1328 (2000) (the "SMCRA"), was enacted, in part, to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations" and to "assure that the rights of surface landowners and other persons with a legal interest in the

---

2/ Any references or transactions that involve Santiago prior to the merger that are attributable to plaintiff Sunrise Corporation will refer to Sunrise.

land or appurtenances thereto are fully protected from such operations[.]" 30 U.S.C. § 1202(a), (b). The SMCRA is administered by the OSM, which is authorized to issue determinations of unsuitability for surface mining. Id. § 1211(a), (c).

The OSM published public notices on/or about December 26, 1984, regarding the filing of the Petition and Amended Petition for designation of approximately 22,858 acres on Walden's Ridge in Hamilton and Bledsoe Counties, Tennessee (the "Petition Area"), as unsuitable for surface coal mining operations. See Benchmark, 64 Fed. Cl. at 528. The Petition Area and Property boundaries share some area in common, but each designation contains property independent of the other.

The OSM published a notice of Intent To Prepare a Combined Draft Unsuitability Petition Evaluation Document/Environmental Impact Statement, 50 Fed. Reg. 50351 (Dec. 10, 1985) (the "Draft PED/EIS"), regarding the Petition Area. The OSM issued notice Rock Creek Watershed, TN, Lands Unsuitable for Surface Mining and Reclamation Operations: Availability of Draft Petition Evaluation Document and Draft Environmental Impact Statement, Comment and Hearing, 51 Fed. Reg. 10119 (Mar. 24, 1986), announcing (1) the availability of the Draft PED/EIS and (2) a public hearing in Pikeville, Tennessee, scheduled for May 8, 1986.

The OSM published notice of Availability of Final Petition Evaluation Document/Environmental Impact Statement on the Rock Creek Watershed, Tennessee, 51 Fed. Reg. 35570 (Oct. 6, 1986) (the "Final PED/EIS"), on October 6, 1986, and subsequently published notice of Availability of Decision and Statement of Reasons for Decision on Rock Creek Unsuitability Petition, 52 Fed. Reg. 10174 (Mar. 30, 1987) (the "Decision"), which contained the language of the decision of the Director of OSM as an appendix. The Decision concludes that a portion of the Petition Area was unsuitable for surface mining purposes (the "Designated Area"), on March 30, 1987. Id. The Designated Area is contained completely within the boundaries of the Petition Area, concentrated in the eastern portion of the Petition Area. The Decision of the Director of OSM, dated March 24, 1987, provides that OSM designated portions of the Petition Area as unsuitable for mining in the following manner:

> a. All surface minable reserves of the Sewanee coal seam within the Rock Creek watershed, Tennessee as unsuitable for coal mining operations using conventional overburden mixing techniques for reclamation;
>
> b. The Hall, Middle, and Rock Creek gorges as unsuitable for all surface coal mining operations and surface disturbance incident to underground mining.

Availability of Decision and Statement of Reasons for Decision on Rock Creek Unsuitability Petition, 52 Fed. Reg. 10174.

## DISCUSSION

1. Standard of Review

1) Motion to dismiss

The legal standards concerning a motion to dismiss replicate the court's opinion in Benchmark, 64 Fed. Cl. at 531-32, because defendant's arguments on the issues discussed therein remain the same.

When a federal court hears such a jurisdictional challenge, "its task is necessarily a limited one." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id. The court must accept as true the facts alleged in the complaint, and must construe such facts in the light most favorable to the pleader. See Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995) (holding that courts are obligated "to draw all reasonable inferences in plaintiff's favor"); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Nevertheless, if the jurisdictional facts alleged in the complaint are disputed, "the . . . court may consider relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999) (holding that "[f]act-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged"). Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction . . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds, 846 F.2d at 748; see McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936) (holding that "[i]f [plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof").

2) Summary judgment

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases the need for a trial is not present, and the motion for summary judgment must be

granted. Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999).

If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied. "The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the non-moving party's case[.]'" Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. Matsushita Elec. Indus., 475 U.S. at 587-88; Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984).

When resolving a motion for summary judgment, the court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Cf. Anderson, 477 U.S. at 255 (holding that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are . . . not [functions] of a judge . . . ruling on a motion for summary judgment . . ."); Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1361 (Fed. Cir. 1998) (holding that "[i]n determining the propriety of summary judgment, credibility determinations may not be made"). The purpose of summary judgment is "'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). However, if "there is reason to believe that the better course would be to proceed to a full trial" a trial court may deny summary judgment. Anderson, 477 U.S. at 255.

2. Ripeness

Defendant faults plaintiffs' amended complaint pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction based on two grounds. First, plaintiffs' claims are not ripe because they failed to exhaust administrative remedies prior to filing a claim with this court. Alternatively, Sunrise's claim is time-barred by the Tucker Act's statute of limitations. 28 U.S.C.A. § 2501 (2006).

When considering a Fifth Amendment takings claim, the court first must consider whether plaintiffs' claims have ripened. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from

judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" Nat'l Park Hospitality Ass'n v. DOI, 538 U.S. 803, 807-08 (2003) (quoting Abbott Lab. v. Gardner, 387 U.S. 136, 148-49 (1967)). Ripeness limitations are "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Servs., 509 U.S. 43, 58 (1993).

In holding a claim to be unripe, the court essentially is refusing to exercise jurisdiction over the case. The burden of establishing the court's jurisdiction rests with the party seeking to invoke it, see Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002), as federal courts are presumed to lack jurisdiction unless the record affirmatively indicates to the contrary. See Renne v. Geary, 501 U.S. 312, 316 (1991).

The touchstone of the ripeness doctrine in regulatory takings is finality of agency decisions. The Supreme Court has held that "[a] takings claim challenging the application of land-use regulations is not ripe unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985)). Usually, if a landowner has the option to submit a permit, he is required to do so in order to ripen his takings claim, because, implicit in the permit system, is the possibility that the Government will grant the landowner permission to do with the property as he wishes. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127 (1985). "[T]he mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." Id. at 126. A permit requirement therefore "does not in and of itself constitute a compensable taking." Bass Enterprises Prod. Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004) (citing Riverside, 474 U.S. at 126-27); accord Boise Cascade Corp. v. United States, 296 F.3d 1339, 1350 (Fed. Cir. 2002) (holding that more than "the mere imposition of a permitting requirement" is necessary to establish valid takings claim).

As this court has held, "if a landowner has the option to submit a permit, he is required to do so in order to ripen his takings claim." Sartori v. United States, 67 Fed. Cl. 263, 268 (2005). A plaintiff is not entitled to seek judicial review before following the prescribed administrative procedures. Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 297 (1981)). "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Williamson County Reg'l Planning, 473 U.S. at 186.

Nevertheless, as the Supreme Court has cautioned, it is "important to bear in mind the purpose that the final decision requirement serves." Palazzolo, 533 U.S. at 622. "While a landowner must give a land use authority an opportunity to exercise its discretion, once it becomes clear that the agency lacks the discretion to permit any development . . . a takings claim is likely to have ripened." Id. at 620. "[T]here is no requirement that a claimant 'submit applications for their own sake' when there is no 'uncertainty as to the [property's] permitted use.'" Washoe County v. United States, 319 F.3d 1320, 1324 (Fed. Cir. 2003) (quoting Palazzolo, 533 U.S. at 622).

The United States Court of Appeals for the Federal Circuit's discussion of this point in Stearns Co., Ltd. v. United States, 396 F.3d 1354 (Fed. Cir. 2005), which involves a regulatory taking claim based on passage of the SMCRA, is instructive to this case. The SMCRA prohibits surface mining in national forests unless a finding is made that the party seeking to mine possesses "valid existing rights" ("VER"), or the OSM has rendered a compatibility finding. The OSM possessed authority to permit the mining of land if such a compatibility decision was made in favor of the applicant. Plaintiff argued that a determination that plaintiff did not possess VER was equivalent to a regulatory taking. Rejecting plaintiff's argument, the Federal Circuit held that the claim was not ripe because plaintiff failed to file an application for the compatibility finding, a prerequisite for exhaustion of administrative remedies.

The Federal Circuit elaborated on the necessity of exhaustion of administrative remedies in Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003):

> When Congress expressly requires exhaustion of administrative remedies before suit is brought, exhaustion is, of course, mandatory. When Congress has not spoken directly to the issue, "appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme."

Id. at 1305 (quoting McCarthy v. Madigan, 503 U.S. 140, 144 (1992)).

In this case the SMCRA, through 30 U.S.C. § 1256(a), mandates the filing of a petition with the OSM prior to seeking judicial review of agency actions. The SMCRA provides that "no person shall engage in or carry out on lands within a State any surface coal mining operations unless such person has first obtained a permit issued by such State pursuant to an approved State program or by the Secretary pursuant to a Federal program." 30 U.S.C. § 1256(a). Thus, under ordinary circumstances, the doctrine of exhaustion of administrative remedies would require filing of a permit with the OSM.

Defendant argues that plaintiffs should be required to file a permit application with the OSM because plaintiffs were aware of the permitting requirement and it was a viable option. Defendant relies upon a letter sent by Beverly Brock, Supervisor of the OSM's Technical Group in Knoxville, on March 30, 2000, which provided Darold E. Proctor, President of Benchmark and Gentry, with a description of the application process, as well as a sample application. Moreover, defendant cites to plaintiffs' admission that they have never filed an application for a permit to mine their property. Dep. of Darold E. Proctor, Feb. 14, 2006, at 125.

Rather than contest the filing of a permit application with the OSM, plaintiffs take the position that correspondence submitted to the OSM eliminated the need for it. Mr. Proctor sent a letter dated November 24, 2001, to the attention of Jeffrey D. Jarrett, Director of the OSM. The letter included requests for "variances, waivers, and/or administrative remedies that must be sought or exhausted" prior to judicial review of plaintiffs' claims. Mr. Proctor submitted a request to George C. Miller, Director of the OSM on January 8, 2002, requesting information regarding "specific procedures required to exhaust all variances, waivers and/or administrative remedies," which also included a February 9, 2002, deadline for response. Mr. Proctor sent a third letter to the OSM, addressed again to Mr. Miller, dated January 20, 2002, stating that no response yet had been received to his letter of January 8, 2001. Plaintiffs argue that no response was received and that the OSM's failure to respond constitutes exhaustion of administrative remedies.

Contrary to plaintiffs' assertion, Mr. Miller wrote in a letter dated February 1, 2002, addressed to Mr. Proctor at Benchmark:

> We were unable to determine what you meant by the phrase "exhaust all variances, waivers and/or administrative remedies under the reclamation act of 1977 (SMCRA)", so we are not responding to this part of your letter.
>
> We did not interpret your letter as requesting any specific administrative relief. Therefore, we are not denying any particular administrative relief. Also, we do not agree that any action with respect to your letter, or this response, could legally constitute an exhaustion of administrative remedies that would serve as a prerequisite to judicial review.
>
> The applicable law allows judicial review of OSM's decision to designate lands unsuitable for coal mining, but only within restricted time limits.

This letter responds to plaintiffs' inquiries regarding exhaustion and announces that plaintiffs' letter does not constitute to a permit application, in contrast to plaintiffs' assertions that the OSM never responded to their requests. Therefore, the court rejects plaintiffs' argument that OSM's failure to respond to correspondence regarding exhaustion of administrative remedies substantiates waiver of the permitting requirement.

Alternatively, rather than argue that the OSM waived the permitting application requirement, plaintiffs cite to Conant v. United States, 12 Cl. Ct. 689 (1987), for the proposition that "it serve[s] no purpose to require a claimant to exhaust administrative procedures before seeking judicial review when it is clear that resort to administrative action would be futile." Id. at 693. The property owner in Conant, 12 Cl. Ct. 689, claimed a regulatory taking based upon actions by the United States Army Corps of Engineers that affected commercial fish ponds that the owner had constructed. Plaintiff's claims were held to be unripe due to a failure to exhaust administrative procedures, because plaintiff did not offer evidence "to overcome the presumption that the Corps will process his permit application in good faith, based on the facts presented." Id. In addition, the court noted that "the plaintiff is not precluded, even now, from applying for the requisite permit." Id. Similar to the situation described in Conant, 12 Cl. Ct. 689, plaintiffs in the instant case have received a Decision by the OSM indicating that no permit applications for surface mining within the Designated Area will be considered. Thus, plaintiffs argue, a permit application to the OSM regarding surface mining in the Designated Area would be futile, because any application made to the OSM would not have had any chance of success.

Defendant rejoins that plaintiffs do not qualify for the limited futility exception to the requirement to exhaust administrative remedies. Defendant relies on the decision in Howard Heck & Associates, Inc. v. United States, 134 F.3d 1468 (Fed. Cir. 1998), in which the Federal Circuit held that "the futility exception simply serves 'to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved.'" Id. at 1472 (emphasis in original) (quoting S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 504 (9th Cir. 1990)). Plaintiffs in Howard Heck, applicants for a Clean Water Act section 404 permit, see 33 U.S.C. § 1344 (2000), filed a permit application that was later withdrawn for failure to comply with permit requirements. Howard Heck, 134 F.3d at 1470-71. In lieu of filing another application, the applicants filed a complaint in the United States Court of Federal Claims, which was dismissed as unripe due to a failure to exhaust administrative remedies. Id. at 1471.

In contrast to the facts in Howard Heck, however, plaintiffs in the case at bar have received a designation that indicates "[a]pplications proposing surface mining operations and underground mining operations having surface effects in the designated portions of the

gorges would be denied." DX B-4 at 368; see also Availability of Decision and Statement of Reasons for Decision on Rock Creek Unsuitability Petition, 52 Fed. Reg. 10174 (Mar. 30, 1987). The Federal Circuit noted in Howard Heck that "the Court of Federal Claims properly disposed of Heck's 'futility' argument as lacking any factual foundation because of testimony that the Corps has previously granted permits despite the allegedly insurmountable obstacles of negative agency comments and of the requirement for an alternatives analysis." Id. at 1472. In contrast, the language of the Decision leaves no question as to the viability of applications for surface mining in the Designated Area. See DX B-4 at 368. This portion of the unsuitability designation shows that the Notice of Decision serves as a final decision by OSM, at least regarding the scope of mining operations described, because it manifests that no consideration will be given to such applications. Thus, plaintiffs argue, a permit application regarding potential surface mining within the area designated as unsuitable is futile.

The Federal Circuit in Washoe County, 319 F.3d 1320, relied upon the fact that it was known to a "reasonable degree of certainty" that plaintiff "was not going to be granted a pipeline right-of-way permit by the BLM" in determining that a takings claim was ripe for adjudication, despite a failure to exhaust administrative procedures. Id. at 1324. Similarly, in Palazzolo the Supreme Court held that the "[r]ipeness doctrine does not require a landowner to submit applications for their own sake. Petitioner is required to explore development opportunities on his upland parcel only if there is uncertainty as to the land's permitted use." 533 U.S. at 622. Such an unambiguous statement from the OSM regarding blanket denial of an application to surface mine in the Designated Area satisfies the futility exception to mandatory exhaustion of administrative remedies that the Federal Circuit endorsed in Washoe County, 319 F.3d at 1324, and supports plaintiffs' argument that the OSM had made a final determination regarding the areas designated as unsuitable. On this basis the court finds that plaintiffs have demonstrated futility regarding surface mining within the portions of the Property designated as unsuitable by the OSM in its Decision on March 30, 1987.

Nevertheless, this finding does not pertain to a substantial area of the Property outside the area designated by the OSM or to applications for mining modalities other than surface mining that could be subject to the doctrine that administrative remedies must be exhausted. Defendant argues that the OSM did not designate as unsuitable that portion of the Property located outside of the area and that, therefore, plaintiffs should be required to apply to the OSM as a prerequisite to asserting a taking for this portion of the Property. Defendant also argues that the OSM designation of unsuitability for surface mining did not constitute a compensable taking because alternative means for mining were available to plaintiffs. Defendant maintains that the designation by the OSM required plaintiffs to file for a permit

regarding alternative mining modalities prior to filing a complaint in the Court of Federal Claims.

The Decision regarding the unsuitability designation of the Property states, in relevant part:

> [A]pplications for underground mining operations proposed for all other areas of the Rock Creek watershed would be processed providing they comply with the requirements of the Federal Program for Tennessee.
>
> Any application for a proposed surface mining operation on the Sewanee coal seam would be required to contain a special materials handling plan and reclamation plan; otherwise, that application would be denied on the basis of this decision.

DX B-4 at 468. Based on this language and relying on the Second Declaration of Douglas K. Siddell, Supervisor of the Technical Group in the OSM's Knoxville Field Office ("KFO"), dated September 28, 2006, defendant argues that plaintiffs could have submitted an application to the OSM for the following types of mining activities:

> (a) <u>The Wharton Property outside of the Petition Area</u>: KFO would entertain permit applications for all surface coal mining operations (including surface and underground mining). All areas outside the Petition Area are unaffected by the partial designation.
>
> (b) <u>The Petition Area outside of the designated gorge areas</u>: KFO would entertain permit applications for all surface coal mining operations (including surface and underground mining) on any coal seam, as long as there would not be any surface activities, or impacts of surface activities, in the designated gorge areas. An applicant proposing to surface mine the Sewanee coal seam would have to submit a special materials handling plan and reclamation plan.
>
> (c) <u>The designated gorge areas</u>: KFO would entertain permit applications for underground mining, as long as there would not be any surface activities, or impacts of surface activities, in the designated gorge areas.

Second Siddell Decl. ¶ 7(a)-(c).

Plaintiffs counter that the OSM designation made the entire Property valueless for mining purposes, thereby rendering an application to the OSM economically unfeasible and therefore futile. Plaintiffs rely upon the Report of Marcus A. Wiley, PE (the "Wiley Report"), dated April 5, 2006. Defendant criticizes the Wiley Report for neglecting to "show affirmatively that the affiant is competent to testify to the matters stated within," as required by RCFC 56(e). Def.'s Br. filed Sept. 28, 2006, at 5. Furthermore, plaintiffs can not offer any evidence of Mr. Wiley's education, training, or experience, so the Wiley Report cannot pass muster under the requirements for expert testimony under the rule established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-95 (1993). 3/

"[I]n a bench trial, where no screening of the factfinder can take place, the Daubert standards of relevance and reliability for scientific evidence must nevertheless be met." Seaboard Lumber v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002). The Supreme Court in Daubert held:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592. The Court in Daubert set forth several factors which could be considered in this inquiry: (1) Whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) "general acceptance." Id. at 593-94.

Defendant argues that the reasoning or methodology underlying the Wiley Report is not scientifically valid because it fails to meet generally accepted standards for estimating coal reserves, and it does not provide evidence to permit assessment of the reliability of the conclusions of Mr. Wiley. Defendant proffers the Declaration of Alan K. Stagg, PG, AIMA, Sept. 28, 2006, in support of these arguments.

---

3/ The Wiley Report initially failed to contain a sworn signature, as required by RCFC 56(e). This defect was cured when defendant offered declarations in its reply brief that permitted Mr. Wiley to submit a responsive declaration to his report. See Decl. of Marcus A. Wiley, PE (undated).

Mr. Stagg states:

> [T]he Wiley Report fails to meet . . . generally accepted techniques and standards for estimating and reporting coal reserves. As a result, the conclusions contained in the Wiley Report cannot be relied upon because they are not supported by disclosure of the underlying data and assumptions and thus cannot be independently verified.

Stagg Decl. ¶ 7. "[A] number of significant deficiencies were noted including the failure to define key classification terms, insufficient data from which to evaluate tonnage estimates, and a failure to establish geological assurance for the estimates contained in the report." Id. ¶ 15. The Stagg Declaration indicates that the Wiley Report fails to apply techniques listed in the *Coal Reserve Classification System of the U.S. Geological Survey* ("Circular 891") and *The SME Guide for Reporting Exploration Results, Mineral Resources, and Mineral Reserves* (the "2005 SME Guide"). See Stagg Decl. ¶¶ 11, 13.

While defendant's arguments attacking the Wiley Report were correct at the time of filing, plaintiffs' sur-reply addresses these weaknesses. Plaintiffs submitted a sworn Declaration of Marcus A. Wiley, PE (undated), which provides documentation of Mr. Wiley's qualifications, as well as a summary of the computational methodology utilized for the Wiley Report. This supplementary documentation sufficiently responds to Mr. Stagg's criticisms and provides sufficient information to satisfy the requirements of RCFC 56(e).

Defendant argues that determinations, such as the one contemplated are particularly relevant to dismissal for lack of ripeness, as the OSM has expertise that is more suited to complex technical claims at issue in this case. Defendant cites McKart v. United States, 395 U.S. 185 (1969), for the proposition that "since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." Id. at 194.

Defendant, moreover, raises objections to the methodology utilized by Mr. Wiley. Defendant has objected to two underlying assumptions that allegedly undermine the scientific validity and applicability of the reasoning in the Wiley Report. First, Mr. Wiley relied upon an incorrect assumption in stating that "[i]t is my opinion, due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, that the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas." Wiley Report at 3. The Second Siddell Declaration, counters:

> OSM's partial designation does not bar subsidence in the designated gorge areas. Pursuant to section 522 of SMCRA, 30 U.S.C. § 1272, the partial designation bars "surface coal mining operations" in the designated gorge areas. By interpretative rule, OSM has explained that subsidence due to underground coal mining is not included in the definition of "surface coal mining operations" and therefore is not prohibited in areas where surface coal mining operations are barred under section 522 of SMCRA. 30 C.F.R. § 761.200. Subsidence, however, is regulated pursuant to section 516 of SMCRA. 30 U.S.C. § 1266. The partial designation did not impose any additional restrictions on subsidence beyond the generally-applicable restrictions of section 516. Any issues related to potential subsidence in the designated gorge areas would be addressed in the permitting process.

Id. ¶ 20.

Second, defendant argues that Mr. Wiley's declaration is based upon the inaccurate presumption that all surface coal mining operations are prohibited throughout the entire Petition Area, in contrast to the language of the OSM Decision, which excludes surface mining operations within the more limited Designated Area. Mr. Wiley asserts:

> It is my opinion, as a professional mining engineer, that the designation of certain lands in the Rock Creek watershed, Tennessee as unsuitable for surface coal mining operations by the Office of Surface Mining has removed from the Wharton tract, a total of 47.9 million tons of coal from the viability of mining. Although the OSM designation decision states that the Sewanee coal seam could be mined using some unconventional overburden mixing technique for reclamation, it is my opinion that such a technique is not a viable option . . . .
>
> Even if a permit could theoretically be obtained, . . . . It is my opinion, due to the potential surface impact from underground mining, such as possible subsidence and probable hydrologic consequences, that the underground mining of coal from areas contained within the Rock Creek watershed boundary are also precluded from mining due to the OSM designation of unsuitability within the drainage areas. Although OSM says that a permit can be submitted in these areas for underground mining, it would be impossible to commit to a plan to mine underground coal within the Rock Creek Watershed that does not have surface disturbance . . . .

Wiley Decl. ¶¶ 10-11.

Although plaintiffs have presented some evidence of the futility of their application through properly supported expert opinion and the language of the Decision, plaintiffs have not provided evidence sufficient to demonstrate futility of application to the OSM regarding coal mining operations over the whole Property. In particular, this court notes that OSM's experts are uniquely qualified to evaluate plaintiff's concerns regarding the economic nonviability of the remaining coal reserves eligible for permitting, such as those methodologies proposed by Mr. Siddell in his Second Declaration. Analysis of the viability of underground mining modalities; thus, determination as to the feasibility of permitting in the Petition Area is consigned to the expertise of the OSM, particularly in light of the Federal Circuit's holding in McKart, 395 U.S. 185. Because plaintiffs' takings claim does not come within the futility exception to the administrative exhaustion doctrine, the claim is not ripe for adjudication, and the court grants defendant's motion to dismiss for lack of subject matter jurisdiction.

3. Statute of limitations

The statute of limitations in the Tucker Act requires that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501; see Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994). "A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action[,]" id. at 1481, and, in the instance of a taking, when the taking occurs. Steel Improvement & Forge Co. v. United States, 355 F.2d 627, 631 (Ct. Cl. 1966) (proceeding regarding cancellation of shipping contract); see Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988) (stating that cause of action accrues "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence").

Plaintiffs have alleged that the single event that fixed the alleged liability of the Government occurred on March 24, 2005, when the OSM designation was issued. Pls.' First Am. Compl., filed Oct. 12, 2005, ¶¶ 1-3, 27; see Benchmark, 64 Fed. Cl. at 527 ("Plaintiffs claim that a taking occurred when [the OSM] designated certain property . . . as unsuitable for surface mining."). Similar to the determination made regarding Benchmark and Gentry in the earlier Benchmark decision, Sunrise disputes the date on which defendant argues that Sunrise was or should have been aware of the OSM designation.

Defendant argues that Sunrise's claim accrued when the OSM designation was made on March 24, 1987, because notice was provided to Santiago through Mr. Bagwell on that date. Thus, defendant presses, Sunrise was required to file its complaint in the Court of

Federal Claims by March 24, 1993, in order to meet the statute of limitations. Because Sunrise's claim was filed on October 12, 2005, according to defendant, its claim should be dismissed as untimely.

This court focused its inquiry regarding defendant's prior allegations of untimeliness by Benchmark and Gentry to "when plaintiffs received proper notice of the OSM's Decision as required by 30 C.F.R. § 764.19(b) (1986), which mandates that a regulatory authority send a 'decision by certified mail to the petitioner and intervenors and by regular mail to all other persons involved in the proceeding.'" Benchmark, 64 Fed. Cl. at 532. As defendant has raised an identical objection regarding Sunrise's compliance with the six-year statute of limitations, this court revisits the circumstances surrounding the notice provided by the OSM. See generally id. at 533-35 (holding failure of the OSM to provide notice in compliance with 30 C.F.R. § 764.19(b) sufficient to deny motion to dismiss).

The OSM sent Santiago Notice of the Petition and Amended Petition regarding the unsuitability designation of the Petition Property, which Mr. Bagwell received on or about December 27, 1984. As an attachment to a letter dated December 31, 1984, Mr. Bagwell forwarded the notice of the filing of the Petition to Mr. Proctor, President of Benchmark, and Peter Triestman, President of Empire Consulting, Inc. The subject line is titled: "Re: Interests of Santiago, Ltd. and Benchmark Oil & Gas Ltd.," and states, in relevant part,

> I am sending each of you a copy of a letter I received today from the Knoxville, Tennessee Office of the U.S. Department of the Interior.
>
> As you can see the purpose of the letter is to put the owners of minerals on notice that a petition to have the Rock Creek Watershed area declared unsuitable for surface coal operations.

Defendant argues that the OSM mailed two copies of the notice of Draft PED/EIS availability to Santiago on or about March 17, 1986, and that the OSM mailed two copies of the notice of the Final PED/EIS to Santiago on September 26, 1986. Defendant relies on the First Declaration of Douglas K. Siddell, Supervisor of the Technical Group of the OSM KFO, dated May 25, 2004, and a list of the mailing labels used for distribution of the letters sent by the OSM regarding the Draft PED/EIS and Final PED/EIS. The mailing list for the Draft PED/EIS includes three entries addressed to Joe G. Bagwell:

Santiaco Ltd.
c/o Joe G. Bagwell
P.O. Box 477
Cleveland, TN 37311

Mr. Joe G. Bagwell
MTB Holding Corp.
P.O. Box 447
Cleveland, TN 37311

Mr. Joe G. Bagwell
Santiaco Ltd.
P.O. Box 477
Cleveland, TN 37311 [4/ ]

In contrast, however, Mr. Siddell also admits that "[n]o mailing list for 'interested parties' appears in the portion of the Rock Creek file relating to notice of the Decision." Id. ¶ 13.

Plaintiffs contend that the notice required under 30 C.F.R. § 764.19(b) was not received and that OSM consequently failed to provide adequate notice of the Decision, regardless of any other notice provided to Santiago or Sunrise. Therefore, plaintiffs argue, the statute of limitations should begin to run when plaintiffs were made aware of the existence of the OSM's Decision in accordance with statutory requirements. According to plaintiffs, this court's prior ruling regarding Benchmark and Gentry in Benchmark, 64 Fed. Cl. 526, should apply to Sunrise due to similarities in the underlying facts. In particular, plaintiffs emphasize that Mr. Bagwell was not authorized to accept service by the OSM and that his authority was limited to collection of rents from the Timber Lease and payment of property taxes, relying on the Deposition of Howard Cohen, Esq., Feb. 22, 2006, attorney for Santiago:

> Q. Was this the type of communicate [sic] that Mr. Bagwell was expected to make with your firm as a representative of Santiago?

---

4/ The OSM mailing list reads "Santia*c*o Ltd." as the recipient of notice regarding the Petition and Amended Petition. As plaintiffs note, "the mailing lists actually reference 'Santiaco' as opposed to 'Santiago.' The taking of millions of dollars of property falls outside of that category of events (i.e. horseshoes, hand grenades) where 'close enough' is adequate." Pls.' Br. filed Aug. 29, 2005, at 15. Contrary to plaintiffs' characterization, this court does not agree that the minor typographical error constitutes inadequate notice. The facts that the letter was addressed to the correct location and, moreover, that it was received and read by Mr. Bagwell, then forwarded to Santiago on or about December 31, 1984, substantially undercut plaintiffs' position.

A. No, I think that mischaracterizes it. This is the type of thing that I characterized before as really doing on his own initiative. The only thing we asked him to do is pay the taxes and collect the Hiwassee rents.

Deposition of Howard Cohen, Feb. 22, 2006, at 122; see also Benchmark, 64 Fed. Cl. at 533 n.11. Additionally, Mr. Proctor submitted a sworn statement that "I subsequently advised the other co-tenant of the Property, Santiago Limited ("Santiago") of the March 30, 2000 letter and Decision. None of Santiago's representatives had previously advised me of the Decision and Santiago's representatives appeared to be very surprised by the Decision." Affidavit of Darold E. Procter, Aug. 28, 2006, ¶ 6. Detracting from this statement is the Deposition of Hosung Kwon, appearing as agent for Santiago and Sunrise, who states:

Q. Did you ever deal personally with Mr. Bagwell, Joseph Bagwell?
A. No, not personally. Never seen him.

Q. Ever exchange correspondence?
A. No correspondence. Over the phone we said hello a few times. That's about it.

Q. What was the purpose of those communications with Mr. Bagwell?
A. I think he receives the payment from Hiwassee – that I remember – on the timber lease. And he's in charge of paying taxes and distribute the rest to both of us. That's my understanding of his role. *In other words, he was our local lawyer,* see, in Tennessee.

Deposition of Hosung Kwon, Feb. 23, 2006, at 61-62 (emphasis added). While this admission by Sunrise does not definitively define Mr. Bagwell's role with regard to Santiago, it does establish that Sunrise admits perception of Mr. Bagwell as its local attorney, at least in some regard.

In contrast to plaintiffs' contentions that Sunrise's circumstances are identical to those of Benchmark and Gentry, several key factors differentiate Sunrise from the other two plaintiffs. First, this court accorded some weight to the fact that the letters sent to Mr. Bagwell by the OSM regarding the Draft PED/EIS and Final PED/EIS did not provide notice because they were addressed to Santiago and MTB, which had no relationship to Benchmark or Gentry. See Benchmark, 64 Fed. Cl. at 533 n.11. Sunrise, on the other hand, does have a direct relationship to Santiago, the addressee of the notices, by operation of Santiago's merger into Sunrise on January 21, 2003.

Second, this court also accorded weight to the fact that the OSM had been provided a proper mailing address for the other plaintiffs in the correspondence sent by Mr. Proctor of Benchmark in August 1985. In contrast, neither Sunrise nor Santiago submitted correspondence to the OSM between the unsuitability determination Decision and the filing of this claim. Plaintiffs argue that Santiago's quitclaim deed lists both Mr. Bagwell's address, as well as the address of Santiago's "long-time attorneys," Warshaw, Burstein, Cohen, Schlesinger, & Kuh ("Warshaw Burstein"), in New York. The quitclaim deed submitted to this court stipulates that "Tax Notice" be sent to Warshaw Burstein and that "This Instrument Prepared By: Warshaw, Burstein, Cohen, Schlesinger & Kuh, Attorneys at Law, 555 Fifth Ave. New York, N.Y. 10017." DX O at 459. The top of the deed reflects a handwritten notation: "Mail: Joe G. Bagwell" and Mr. Bagwell's mailing address. Plaintiffs argue, based upon the Deposition of Mr. Cohen, that the OSM should have been able to discern the fact that Warshaw Burstein was the appropriate contact for Santiago, stating that "[t]he first thing I'd say is my God, Warshaw Burstein prepared this, let me contact them, they must know who Santiago [is] and where they're located." Cohen Dep. at 158.

Plaintiffs also argue that the handwritten nature of the notations on Santiago's quitclaim deed signal the fact that mail should be sent to Mr. Bagwell and should not be relied upon by the OSM. Mr. Cohen stated in deposition:

Q. This identifies Warshaw Burstein only as the tax representative, does it not?
A. No. At the top it says this instrument was prepared by Warshaw Burstein.

Q. But it also indicates that mail is to be forwarded to Mr. Bagwell, doesn't it?
A. I don't know who wrote that in, why or when. I had nothing to do with that. All I know is we did prepare the document.

Cohen Dep. at 155-56. This court, however, emphasized the fact that the OSM could have researched Benchmark's contact information from a title search in its prior summary judgment ruling. See Benchmark, 64 Fed. Cl. at 535.

The quitclaim deed regarding Benchmark's acquisition of interest in the Property, the contact information listed also is handwritten and states:

Mail: Prepared by Karl Farro & Benchmark Resources Corp.
P.O. Box 5611 Carefree AZ
85377 1-480-595-7636
c/o Darold E. Proctor

PX 2. This court's reliance upon the title search demonstrated that the OSM easily could have consulted public records that would have provided the OSM with the appropriate contact information to provide notice of the Decision. See Benchmark, 64 Fed. Cl. at 535. In contrast, the Santiago quitclaim deed does not display such an easy route to the appropriate contact information. As defendant correctly notes, the fact that Warshaw Burstein was Santiago's long-time attorney was not evident on the face of the quitclaim deed to Santiago, and, contrary to Mr. Cohen's assertions, it would not be obvious to contact the party listed for the Tax Notice to locate the contact information for Santiago when Mr. Bagwell's notification information appeared on the top of the deed.

Because the BOR has shown no evidence of a record of the mailing lists actually employed to send notice of the Decision, plaintiffs dispute that defendant can establish that no material issue exists regarding the notice sent. Although defendant has provided no evidence of the mailing lists actually used by the OSM in sending notices, defendant has submitted mailing lists of previously sent notices regarding the Draft and Final PED/EIS, which do include Mr. Bagwell's contact information. Defendant also relies upon the First Declaration of Mr. Siddell, which states, "No mailing list for 'interested parties' appears in the potion of the Rock Creek file relating to notice of the Decision (RC 5.03). The letter in that portion of the file beginning with the salutation 'Dear interested Party,' . . . states, however, that 'a copy of the final PED/EIS was sent to you earlier.'" First Siddell Decl. ¶ 13. Thus, defendant argues, the identical mailing list was used by the OSM in sending the Final PED/EIS and the Decision. Since the mailing list that exists regarding the Final PED/EIS provides for notice to Santiago care of Mr. Bagwell, defendant concludes that the mailing list for the Decision also includes the same addresses.

Plaintiffs' final position is that no evidence suffices, short of direct evidence that the OSM complied with the notice requirement of 30 C.F.R. § 764.19(b). Contrary to their assertions, plaintiffs have the burden of proof to demonstrate that jurisdiction exists over this claim. See Reynolds, 846 F.2d at 748. While defendant is unable to provide direct evidence of notice sent to Santiago, plaintiffs have failed to provide facts to rebut defendant's indirect evidence of appropriate notice. This court finds that plaintiffs have failed to demonstrate that no notice was received in compliance with the requirements of 30 C.F.R. § 764.19(b) with regard to Sunrise. Therefore, Sunrise is subject to dismissal for failure to file a claim within the six-year statute of limitations imposed by the Tucker Act.

4. Right to mine the property

Defendant has moved, in the alternative, for summary judgment, contending that plaintiffs did not possess a right to mine the property at the time of the alleged taking and therefore lack a compensable property interest.

The Fifth Amendment provides, in pertinent part: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In addition to taking property by physical occupation or invasion, a taking may occur where the Government regulates private property. Penn. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). Although the Government certainly may regulate property without giving rise to a compensable taking, "if regulation goes 'too far' it will constitute a compensable taking." M & J Coal Co. v. United States, 47 F.3d 1148, 1153 (Fed. Cir. 1995) (quoting Penn. Coal, 260 U.S. at 415). Limits are placed on the Government's regulation of private property flowing from the recognition that, if "subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed].'" Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014 (1992) (alterations in original) (citation omitted).

Assuming that a claim is ripe, the court must determine if the regulation goes "too far." See M & J Coal, 47 F.3d 1148. To do this, the court must make a "'two-tiered' inquiry into the government act alleged to have constituted a taking." Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003). First, the court must consider "the nature of the interest allegedly taken to determine whether a compensable property interest exists." Id.; M & J Coal, 47 F.3d at 1154 (analyzing whether "interest was a 'stick in the bundle of property rights' acquired by the owner"). If plaintiffs are unable to prove that they held a protected property interest, their takings claim will fail. Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) (holding that "only persons with a valid property interest at the time of the taking are entitled to compensation"). If plaintiffs succeed in meeting the first element, the court then must determine whether the Government's action "constitutes a compensable taking of that interest for a public purpose." Chancellor Manor, 331 F.3d at 902; see also M & J Coal, 47 F.3d at 1154.

Plaintiffs' protected property interest is the ownership of coal mining rights in the Property. Defendant challenges that claim, arguing that plaintiffs did not possess a protected property interest in the Property at the time of the alleged taking based on the terms of the Timber Lease and Coal Lease and that plaintiffs therefore fail meet the first requirement of the "two-tiered" inquiry set forth in Chancellor Manor, 331 F.3d at 901.

1) Timber lease with Hiwassee

The Timber Lease between Hiwassee and Wharton's, Inc., was executed May 1, 1967. The Timber Lease entitles Hiwassee to the merchantable timber on the Property for a term of eighty years. Section 8.1 of the Timber Lease provides:

> Lessor reserves and retains all coal, oil, gas, and other minerals and mineral rights in, on , or beneath the above described lands . . . , but shall not develop, mine, extract, or remove the same without the prior written consent of Lessee which shall not be unreasonably withheld, but in no event shall strip mining be permitted on said lands, except as provided in paragraph 8.2 herein.

DX T at 558. Section 8.2 of the Timber Lease reads:

> Lessor reserves the right to strip mine for coal only on a maximum of 500 acres of the above described lands. The 500 acres shall be chosen by Lessor and shall include the area from which coal is removed and the area where the overburden or spoil is deposited. . . . The stripping rights reserved by Lessor under this paragraph shall terminate on April 30, 1977.

Id.

Because consent for mining would not be "unreasonably withheld" under section 8.1 of the Timber Lease, plaintiffs first argue that the fact that they possessed a protected property interest in the coal. This argument fails to address the fact that "[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Wyatt, 271 F.3d at 1096. The focus of this court's inquiry is on the property rights of the plaintiffs at the time of the alleged taking and not subsequent to hypothetical future negotiations.

Plaintiffs' limited right to mine the 500 acres of property reserved by section 8.2 of the Timber Lease expired on April 30, 1977, and was thus not operative at the time of the alleged taking in 1987. Plaintiffs cannot demonstrate that they possessed a protected property interest at the time of the alleged taking pursuant to section 8.2 of the Timber Lease. As the Federal Circuit has held in Wyatt, 271 F.3d at 1096, that such a current property interest is an essential element of a successful takings claim, section 8.2 of the Timber Lease does not give rise to a valid protected property interest in coal rights to the Property.

Nevertheless, while the terms of the Timber Lease impact the ability of plaintiffs to pursue mining of the Property at the time of the alleged taking, plaintiffs maintain a reversionary property right in the underlying coal reserves, as described in section 8.1 of the Timber Lease. The terms of section 8.1 indicate that plaintiffs as lessor "reserves and retains all coal, oil, gas, and other minerals and mineral rights in, on, or beneath the above described lands." DX T at 558. Thus, under the terms of the Timber Lease, plaintiffs possessed at the time of the alleged taking, a reversionary interest in the coal reserves subject to the Timber Lease. Thus, contrary to defendant's arguments, the terms of the Timber Lease support

plaintiffs' assertion that they were in possession of a protected property interest in the Property at the time of the Decision by the OSM.

2) Coal lease with Tennessee Partners

The Coal Lease was executed on December 28, 1977, ten years after execution of the Timber Lease, between MTB Holding Corp. ("MTB"); L.B. Can Am Corp.; Billy G. Corporation; and Tennessee Partners, Ltd. ("Tennessee"). DX U. The terms of the Coal Lease granted Tennessee exclusive mining rights for all the minable and merchantable coal on 28,600 acres of property (the "Lease Property") for a lease term of twenty years. Id. at 570. The 28,600 acres of property consisted of "7,000 acres of fee property and 21,600 acres of mineral properties in the counties of Hamilton and Bledsoe, Tennessee." Id. at 568. Thus, the Coal Lease encompasses the 7,000 acre lot of land covered by the Timber Lease and concerns the mineral rights that were reserved in section 8.1 of the Timber Lease.

Section 2 of the Coal Lease provides for modification of the term of the Coal Lease:

> The term of the Agreement shall commence on the day and year first above written, and shall continue for a period of twenty years thereafter, unless in the judgment of the Lessee the merchantable, commercially available and economically recoverable coal in said premises shall be sooner exhausted; in which case this Agreement shall terminate. The Partnership, shall have, after the end of the twenty (20) year term, an annual renewal, at the sole option of Partnership, on a year to year basis until such time as [Tennessee] has removed all the commercially mineable and merchantable coal from the Coal Properties or until such time as the Partnership terminates this Agreement . . . .

DX U at 570.

Because Tennessee possessed the sole option to renew the contract as long as mineable and merchantable coal reserves still exist on the Lease Property, the natural termination of the Coal Lease envisions the mining of all coal from the Lease Property. Thus, as defendant argues, the terms of the Coal Lease indicate that, whatever reversionary interest exists for plaintiffs, this interest does not include any mineable or merchantable coal reserves on the land occupied by the Coal Lease. While plaintiffs argue that the agreement subsequently was settled with Tennessee after the dates of the Decision and that plaintiffs now possess the mineral rights to the Property, it remains a fact that, at the time of the alleged taking, plaintiffs did not possess a reversionary interest that contemplated any remaining mineable coal within the Lease Property. Thus, plaintiffs have not raised a genuine issue of

material fact concerning whether they possess a protected reversionary interest of any value in the mineable coal on the Property.

In return for the right to mine, section 3 of the Coal Lease provides:

> The Partnership covenants and agrees to pay the Lessor a production royalty of Eight per cent (8%) of the gross sales price per two thousand (2,000) pounds for coal mined and sold by the Partnership from the Coal Properties during the term hereof or Two Dollars and Forty Cents ($2.40) per ton of two thousand pounds for coal mined and sold by the Partnership from the Coal Properties during the term hereof, whichever is less.

DX U at 571. Moreover, section 5(A) of the Coal Lease recites:

> As further consideration for the leasing of the Coal Properties hereunder, the Partnership covenants and agrees to pay to Lessor a non-refundable minimum annual advance royalty of $2.00 per ton based upon Three Million Eight Hundred Forty Thousand (3,840,000) tons for a total of Seven Million Six Hundred Eighty Thousand Dollars ($7,680,000) for each annual period following the closing date, over the life of this Agreement.

Id. at 572.

Plaintiffs contend that the they maintain a right to royalties in the coal on the Property that constitutes a protected property interest. 5/ The terms of the Coal Lease confirm that plaintiffs possessed a valid right to royalties at the time of the alleged taking in 1987. As the Federal Circuit held in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003),

> Present possessory rights are, thus, not necessary. It is also clear that fee owners who transfer a leasehold interest are still entitled to compensation.

---

5/ Defendant also raises the argument that plaintiffs' complaint fails to claim taking of a reversionary interest or a right to royalties. The language of plaintiffs' complaint reads: "Plaintiffs pray for judgment as follows: A. For just compensation . . . , as compensation for surface minable coal reserves and mining rights taken as a result of the Secretary's Decision." Pls.' Br. filed Jan. 24, 2003, at 3. This language is sufficiently broad to encompass both a reversionary interest and a right to royalties, because compensation for "mining rights taken as a result of the Secretary's Decision" included such property interests. Id.

> Alamo Land & Cattle Co. v. Arizona, 424 U.S. 295, 303, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976) (explaining that a lessor is entitled to compensation for the taking of leased land regardless of whether the lessor has possession of the land at the time it is taken-the measure of damages simply does not include the value of the leasehold interest if the lessor does not have possession). In fact, '[e]very sort of [real property] interest the citizen may possess' counts as a property interest under the Fifth Amendment.

Id. at 1329 (quoting United States v. Gen. Motors Corp., 323 U.S. 373, 378 (1945)). A right to royalties is a real property interest, and, as such, the right to royalties in the Coal Lease is sufficient to demonstrate that a material issue of facts exists regarding a protected property right under the Chancellor Manor test. See Cane Tenn. Inc. v. United States, 60 Fed. Cl. 694, 699 (2004) (holding that non-participating royalty interest in coal is real property interest compensable under Fifth Amendment based on underlying Tennessee law).

Review of the terms of the Coal Lease, and more specifically the terms of section 5(A), demonstrates that, while plaintiffs have failed to prove the existence of a protected revisionary interest in the Property, plaintiffs have shown that a material issue of fact exists regarding a right to royalties at the time of the alleged taking.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion to dismiss is granted with respect to all plaintiffs for failure to exhaust administrative remedies.

2. Defendant's motion to dismiss regarding plaintiff Sunrise Holding, Inc., is granted for failure to file a claim within the statute of limitations.

3. Were the case not dismissed on jurisdictional grounds, defendant's motion for summary judgment would have been denied.

4. The Clerk of the Court shall dismiss the amended complaint of Benchmark Resources Corporation and Gentry Corporation for lack of subject matter jurisdiction, on the ground of ripeness, without prejudice. Should these plaintiffs apply to the OSM and decide to challenge the OSM decision in the Court of Federal Claims, filing fees shall be waived, and the case will be assigned to the undersigned and shall proceed on an expedited basis.

5. The Clerk of the Court shall dismiss the amended complaint of Sunrise Holding, Inc., f/k/a Santiago Ltd., without prejudice for lack of subject matter jurisdiction based on a failure to satisfy the applicable statute of limitations.

s/ Christine O.C. Miller

________________________________

**Christine Odell Cook Miller**

Judge